IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

| | | |
|---|---|---|
| **DAVID R. WILSON and** | : | |
| **CHARLENE WILSON,** | : | |
| | : | |
| **Plaintiffs,** | : | **CIVIL ACTION** |
| **V.** | : | **FILE NO. 4:06-CV-179-HLM** |
| | : | |
| **TASER INTERNATIONAL, INC.,** | : | |
| | : | |
| **Defendant.** | : | |

_____

## PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Come now Plaintiffs, **DAVID R. WILSON and CHARLENE WILSON**, and file this Brief in Response to Defendant's Motion for Summary Judgment, showing to the Court the following:

## I.    STATEMENT OF THE FACTS

### A.    David Wilson Attends a TASER Training Class For the Georgia State Patrol.

Plaintiff David Wilson was employed by the Georgia State Patrol from June 16, 1985 until his retirement on medical disability on October 1, 2005. [D. Wilson depo., pp. 7, 99, 105].   David Wilson has been married to Plaintiff Charlene Wilson since 1978, [C. Wilson depo., p. 4], and the couple have two grown children. [D. Wilson depo., p. 43].   Wilson's first position with the Georgia State Patrol was as a radio operator/dispatcher. [D. Wilson depo., p. 7].   In August of

1989, Wilson attended trooper school, and was promoted to State Trooper in March of 1990. [D. Wilson depo., pp. 11-18].

Some time prior to September of 2004, the Georgia State Patrol began purchasing Defendant's products, an electronic control device hereinafter referred to as a "TASER". [D. Wilson depo., pp. 44-47]. A note was posted at Wilson's State Patrol office in Cedartown, Georgia informing the troopers stationed there that the State Patrol would be issuing TASERs for any trooper who wanted one. [D. Wilson depo., p. 44]. Wilson told his Post Commander that he did not want one. [D. Wilson depo., p. 44]. Wilson explained:

> "I had enough stuff on me to carry already. I had the pepper spray, the handcuffs, the gun. I mean, the gun belt was pretty crowded. And I just didn't really think I needed one. I had always / I had been on the road probably fourteen or fifteen years and / I didn't feel like I really needed one. And I had heard that they was just real painful and I didn't want to be shot with it, but I didn't / I didn't want the gun, either." [D. Wilson depo., p. 52].

All of the other troopers stationed at Wilson's post attended training and were issued a TASER. [D. Wilson depo., p. 48].

On or about September 2, 2004, Wilson was sitting in the office doing his paperwork when Wilson's Post Commander, Sgt. Steve Payne, approached him and told him that he was required to attend the TASER training. [D. Wilson depo., p. 48]. "The ones that had went before me, the troopers that went before me, they told me that they was told at that class if you didn't get shot, to pack your stuff.

2

And in State Patrol talk, that pretty much, we're going to fire you." [D. Wilson depo., p. 50].

Wilson attended the TASER certification class on September 7, 2004 in Forsyth, Georgia at the Georgia Public Safety Training Center. [D. Wilson depo., p. 54]. Wilson was given no materials to review prior to the training. [D. Wilson depo., p. 56]. Wilson believes he may have been shown a slide presentation. [D. Wilson depo., pp. 58-61]. Wilson was told that "its going to be five seconds of pain and then its over with." [D. Wilson depo., p. 62].

"They was talking about injuries that could occur as far as people falling, and they mentioned something about, you know, pulling muscles. They was just talking about injuries in general, you know. And I was taking it we were talking about victims / violators as we would call them. I mean, I didn't have any reason to believe that anything was going to happen to me other than five seconds of just unbelievable pain. You know, that's the way they was describing it. I had no reason to believe that anything was going to happen other than that." [D. Wilson depo., pp. 64, 65].

"I believe I heard that, you know, it would / a physical exertion type injury. But I never – I never dreamed that it was going to break my back. I mean, you know, they was talking about the muscle contractions and the injuries. . . It never occurred to me that it may break my back . . . Nobody said that, you know, we've never had anybody. All they was saying is nobody's ever died from this, and nobody has ever been injured other than like falling . . . I didn't think they was talking about me, because they was going to hold us up. They told us there was going to be three people holding us; we wasn't going to fall. I didn't know they was talking about me." [D. Wilson depo., pp. 66, 67].

When it came time for the troopers to be shot with the TASER, they lined up in front of a mat. [D. Wilson depo., p. 70]. Wilson was fourth or fifth in line, and helped hold the person ahead of him while he was shot. [D. Wilson depo., pp. 70, 71]. When it was Wilson's turn, he was held by three spotters, one on each arm, and one in front holding his face. [D. Wilson depo., pp. 71, 72]. Wilson described the TASER exposure as follows:

> "I mean, just, its unbelievable. No way of describing it. I mean, I don't know how to describe it. It was just, I mean, you just can't do – I mean, you lock up. I mean, your whole body. You feel like you – I remember when it first happened I thought something went wrong. The pain was so bad I thought something had happened. I thought I was going to die. And so when I got on the ground or got on the mat, Sergeant Cosper, I guess, took the probes out. I don't remember feeling the probes come out or anything. I remember he told me to get up and I'm thinking I don't know if I can. But I remember him tapping, just kind of tapping my shoulder, and saying "Its over, Wilson, get up." [D. Wilson depo., p. 73].

Wilson stood up and walked over to a chair and sat down. [D. Wilson depo., p. 74]. Everyone else who had been shot seemed to be fine. [D. Wilson depo., p. 74]. Wilson's pain became more intense. [D. Wilson depo., p. 75]. His hands and feet turned cold. [D. Wilson depo., p. 75]. Finally, Sgt. Cosper called for an ambulance. [D. Wilson depo., p. 76]. When the ambulance arrived, Wilson at first refused to go, preferring to ride with his friend, Keith Sorrells. [D. Wilson depo., pp. 76, 77].

> "And I got in that room, and of course, Keith was in there, and the instructors come in there, and EMS got there, and they told me I was

going to have to go to the hospital.  And I told them that I didn't have a problem in going, but I wasn't riding in that ambulance.  And they said, 'well, how are you going to get there?'  And I said – I looked at Keith – he's a Major, but, you know, I call him Keith because we're close friends, and I said, 'Keith will you carry me?'  And he said, 'yeah.'  And the EMS said, 'you need to go with us in the ambulance.'  And I looked at one of them, and I don't know their name, and he said, 'you need to go with us.'  And I looked at him, and I said, 'I am not riding in that ambulance.'  And he said, 'Okay. Get up and walk to the car.' And I looked at him and I said, 'I can't.'  And I knew then that I was in a mess.  So I – they – I don't know who it was, but some people reached down to pick me up out of that chair to lay me on that stretcher and that – I mean, it was unbelievable the pain I was in by that time.  I don't know whether it was five minutes after or thirty minutes after." [D. Wilson depo., p. 76-77].

At the hospital in Forsyth, Wilson was x-rayed and given some muscle relaxers for what the hospital personnel believed was a pulled muscle. [D. Wilson depo., pp. 78-79].  Wilson was released the same day, and returned home with his friend, Keith Sorrells, throwing up in the patrol car on the way home. [D. Wilson depo., p. 78].  Wilson never went back to his former job as a State Trooper. [D. Wilson depo., p. 84].

The day following his exposure to the TASER during training, Wilson was sent by his employer to Dr. Edward Meier, a physician in Rome, Georgia. [Meier Aff. *(Exh. E)*]

"During this time, they was sending me to a doctor in Rome, I guess a worker's comp doctor, a Dr. Myers [sic], and I was taking physical therapy.  And so I told him after a few weeks that sometimes I felt worse after therapy than I did prior to therapy.  And he told me it was just going to take some time and stay with it.  At that time it was a pulled muscle, is what they diagnosed. . .Maybe four or five, six

weeks later I went to him and I told him, 'Sir, I don't doubt you're a good doctor, and I don't want you to take this the wrong way, but I ain't getting no better.' And I said that, you know, you all are going to have to do something. And he told me, he said, well, I can try to order an MRI, but he said worker's comp ain't going to want to pay for it. And I said, 'Sir, you all have got to do something because I'm not getting any better.' So they set up an MRI after a couple of weeks, and I went. . .That afternoon they called me and told me not to go back to therapy . . . the doctor will talk to you tomorrow. So the next day I went up there and he comes in there and told me they had the results back. He said he had some good news and he had some bad. And I said, 'well, what is it?' And he said, 'well, the good news is that you're going to get better than you are now.' And I said, 'what's the bad news?' He said, 'the bad news is your back is broke in two places.'" [D. Wilson, depo., pp. 85, 86].

The shock from the TASER caused a T6 and T8 compression fracture of Wilson's vertebral spine. [Meier Aff., ¶7, 8 *(Exh. E)*]. Wilson has never completely recovered. [D. Wilson depo., pp. 109, 110]. Wilson's injury forced his disability retirement in October 2005. [D. Wilson depo., p. 102].

**B.     TASER International**

TASER International began operations under a prior name in approximately 1993. Between 1993 and 1999, TASER International sold several different types of stun guns [Smith depo., p. 11].

In late 1999, TASER International placed the M26 on the market. [Smith depo., p. 11]. The M26 differed substantially from earlier versions of the electrical devices manufactured by TASER as it was much more effective in incapacitating the subject by causing much greater muscle contractions. [Smith depo., p. 12;

Tuttle depo., pp. 20, 21]. The M26 works by causing muscle contractions that override a person's ability to perform coordinated movement. [Smith depo., p. 12].

Prior to introducing the M26, TASER International tested the M26 on one pig in 1996, and approximately five dogs in 1999. [Smith depo., p. 13]. Those tests were conducted primarily to look at the affects of the M26 on the heart. [Smith depo., p. 13]. TASER International never took x-rays of the pig or the dogs to determine whether there were any affects from the TASER shocks to the animals' musculoskeletal system. [Smith depo., p. 13]. TASER International never took any MRIs of the animal subjects to determine if there was any damage to the musculoskeletal system. [Smith depo., p. 14]. Prior to the M26 being placed on the market, the only human testing done was shooting "around a dozen" of the company's employees. [Smith depo., p. 14]. TASER did no quantitative measurement of the force of the muscle contractions. [Smith depo., p. 15].

When the M26 debuted in 1999, TASER International was nearly broke. According to Rick Smith, the company's CEO, "we were very financially strained. It took every resource we had to make that product happen." [Smith depo., p. 19].

The M26 was enormously successful. [Smith depo., p. 20]. Between 2001 and 2004, sales increased from seven million to sixty-eight million annually. [Smith depo., p. 20].

The M26 was marketed to law enforcement. [Smith depo., p. 23]. TASER's marketing strategy for the M26 was to host training sessions for law enforcement where officers could experience "first hand" the affects of a TASER. [Smith depo., p. 25]. TASER recommended that officers be subjected to a hit. [Smith depo., p. 28].

In May 2003, TASER International began marketing the X26. The M26 and X26 worked by using the same principles – causing muscle contractions which override a person's ability to fight back. [Smith depo., pp. 29-30]. The X26 causes even stronger muscle contractions than the M26. [Smith depo., p. 30]. The X26 was the weapon sold to the Georgia State Patrol, and was the weapon used in the training in which David Wilson received his injuries. [TASER Statement of Material Facts No. 18].

Sales of the X26 in 2004 included an operating manual and a "Version 11 Training CD" containing information on the weapon and lesson plans for training users. [Guilbault depo., pp. 25-32; Depo. Exhs. 3 and 4 *(Exhs. G and H)*]. Both the operating manual and the training CD contained a warning that the weapon "causes muscle contractions that may result in athletic exertion type injuries to some people." [Depo. Exh. 3, p. 2 *(Exh. G)*; Depo. Exh. 4, Warnings and Cautions *(Exh. H)*; Smith depo., pp. 95-98]. None of the warnings contained in the training materials or operating manual specifically warned of the risk of stress fractures

from exposure. [Guilbault depo., p. 41]. To the contrary, the training materials were designed to assure users that the product would <u>not</u> injure. One of the documents contained in the Version 11 Training CD was a "Comparison of Injuries Graph" which included a statement that "human volunteer studies of over 1,000 volunteers have confirmed a 0% injury rate for the 26 Watt Advanced TASER." [Guilbault depo., p. 43; Depo. Exh. 4, p. 1 *(Exh. H)*]. The training materials also contained a "Training Review Questions" section informing the user that, "[t]he TASER conducted energy weapons are non-destructive to nerves, muscles and other body elements," and that, "it does not cause permanent damage or long-term aftereffects to muscles, nerves or other body functions." [Depo. Exh. 4, p.15,16 *(Exh. H)*].

TASER International trains "master instructors" and pays them on a contract basis to provide training to certified instructors. [Guilbault depo., p. 11; LaChapelle depo., p. 12]. As of September 7, 2004, TASER International was still recommending exposures for both certified trainers and users (officers assigned to carry the weapon), and was requiring exposures for master instructors. [Guilbault depo., pp. 12-13]. The training materials, which were provided with each sale of the weapon to law enforcement agencies, [Guilbault depo., p. 22; LaChapelle depo., pp. 6-7], included forms known as "volunteer exposure reports" or "demo reports," to be filled out by the volunteer after each exposure. [Guilbault depo., p.

18; LaChapelle depo., 18; Depo. Exhs. 4 and 58 *(Exhs. H and Q)*].   TASER International used these volunteer exposure reports to communicate to the public the safety of the product. [Smith depo., p. 44].  Exposure reports were **required** to be filled out for every exposure. [LaChapelle depo., p. 18].   Instructors were trained to have the forms filled out by those taking the voluntary hits, and to return them to TASER International after the training. [Guilbault depo., p. 19].  As of the fall of 2004, Guilbault estimated that there were at least 70,000 volunteer exposures. [Guilbault depo., p. 19].  Rick Smith estimated between 60,000 and 120,000 volunteer exposures through 2004. [Smith depo., p. 34].   TASER International has provided no explanation why only 5,919 volunteer reports were produced in discovery in this case. [LaChapelle depo., p. 19].

Rick Smith, the company's CEO, testifying on behalf of TASER International pursuant to a 30(b)(6) notice of deposition, stated under oath that prior to Wilson's injury on September 7, 2004, "there was maybe a handful of fall or exertion type injuries that we would have known about or were learning about in late 2004." [Smith depo., p. 33].

However, before September 2004, TASER International had no policy for investigating allegations of injuries to law enforcement personnel during training. [Smith depo., pp. 43-44].  Jami Hill LaChapelle, who was responsible for handling all of the certification paperwork, including the volunteer demo forms, was never

instructed about what to do if a returned form indicated an injury. [Smith depo., p. 45-46]. LaChapelle created a spreadsheet of information contained within the demo reports, but was never instructed to enter the data about injuries. [Smith depo., p. 49; LaChapelle depo., pp. 23-25]. TASER International did nothing to monitor the persons volunteering for exposures to determine whether there were lasting affects down the road. "We pick them up, dust them off, give them a t-shirt." [Smith depo., p. 74].

Meanwhile, volunteers who were being told that the TASER would not cause permanent injury unless they fell, were suffering injuries on a regular basis. [Tuttle Depo. pp. 49-78; Schreiner Aff. *(Exh. A)*; Kramer Aff. *(Exh. B)*; Collins Aff. *(Exh. C)*;; Smith depo., pp. 31, 32, 89, 100; Depo. Exh. 57 *(Exh. P)*]. No one at TASER, other than a clerical employee hired to input data from the exposure forms, was even looking at the evidence of people being injured. [LaChappelle Depo. p. 28; Smith depo., pp. 90, 91, 92]. When Willie Collins, a Phoenix police officer exposed to a TASER during a training in February of 2002, spoke with a TASER International manager in 2002 about her severe injury, she was given a polo shirt and sent on her way. [Collins Aff., ¶ 3,4 *(Exh. C)*]. TASER International undertook no steps to investigate allegations of injury despite being placed on notice of injuries which were occurring in training. [Smith depo., pp. 31-45, 92, 124; Depo. Exhs. 57, 58 *(Exhs. P and Q)*]. TASER International's VP of

Communications, Steve Tuttle, testified that if a call came in about an injury in training, "myself or someone in training would take this to Rick Smith literally as an urgent matter." [Tuttle depo., p. 28]. Not so, testified Smith. Smith testified that such calls would be referred directly to Doug Klint, corporate counsel. [Smith depo., p. 38].

TASER International did, however, initiate a medical literature review to determine the potential for injury. [Smith depo., p. 119; Tuttle depo., p. 87]. That review, sponsored by TASER, and completed by Dr. Anthony Bleetman, was released and available to TASER International on April 27, 2003, sixteen months before David Wilson's injury. [Depo. Exh. 33 *(Exh. L)*]. Dr. Bleetman's report noted that medical literature confirmed that "bones and joints can be damaged by tetanic muscle contraction" [Depo. Exh. 33, p. 13 *(Exh. L)*], and that "violent muscle spasms caused by the tasering might conceivably cause fractures and dislocations." [Depo. Exh. 33, p. 18 *(Exh. L)*]. Although TASER International included many medical studies touting the safety of its product with its training materials sent out to police agencies, it curiously did not include the Bleetman study in those materials. [Tuttle depo., pp. 71-72].

Both Rick Smith and Steve Tuttle testified that the company learned, at the latest, in early 2003 that a Maricopa County, Arizona Sheriff's Deputy alleged that his thoracic spine compression fracture was caused by an exposure to a TASER

during training. [Smith depo., pp. 31, 32; Tuttle depo., p. 25, 30; *Exh. F*]. Smith testified that any notes or e-mails about the Powers injury were in the possession of corporate counsel. [Smith depo., p. 42]. Tuttle denied having any copies of e-mails to him concerning the Powers injury. [Tuttle depo., p. 30]. Tuttle then testified that he forwarded a video of Powers' exposure to a doctor, who looked at the video, then told Tuttle, "he didn't think the claim had merit." [Tuttle depo., p. 34]. When no e-mails concerning the Powers injury were produced by TASER International in this case, Wilson's counsel obtained a copy from Powers' attorney in Arizona. [*Exh. F*]. Review of the e-mail from Dr. St. Ville reveals that Mr. Tuttle's memory of its content was, at best, murky. Dr. St. Ville expressed no opinion on the merits of Mr. Powers' claim in 2003, however he did have a few suggestions for ways to discredit Mr. Powers. [*Exh. F*]. It is undisputed that TASER International did no investigation to determine whether Mr. Powers' injuries were caused by the TASER. [Smith depo., pp. 43, 44; Tuttle depo., pp. 33, 54].

Despite knowledge of injuries occurring in trainings, TASER International continued to communicate to the public, through the VP of Communications, Steve Tuttle, that the products were safe. [Wilczynski Aff., ¶3 *(Exh. D)*; Tuttle depo., pp. 9, 16]. TASER's 2004 website described the aftereffects of the TASER as follows:

> A person hit with an ADVANCED TASER will feel dazed for several seconds. Recovery is fast and the effects stop the very instant that the M26 shuts off. Some will experience critical response amnesia and others will experience tingling sensations afterwards. The pulsating

electrical output causes involuntary muscle contractions and a resulting sense of vertigo. It can momentarily stun or render immobilized. Yet, the ADVANCED TASER's low electrical amperage and short duration of pulsating current, ensures a non-lethal charge. Moreover, it does not cause permanent damage or long-term aftereffects to the muscles, nerves or other body functions. A January 1987 Annals of Emergency Medicine study reported that similar TASER technology leaves no long term injuries compared with 50% long term injuries for gun shot injuries. [Depo. Exh. 7 *(Exh. J)*].

In March of 2004, TASER International hired Pamela Schreiner as an assistant to Doug Klint, TASER's General Counsel, and to Rick Smith, its CEO. [Schreiner Aff., ¶2 *(Exh. A)*]. One of the first tasks assigned to Ms. Schreiner was to organize a "huge" number of volunteer exposure reports which were scattered throughout TASER's offices. [Schreiner Aff., ¶3 *(Exh. A)*]. Ms. Schreiner prepared a spreadsheet, creating for the first time a field for the entry of data on injuries in trainings. [Schreiner Aff., ¶4 *(Exh. A)*; LaChapelle depo., p. 25). In the fall of 2004, the SEC and the Department of Justice began an investigation prompted by concerns about the safety of the Defendant's products. [Schreiner Aff., ¶5 *(Exh. A)*]. When Rick Smith and Doug Klint learned of the volume of reported injuries (hundreds to thousands of them), they ordered Ms. Shreiner to alter the spreadsheets by deleting the entries showing injuries. They then rented dumpsters and shredded most of the reports which documented injuries. [Schreiner Aff., ¶5 *(Exh. A)*]. Schreiner was never identified in this case as a witness with

knowledge of relevant facts. [Smith depo., p. 76; TASER's Answers to Interrogatories *(Exh. N)*].

The SEC, lacking access to the destroyed evidence of injuries, ultimately took no enforcement action and closed their investigation in December of 2005. [Rule 30(b)(6) depo. of Rick Smith, pp. 69-73, <u>Heston v. City of Salinas</u>, Depo. Exh. 47 *(Exh. M)*]. TASER's stock rebounded. [Smith depo., pp. 20-23].

## II.    <u>ARGUMENT AND CITATION OF AUTHORITY</u>

**A.    TASER International Was Under A Duty to Warn Plaintiff of A Known Risk That Exposure To A TASER Could Cause Fractures.**

In failure to warn cases, the duty to warn arises when the manufacturer knows or reasonably should know of the danger from the use of its product. <u>Hunter v. Werner Co.</u>, 258 Ga. App. 379, 384 (2002). Whether a product is so inherently dangerous as to require a particular warning is a factual question which must be determined by a jury. <u>Pepper v. Selig Chemical Industries</u>, 161 Ga. App. 548 (1982); <u>Collins v. Newman Machine Co.</u>, 190 Ga. App. 879 (1989); <u>Boyce v. Gregory Poole Equip.</u>, 269 Ga. App. 896 (2004).

David Wilson suffered a compression fracture to his thoracic spine as a result of his exposure to Defendant's product. [Meier Aff., *(Exh.E)*]. TASER International knew more than two years prior to Wilson's injury that Wilma Collins had suffered fractured teeth, nerve damage, and subsequent bone infection, and did nothing to investigate the injury or warn subsequent volunteers. [Collins

Aff., *(Exh C)*].  TASER International knew at least 16 months before Wilson's injury that fractures were a risk of exposure, when it received the Bleetman study. [Smith depo. p.119; Tuttle depo. p.87; Depo. Exh. 33, *(Exh. L)*].  TASER International also knew that at least two other officers, Samuel Powers and Melissa Allen, alleged spinal fractures caused by exposure during training more than a year prior to Wilson's injury. [*Exh. F*; Depo. Exh. 57 *(Exh. P)*].  TASER International had in its possession thousands of documents noticing the company of numerous claims of injuries to volunteers' backs, but failed to even look at its own forms until six months prior to Wilson's injury. [Schreiner Aff. *(Exh. A)*].  When TASER International discovered the extent of injuries claimed, it destroyed the evidence and subsequently lied to federal investigators and the public. [Schreiner Aff. *(Exh.A)*].

Despite having scads of evidence of back injuries right under its nose, TASER International continued to warn only of a risk of "athletic exertion type injuries,"  knowing full well that officers considering whether or not it was prudent to volunteer for exposure would interpret the language as warning of a possible risk of a pulled muscle.  Incredibly, TASER International urges this Court to find that they had no duty to warn Wilson because the danger of a fractured spine from being shot with the TASER was something that was "generally known" to his profession.

Having touted the TASER as safe in its training literature, product manual, and public releases, TASER International would now have the Court believe that Wilson should have expected that any type of injury was possible because he had extensive experience with the Georgia State Patrol and had participated in other training exercises.

TASER International admits that its weapons were vastly superior and more powerful in producing muscle contractions and resulting incapacitation than any other weapon ever before created. [Smith depo., p. 12]. An officer being trained in the use of a baton can look at a baton and tell that the very nature of being hit with the weapon could involve injury to bones or muscles. An officer being trained on pepper spray could similarly look at the weapon and tell the risks of respiratory problems or burns. Nothing about the TASER's danger is readily apparent. The cases cited by TASER International are clearly distinguishable in that they involve risks that are readily apparent to one in the plaintiff's profession, or obviously known.

For example, the case of <u>Powell Duffryn Terminals Inc. v. Calgon Carbon Corp.</u>, 4 F.Supp.2d 1198, cited in Defendant's Brief at p. 11, involved a storage company in the business of storing hazardous chemicals that filed suit complaining of damages which resulted when two incompatible chemicals stored by it caught fire. The court upheld summary judgment for the chemical owners, finding that

the plaintiff was a sophisticated industrial user of hazardous chemicals and knew or should have known of the risks associated with its use of the chemicals.

In the Eyster v. Borg-Warner Corp. case cited by TASER International, homeowners sued the manufacturer of an air conditioning unit improperly wired by an installer for damages when the unit caught fire. Eyster, 131 Ga. App. 702 (1974). Again, the risk of attaching copper wire to aluminum wire was widely known by installers and contrary to national and local electrical codes and accepted trade practices. Accordingly, a directed verdict was properly entered for the manufacturer, which failed to warn of a known risk. Translation – it was the installer, not the manufacturer's fault!

In Morris v. Clark Equipment Co., 904 F. Supp. 1379, (M.D.Ga. 1995), a mechanic with 20 years of experience working on forklifts crushed his hand when a clamp that got stuck on his employer's forklift gave way while he was trying to repair it. The plaintiff was experienced in methods to immobilize the machine so as to avoid the risk, but chose not to do so before attempting repair. The evidence showed the plaintiff admitted knowing of the precise danger he was in and chose to assume the risk of the open and obvious danger. Thus, summary judgment on his product claim was warranted.

TASER International also cites Wabash Metal Products, Inc. v. AT Plastics Corp., 258 Ga. App. 884 (2002), but it is unclear why. The Wabash court denied

summary judgment for the manufacturer, and the Georgia Court of Appeals affirmed that denial. The plaintiff was injured when the manufacturer's machine tipped over and fell on him while he was installing it. The trial court held that genuine issues of disputed fact existed as to whether the manufacturer had a duty to warn that the press could be tipped over. In finding summary judgment inappropriate, the court stated that whether a duty to warn exists depends on the foreseeability of the use in question, the type of danger involved, and the foreseeability of the user's knowledge of the danger. "Such matters generally are not susceptible to summary adjudication and should be resolved by a trial in the ordinary manner . . . Moreover, the right to draw an inference of negligence lies peculiarly within the exclusive province of the jury." <u>Wabash</u> at 887, cites omitted.

It is for the jury in this case to determine whether TASER International had a specific duty to warn that exposure to its product could result in a fracture to Wilson's back.

**B.     TASER International's Warning is Clearly Inadequate to Warn of A Risk of Spinal Fractures.**

TASER International argues that a warning that the TASER may cause muscle contraction "athletic exertion type injuries" is a sufficient warning that those muscle contractions could fracture his spine.

First of all, TASER International cites only a part of Wilson's deposition testimony, and that portion is incomplete and totally out of context. [See Plaintiffs'

Statement of the Facts, p. 3 above]. Wilson was told, "nobody has ever been injured other than like falling," and "pulling muscles." [D. Wilson depo., pp. 64, 65]. Wilson did not worry about falling and being injured because he was told that he would be held up by three spotters. [D.Wilson depo., pp. 66, 67].

TASER International's reliance on Farmer v.Brannan Auto Parts, 231 Ga. App. 353 (1998); and Pruitt v. P.P.G. Industry, 895 F.2d 734 (11th Cir. 1990) for the reasonableness of its warning is misplaced. In Farmer, the plaintiff was injured while trying to repair a flat tire by welding a crack in the wheel's metal rim with a blowtorch while the tire was still attached. Several months prior to the explosion which ensued the plaintiff had filled the tire with a flammable substance purchased from the defendant to seal the tire. The can of "Fix-a-Flat" contained a clear warning that the content was flammable. The court held that summary judgment was appropriate because the store from which the plaintiff purchased the product was under no duty to separately warn the plaintiff.

In Pruitt, a wrongful death action was brought arising from the death of a Lockheed supervisor killed when he was exposed to fumes from a solvent manufactured by defendant. The solvent was sold with a warning that inhalation of the vapors could cause unconsciousness or death. Plaintiff argued that the warning was insufficient because the decedent died from "aspiration of liquid droplets of the solvent used in a spray bottle, as opposed to 'inhalation' of the

substance." The trial court granted summary judgment because the warning was sufficient to place the user on notice of the dangerousness of the chemical.

Both <u>Pruitt</u> and <u>Farmer</u> turn on the clarity of the notice given, and the obvious failure of the plaintiff or plaintiff's decedent to heed the warning.

Here, however, the jury issue is clearly presented as to whether TASER International's warning of muscle contraction "athletic type injuries" was sufficient to specifically warn of a risk of a fractured back.[1]

## C. Wilson's Treating Physician Opines That Wilson's Exposure to the TASER Caused His Compression Fracture.

"It is axiomatic that questions regarding proximate cause are undeniably a jury question and may only be determined by the courts in plain and undisputed cases." <u>Ontario Sewing Machine Co. v. Smith</u>, 275 Ga. 683, 687 (2002).

Wilson's treating physician, Dr. Edward Meier, specializes in Occupational Medicine. [Meier Aff. ¶2 *(Exh. E)*]. Dr. Meier began treating Mr. Wilson on September 8, 2004, the day following his injury. He reviewed all of the records from the ER which treated Wilson the day of his injury. [Meier Aff., ¶3, 8 *(Exh. E)*]. Dr. Meier found Wilson be suffering from severe back pain and spasms which continued to be a problem for him until a decision was made to obtain an MRI on November 9, 2004. [Meier Aff., ¶7 *(Exh. E)*] An MRI is the standard medical

---

[1] It is notable that four months after Wilson's injury, TASER International published a new warning, specifically as to the risk of "stress fractures," and requiring a signed release of all liability for volunteers. [Depo. Exh. 5 *(Exh. I)*].

procedure for diagnosing compression fractures. [Meier Aff., ¶7 *(Exh. E)*]. The MRI showed a T6 and T8 wedge compression fracture of Wilson's vertebral spine. [Meier Aff., ¶7 *(Exh. E)*]. Meier opines that the cause of Wilson's compression fracture and his severe pain was due to the shock from the TASER. [Meier Aff., ¶8 *(Exh. E)*].

A disputed factual issue exists as to the proximate cause of Wilson's injured back.

## D. Plaintiff Has Produced Evidence Sufficient to Support His Claim for Punitive Damages.

In product liability actions, evidence of other incidents involving the product, if substantially similar, are relevant to the issues of notice of a defect and punitive damages. Barger v. Garden Way, Inc., 231 Ga. App. 723, 744 (1998).

Defendant's failure to warn of a risk of which it was aware at least two years prior to Wilson's injury raises a question as to whether punitive damages are warranted. *See*, Ford Motor Co. v. Sasser, 274 Ga. App. 459 (2005).

In addition, TASER International's destruction of relevant documents, and intentional cover-up of other injuries, warrants consideration by the jury as to whether Defendant should be required to pay punitive damages.

## E. Plaintiff Charlene Wilson's Loss of Consortium Claim Survives.

Because Plaintiff David Wilson's case survives TASER International's Motion for Summary Judgment, Charlene Wilson's derivative claim also survives.

## III.  CONCLUSION

Plaintiffs have provided ample evidence to dispute TASER International's claim for entitlement to summary judgment.  TASER International's plan to thwart the efforts of injured officers in their quest for justice should not be rewarded. TASER International's pledge "that the lawsuits against TASER would go away because there would be no documents to prove that TASER knew that injuries were happening," [Schreiner Aff. ¶8 *(Exh. A)*], thus far has been extremely successful.  Its website boasts daily of each new case dismissed for lack of evidence. [www.taser.com].  This Court should not allow TASER to continue to thumb its nose at the legal system.  Summary judgment should be denied.

Respectfully submitted this 27th day of July, 2007

JOHNSON LAW, P.C.

**s/ Cynthia Noles Johnson, Esq.**

313 Wolfe Street                         GA State Bar No. 545615
P. O. Box 48                               Attorney for Plaintiffs
Cohutta, GA  30710
(706) 694-4298
E-mail: cindy@johnsonlawpc.com

# CERTIFICATE OF COMPLIANCE

The undersigned counsel for Plaintiffs hereby certifies that the foregoing Brief has been prepared using Times New Roman 14 point.

JOHNSON LAW, P.C.

**s/ Cynthia Noles Johnson, Esq.**

313 Wolfe Street     GA State Bar No. 545615
P. O. Box 48       Attorney for Plaintiffs
Cohutta, GA  30710
(706) 694-4298
E-mail: cindy@johnsonlawpc.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 27, 2007, I electronically filed **Plaintiffs'**
**Response to Defendant's Motion for Summary Judgment** with the Clerk of
Court using the CM/ECF System which will automatically send e-mail notification
of such filing to the following attorneys of record:

        Joel G. Pieper, Esq.
        Jessie C. Fontenot, Jr., Esq.
        Womble, Carlyle, Sandridge & Rice, PLLC
        One Atlantic Center, Suite 3500
        1201 West Peachtree Street
        Atlanta, GA  30309

        Holly L. Gibeaut
        TASER International, Inc.
        17800 North 85th Street
        Scottsdale, AZ  85255

This 27th day of July, 2007.

        JOHNSON LAW, P.C.

        **<u>s/ Cynthia Noles Johnson, Esq.</u>**
313 Wolfe Street        GA State Bar No. 545615
P. O. Box 48        Attorney for Plaintiffs
Cohutta, GA  30710
(706) 694-4298
E-mail: cindy@johnsonlawpc.com