IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

| | | |
|---|---|---|
| DAVID R. WILSON and<br>CHARLENE WILSON, | : | |
| Plaintiffs, | : | CIVIL ACTION |
| V. | : | FILE NO. 4:06-CV-179-HLM |
| TASER INTERNATIONAL, INC., | : | |
| Defendant. | : | |

## PLAINTIFFS' STATEMENT OF MATERIAL FACTS TO WHICH THERE IS NO GENUINE ISSUE TO BE TRIED

Come now Plaintiffs, **DAVID R. WILSON and CHARLENE WILSON**, and pursuant to Local Rule 56.1(B)(2)(b), submits their Statement of Material Facts to Which There is No Genuine Issue to Be Tried as follows:

1. Plaintiff David Wilson was employed by the Georgia State Patrol from June 16, 1985 until his retirement on medical disability on October 1, 2005. [D. Wilson depo., pp. 7, 99, 105].

2. Plaintiff David Wilson has been married to Plaintiff Charlene Wilson since 1978. [C. Wilson depo., p. 43].

3. Some time prior to September 7, 2004, the Georgia State Patrol began purchasing Defendant's products, an electronic control device referred to as a TASER. [D. Wilson depo., pp. 44-47].

4. Although David Wilson told his Post Commander, Sgt. Steve Payne, that he did not want to carry a TASER [D. Wilson depo., p. 44], he was told by Sgt. Payne that he was required to attend a TASER training. [D. Wilson depo., p. 48].

5. Wilson attended the TASER certification class on September 7, 2004 in Forsyth, Georgia at the Georgia Public Safety Training Center. [D. Wilson depo., p. 54].

6. Although Wilson may have been shown a slide presentation, Wilson was given no materials to review prior to the training. [D. Wilson depo., pp. 56, 58-61].

7. Wilson was led to believe by the training materials communicated to him in training that injuries from the TASER were due to falls. [D. Wilson depo., p. 67].

8. Wilson was led to believe that he would not be injured because he was not going to be allowed to fall. [D. Wilson depo., p. 67].

9. When Wilson was shot he experienced an unbelievable amount of pain, which continued after the exposure was over. [D. Wilson, depo., pp. 73-79].

10. The shock for the TASER caused a T6 and T8 compression fracture of Wilson's vertebral spine [Meier Aff., ¶7, 8 *(Exh. E)*], from which he has never recovered. [D. Wilson depo., p. 109].

11. In late 1999, TASER International placed the M26 on the market. [Smith depo., p. 11]. The M26 differed substantially from earlier versions of the electrical devices manufactured by TASER as it was much more effective in incapacitating the subject by causing much greater muscle contractions. [Smith depo., p. 12; Tuttle depo., pp. 20, 21].

12. Prior to introducing the M26, TASER International tested the M26 on one pig in 1996, and approximately five dogs in 1999. [Smith depo., p. 13]. Those tests were conducted primarily to look at the affects of the M26 on the heart. [Smith depo., p. 13].

13. TASER International never took x-rays of the pig or the dogs to determine whether there were any affects from the TASER shocks to the animals' musculoskeletal system. [Smith depo., p. 13].

14. TASER International never took any MRIs of the animal subjects to determine if there was any damage to the musculoskeletal system. [Smith depo., p. 14].

15. Prior to the M26 being placed on the market, the only human testing done was shooting "around a dozen" of the company's employees. [Smith depo., p. 14]. TASER did no quantitative measurement of the force of the muscle contractions. [Smith depo., p. 15].

16. The M26 was marketed to law enforcement. [Smith depo., p. 23].

17. TASER's marketing strategy for the M26 was to host training sessions for law enforcement where officers could experience "first hand" the affects of a TASER. [Smith depo., p. 25].

18. TASER recommended that officers be subjected to a hit. [Smith depo., p. 28].

19. In May 2003, TASER International began marketing the X26. The M26 and X26 worked by using the same principles – causing muscle contractions which override a person's ability to fight back. [Smith depo., pp. 29-30].

20. The X26 causes even stronger muscle contractions than the M26. [Smith depo., p. 30].

21. The X26 was the weapon sold to the Georgia State Patrol, and was the weapon used in the training in which David Wilson received his injuries. [TASER Statement of Material Facts No. 18].

22. Sales of the X26 in 2004 included an operating manual and a "Version 11 Training CD" containing information on the weapon and lesson plans for training users. [Guilbault depo., pp. 25-32; Depo. Exhs. 3 and 4 *(Exhs. G and H)*].

23. Both the operating manual and the training CD contained a warning that the weapon "causes muscle contractions that may result in athletic exertion type injuries to some people." [Depo. Exh. 3, p. 2 *(Exh. G)*; Depo. Exh. 4, Warnings and Cautions *(Exh. H)*; Smith depo., pp. 95-98].

24. None of the warnings contained in the training materials or operating manual specifically warned of the risk of stress fractures from exposure. [Guilbault depo., p. 41].

25. One of the documents contained in the Version 11 Training CD was a "Comparison of Injuries Graph" which included a statement that "human volunteer studies of over 1,000 volunteers have confirmed a 0% injury rate for the 26 Watt Advanced TASER." [Guilbault depo., p. 43; Depo. Exh. 4, p. 1 *(Exh. H)*].

26. The training materials also contained a "Training Review Questions" section informing the user that, "[t]he TASER conducted energy weapons are non-destructive to nerves, muscles and other body elements," and that, "it does not cause permanent damage or long-term aftereffects to muscles, nerves or other body functions." [Depo. Exh. 4, p.15,16 *(Exh. H)*].

27. TASER International trains "master instructors" and pays them on a contract basis to provide training to certified instructors. [Guilbault depo., p. 11; LaChapelle depo., p. 12].

28. As of September 7, 2004, TASER International was still recommending exposures for both certified trainers and users (officers assigned to carry the weapon), and was requiring exposures for master instructors. [Guilbault depo., pp. 12-13].

29. The training materials, which were provided with each sale of the weapon to law enforcement agencies, [Guilbault depo., p. 22; LaChapelle depo., pp. 6-7], included forms known as "volunteer exposure reports" or "demo reports," to be filled out by the volunteer after each exposure. [Guilbault depo., p. 18; LaChapelle depo., 18; Depo. Exhs. 4 and 58 *(Exhs. H and Q)*].

30. TASER International used these volunteer exposure reports to communicate to the public the safety of the product. [Smith depo., p. 44].

31. Exposure reports were **required** to be filled out for every exposure. [LaChapelle depo., p. 18].

32. Instructors were trained to have the forms filled out by those taking the voluntary hits, and to return them to TASER International after the training. [Guilbault depo., p. 19].

33. As of the fall of 2004, Guilbault estimated that there were at least 70,000 volunteer exposures. [Guilbault depo., p. 19]. Rick Smith estimated between 60,000 and 120,000 volunteer exposures through 2004. [Smith depo., p. 34]. TASER International has provided no explanation why only 5,919 volunteer reports were produced in discovery in this case. [LaChapelle depo., p. 19].

34. Rick Smith, the company's CEO, testifying on behalf of TASER International pursuant to a 30(b)(6) notice of deposition, stated under oath that prior to Wilson's injury on September 7, 2004, "there was maybe a handful of fall

or exertion type injuries that we would have known about or were learning about in late 2004." [Smith depo., p. 33].

35. Before September 2004, TASER International had no policy for investigating allegations of injuries to law enforcement personnel during training. [Smith depo., pp. 43-44].

36. Jami Hill LaChapelle, who was responsible for handling all of the certification paperwork, including the volunteer demo forms, was never instructed about what to do if a returned form indicated an injury. [Smith depo., p. 45-46]. LaChapelle created a spreadsheet of information contained within the demo reports, but was never instructed to enter the data about injuries. [Smith depo., p. 49; LaChapelle depo., pp. 23-25].

37. TASER International did nothing to monitor the persons volunteering for exposures to determine whether there were lasting affects down the road. "We pick them up, dust them off, give them a t-shirt." [Smith depo., p. 74].

38. Volunteers who were being told that the TASER would not cause permanent injury unless they fell, were suffering injuries on a regular basis. [Tuttle Depo. pp. 49-78; Schreiner Aff. *(Exh. A)*; Kramer Aff. *(Exh. B)*; Collins Aff. *(Exh. C)*;; Smith depo., pp. 31, 32, 89, 100; Depo. Exh. 57 *(Exh. P)*].

39. No one at TASER, other than a clerical employee hired to input data from the exposure forms, was even looking at the evidence of people being injured. [LaChappelle Depo. p. 28; Smith depo., pp. 90, 91, 92].

40. When Willie Collins, a Phoenix police officer exposed to a TASER during a training in February of 2002, spoke with a TASER International manager in 2002 about her severe injury, she was given a polo shirt and sent on her way. [Collins Aff., ¶ 3,4 *(Exh. C)*].

41. TASER International undertook no steps to investigate allegations of injury despite being placed on notice of injuries which were occurring in training. [Smith depo., pp. 31-45, 92, 124; Depo. Exhs. 57, 58 *(Exhs. P and Q)*].

42. TASER International initiated a medical literature review to determine the potential for injury. [Smith depo., p. 119; Tuttle depo., p. 87]. That review, sponsored by TASER, and completed by Dr. Anthony Bleetman, was released and available to TASER International on April 27, 2003, sixteen months before David Wilson's injury. [Depo. Exh. 33 *(Exh. L)*].

43. Dr. Bleetman's report noted that medical literature confirmed that "bones and joints can be damaged by tetanic muscle contraction" [Depo. Exh. 33, p. 13 *(Exh. L)*], and that "violent muscle spasms caused by the tasering might conceivably cause fractures and dislocations." [Depo. Exh. 33, p. 18 *(Exh. L)*].

44. Although TASER International included many medical studies touting the safety of its product with its training materials sent out to police agencies, it did not include the Bleetman study in those materials. [Tuttle depo., pp. 71-72].

45. Despite knowledge of injuries occurring in trainings, TASER International continued to communicate to the public, through the VP of Communications, Steve Tuttle, that the products were safe. [Wilczynski Aff., ¶3 *(Exh. D)*; Tuttle depo., pp. 9, 16].

46. TASER International learned, at the latest, in early 2003 that a Maricopa County, Arizona Sheriff's Deputy (Samuel Powers) alleged that his thoracic spine compression fracture was caused by an exposure to a TASER during training. [Smith depo., pp. 31, 32; Tuttle depo., p. 25, 30; *Exh. F*].

47. TASER International did no investigation to determine whether Mr. Powers' injuries were caused by the TASER. [Smith depo., pp. 43, 44; Tuttle depo., pp. 33, 54].

48. In March of 2004, TASER International hired Pamela Schreiner as an assistant to Doug Klint, TASER's General Counsel, and to Rick Smith, its CEO. [Schreiner Aff., ¶2 *(Exh. A)*].

49. One of the first tasks assigned to Ms. Schreiner was to organize a "huge" number of volunteer exposure reports which were scattered throughout TASER's offices. [Schreiner Aff., ¶3 *(Exh. A)*].

50. Ms. Schreiner prepared a spreadsheet, creating for the first time a field for the entry of data on injuries in trainings. [Schreiner Aff., ¶4 *(Exh. A)*; LaChapelle depo., p. 25).

51. In the fall of 2004, the SEC and the Department of Justice began an investigation prompted by concerns about the safety of the Defendant's products. [Schreiner Aff., ¶5 *(Exh. A)*].

52. When Rick Smith and Doug Klint learned of the volume of reported injuries (hundreds to thousands of them), they ordered Ms. Shreiner to alter the spreadsheets by deleting the entries showing injuries. They then rented dumpsters and shredded most of the reports which documented injuries. [Schreiner Aff., ¶5 *(Exh. A)*].

Respectfully submitted this 27th day of July, 2007

JOHNSON LAW, P.C.

**s/ Cynthia Noles Johnson, Esq.**

313 Wolfe Street GA State Bar No. 545615
P. O. Box 48 Attorney for Plaintiffs
Cohutta, GA  30710
(706) 694-4298
E-mail: cindy@johnsonlawpc.com

# CERTIFICATE OF SERVICE

I hereby certify that on July 27, 2007, I electronically filed **Plaintiffs' Statement of Material Facts to Which There is No Genuine Issue to be Tried** with the Clerk of Court using the CM/ECF System which will automatically send e-mail notification of such filing to the following attorneys of record:

    Joel G. Pieper, Esq.
    Jessie C. Fontenot, Jr., Esq.
    Womble, Carlyle, Sandridge & Rice, PLLC
    One Atlantic Center, Suite 3500
    1201 West Peachtree Street
    Atlanta, GA 30309

    Holly L. Gibeaut
    TASER International, Inc.
    17800 North 85th Street
    Scottsdale, AZ 85255

This 27th day of July, 2007.

                      JOHNSON LAW, P.C.

                      **s/ Cynthia Noles Johnson, Esq.**
313 Wolfe Street          GA State Bar No. 545615
P. O. Box 48             Attorney for Plaintiffs
Cohutta, GA 30710
(706) 694-4298
E-mail: cindy@johnsonlawpc.com