# EXHIBIT "M"
Deposition Exhibit 47
Rule 30(b)(6) Deposition of Patrick Smith
<u>Heston v. City of Salinas, et al</u>
U.S.D.C., N.D. Ca., No. CV05-03658

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

BETTY LOU HESTON, individually,  )
and ROBERT H. HESTON,            )
individually and as the          )
personal representatives of      )
ROBERT C. HESTON, deceased,      )
                                 )
        Plaintiffs,          )     No. CV 05-03658 JW
                                 )
  -vs-                           )
                                 )
CITY OF SALINAS and SALINAS      )
POLICE DEPARTMENT, SALINAS       )
                                 )
(CAPTIONS CONTINUED NEXT PAGE)   )

RULE 30(b)(6) ORAL AND VIDEOTAPED
DEPOSITION OF TASER INTERNATIONAL, INC.
(PATRICK WALLER SMITH, PMK)
AND
ORAL AND VIDEOTAPED DEPOSITION OF
PATRICK WALLER SMITH, AN INDIVIDUAL
(Volume I, Pages 1 - 180)

Scottsdale, Arizona
December 14, 2006
10:17 a.m.

REPORTED BY:
Jacquelyn A. Allen, RPR
AZ Certified Reporter No. 50151

2

```
 1
 2       (CAPTIONS CONTINUED)
 3
   POLICE CHIEF DANIEL ORTEGA,
```



EXHIBIT 42

16    A.    Around $33 a share.

17    Q.    And then it lost quite a bit of value in the

18  next couple months?

19    A.    It did.

20    Q.    And what was its low? $7 something?

21    A.    It may have even tickled into the 5s, but

22  somewhere between, you know, 5 and $7.

23    Q.    To what do you attribute the drop in stock

24  price?

25    A.    There was a lot of controversy about TASER that

1  led to the SEC stepping in and doing an investigation,

2  and as soon as the public found out there was an SEC

3  investigation, that added a tremendous amount of risk to

4  the company as an investment. Literally from the day,

5  from the moment the SEC investigation was announced, we

6  saw a 50 percent drop in stock price in probably two

7  days. And it continued to drop from there.

8    Q.    And when you say a controversy about TASER, you

9  mean a controversy about the safety of the device?

10    A.    Correct.

11    Q.    And what happened to the SEC investigation?

12    A.    We provided around 100,000 pages of

13  documentation; we voluntarily flew and offered our

14  testimony in San Francisco at the SEC offices, basically

15  because it was very much hurting our business. And in

16  about 12 months, they concluded that investigation with

17  a finding of no enforcement action, which means they

18  looked through the documentation and found no evidence

19  the company had misstated the safety of our products.

20     Q. So there was a point when the SEC closed its
21 investigation with a finding of no enforcement action?
22     A. Correct. It occurred in two points in time.
23 One was in December of 2005. They alerted us that they
24 had closed the investigation into the safety issues.
25 There were some straggling accounting issues that they

70

1 were investigating that they closed those, and the
2 entire investigation was closed out around June of 2006.
3     Q. Let me just finish one kind of related line of
4 questioning --
5     A. Sure.
6     Q. -- and then we can break for lunch.
7         There was a settlement between TASER
8 International and some shareholders?
9     A. Correct.
10     Q. And that was something in the magnitude of
11 $21.5 million?
12     A. Correct.
13     Q. And what was the basis of that? Was that
14 related to this SEC action?
15     A. Yes. The shareholder lawsuits, anytime a stock
16 drops significantly, you tend to get these shareholder
17 plaintiff firms that file lawsuits.
18         And when there's an SEC investigation, they
19 basically filed a suit alleging the same matters as were
20 in the SEC investigation, so if the world was right,
21 that should have just gone away when the SEC concluded
22 there was no problems. But unfortunately, I learned
23 from our law firm that the nature of shareholder

24    litigation is such that virtually 100 percent of those
25    cases settle, so as much as we believe in doing the

71

1     right thing and not settling cases where we don't
2     believe there's been something that was done wrong, that
3     was a unique case. And it was presented to me by our
4     counsel that the process of the discovery of a
5     shareholder case could potentially destroy the company,
6     because it would open up all of our customers to very
7     intrusive depositions and discovery requests that could
8     greatly impair our ability to do business with our own
9     customers.
10         So it was kind of like dealing -- it was
11    someone's got your family hostage, and even though we
12    felt very strongly that we could win on the merits of
13    the case, the process of winning is sort of like
14    fighting a nuclear war. It didn't -- and again, when
15    our law firm explained that nobody takes these cases to
16    trial, and they explained the magnitude of what was
17    happening, we had no choice but to settle that case. So
18    we did. It was very painful.
19         But that shouldn't be confused with our
20    strategies in our other course-of-business cases where
21    we tend to take a different tactic.
22    Q.   What would you characterize as sort of the
23    fundamental allegation of the shareholder lawsuits?
24    A.   The fundamental allegation of the shareholder
25    lawsuits was that the company insiders knew that there

72

1   was a problem coming in the future, that the stock price
2   would drop, and that insiders had sold stock knowing
3   that the stock would drop in the future. Of course, our
4   response was the stock dropped in response to the SEC
5   investigation. We had no idea we would be investigated
6   until the day we found out and the rest of the markets
7   did. So that's the nature of the claims there.
8       Q. Famous last words from a lawyer, "one more
9   question," but have there been other suits against TASER
10  that relate to product safety other than, let's say, the
11  shareholder lawsuits that you resolved, the products
12  liability lawsuits that we talked about at the beginning
13  of the deposition today? For example, a competitor or
14  somebody filing lawsuit saying that TASER has
15  misrepresented the safety of its products?
16      A. Yes.
17      Q. And what lawsuits have there been in that
18  regard?
19      A. Probably two that would fit that description.
20  There was a lawsuit between us and Stinger, which is a
21  competitor, and we sued them over a number of what we
22  felt were false advertising claims. And I think they
23  probably countersued -- I don't remember the
24  specifics -- and I'm sure their countersuit included
25  allegations about product safety advertising.

73

1   And then a second case with Bestex, which is a
2   company that we sued for patent infringement, and as
3   part of their response, I believe they've counterclaimed
4   for, you know, interference with contracts and things