**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ROME DIVISION**

| | | |
|---|---|---|
| DAVID R. WILSON and CHARLENE WILSON, | ) ) ) | |
| Plaintiffs, | ) ) | Civil Action |
| v. | ) ) | File No. 4:06-CV-179-HLM |
| TASER INTERNATIONAL, INC., | ) ) | |
| Defendant. | ) | |

**BRIEF IN SUPPORT OF TASER INTERNATIONAL, INC.'S MOTION TO STRIKE THE AFFIDAVIT OF PAM SCHREINER**

## I.   INTRODUCTION

The purpose of this motion is to expose the affidavit of Pam Schreiner, submitted by Plaintiffs in opposition to TASER's Motion for Summary Judgment, as a complete sham and to ask it be stricken and/or disregarded.

Schreiner is a former employee of TASER, who voluntarily resigned from the Company on January 27, 2005.  Schreiner admits she resigned in the midst of accusations she was providing false information during a corporate investigation. In her affidavit, she accuses TASER's top executives of intentionally destroying information concerning reports of officer injuries sustained during TASER

training.  The affidavit also states she was forced by these executives to remove and alter some of this data herself.

In May 2005, four months *after* she resigned from TASER, Schreiner was deposed as a witness in a personal injury lawsuit against TASER known as the *Powers* litigation.  In that deposition, Schreiner testified at length about her role in the gathering and documentation of information concerning injuries reportedly sustained by law enforcement officers during TASER training.  Significantly, at no time did Schreiner ever remotely suggest--as she now states by affidavit--that there was *any* attempt by TASER to conceal and/or destroy this data.  In fact, Schreiner testified that all available data was in fact entered onto spreadsheets and provided to all counsel in the *Powers* litigation.  Contradictory to her affidavit, she also testified that no one at TASER ever instructed her to withhold any of this information.

Because Schreiner's affidavit is the polar opposite of her sworn deposition testimony in all key aspects, it should be stricken and/or disregarded as a sham created for the sole purpose of manufacturing an issue of fact in opposition to TASER's Motion for Summary Judgment.

WCSR 3677609v11

## II.　STATEMENT OF FACTS

On May 25, 2005, Pamela Schreiner was deposed as a witness in the case of *Samuel E. Powers v. TASER International, Inc.*, Maricopa County (AZ) Superior Court Case No. CV2003-013457 (transcript attached hereto as Exhibit "A"). During the over two hour deposition, Schreiner was questioned at length by counsel for Samuel Powers, an Arizona law enforcement officer suing TASER for what he claimed was a TASER-related training injury. The questioning focused upon Schreiner's job duties while employed at TASER, and particularly her role in gathering information concerning officer training injuries for production in the *Powers* litigation.

By way of background, Schreiner testified she was hired by TASER as an executive assistant on March 8, 2004. (8:25-9:2). She resigned on January 27, 2005, after being accused of providing false information during a corporate investigation. (14:10-21) (letter of resignation attached hereto as Exhibit "B"). Schreiner maintained her innocence (14:22-23), and her testimony reveals she was quite upset at having to leave TASER. For example, Schreiner very much "enjoyed working at Taser" and "enjoyed working with the people at Taser." (21:15-16) In fact, she enjoyed the TASER work environment and her relationship with her co-workers so much that she became "very upset" and "emotional" when

it became clear that she would not be working there. (21:18) The event completely "blind-sided" her. (21:17)

During her deposition Schreiner described at length her work with the "demo reports" (referred to in her affidavit as "volunteer exposure reports" hereinafter referred to as simply "the reports"), which are designed to notify TASER of, among other things, any injuries sustained by police officers during TASER training. It was Doug Klint, TASER Vice-President and General Counsel, who asked her to create a new spreadsheet capturing the raw data derived from the individual reports. (57:8-10). The reports came in either of two forms. Participants in TASER training classes could either fill out an actual hard copy document or they could complete an online form providing the same information. (57:22-58:12)

Schreiner's work on this project began around May 4, 2004. (59:20-21) TASER employee Jami Hill provided her with a previously created spreadsheet that ran only through May 23, 2000. (59:23-60:22) Hill explained that the spreadsheet had not been updated since TASER had implemented a new format:

Q.    And what did she tell you?

A.    There was a point where they decided, meaning -- they meaning Taser, that they decided to change the form or the -- the form just a little bit, or the worksheet, I'm sorry. They wanted to

4

change it just a little bit.  And Rick Smith had asked her to stop inputting the information and change it.  (60:23-61:4)

Significantly, after consultation with Doug Klint, Schreiner sought to collect and input data from all reports that could be found:

Q. When you first produced the documents that were on this, the green CD, in May of 2004 –

A. Yes.

Q. -- you attempted to produce all of the individual demo report forms that you were able to locate as of that time; is that correct?

A. Yes, sir.

Q. And your efforts to locate those documents consisted of talking to Mr. Klint initially, talking to Jami Hill, and then talking to Steve Tuttle?

A. Yes, that is correct.

Q. Okay.  Now, sometime after you produced the green disc –

A. Yes.

Q. -- or sometime after defendant produced the green disc, you went back again and tried to find more of these individual demo report forms; is that right?

[objection]

A. That is correct.

Q. Okay.  And who directed you to do that, if anybody?

A. Nobody.  I just did that on my own to try and find any, you know, anything else that I may have missed.

Q. Okay. And were you able to find additional of these demo report forms?

A. Yes. I believe we did find more.

Q. Where?

A. In a warehouse in the back, one of the warehouses.

Q. Okay. Where was the warehouse located?

A. Well, we had different ones. We had the accounting warehouse, we had the shipping and receiving warehouse, and then we also had engineering. And I believe we found some in the accounting warehouse and we also found some in our shipping and receiving. And then we have, in our production area, it was a loft type area above production, and we found some information up there as well.

Q. Okay. What I want to do is focus simply on the demo reports. Okay?

A. Okay.

Q. Did you find some of the demo reports in each of the locations that you just described?

A. Yes. I would say so.

Q. So there wasn't a centralized location where these demo reports were maintained?

A. No, sir.

Q. Okay. Were the demo reports organized in any way?

A. No, sir. (74:24-76:25)

The information contained in the reports was then used to create the new

spreadsheet. Although Schreiner was directly involved in creating new

6

spreadsheet, she simply copied and entered the data from the reports without taking the time to study it or try to understand it.

> Q.    Did anybody ever tell you that there was certain information on certain demo reports that were not being included in the spreadsheet?
>
> [objection]
>
> A.    No, sir.
>
> Q.    Okay.  You never personally studied the spreadsheet -- the demo reports themselves to understand the information on them, did  you?
>
> A.    No.  (80:7-16)

Additionally, Schreiner was unable to estimate how many reports actually reflected officer injury, *i.e.,* had the box checked "yes" as opposed to "no."

> Q.    Can you give me any idea, in terms of percentage of total forms that you reviewed, that had "yes" for injuries as opposed to "no?"
>
> A.    Ah.
>
> Q.    Just an approximate.
>
> [objection]
>
> A.    I don't know.  It's hard to say because, you know, there were -- there were, you know, a handful of everything.  I wouldn't even want to speculate because that would be just an unfair statement because I truly don't recall.  (109:6-16)

Significantly, Schreiner's acknowledgement there were only a "handful" of various injuries stands in stark contrast to her affidavit statement that "there were

7

hundreds, if not thousands, of injuries noted on the volunteer exposure reports."

(Aff., ¶ 5)

The new spreadsheet that Schreiner helped create was repeatedly characterized as evolving "from scratch" so as to capture all the reports in TASER's possession and bring the data current.

> Q. You said that at a later date, you did in fact generate an entire new spreadsheet from scratch; is that right?
>
> A. Yes, that is correct.
>
> Q. And you did that at Doug Klint's direction, right?
>
> A. Yes.
>
> Q. Okay. Why did you do that?
>
> A. We were actually trying to have more formality, I guess, in, you know, keeping these files straight. And because there were so many files everywhere, the reports were just scattered throughout the company that I -- you know, we needed to do something to get some sort of a system in place and to make it more uniform. (69:25-70:14)
>
> ***
>
> Q. Why did you start over with the database as opposed to simply bring the database that you got on the P drive from Jami Hill current?
>
> A. I -- truly when we found additional forms or, you know, the demo reports, honestly Jami and I, neither one of us knew if it had already been added to the spreadsheet. So it was a matter of not knowing if it had already been added.

Q.    I gotcha.  So when you went back and talked to Jami, she wasn't able to tell you whether all of the human demo report individual forms that you found had ever been included on the database that she sent you on the P drive that we talked about, RFP-00001, and so in order to make sure you got everything, you just started from scratch, right?

[objection]

A.    That is correct.

Q.    All right.  So as far as you knew, they didn't even have a process for making -- for checking off or identifying the individual demo reports once those were entered into the system?

[objection]

A.    That is correct.

Q.    I assume you created such a protocol when you created yours?

[objection]

A.    That is true.  (91:10-92:13)

Once the new spreadsheet showing *all* training injuries derived from *all*

demo  reports was completed, Schreiner copied it onto CD and delivered it to the

law firm of Renaud Cook Drury Mesaros, PA, TASER's outside counsel in the

*Powers* case, for production to plaintiff's counsel:

Q.    Okay.  When you went back and started putting -- creating your own spreadsheet, you had to gather the various demo report forms that you were able to find to begin that process; is that right?

A.    Yes, sir.

Q.    Okay.  When you found those additional demo report forms that you've talked about a few minutes ago, did you then generate that second CD that I had you hold up and send it to Renaud Cook for distribution to us?

[objection]

A.    Yes.  (87:14-25)

***

Q.    Did anybody ever tell you that there was certain information on certain demo reports that were not being included in the spreadsheet?

[objection]

A.    No, sir.  (80:7-11)

The foregoing testimony demonstrates Schreiner's belief some four months after leaving TASER's employment that *all* available demo report forms were utilized in preparing the spreadsheet and that the data was forever preserved by transfer onto CD and distributed to the parties in the *Powers* litigation. Throughout her deposition, Schreiner never once qualified her testimony by stating or implying the number of officer training injuries was being underreported because TASER was intentionally destroying relevant documents.  In fact, the *only* destruction of documents Schreiner mentioned was the possible throwing away and/or shredding of the reports *after their raw data was entered into the spreadsheet*:

Q.   All right.  Did anybody ever give you any indication how many of these demo reports had been thrown out that you talked about earlier?

[objection]

A.   No, sir.

Q.   Did anybody ever tell you why they were thrown out?

A.   I was just told that they didn't need them.

Q.   Okay.

A.   That the information had been entered into this, so –

MS. REID-MOORE:  I'm sorry, 'this'

A.   I'm sorry, into -- I'm sorry, into the spreadsheet RF -- I don't have the number here.  (92:14-93:7)

***

Q.   Okay.  Did she tell you that once – what she did with the demo reports once she did enter the information into the spreadsheet?

A.   Yeah.  There were several things that may have happened or could have happened.

Q.   What did she tell you?

A.   There were things where they actually sometimes they'd file them.  You know, some of them possibly were thrown away, you know, things of that nature.

Q.   And that's what she told you?

A.   Yes.

Q.   Did she tell you there was any formal procedure in place to make sure that certain people in the company actually saw those demo reports?

A.    No.

Q.    Did you ever ask Mr. Tuttle whether he'd ever actually seen any of those demo reports?

A.    Well, I had actually asked Doug if – you know, I did ask Doug at one point, you know, if – to me, these things that, you know, may have been thrown away or whatever, you know, is there a process for shredding, you know, things of that nature.  And he said, you know, no, but that we were trying to get something in place.  (77:19-78:18)

As the foregoing demonstrates, it was Schreiner who voiced a concern about document confidentiality and who actually asked Doug Klint if there was "a process for shredding" the demo reports once the raw data had been entered into the spreadsheet.  Mr. Klint replied there was nothing in place at the time, but they were working on it.  In fact, it was not until the end of 2004 that large containers were finally brought on site as repositories for documents needing shredding.  According to Schreiner, the purpose for the shredding was simply to prevent "dumpster diving," as opposed to a calculated effort to forever destroy and hide relevant data as her affidavit now states:

Q.    Did their policy or procedures change at all with respect to how they dealt with incoming communications or documents?

[objection]

A.    There were some things that were changing.  As, you know, as far as if someone called in, you know, who they might want to talk to, you know, things of that nature.  Towards the end of the year, they brought somebody in to handle documentation in

12

the production area as far as how training would be handled, you know, how the work bees would be trained or things of that nature.  They also, towards the end of the year last year, all of a sudden, they were concerned  about dumpster diving and brought in these big huge containers that were locked so that people could put documents in it to be shred at some point.

Q.      And that began towards the end of 2004?

A.      Yes, sir.  (97:2-21)

Notably, Schreiner never once said anything at deposition that even remotely resembles the wild accusations appearing for the first time in her affidavit.  The affidavit is irreconcilable with her deposition testimony, and is often patently contradictory.  For example, consider Schreiner's present assertion that TASER's principals "are responsible for hiding and covering up information on the extent of injuries to officers during TASER trainings.  *I know this because I was instructed to alter the spreadsheets and saw them destroy documents.*"  (Aff., ¶ 8)  (emphasis added)  Yet, at deposition, Schreiner testified as follows:

Q.      Okay.  Were you ever asked to do anything by anybody at Taser that you felt wasn't honest or on the up-and-up?

[objection]

A.      Not really.  I mean, I had my own opinions of things.

Q.      What do you mean you had your own opinions of things?

A.      Well, I just -- I -- I felt that there were things that should have been done differently.

Q.      Like what?

A.  You know, from working in a law firm, I just felt that there needed to be more -- a larger sense of urgency or confidentiality or things of that nature.  (95:12-96:1)

*** 

Q.  And did you in fact gather all the documents that they had given you and then produce them to Renaud Cook for production in this case?

A.  Anything that I was able to obtain, yes.

Q.  Okay.  You didn't withhold anything or nobody told you inside Taser not to produce anything?

A.  Not to my recollection.  (104:6-12)

Schreiner also never testified that she watched anyone destroy or shred documents, and she answered "no" when asked if she had ever shredded any documents.

Q.  Did you at any time while you were at Taser ever shred any documents?

A.  No, sir.  (79:24-80:1)

The patent falsity of Schreiner's affidavit is further evidenced by the fact the alleged document destruction could not have occurred when Schreiner says it did. According to the affidavit, the alleged document destruction resulted from TASER's concern over a pending SEC investigation.  However, as more fully set forth in the Affidavit of Douglas Klint (attached hereto as Exhibit "C"), it was not until December 23, 2004 that TASER first learned of a possible SEC investigation,

14

when the Company received a fax instructing it to retain documents for an inquiry. (Klint Aff., ¶ 2). It was not until December 30, 2004 that TASER received a letter from the SEC providing formal notice of an official inquiry regarding safety statements and a distributor purchase order. (Klint Aff., ¶ 3). The alteration and shredding of the demo reports that Schreiner describes could not have occurred until after that time. However, as Schreiner's deposition testimony clearly illustrates, she had already assembled this information and began providing it to TASER's outside counsel in the *Powers* case as much as seven months prior to receiving notice of the SEC investigation, and the information was subsequently provided to Mr. Powers' counsel. The first CD and spreadsheet were received by Mr. Powers' counsel on May 5, 2004 (48:11-16), and the second CD and spreadsheet were received on November 19, 2004. (74:2-7). By December 2004, the "cat was already out of the bag" so to speak, and document shredding in an attempt to hide the underlying data would have been pointless.

This reality exposes the fundamental problem with TASER's alleged motivation to destroy the reports. According to Schreiner's affidavit, Doug Klint and CEO Rick Smith "told me to remove the data from the spreadsheets for most of the injuries which I had entered," after which they supposedly "shredded most of the reports showing injuries," all in furtherance of a grand plan to make lawsuits

15

against TASER "go away because there would be no documents to prove that TASER knew the injuries were happening." (Klint Aff., ¶¶ 5 & 8). But again, by Schreiner's own admission at deposition, the spreadsheets containing the data from the demo reports had already long been disclosed to all counsel in the *Powers* litigation in both hard copy and CD format, and in fact still exists today. There was simply nothing left to conceal. And, of course, Schreiner's assertion that Doug Klint and Rick Smith told her to remove the injury data from the spreadsheets is flatly contradicted by her prior deposition testimony that she was never asked to withhold any information, and, in fact, was never asked to do anything she felt was dishonest or not "on the up-and-up." (104:10-12 & 95:12-16).

## III.   ARGUMENT AND CITATION OF AUTHORITY

### A.   SCHREINER'S AFFIDAVIT CLEARLY FALLS WITHIN THE "SHAM AFFIDAVIT" RULE AND MUST BE DISREGARDED.

The sham affidavit rule has long been recognized in the Eleventh Circuit. *Van T. Junkins & Assocs., Inc. v. U.S. Indus., Inc.*, 736 F.2d 656, 657 (11th Cir. 1984) ("When a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony"). Under the rule, an affidavit at

16

variance with the declarant's prior sworn testimony may be disregarded by the court ruling on a motion for summary judgment absent a satisfactory explanation for the conflict. *Id. See also Cleveland v. Policy Management Systems Corp.*, 526 U.S. 795, 806, 119 S. Ct. 1597, 1603, 143 L.Ed.2d 966 (1999) (noting the "virtual unanimity" of the lower federal courts in fashioning the rule "that a party cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his or her own previous sworn statement (by, say, filing a later affidavit that flatly contradicts that party's earlier sworn deposition) without explaining the contradiction or attempting to resolve the disparity"). Although the case law usually speaks in terms of a *party's* prior testimony, the rule applies with equal force to the conflicting testimony of third-party witnesses. *See Bank of Illinois v. Allied Signal Safety Restraint Sys.*, 75 F.3d 1162, 1169 (7th Cir. 1996) (noting that the sham affidavit rule extends "beyond the parties to include statements made by witnesses that contradict their prior deposition testimony").

"Factors to be considered in determining whether an affidavit presents a sham issue include 'whether the affiant was cross-examined during his earlier testimony, whether the affiant had access to the pertinent evidence at the time of his earlier testimony or whether the affidavit was based on newly discovered evidence, and whether the earlier testimony reflects confusion which the affidavit

17

attempts to explain.'" *Burns v. Board of County Commr's. of Jackson County*, 330 F.3d 1275, 1282 (10th Cir. 2003). None of these factors favors consideration of Schreiner's affidavit. First, Schreiner's entire deposition consisted of cross-examination. Second, the deposition took place four months after she resigned from TASER, such that she was fully able to testify to all "pertinent evidence" concerning what happened *during* her employment. Third, nothing about her deposition testimony reflects any "confusion" that the affidavit merely tries to explain. Where, as here, there is no evidence of confusion, and the deposition was taken close in time to the relevant events so as to negate the possibility of memory loss, the deposition controls and the conflicting affidavit must be disregarded. *Pourghoraishi v. Flying J, Inc.*, 449 F.3d 751, 759 (7th Cir. 2006) ("When a conflict arises between a plaintiff's sworn testimony and a later affidavit or declaration, the 'affidavit is to be disregarded unless it is demonstrable that the statement in the deposition was mistaken, perhaps because the question was phrased in a confusing manner or because a lapse of memory is in the circumstances a plausible explanation for the discrepancy.'"). *See also Shearer v. Homestake Min. Co.*, 557 F. Supp. 549, 558 n.5 (D.S.D. 1983) ("When a witness has given testimony both by affidavit and by deposition, the two forms should be considered on a motion for summary judgment, but greater reliability is usually

attributed to the deposition. [citations]  <u>Summary judgment may be granted based upon the deposition testimony [alone] if the court is satisfied that the issue potentially created by the affidavit is not genuine.</u>")  (emphasis added).

Lest plaintiffs argue that Schreiner's affidavit is not completely contradictory since she was never directly asked at deposition if she saw *anyone else* destroy documents, the cases applying the sham affidavit rule have extended it to situations where a witness's deposition testimony is totally silent about certain events that are later added to an affidavit opposing a motion for summary judgment.  The common thread running throughout these cases is the rationale that, given the context of the particular deposition questioning, the witness would have been reasonably expected to know about and reveal the information that later magically appears for the first time by way of affidavit.  The following cases are illustrative.

In *Lantec, Inc. v. Novell*, 306 F.3d 1003, 1017 (10th Cir. 2002), the plaintiff submitted an affidavit in opposition to the defendant's motion for summary judgment which included facts about a private conversation he did not disclose during his deposition.  During his deposition, the plaintiff was asked whether the defendant was receptive to a discussion about a certain matter. After the plaintiff testified "it was discussed," defense counsel asked questions seeking further

clarification. While testifying about a discussion held during a formal meeting, plaintiff never disclosed that the matter was further discussed during a separate, private conversation. Although the plaintiff later argued the deposition questions were too narrow to elicit his testimony about the private conversation, the court rejected his explanation, finding that nothing in the line of questioning would have indicated to a reasonable person he was to limit his answers to only the discussion at the actual meeting. In other words, even if it could be said the affidavit "did not directly contradict" the prior deposition testimony, the Tenth Circuit concluded the District Court did not abuse its discretion in disregarding it. *Id.*

The court in *Mack v. Augusta-Richmond County, Ga.*, 365 F. Supp. 2d 1362, 1372 (S.D. Ga. 2005), was similarly faced with an affidavit containing factual information not revealed at the plaintiff's deposition. The plaintiff in *Mack* was a former county department head suing the county under the whistleblower provisions of the False Claims Act. After the county moved for summary judgment, the plaintiff filed an affidavit that, while not in direct conflict with his previous deposition testimony, asserted facts which should have been testified to given the scope of the questioning.

> [In his affidavit Plaintiff testified that he] 'conflicted with Commissioner Beard who was strong-willed and insistent that Augusta conduct business in a way that favored his family and friends. He also championed several projects for [State Senator]

20

> Charles Walker.' Defendants claim this statement is unsupported by
> the evidence of record. In his deposition, Plaintiff was asked how
> Commissioner Beard 'pushed' so-called favorite organizations for
> funding. Plaintiff responded that he and Commissioner Beard met
> every Monday for the first two months of Plaintiff's tenure as Director
> of Housing and Neighborhood Department, at which time
> Commissioner Beard would 'push' for certain programs. Plaintiff
> testified that he often refused Commissioner Beard's suggestions,
> especially if the requests had not gone through appropriate channels.
> This testimony, however, does not specify that Commissioner Beard
> was trying to favor family and friends and makes no mention of
> Charles Walker. Accordingly, the objection to this statement in
> Plaintiff's affidavit is SUSTAINED.

*Id.* at 1371-72 (record citations omitted).

In *Martinez v. Marin Sanitary Service*, 349 F. Supp.2d 1234 (N.D. Cal. 2004), the plaintiff opposed the defendant's motion for summary judgment with a declaration reciting examples of his former supervisor's obnoxious behavior that went well beyond what he testified to at deposition. For example, the plaintiff testified at deposition that his "problem" with the supervisor started in 2000. *Id.* at 1238. When plaintiff was asked what events "traumatized" him, he limited his response to ones "[m]ainly start[ing] with the year 2000." *Id.* In contrast, his declaration recited several instances of racist comments made by the supervisor in the late 1990's. *Id.* at 1237-38. Although it does not appear the plaintiff was ever directly asked at deposition to identify any instances of inappropriate behavior

occurring prior to 2000, the court nevertheless invoked the sham affidavit rule to disregard the declaration's attempt to create a triable issue of fact.

> Martinez presents no explanation for the contradictions between his deposition testimony and his declaration. Martinez was given ample opportunity at his deposition to raise the issue of any alleged discriminatory remarks made to him; yet Martinez failed to discuss any such incidents prior to the year 2000. Further, the declaration presents no explanation why Martinez did not raise such incidents in his deposition or why he testified in his deposition that his problems with Garbarino Sr began in 2000. Any such occurrences of discriminatory behavior are subjects that would have been within Martinez' personal knowledge at the time of the deposition, and Martinez (and his attorney) had every reason to bring forth such occurrences at Martinez' deposition in response to the questions asked. Thus, there is no ground to conclude that Martinez' contradictory allegations regarding the events before fall 2000 are based on newly discovered evidence.

*Id*. at 1243. *Martinez* therefore illustrates how the sham affidavit rule applies to an affidavit setting forth alleged behavior that should have been "raised" by a witness while giving his deposition testimony but which was not. It also underscores the general rule applied throughout these cases that where the affidavit evidence is not "newly discovered," and the affidavit itself fails to explain why the information could not have been raised by the witness at deposition, the affidavit should be disregarded.

Lastly, in *Penny v. United Parcel Service*, 128 F.3d 408, 415 (6th Cir. 1997), the Sixth Circuit affirmed the trial court's rejection of an affidavit submitted by the

plaintiff in an effort to defeat summary judgment that only "essentially"

contradicted his prior deposition testimony.  The plaintiff, who allegedly suffered

severe shoulder and back pain due to work-related injuries that limited his ability

to walk without pain, sued his employer pursuant to the Americans With

Disabilities Act for an alleged failure to accommodate.  An obstacle facing

plaintiff's case was the generally accepted principle that "moderate difficulty or

pain experienced while walking does not rise to the level of a disability."  *Id.*

Plaintiff testified at deposition that although he experienced pain, he could

nonetheless do a number of things, including hunting and fishing.  Because this

testimony suggested that plaintiff was not "disabled" within the meaning of the

ADA, the employer moved for summary judgment.  In response, plaintiff

submitted an affidavit offering for the very first time that the hunting and fishing

trips he engaged in required no walking.  Although this did not *directly* contradict

plaintiff's deposition testimony since he had not been specifically asked whether

he walked on these trips, the court obviously recognized this was the sort of

information he should have revealed, and therefore it "essentially" contradicted his

deposition testimony.

> Penny's deposition testimony provides little support for the claim that
> his impairment rises to the level of a disability.  Aside from
> statements that 'I limp on occasion' and  'It hurts to do my job
> everyday. Sometimes it hurts to walk[,]' this testimony contains no

23

detail about how his alleged disability hinders his ability to walk. To the contrary, the deposition indicates that the plaintiff led an active life during the relevant period of time despite his impairment. He testified that during 1993 and 1994 he was able to go fishing and hunt rabbits, squirrels, pheasant and deer. Perhaps realizing belatedly the import of these admissions, the plaintiff's attorney subsequently filed an affidavit claiming that plaintiff's hunting and fishing trips did not require him to walk. We do not consider this affidavit, however, because a party cannot create a genuine issue of material fact by filing an affidavit, after a motion for summary judgment has been made, that essentially contradicts his earlier deposition testimony. [citation]

*Id.*

Against the backdrop of these cases, it is obvious that Schreiner's affidavit qualifies as "sham" under any of the rule's various formulations. Her deposition testimony unambiguously recounted her work to gather officer injury data and her successful incorporation of that data into one of the two spreadsheets produced in the *Powers* litigation. That same testimony also expressly denied her withholding of any of the underlying data (104:6-12), stated her belief that the spreadsheet contained all available information from the demo reports (80:7-11 & 87:14-25), stated that no one at TASER had ever asked her to do anything dishonest (95:12-96:1), and stated that any throwing away or shredding of the demo reports occurred *after* the relevant data had been incorporated into the spreadsheet (77:19-78:18 & 92:14-93:7). Under these circumstances, TASER is entitled to an order striking and/or disregarding Schreiner's affidavit in its entirety.

Respectfully submitted, this 15th day of August, 2007.

WOMBLE CARLYLE SANDRIDGE & RICE, PLLC

By: /s/  Jessie C. Fontenot, Jr.
    Joel G. Pieper
One Atlantic Center, Suite 3500     State Bar No. 578385
1201 West Peachtree Street     (404) 888-7435 direct dial
Atlanta, Georgia 30309
(404) 888-7490 fax     Jessie C. Fontenot, Jr.
    State Bar No. 267528
    (404) 888-7423 direct dial

**Attorneys for TASER International, Inc.**

25

## CERTIFICATE OF TYPE SIZE AND STYLE

Counsel for TASER International, Inc. hereby certifies that the size and style of type used in the foregoing document is Times New Roman: 14 point.

WOMBLE CARLYLE SANDRIDGE & RICE, PLLC

By: /s/ Jessie C. Fontenot, Jr.
    Joel G. Pieper
    State Bar No. 578385
    (404) 888-7435 direct dial

One Atlantic Center, Suite 3500
1201 West Peachtree Street
Atlanta, Georgia 30309
(404) 888-7490 fax

    Jessie C. Fontenot, Jr.
    State Bar No. 267528
    (404) 888-7423 direct dial

**Attorneys for TASER International, Inc.**

WCSR 3677609v11

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on August 15, 2007, a true and correct copy of the within and foregoing **BRIEF IN SUPPORT OF TASER INTERNATIONAL, INC.'S MOTION TO STRIKE THE AFFIDAVIT OF PAM SCHREINER** was electronically filed with the Clerk of Court using the CM/ECF system which will automatically send email notification of such filing to the following attorneys of record:

Cynthia Noles Johnson, Esq.
ATTORNEY FOR PLAINTIFFS
Johnson Law, P.C.
313 Wolfe Street
P.O. Box 48
Cohutta, GA 30710

This 15th day of August, 2007.

_____/s/  Jessie C. Fontenot, Jr._____
Jessie C. Fontenot, Jr.
State Bar No. 267528