# EXHIBIT "A"

&lt;!DOCTYPE HTML PUBLIC "-//W3C//DTD HTML 4.0 Transitional//EN"&gt;
&lt;!-- saved from
url=(0200)https://mail.taser.com/exchange/brave/Inbox/URGENT%20-%20Powers%20(AZ),%20
depo%20transcript%20of%20Pam%20Schreiner.EML/1_multipart_xF8FF_2_PAM.TXT/C58EA28C-18
C0-4a97-9AF2-036E93DDAFB3/PAM.TXT?attach=1 --&gt;
&lt;HTML&gt;&lt;HEAD&gt;
&lt;META http-equiv=Content-Type content="text/html; charset=windows-1252"&gt;
&lt;META content="MSHTML 6.00.2900.2769" name=GENERATOR&gt;&lt;/HEAD&gt;
&lt;BODY&gt;&lt;PRE&gt;

                    IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

                        IN AND FOR THE COUNTY OF MARICOPA


        SAMUEL E. POWERS, a married man,  )
                                          )
                        Plaintiff,        )
                                          )
                vs.                       ) NO. CV2003-013457
                                          )
        TASER INTERNATIONAL, INC., a      )
        Delaware corporation,             )
                                          )
                        Defendant.        )
        _____)


                    VIDEOTAPED DEPOSITION OF PAM SCHREINER




                            Phoenix, Arizona
                             May 25, 2005
                              9:04 a.m.




        Prepared For:            Prepared By:

        SUPERIOR COURT           SHELLEY HAVERMANN, RPR, CCR
                                 Certification, No. 50432
        MARICOPA COUNTY          Bartelt &amp; Kenyon
                                 101 N. First Ave., Ste. 2450
        (ORIGINAL)               Phoenix, Arizona  85003

1                            I N D E X

2     WITNESS                                           PAGE

3     PAM SCHREINER

4            Examination by Mr. Dillingham.....6, 108, 111

5            Examination by Ms. Reid-Moore...106, 110, 112

6                          *   *   *
                       E X H I B I T S
7     NO.              DESCRIPTION                      PAGE

8     1      12/5/03 Nine-Page Demand Letter to
             Mr. Struble from Mr. Dillingham
9            And Mr. Wilmer............................87

10

11    2      Plaintiff's Third Request for Production
             Of Documents To Defendant Taser
12           International...........................102

13

14

15

16

17

18

19

20

21

22

23

24

25

1              VIDEOTAPED DEPOSITION OF PAM SCHREINER
                             Page 2

2   commenced at 9:04 a.m., on May 25, 2005, at

3   the law offices of DILLINGHAM &amp; REYNOLDS, LLP, 5080

4   North 40th Street, Suite 335, Phoenix, Arizona, before

5   SHELLEY HAVERMANN, a Certified Court Reporter in and

6   for the County of Maricopa, State of Arizona.

7                         \*    \*    \*

8

9                  A P P E A R A N C E S

10   For the Plaintiffs:

11         DILLINGHAM &amp; REYNOLDS, LLP
             By:   John L. Dillingham, Esq.

12                5080 North 40th Street, Suite 335
                Phoenix, Arizona  85018

13

14         THOMAS C. WILMER, P.C.
             By:   Thomas C. Wilmer, Esq.

15                2504 North Third Street
                Phoenix, Arizona  85004

16

17   For the Defendants:

18         RENAUD, COOK, DRURY, MESAROS, PA
             By:   Christina J. Reid-Moore, Esq.

19                One North Central Avenue, Suite 900
                Phoenix, Arizona  85004

20

21      Also present:  Brent Jensen, K-Video

22

23

24

25

1                     STIPULATION

2     IT IS STIPULATED by and between counsel for the

3   respective parties hereto that the deposition of

4                 PAM SCHREINER

5    may be taken on oral interrogatories before

6    SHELLEY HAVERMANN, a court reporter and Notary Public

7    in and for the County of Maricopa, State of Arizona.

8         IT IS FURTHER STIPULATED that the deposition is

9    taken pursuant to the Rules of Civil Procedure relating

10   to the taking and returning of depositions for use in

11   the Superior Court of Arizona, County of Maricopa; that

12   the witness waived reading and signing said deposition;

13   and that notice of filing and other formalities

14   required by law for the taking and returning of said

15   deposition are waived.

16

17

18

19

20

21

22

23

24

25

1                              Phoenix, Arizona
                               May 25, 2005
2                              9:04 a.m.

3                    *    *    *

4         THE VIDEOGRAPHER:  To comply with

5    Arizona Rule 28, it is agreeable by all parties that

6    the videographer read the introduction, conclusion, and

7    retain all videotapes or so state an objection now.

8                My name is Brent Jensen, legal video

9     specialist with K-Video Productions.  Our court

10    reporter is Shelley Havermann, representing Bartelt &amp;

11    Kenyon at 101 North First Avenue, Phoenix, Arizona.

12                We are at the law offices of

13    Dillingham &amp; Reynolds, 5080 North 40th Street, Phoenix,

14    Arizona, to take the deposition of Pam Schreiner on

15    behalf of the plaintiff in the Superior Court of

16    Arizona, Maricopa County case of Powers versus

17    Taser International, Incorporated, Case Number

18    CV 2003-013457.

19                The date is May 25th, 2005, and the

20    time is 9:04 a.m.  The attorneys will now introduce

21    themselves, plaintiffs first, please.

22                MR. DILLINGHAM:  John Dillingham and

23    Tom Wilmer for the plaintiff.

24                MS. REID-MOORE:  Christina Reid-Moore for

25    Taser International.

1                THE VIDEOGRAPHER:  Please swear in the

2     witness.

3                      *   *   *

4                      PAM SCHREINER,

5     called as a witness herein, having been first duly

6     sworn, was examined and testified as follows:

7                      *   *   *

8                      EXAMINATION

9     BY MR. DILLINGHAM:

10                Q.   Good morning.

11      A.   Good morning.

12      Q.   Would you please tell us your name.

13      A.   Pam Schreiner.

14      Q.   And, Pam, where do you live?

15      A.   I live at 3731 East Renee Drive, Phoenix,

16  Arizona.

17      Q.   Okay.  Pam, have you ever had your

18  deposition taken before?

19      A.   No.

20      Q.   Okay.  I'm going to take a couple of

21  minutes to explain to you the process and make sure you

22  understand the process before we start asking you some

23  questions.  Okay?

24      A.   Okay.

25      Q.   First of all, you do understand that

1  you're under oath just as you would be if you were

2  testifying in court?

3      A.   Yes.

4      Q.   Okay.  Because of the nature of a

5  deposition, even though you can see you're being video

6  recorded, you're also being transcribed as is everybody

7  in this room.  The court reporter is taking down a

8  verbatim transcript of everything we say in addition to

9  the fact that the matter is being videoed.  And

10  because of that, it's important that we follow certain

11  rules of communication to make sure the court reporter

12  can have a clear record.  Okay?

13      A.   Yes.

14          Q.   You have to give verbal responses to

15     questions.  Uh-huhs, huh-uhs, nods and shakes of the

16     head make it very difficult to keep a clear record.

17     Okay?

18          A.   Yes.

19          Q.   One of the biggest problems that lawyers

20     and witnesses have is talking over one another.  There

21     will be many times when you will anticipate my question

22     before I've finished asking it.  Please wait until I've

23     finished asking it until you give your answer.  Okay?

24          A.   Yes.

25          Q.   If you don't understand a question that

1     I've asked you, tell me you don't understand it and

2     I'll rephrase it to make sure you do.  All right?

3          A.   Okay.

4          Q.   If you answer my question, I will assume

5     that you've heard it and that you've understood it.

6     Okay?

7          A.   Yes.

8          Q.   If at any time you want to take a break,

9     if you need more water, something to drink, you want to

10     go to the rest room, anything like that, just let us

11     know.  The only caveat to that is not right in the

12     middle of a question.  As soon as the answer is done,

13     then if you want to take a break, just let us know.

14     Okay?

15          A.   Okay.

16          Q.   All right.

17    A.   Yes.

18    Q.   Where do you work currently?

19    A.   I work at Quality Building Maintenance.

20    Q.   Okay.  And what do you do there?

21    A.   I'm the office manager.

22    Q.   Okay.  Now, it's my understanding that at

23 some point you did work for Taser International.

24    A.   Yes.

25    Q.   When were you hired by Taser

1  International?

2    A.   March 8th of 2004.

3    Q.   And how did your relationship with Taser

4  begin?  In other words, did you respond to an ad?  Did

5  somebody call you?  How did you get hooked up with

6  them?

7    A.   I actually responded to an ad that I had

8  seen on one of the Internet job sites.

9    Q.   Okay.  What was the ad for?

10    A.   It was for an executive assistant.

11    Q.   Okay.  And did you call up and ask to

12 submit an application?

13    A.   No.  I actually submitted the application

14 online.

15    Q.   Okay.  And then what happened next?

16    A.   I received a phone call from the human

17 resource manager, Marcy Rigoni.  She just had given me

18 a few questions to see if I would be qualified for the

19 position.  And then it moved to the second phase of an

Page 8

20    interview with Kate Sinclair, and I believe it was with

21    Kate Sinclair and Marcy Rigoni.

22             Q.    Okay.  Had you known anybody at Taser

23    International before you responded to the ad?

24             A.    No, sir.

25             Q.    Did you know anything about what the

1     company did?

2             A.    No.

3             Q.    Okay.  And I assume you went to the

4     interview?

5             A.    Yes.

6             Q.    Did anybody else participate in the

7     interview other than Kate and Marcy?

8             A.    Not at the first interview, no.

9             Q.    Was there a second interview?

10            A.    Yes.

11            Q.    And who was the second interview with?

12            A.    The second interview was with

13    Kate Sinclair, Rick Smith and Doug Klint.

14            Q.    Okay.  What type of questions were asked

15    of you during that interview?

16            A.    Basic questions, you know, my skill sets,

17    what I was familiar with doing, how I handled stress,

18    things that would, you know, normally come up in an

19    interview.

20            Q.    And did they describe to you in a little

21    more detail at the second interview what your specific

22    duties and responsibilities would be?

Page 9

23          A.    Not really.  They did specify that, you

24   know, percentagewise it would be, you know, 50 percent

25   legal, 20 percent just general clerical type things.

1    And the rest of it would be your, you know, executive

2    assistant type admin role.

3           Q.    Did they explain who you would primarily

4    be working for?

5           A.    Yes.

6           Q.    And who was that?

7           A.    It would be Rick Smith, Phil Smith and

8    Doug Klint.

9           Q.    Phil Smith?

10          A.    Phil Smith, yes.

11          Q.    What about Tom Smith?

12          A.    No.

13          Q.    When they talked to you about the

14   50 percent portion of your job that would be involved

15   in legal, did they get any more specific as to what

16   that entailed?

17          A.    No.  Basically, it would be doing --

18   creating files, you know, basically opening up legal

19   files and, also, basically helping the attorney with

20   any matters that would come before him, such as, you

21   know, speaking with attorneys, setting up appointments,

22   things of that nature.

23          Q.    Okay.  Did they enlighten you on what

24   their business was, what they did, and what was going

25   on?

1          A.   I actually asked the question at the

2    first interview, what Taser was really about, because I

3    did some research on my own and -- because I honestly

4    didn't know anything about them.  So I conducted my own

5    research to find out more about the company.

6               And we did go into a little bit more

7    detail.  You know, I wanted to see where they saw

8    themselves in the future, how, you know, big they were

9    planning on getting, you know, things of that nature,

10   and so we did discuss that.

11        Q.   And was that discussed with Mr. Klint and

12   Mr. Smith at the second interview?

13        A.   Yes.

14        Q.   Okay.  What did they tell you about the

15   business?

16        A.   Basically they saw that the company was

17   going to grow and they felt that it was something that

18   they, you know, in the future thought that they were

19   going to be a huge company.  And they were looking at

20   other avenues of things that they wanted to get into as

21   far as --

22        Q.   Did they explain --

23        A.   No.  They didn't go into specifics with

24   me.

25        Q.   Okay.  And did you in fact get hired

1  after that second interview?

2          A.   Yes.

3          Q.   And who notified you that you had been

4  hired for the position?

5          A.   Rick Smith.

6          Q.   And your first day of work there was

7  March --

8          A.   I think it was March 8th.  It was a

9  Monday.

10         Q.   Of 2004?

11         A.   Yes.

12         Q.   Okay.  At any time did you have a written

13  employment agreement?

14         A.   Yes.

15         Q.   Okay.  And did that written employment

16  agreement provide for compensation?

17         A.   Yes.

18         Q.   And was it a fixed fee amount of

19  compensation?

20         A.   Yes.  It was a salary amount.

21         Q.   Okay.  Was there any bonus provisions?

22         A.   There were stock options.

23         Q.   Okay.  Do you remember what your stock

24  options were?

25         A.   I -- no, I don't.  I'm sorry, I don't.

1          Q.   Did you ever get a chance to exercise any

2  of those stock options?

3        A.   No.

4        Q.   Okay.  What I'm going to do is I'm going

5  to go to the other end now of your employment with

6  Taser.

7        A.   Okay.

8        Q.   And then we'll fill in the middle later.

9        A.   Okay.

10       Q.   It's my understanding that at some point

11  in time you no longer were employed by Taser?

12       A.   Yes, that's correct.

13       Q.   When was that?  When were you no longer

14  employed?

15       A.   January 27th of 2005.

16       Q.   Okay.  And can you explain the

17  circumstances that led to the fact that you were no

18  longer employed?

19       A.   There was an internal investigation being

20  handled through the company.  And they are alleging

21  that I falsified information during an investigation.

22       Q.   Were the allegations true?

23       A.   No.

24       Q.   Who told you at Taser that you were being

25  accused of falsifying information during an

1  investigation?

2       A.   Nobody verbally told me.  I received a

3  letter.

4       Q.   Who was the letter signed by?

5       A.   Tom Smith.  There were actually two

 6  letters, I apologize.  There were actually two letters.

 7  One was signed by Marcy Rigoni and one was signed by

 8  Tom Smith.

 9        Q.    Did you get them both the same day?

10        A.    Yes.

11        Q.    Before the day you received the letter,

12  had anybody ever talked to you about this topic?

13        A.    Yes.

14        Q.    Who?

15        A.    I was investigated by Chandler Police

16  Department in three different interviews.

17        Q.    Do you remember the name of the officers?

18        A.    I only know their first names and that

19  was Burt and Tim, I believe.

20        Q.    How long before you got these letters

21  from Tom and Marcy did you have the discussions with

22  Burt and Tim?

23        A.    There was an interview on the -- it was

24  Monday the -- I guess it would have been the 24th,

25  January 24th.  It was a Monday.  And I was -- on that

 1  day, I was put on administrative leave for two days.

 2              I was called by Doug Klint on Wednesday

 3  to come into the office on Monday -- or on Thursday

 4  morning, which was the 27th at 9:30, and they would

 5  discuss my employment further.

 6              I went to the office.  I spoke to

 7  Marcy Rigoni.  And I was told to sit in her office, and

 8  at that point, I believe that it was Burt came and got

 9    me, and we had to go to another off-site location, and,

10    basically, had another interview with them, which was

11    about an hour, hour and a half.

12            And at that point, I was asked to write a

13    letter of resignation, which I did, and I turned in all

14    my personal belongings -- oh, well, my Taser

15    belongings, I should say.  I'm sorry.

16        Q.    Okay.  What was the specific information

17    they were accusing you of falsifying?

18        A.    Opening a letter.  There were two

19    different letters that came in from a government

20    agency, and I got my dates screwed up and, also, you

21    know, it was an honest mistake.  I just -- there were

22    two envelopes.  One was opened, one was not, and I got

23    them confused.  And that's what I told them, and that's

24    what they're alleging, I'm assuming.

25        Q.    Who was the letter from that you opened?

 1        A.    It was the Securities Exchange

 2    Commission.

 3        Q.    Did you read the letter?

 4        A.    I saw the letter because it wasn't

 5    addressed.  I didn't know what it was, so I, you know,

 6    needed to see what it was so that I could give it to

 7    the appropriate person.

 8        Q.    When -- what was the date of this letter,

 9    approximately?

10        A.    I truly don't remember.

11        Q.    Do you remember what month it was?

12          A.   It would have been probably late

13   December.

14          Q.   How did they find out, to your knowledge,

15   that you opened it?

16          A.   I actual --

17               MS. REID-MOORE:  Form, foundation.

18          Q.   BY MR. DILLINGHAM:  Go ahead.

19               THE WITNESS:  Is it okay to answer?

20               MS. REID-MOORE:  Yes.  Go ahead.

21               THE WITNESS:  Okay.  I'm sorry.  I

22   actually gave the letter to Tom Smith, and said to him

23   that this letter came through the mail, and that was

24   the first letter that was received.  I gave it to Tom

25   and I said, you know, this letter was received.  I

1   didn't want to just leave it out for anybody, and, you

2   know, if there's anything I could do to help him with

3   that, just to let me know.  And that was the last I

4   seen the letter.

5               And a short time after that, I would say

6   within a week or two, another letter came through,

7   which was not addressed to anybody, and it was opened

8   and given to me, and I gave that letter to Doug Klint.

9          Q.   BY MR. DILLINGHAM:  Okay.  So as I

10   understand it, your indiscretion that they were

11   accusing you of had to do with opening these letters?

12          A.   That's what I was thinking, because

13   there's nothing else that I would have known about.

14   I -- there was -- you know, they'd asked me about that

15    and also some purchase order that was faxed in.  And I

16    guess there was something -- something wrong with the

17    purchase order, but I don't deal with purchase orders

18    or did not deal with purchase orders.

19            Q.    What -- when we first started talking

20    about this, you indicated to me that they had accused

21    you of falsifying information during the investigation.

22            A.    Uh-huh.

23            Q.    What you've --

24            A.    The only --

25            Q.    What you've told me so far --

1             A.    Oh, I'm sorry.

2             Q.    -- relates to opening a letter that maybe

3     in hindsight you shouldn't have opened, but how does

4     that relate to falsifying information?

5             A.    Because I gave -- they had asked me

6     if I had opened any envelopes and if I had seen the

7     letter, and I told them at the time that I had

8     knowledge, you know, that these letters were there.

9                   I confused the two envelopes, because one

10    was opened and one was not.  And the only thing I had

11    told them was that the first letter that was received

12    was not opened, and, you know, vice versa.

13                  And they're claiming that that was

14    falsified because I confused dates and I confused

15    letters that were opened or not opened.  And that's

16    what they're alleging.  That's the only thing that we

17    really talked about in the interviews.

18          Q.   Did they ever explain to you how that

19   type of mistake --

20          A.   No, sir.

21          Q.   Let me -- I know you know where I'm

22   going.

23          A.   I know.

24          Q.   Did they ever explain to you why that

25   type of mistake they felt warranted termination?

1                    MS. REID-MOORE:  Form.

2                    THE WITNESS:  No.

3          Q.   BY MR. DILLINGHAM:  Did you ask anybody

4    that?

5          A.   I was not allowed to talk to anybody.

6          Q.   So from the time you began talking to the

7    Chandler Police Department, Burt and Tim --

8          A.   Uh-huh.

9          Q.   -- you were never given the opportunity

10   to talk to anybody directly at Taser; is that right?

11         A.   Correct.

12         Q.   You never talked to Doug Klint,

13   Tim Smith -- Tom Smith, Rick Smith or Phillip Smith?

14         A.   No.

15         Q.   Okay.

16         A.   I was told not to talk to them.

17         Q.   Did you request an opportunity to talk to

18   them?

19         A.   Yes.

20         Q.   Who did you request the opportunity to

21    talk to them with?

22          A.   Marcy Rigoni who was the human resource

23    manager.

24          Q.   Okay.  Did you at any time think there

25    must be some other reason that they're trying to

1     terminate you?

2                MS. REID-MOORE:  Foundation.

3                THE WITNESS:  Yeah.

4                MS. REID-MOORE:  Go ahead.

5                THE WITNESS:  Yes.

6          Q.   BY MR. DILLINGHAM:  What was the reason

7     you thought they were trying to terminate you?

8          A.   Well, I -- honestly I didn't know.  I

9     mean, I thought, you know, if it was something, you

10    know, that I had done wrong, the least they could have

11    done was told me, you know, given me warning or, you

12    know, done something so that I had a chance to correct

13    whatever it is that I did wrong.

14               And, you know, in my opinion, I didn't do

15    anything because I, you know, I enjoyed working at

16    Taser, I enjoyed working with the people at Taser.  And

17    I just -- it kind of hit me blind-sided.  I truly -- I

18    was just -- I was very upset.  It was a very emotional

19    time for me because I truly did not know what was

20    happening or why it was that they let me go.

21          Q.   Okay.  Have you talked to anybody at

22    Taser since January 27th, 2005?

23          A.   No.

                          Page 19

            Pam Schreiner depo (AZ) Powers 05-25-05
24                Q.   Have you talked to Taser's counsel in
25   this case since January 27th, 2005?  Without telling me


            BARTELT &amp; KENYON (602) 254-4111
   PAM SCHREINER - 5/25/05                                    22

1   what you said, just tell me, have you talked to them,

2   anybody that you understand was representing Taser?

3                A.   Yes.

4                Q.   Who have you talked to?

5                A.   Tina Moore.

6                Q.   When was the last time you talked to her?

7                A.   It was probably two weeks ago.

8                Q.   How long was the conversation?

9                A.   Just a few minutes.

10                Q.   Okay.  Did she give you any legal advice

11   during that conversation?

12                A.   No, sir.

13                Q.   Okay.  What was discussed?

14                A.   Basically that -- just to prepare me to

15   know that I was going to be possibly subpoenaed for a

16   deposition.

17                Q.   Okay.  Had you talked to Ms. Moore at any

18   time before that and after your termination?

19                A.   No.

20                Q.   Have you talked to any other attorneys

21   that you understood were representing Taser since your

22   termination on January 27th, 2005?

23                A.   In reference to Taser?  I mean, as far as

24   that would represent Taser?

25                Q.   Yes.

                              Page 20

1          A.   No.

2          Q.   Okay.  Let's talk a little bit about

3   what you actually did once you started working there.

4          A.   Okay.

5          Q.   Can you describe to me a typical day for

6   you once you started working there in March of 2004.

7          A.   Well, my typical day would be, you know,

8   I'd come in in the morning and, you know, prepare my

9   day.  I would, you know, see what was on the agenda to

10  make sure that calendaring was done for Rick or

11  Phil or, you know, Doug.

12              I also started to help out a little bit

13  more with expense things for Dave Dubay, Ray Rivera,

14  Tom Smith, if need be.  And I would also work on any

15  legal files that were there as far as discovery goes on

16  any of the legal cases.

17         Q.   Had you ever done that before in any

18  other prior employment, worked on legal files?

19         A.   Yes.

20         Q.   Where had you done that before?

21         A.   I worked at a law firm in Phoenix.

22         Q.   Which law firm?

23         A.   Parker Stanbury.

24         Q.   How long did you work there?

25         A.   About two and a half years, almost three.

1              Q.   And what did you do at that law firm?

2          A.    I was the legal administrator.

3          Q.    What does that mean, legal

4    administrator?

5          A.    I basically was the office manager.  I

6    was the point person for everything in the office.

7          Q.    Okay.  When you say you worked on legal

8    files at Taser, what do you mean by that?

9          A.    I would compile the discovery, as far as

10   the information that needed to go to other counsel for

11   discovery.  If it was paperwork to show, you know, the

12   safety of the weapon or, you know, things of that

13   nature.  I would also do the interrogatories as far as

14   trying to answer the questions if I could.

15                I would basically work on things that

16   would pertain to the particular case, if they needed,

17   you know, if they needed copies of the autopsies, I

18   would get them or, you know, information pertaining to

19   that specific case.

20         Q.    Okay.  Approximately how many different

21   cases would you estimate you worked on while you were

22   at Taser?

23         A.    I would say when I was there, there was

24   probably, and I'm just guesstimating so, you know,

25   don't hold me --

1          Q.    Sure.

2          A.    I'm guesstimating there were probably

3    10.

4          Q.    Okay.  Did you work on any other cases

 5    where litigation hadn't been filed but there had been

 6    some reports of injury that was in the works?

 7              A.   There --

 8                   MS. REID-MOORE:  Form.  Go ahead.

 9                   THE WITNESS:  There was actually one case

10    that I know of that we had received a letter on.  And

11    basically I was told to just hold off on it until we

12    were, you know, served with actual paperwork.

13              Q.   BY MR. DILLINGHAM:  Do you remember what

14    that -- name of that case, the name of the lawyer, the

15    name of the --

16              A.   No, I'm sorry, I do not.

17              Q.   Does the name Tim Gungle ring a bell?

18              A.   No.

19              Q.   Who did you generally get your work

20    assignments from while you were at Taser?

21              A.   I -- well, I primarily would get the

22    information to my desk first, and I would start working

23    on it.  And then I would go to Doug and have him assist

24    me with, you know, tell me what I needed to do as far

25    as, you know, do you want me to do this, do you want

 1    me to do that, so primarily it would come from

 2    Doug Klint.

 3              Q.   Okay.  Do you remember getting work

 4    assignments from anybody else other than Doug Klint

 5    while you were there?

 6              A.   You know, Rick would occasionally give me

 7    some things to do, or -- but nothing on the legal

8    side.  So it would be, you know, the legal side would

9    strictly be from Doug.

10         Q.   Any other employees give you work

11   assignments other than Doug Klint or Rick Smith?

12         A.   No.  Occasionally, I -- you know,

13   someone may come and ask me, you know, can you help me

14   out with this, as far as, you know, doing an expense

15   report or I need copies of this or, you know, things of

16   that nature.

17         Q.   Can you give me the names of anybody in

18   specific that may have asked you to help them in that

19   regard?

20         A.   Well, I would help out Mark Johnson.  I

21   would help Steve Tuttle, Ray Rivera, but, again, that

22   was just expense reports.  I would help -- you know, I

23   would just -- I would help out everybody if I could.  I

24   tried to help out as much as I could anybody that

25   needed help.

1          Q.   Did Jami Hill ever give you any work

2    assignments?

3          A.   No.

4          Q.   Did you have an office that you actually

5    called your own?

6          A.   No, just a desk.

7          Q.   And did your desk have a computer?

8          A.   Yes.

9          Q.   Was it your understanding that your

10   computer was networked with other computers in the

11      office?

12              A.   Yes.

13              Q.   Okay.  Do you remember the program that

14      was involved that they used?

15                   MS. REID-MOORE:  Form.  Go ahead.

16                   THE WITNESS:  It was Word and Excel.  We

17      had Outlook, Maximizer.  I'm trying to think of the

18      other programs that were there that -- those are the

19      four main ones that were worked.

20              Q.   BY MR. DILLINGHAM:  Did you have to have

21      a specific password or code to get into certain files?

22              A.   I didn't, no.

23              Q.   Did you have a password to get into your

24      computer?

25              A.   I had a password to get on my computer,

1       yes.

2               Q.   What was your password?

3               A.   Oh, gee, I think it was -- I think it was

4       Mikey 16.  I don't remember.  It was a while ago.

5               Q.   Is that your son?

6               A.   No.  It was my husband.

7               Q.   Okay.  While you were employed at Taser,

8       did you have any responsibility for maintaining any

9       particular files for Doug Klint?

10                   MS. REID-MOORE:  Form.

11                   THE WITNESS:  Yes.

12              Q.   BY MR. DILLINGHAM:  What files did you

13      have the responsibility for maintaining?

14                    MS. REID-MOORE:  Same objection.  Go

15    ahead.

16                    THE WITNESS:  It would be any of the case

17    files that were ongoing, any new files that were coming

18    in.  Basically I handled the, you know, the files from

19    the U.S. stock transfer, as far as -- and basically all

20    I did there was file any information that came in to

21    the company.  I never actually created or, you know,

22    did anything with them.  I would just file them away

23    for Doug.  But primarily it was the legal cases that we

24    had going on.

25                    Q.   BY MR. DILLINGHAM:  Okay.  What I want to


                    BARTELT &amp; KENYON (602) 254-4111
        PAM SCHREINER - 5/25/05                               29


1    do is I want to try to get you to think back and

2    remember when you first started there.

3                    A.   Uh-huh.

4                    Q.   When you were first asked to help

5    maintain these files.

6                    A.   Yes.

7                    Q.   When you first began looking at these

8    litigation files, were there separate litigation files

9    for each matter, or were all of the complaints of the

10    lawsuits that had been received by Taser in one file?

11                    MS. REID-MOORE:  Object to form.

12                    THE WITNESS:  Yes.  Everything was

13    pretty much just in one big pile.  There wasn't any

14    system in place.

15                    Q.   BY MR. DILLINGHAM:  Okay.  Was it -- was

16    there really a file or was it just loose documents?

17          A.   It was just loose documents.

18          Q.   Where did you find the loose documents?

19          A.   Pretty much everywhere.  They were in the

20   office, they were in the warehouse, they were, you

21   know, production, above production.  They were just

22   everywhere.  It wasn't just in one general area.

23          Q.   How many different locations would you

24   estimate you found some of this information?

25          A.   At least --

1                MS. REID-MOORE:  Form.  Go ahead.

2          Q.   BY MR. DILLINGHAM:  Go ahead.

3          A.   At least five.

4          Q.   Okay.  Did it take you a while to try to

5    put it all together?

6          A.   Yes.

7          Q.   How long?

8          A.   Well, up until the end of my employment.

9    I was still working on it as I -- before I left.

10         Q.   Did you ever feel comfortable that you

11   were able to gather all of the information that related

12   to files or complaints that had been filed against

13   Taser?

14         A.   No.

15               MS. REID-MOORE:  Form.

16               Pam, if I could just get my objection in

17   before you answer.

18               THE WITNESS:  I'm sorry.  I'm sorry.

19               MS. REID-MOORE:  That's okay.

20          Q.    BY MR. DILLINGHAM:  What did you do as

21    you started gathering these complaints?  And let's --

22    before we go -- let me strike that.  Let me make sure

23    we're talking about the same thing.

24              You understand what a formal complaint is

25    when a lawsuit has been filed based on your experience

1    working at a law firm, right?

2          A.    Yes.

3          Q.    Okay.  When you found these complaints in

4    various locations, what did you physically do with

5    them?

6              THE WITNESS:  Can I go ahead?

7              MS. REID-MOORE:  Sure.

8              THE WITNESS:  Okay.  I actually -- I went

9    to Doug and said, you know, do we have files on these.

10    I would try and figure out what was being done with

11    them.  Because there were, you know, dates on a set of

12    issues.  I mean, to me whenever there's a complaint,

13    you know, if there's a date on it, you have a certain

14    time frame, you know, to get the information to whoever

15    you need to get it to.

16              And he just said --

17              MS. REID-MOORE:  The only thing I want to

18    do, John, is to the extent that Doug directed her on

19    what to do with information, in other words, you get a

20    complaint, you have to do something legally with it, I

21    think we're getting close to --

22              MR. DILLINGHAM:  No, no, no.
                        Page 28

23                    MS. REID-MOORE:  I think we're getting

24      close to legal advice.

25                    MR. DILLINGHAM:  We're getting close, but

1       until we get into legal advice, I don't think we're

2       there.  I'll be careful and I'm sensitive to that

3       issue.

4                    Q.    BY MR. DILLINGHAM:  Okay  Continue.

5                    THE WITNESS:  Okay?

6                    MS. REID-MOORE:  Well, go ahead.  We'll

7       go from -- go ahead.

8                    THE WITNESS:  Okay.  Anyways, so I

9       basically would just, you know, ask Doug, you know,

10      where files were or whatever, and I was told to, you

11      know, to work on getting files set up, because there

12      was nothing in place.

13                   Q.    BY MR. DILLINGHAM:  Okay.  Did you begin

14      to try to set up files?

15                   A.    Yes.

16                   Q.    When you set them up, how did you set

17      them up?

18                   A.    Basically I was trying to go with a

19      system that was used at the prior law firm or the way I

20      have seen it in some other law firms, you know, by case

21      number, by the plaintiff's name, and, also -- because

22      we also had, you know, it wasn't just maybe a civil

23      litigation matter, it could have been other things.  So

24      I would try and do it that way.  Unfortunately, it was

25      a difficult thing to do because there were so many

1  pieces throughout that I was trying to gather

2  everything without, you know, missing a beat.  So I

3  actually did it name and case number, and then also by

4  the state.

5          Q.   Okay.  And did you set up individual

6  files for the complaints that you actually found?

7          A.   Yes.

8          Q.   Did you set up an individual file for the

9  Powers files -- case?

10         A.   Yes.

11         Q.   Did you put a copy of the complaint in

12  that file?

13         A.   I believe so, yes.

14         Q.   Do you recall what other documents you

15  put in the Powers file other than the complaint?

16         A.   God, there were so many.

17         Q.   When you say so many give me --

18         A.   Well, I'm just -- I'm just thinking out

19  loud.  There were, you know, the things that were sent

20  in by your office as well as, you know, like discovery,

21  the interrogatories, things of that nature that were

22  also put in the file.

23         Q.   Okay.  Did you try to put them in the

24  file in chronological order?

25         A.   I tried, yes.

1          Q.   Did you have separate like backers, so to
2     speak, with correspondence, discovery, disclosures?
3          A.   Yes.
4          Q.   And did you have a correspondence backer
5     in that file as well, as far as you recall?
6          A.   I believe so.  I believe there was one,
7     yes.
8          Q.   Okay.  And did any of that correspondence
9     include correspondence between Taser and its insurance
10    carrier?
11         A.   I don't recall, sir.
12         Q.   Okay.
13         A.   I truly don't remember.
14         Q.   Okay.  Now, as you searched in these
15    various locations for this information that you've been
16    talking about --
17         A.   Yes.
18         Q.   -- did you find sometimes just
19    correspondence from lawyers reporting injuries even
20    though a formal complaint hadn't been filed?
21              MS. REID-MOORE:  Form.  Go ahead.
22              THE WITNESS:  Go ahead?
23              MS. REID-MOORE:  Yes.
24              THE WITNESS:  There were a few letters
25    that I did find and I had asked Doug, you know, did he

1     want me to open a file for these even though we had not
2     been served anything on them.

3                    And I actually just would put them in a

4    separate file just of, you know, pending matters, that

5    type of thing.

6            Q.   BY MR. DILLINGHAM:  Okay.  So if I

7    understand what you did when you were there with

8    respect to these issues, when you found a formal

9    complaint that was filed, you would set up a separate

10   file for that, but if you found just a letter of a

11   purported injury where a lawsuit hadn't been filed,

12   then you would take that information and put it in a

13   single file?

14           A.   Yes.

15                MS. REID-MOORE:  Object to form.

16                THE WITNESS:  I'm sorry.

17                MS. REID-MOORE:  That's okay.

18                THE WITNESS:  I'm sorry.

19           Q.   BY MR. DILLINGHAM:  And when did you

20   start doing that, where you got letters and actually

21   started putting them in a single file?

22           A.   Could you repeat the question for me?

23   I'm sorry.

24           Q.   When did you start maintaining that

25   single file which would contain letters that you'd


                 BARTELT &amp; KENYON (602) 254-4111
           PAM SCHREINER - 5/25/05                      36


1    received even if a formal complaint hadn't been filed?

2            A.   I -- I don't remember when.  I mean, it

3    would have probably been, oh, June, July, sometime

4    around there.  I don't really remember.

5            Q.   Of 2004?

                         Page 32

 6    A.   Yes.

 7    Q.   Okay.

 8    A.   I don't recall an actual date or a time

 9  frame.

10    Q.   Okay.  Can you give me some idea, to the

11  best of your recollection, at the time you left

12  approximately how many different of these types of

13  letters was maintained in this file that you had

14  started to create of reports of injury that had not

15  actually resulted in formal complaints being filed?

16         MS. REID-MOORE:  Form.

17         THE WITNESS:  I don't know.  I would say

18  maybe, maybe five, maybe more.

19    Q.   BY MR. DILLINGHAM:  Okay.

20    A.   I mean, and that's just an estimate

21  because I truly don't -- I don't recall.

22    Q.   And as I understand your testimony, at

23  the time you were terminated, you were still looking

24  for this information?

25    A.   That is correct.

 1         MS. REID-MOORE:  Form.

 2    Q.   BY MR. DILLINGHAM:  Okay.  When you began

 3  looking for this information, did you ask anybody at

 4  Taser if they had a formal system in place for the

 5  routing of this information once it came in and where

 6  it wound up, anything like that?

 7         MS. REID-MOORE:  Object to form.

 8         THE WITNESS:  Yes.  I actually -- you

9      know, I was -- I had always went to Doug and Rick and

10     whoever, you know, was in charge, you know, what type

11     of docketing system they had, or, you know, a filing --

12     you know, did they have a filing room, did they have

13     specific things in place.

14                   And I told them if they didn't, you know,

15     to let me do that for them, because to me that's a very

16     important piece.

17            Q.    BY MR. DILLINGHAM:  What were you told

18     about whether or not they had a formal filing system in

19     place at the time you came?

20            A.    I was told that there was nothing there.

21            Q.    What about a system in place to date

22     stamp the receipt of correspondence or information, did

23     they have anything like that in place?

24            A.    No.

25            Q.    Did they ever implement that type of

1      procedure?

2             A.    I actually started doing that myself

3      towards -- you know, once I got everything -- well, not

4      everything, but once I started going through the

5      process, you know, I was trying to do that as documents

6      came in.  And, you know, because to me it's very

7      important that we know when a document is received,

8      especially complaints.

9             Q.    Did you ever talk to anybody at Taser

10     about implementing a date stamp type procedure?

11                   MS. REID-MOORE:  Form.

12              THE WITNESS:  Yes.  As a matter of fact,

13  I, towards the -- towards the end of my career there,

14  I, you know, said, you know, can we use a Bates system,

15  can we use something.  And this would have been

16  probably, you know, mid last year to the end of the

17  year.

18              And I created my own thing where I just

19  would actually stamp it with a -- just a number of, you

20  know, like, you know, 001, you know, something just so

21  we had something started.

22          Q.  BY MR. DILLINGHAM:  Did you ever actually

23  ask anybody at Taser, is it okay to establish a

24  procedure whereby when correspondence or documents come

25  in, we date stamp them?  Did you ever have that

1   discussion with anybody at Taser?

2          A.  I had that discussion with Doug Klint.

3          Q.  And what were you told?

4          A.  I was just -- said, well, you know, if

5   you want to do that, that's fine.

6          Q.  Okay.  Were you a little bit surprised

7   that they didn't have any sort of a formal procedure in

8   place for dealing with incoming information?

9              MS. REID-MOORE:  Form.

10             THE WITNESS:  Yes.

11         Q.  BY MR. DILLINGHAM:  Why?

12         A.  Well, because in any corporation or

13  any -- anywhere where I've ever been employed, they've

14  always had some system in place, where, you know,

**Page 35**

15 certain things were put in certain places.  And things

16 were just not left out in the open for everybody to

17 find and see.  So I was somewhat surprised.

18          Q.   Okay.  I want to talk to you about the

19 files that you started maintaining for the complaints.

20          A.   Okay.

21          Q.   And then I'm going to talk to you about

22 the single file that you had where you put the various

23 letters in where a formal file wasn't opened for each

24 individual matter.  Okay?

25          A.   Okay.

1          Q.   Let's talk about the files that you

2 started maintaining for the actual complaints that had

3 been filed.

4          A.   Okay.

5          Q.   You told me a little bit about the type

6 of information that was in there.  Where did you keep

7 those files?

8          A.   I actually had a -- I brought in a file

9 cabinet that I had from home, and I, you know, I said,

10 you know, I'm bringing it in and I'm going to use it

11 because we need to put these files somewhere.  And I

12 brought it in from home, and I actually started keeping

13 all the files in that cabinet.

14          Q.   What type of file cabinet was it,

15 two-drawer, three-drawer --

16          A.   It was a four-drawer, four-drawer

17 lateral.

18          Q.   And did you keep that right next to your

19   desk?

20          A.   Yes.

21          Q.   Where was your desk in proximity to

22   Mr. Klint's office?

23          A.   Basically it was right in front of his,

24   within maybe six feet, seven feet.

25          Q.   Did he know you kept those files in that

1   lateral file?

2          A.   Yes.

3          Q.   What about the single file that you were

4   telling me about that you maintained on these documents

5   that you received that were just letters or things like

6   that where a formal complaint hadn't been filed, where

7   did you keep that file?

8          A.   That was also kept in the same file

9   cabinet.

10          Q.   And did Mr. Klint know you kept that in

11   the same file cabinet?

12               MS. REID-MOORE:  Foundation.

13               THE WITNESS:  Yes.

14          Q.   BY MR. DILLINGHAM:  And how do you know

15   he knew that?

16          A.   I told him it was there.

17          Q.   Okay.  Did you ever see him periodically,

18   before you left Taser, go into the file to get any of

19   that information?

20          A.   Yes.  And he would periodically, you

21   know, ask me to get a file for him if he needed to look

22   at something or, you know, whatever.

23        Q.   Okay.  Did you keep other types of files

24   in these file cabinets other than these litigation

25   files that you said you started maintaining in this

1    single file with reports of injuries?

2         A.   As far as in the file cabinet?

3         Q.   Yes.

4         A.   No.

5         Q.   Okay.  That was basically -- everything

6    that was in the file cabinet consisted of this type of

7    information?

8         A.   There were other things in the file

9    cabinet that were, you know, Rick Smith's information,

10   if he -- you know, things on different matters for

11   Rick Smith that had nothing to do with legal.  There

12   were also things in there for Phil Smith that had

13   nothing to do with legal.

14        Q.   Anything else in this lateral file that

15   you've described other than what you've just told me

16   about?

17        A.   No, sir.

18        Q.   Was this lateral file that you maintained

19   near your desk, did that basically contain all the

20   files that you yourself actually worked on?

21        A.   Yes.

22        Q.   And that was good because it made it

23   convenient for you real close to where you worked?

**Page 38**

 24          A.    Yes, sir.

 25          Q.    All right.  Were you ever asked to gather

  1    any information or to help provide any information in

  2    this case?

  3               MS. REID-MOORE:  Form.

  4               THE WITNESS:  In the Sam --

  5          Q.   BY MR. DILLINGHAM:  The Powers case?

  6          A.   Yes.

  7          Q.   Okay.  Tell me when the first time was

  8    you were asked to gather, generate, produce, whatever

  9    you did, any information in this case.

 10          A.   It would have been the first week of my

 11    employment.

 12          Q.   Okay.  So sometime in the first week of

 13    March of 2004, maybe the second week?

 14          A.   Maybe in the second week, yes.

 15          Q.   Okay.  And what were you asked to do?

 16          A.   I was asked to pull together information

 17    regarding the training demo reports and make copies of

 18    those, and also compile, you know, get some information

 19    together from everyone on safety, things like that,

 20    things that were part of the discovery process and get

 21    those to Renaud Cook.

 22          Q.   Who asked you to do that?

 23          A.   Doug Klint.

 24          Q.   Okay.  Let me ask it this way.  Would

 25    it be fair to say that he came to you and said, Pam,

 1    here's the documents that the plaintiff wants, go get
 2    them and produce them to Renaud Cook?
 3                 MS. REID-MOORE:  Object to form.
 4            Q.   BY MR. DILLINGHAM:  Or words to that
 5    effect?
 6            A.   Not really.
 7                 MS. REID-MOORE:  Same objection.
 8            Q.   BY MR. DILLINGHAM:  Go ahead.
 9            A.   Oh, I'm sorry.
10                 MS. REID-MOORE:  Go ahead.  I'm sorry.
11                 THE WITNESS:  Not -- not really.
12            Q.   BY MR. DILLINGHAM:  Okay.  Explain it to
13    me.  Explain what happened.
14            A.   Okay.  He had given me a -- and I truly
15    don't remember verbatim the sheets.  I know that there
16    were -- it was either discovery or some sort of a
17    request from a law firm, you know, the -- I can't think
18    of the word now.  It was a discovery request,
19    basically.
20                 And on there, it stated things that were
21    needed to go further with the case.  You know, the
22    information was needed for this case.  And he
23    basically, you know, directed me to individuals to
24    where I might be able to find that information.
25                 And once I gathered the information, I

 1    was to make a copy for Renaud Cook, both hard copy and

2    CD, and keep a copy for us.  Well, the original was for

3    us, I'm sorry.

4             Q.   Did you do that?

5             A.   Yes, I did.

6             Q.   Okay.  I want to make sure I understand

7    the physical form of the information that you

8    generated --

9             A.   Uh-huh.

10            Q.   -- and the physical form of the items

11   that you forwarded to Renaud Cook and the physical form

12   of the items that you kept a copy of for Taser.  Okay?

13            A.   Okay.

14            Q.   Okay.  Let me start with that.  Did you

15   produce hard copies of documents that you delivered to

16   Renaud Cook?

17            A.   Yes.

18            Q.   Did you keep inside Taser duplicates of

19   those hard copies?

20            A.   Yes.

21            Q.   Okay.  Did you generate inside Taser a CD

22   with images of those documents on the CD?

23            A.   Yes.

24                 MS. REID-MOORE:  Form.

25                 THE WITNESS:  Oh, I'm sorry.

1                 A.   BY MR. DILLINGHAM:  Did you deliver a

2    copy of that CV to Taser?

3            A.   To --

4                 MS. REID-MOORE:  Form.

5          Q.    BY MR. DILLINGHAM:  I'm sorry.  Did you

6    deliver a copy of that CD to Renaud Cook?

7                MS. REID-MOORE:  Form.

8                THE WITNESS:  Yes.

9          Q.    BY MR. DILLINGHAM:  Did Taser keep a copy

10    of that CD with the scanned images from the hard copies

11    of the documents that you produced?

12          A.    Yes.

13                MS. REID-MOORE:  Form.

14          Q.    BY MR. DILLINGHAM:  Okay.  When you were

15    given this task, did you have any idea what documents

16    existed in Taser that fell within the scope of the

17    items that you were being asked to gather when you were

18    first given the assignment?

19          A.    No.

20          Q.    Did Mr. Klint direct you to go to certain

21    specific people to try to get certain specific

22    information?

23          A.    Yes.

24          Q.    What people did he direct you to go see?

25          A.    Steve Tuttle, Jami Hill, and, really,

1    those were the two primary people.

2          Q.    Okay.

3          A.    And then go from there if I needed other

4    help.

5          Q.    Okay.  And I assume you followed his

6    directions and went to both Steve Tuttle and Jami Hill?

7          A.    Yes.

8          Q.    What information did you get from

9    Steve Tuttle?

10         A.    I was able to get from him press

11   releases, you know, news articles, the -- some of the

12   safety reports, things of that nature.

13         Q.    When you say some of the safety reports,

14   what do you mean by that?

15         A.    Things that were publicly, you know, put

16   out for -- on safety of the device.

17         Q.    Okay.  Anybody -- Anything else that you

18   can think of that you got from Steve Tuttle?

19         A.    Not really.  I mean, there was so much

20   and it was so -- it was actually so long ago I truly

21   don't remember everything else, you know, everything

22   that I did get from him.  I know that those were

23   specific things.

24         Q.    Okay.  What about Jami Hill, what did you

25   get from her?

1          A.    Jami, I actually went to her to get the

2    demo report information.

3          Q.    And when we talk demo report, we're

4    talking about the single sheets that have a picture of

5    a front and back of a human body on it that are

6    completed by some officers at some time?

7          A.    Yes, sir.

8          Q.    Okay.  Did you get anything else from

9    her?

10         A.    Not at that time, no.

11          Q.   We were provided in this case a CD or

12   DVD on approximately May 5th of 2004 with a series of

13   various documents that were scanned in which included

14   some demo reports.  Are you aware of that?

15               MS. REID-MOORE:  Foundation.

16               THE WITNESS:  Yes.

17               MS. REID-MOORE:  There are -- just so

18   that you know, there are two sets.  We made one.

19               MR. DILLINGHAM:  No, I do understand.  I

20   just want to --

21               MS. REID-MOORE:  And then they made one,

22   so --

23               MR. DILLINGHAM:  I'm going to try to get

24   that clarified.

25               MS. REID-MOORE:  Sure.  He'll clear it

 1   up.

 2               THE WITNESS:  Okay.

 3               MS. REID-MOORE:  He'll clear it up for

 4   you.

 5               THE WITNESS:  It was just a CD.

 6          Q.   BY MR. DILLINGHAM:  Okay.  I'm going to

 7   have you hold this, and hold it up to the camera, and

 8   it's a CD dated May 5th, 2004 with the name Renaud Cook

 9   of it.  And can you go a little closer to the camera so

10   they can get it.

11               THE VIDEOGRAPHER:  Okay.

12          Q.   BY MR. DILLINGHAM:  Okay.  Have you ever

13   seen a copy of that actual CD in that form with Renaud

14      Cook's name on it with the date on it?

15              A.      No.

16              Q.      Okay.  You can put it down.

17              A.      Oh, okay.  I'm sorry.

18              Q.      Okay.  Now, if I understood your

19      testimony correctly, and I just want to make sure, when

20      you produced the documents to Renaud Cook, you actually

21      gave them a CD, but it wasn't this CD; is that right?

22                      MS. REID-MOORE:  Form.

23                      THE WITNESS:  That is correct.

24              Q.      BY MR. DILLINGHAM:  Okay.

25                      MS. REID-MOORE:  There's different time

1       periods.

2                       MR. DILLINGHAM:  I'm do --

3                       MS. REID-MOORE:  I'm just trying to --

4                       MR. DILLINGHAM:  I'm going to get to

5       that.

6                       MS. REID-MOORE:  That's fine.

7                       MR. DILLINGHAM:  I know there's a second

8       one.

9               Q.      BY MR. DILLINGHAM:  Now, there was

10      another CD at a later date that was produced in this

11      case, and this doesn't have a particular date on it,

12      but we can get it at a later time.  And I want you to

13      take it, hold that up.

14                      MR. DILLINGHAM:  Let me know when you get

15      it, Brent.

16                      THE VIDEOGRAPHER:  Okay.

17          Q.    BY MR. DILLINGHAM:  Okay.  Now, you've

18   seen a copy of that CD, the one you were just holding

19   up, right?

20          A.    Yes.  Well, there was one that I had

21   created, you know, with that information, but there

22   were various CD's.

23          Q.    Okay.  My only question is, with respect

24   to the first CD that I had you hold up, the one that's

25   green --

1          A.    Right.

2          Q.    -- which is dated May 4th, 2004 --

3          A.    Uh-huh.

4          Q.    -- before May 4th, 2004, had you actually

5   physically forwarded a CD to Renaud Cook with the

6   images on it?

7               MS. REID-MOORE:  Object to form.

8               THE WITNESS:  I believe so.  I don't

9   remember the dates or anything, but there were, you

10   know, we had went through a lot of correspondence.

11          Q.    BY MR. DILLINGHAM:  Okay.

12               MS. REID-MOORE:  What was the date of

13   that one again?

14               MR. DILLINGHAM:  May 4th, 2004.

15               MS. REID-MOORE:  May 4th, 2004.  Okay.

16          Q.    BY MR. DILLINGHAM:  Okay.  Now, before

17   May 4th, 2004, which is the date of this green CD --

18          A.    Yes.

19          Q.    -- other than the documents that you got

20    from Steve Tuttle, which you've described, and the demo

21    reports, did you get anything else from them?

22          A.   From --

23          Q.   Either Steve Tuttle or Jami Hill?

24          A.   At some point, and I, honestly, I don't

25    remember date-wise, so forgive me on that.

1           Q.   Okay.

2           A.   At some point there was an actual

3     worksheet, a spreadsheet in Excel, that would show

4     the different trainings that were across, you know, the

5     country, I'm assuming, that would show, you know, any

6     possible injuries or things of that nature.

7           Q.   Okay.

8           A.   But, again, I don't remember when that

9     was.

10          Q.   Who did you get that from?

11          A.   I actually went to Jami and asked her

12    about it, because I was told that this was out there

13    by Doug Klint.  And I had went to Jami and asked her if

14    she knew of this report or this worksheet.  And she

15    basically forwarded that information to me.  It was --

16          Q.   And how did she --

17          A.   It was on her -- it was in Excel and she

18    had sent it to me via e-mail.

19          Q.   And then what you did was pull it up on

20    your screen and then print it out?

21          A.   Yes.

22          Q.   And then you sent a hard copy of that

Page 47

23    document to Renaud Cook?

24            A.   I believe I sent a hard copy, but I may

25    have also had it on CD.  I truly don't recall if it was

1    on CD or not.

2            Q.   Okay.  Now, I'm going to hand you some

3    documents.

4            A.   Okay.

5            Q.   And ask you to hold them up so that the

6    videographer can --

7            A.   See it?

8            Q.   -- see it, and then I'm going to ask you

9    some questions about it.  Okay?

10            A.   Okay.

11            Q.   Could you hold it up so the videographer

12    can see it.

13            MR. DILLINGHAM:  And, Brent, what I'd

14    like you to do is to focus in on the Bates label on the

15    bottom.  Tell me when you got it.

16            THE VIDEOGRAPHER:  Okay.

17            Q.   BY MR. DILLINGHAM:  Okay.

18            A.   Okay.

19            Q.   Now, Pam, I will tell you that -- you see

20    that Bates label on the bottom?

21            A.   Yes, sir.

22            Q.   That Bates label was on the documents

23    that are contained on this green disc that were

24    produced to us on May 5th, 2004.

25            A.   Okay.

Page 48

1          Q.   Okay.  Now, is this document that begins
2     with that Bates label, RFP0617, is that the document
3     that Jami Hill e-mailed to you that you then printed
4     out and forwarded to Renaud Cook?
5          A.   Yes, sir.
6          Q.   Okay.  And how do you know that?
7          A.   I know because this was a document that I
8     had never seen before up until the time of asking Jami.
9     And I -- I had asked questions on, you know, the
10    information of, you know, how it would pertain to
11    certain things if, you know, if it came out.
12         Q.   Okay.  Now, at the time you printed that
13    document out from your screen and you forwarded it to
14    Renaud Cook, had you personally entered any data into
15    that database?
16         A.   No, sir.
17         Q.   We're going to get to this topic a
18    little bit later, but let me ask you the question now
19    just so I have it clear.
20              At some later point in time, after you
21    first generated a copy of this document and forwarded
22    it to Renaud Cook, did you at some later date enter
23    data into that spreadsheet?
24         A.   Into this spreadsheet, no.
25         Q.   Did you enter it into a different

1   spreadsheet that had similar information?

2         A.   Yes.

3         Q.   Okay.  Where did you get that second

4   spreadsheet that had different information?

5              MS. REID-MOORE:  I'm going to object.

6   This is, correct me if I'm wrong, in reference to the

7   spreadsheet that we reference in our twenty-ninth

8   supplemental disclosure statement.

9              So to the extent that you get into why it

10  was created and how it was directed to be created by

11  Doug Klint, I'm going to have to instruct her not to

12  answer if we get to that point.

13           MR. DILLINGHAM:  Well, wait a second.

14  All I'm asking her is what was the second -- where did

15  she get the spreadsheet that she entered the data into

16  that she did enter the data into.  That doesn't ask for

17  any of that stuff.

18           MS. REID-MOORE:  Well, I'm just setting

19  it up, so --

20           MR. DILLINGHAM:  Okay.

21           MS. REID-MOORE:  We'll see.  It may not

22  get there, and that's fine.

23         Q.  BY MR. DILLINGHAM:  Okay.  This

24  information that is printed out on that exhibit in

25  front of you is nothing more than a printout of the

1   screen that Jami Hill e-mailed to you that you printed

2   out, sent a hard copy up to Renaud Cook, right?

 3     MS. REID-MOORE:  Form, foundation.  Go

 4 ahead.

 5     THE WITNESS:  Yes, sir.

 6    Q. BY MR. DILLINGHAM:  Okay.  At some later

 7 date, as I understand it, you did enter information

 8 into a similar type of spreadsheet as the one that's in

 9 front of you, right?

10     MS. REID-MOORE:  Form.

11     THE WITNESS:  Yes.

12    Q. BY MR. DILLINGHAM:  Okay.  Where -- and

13 you did that on a computer screen when you entered the

14 data?

15    A. Yes.

16    Q. Where did that spreadsheet form come

17 from?

18    A. I created it.

19     MS. REID-MOORE:  Foundation.

20    Q. BY MR. DILLINGHAM:  Go ahead.

21    A. I created it.

22    Q. From scratch?

23    A. Yes.

24    Q. When did you do that?

25    A. Oh, I don't remember when.  I know it was

 1 probably sometime, you know, in the summer.  I just --

 2 I don't recall when.

 3    Q. Why did you do it?

 4     MS. REID-MOORE:  Form.

 5     THE WITNESS:  Is it okay?  I'm sorry.

 6                  MS. REID-MOORE:  Go ahead.  We'll see

 7    where it goes.

 8                  THE WITNESS:  I was asked to create it.

 9         Q.    BY MR. DILLINGHAM:  By whom?

10         A.    By Doug Klint.

11         Q.    Okay.  I'm going to get back to that

12    topic a little bit later.

13         A.    Okay.

14         Q.    But I'm going to try to take you back to

15    the time frame when you were gathering the documents

16    that were produced that were on this green CD that you

17    held up a few minutes ago.  Okay?

18         A.    Yes, sir.

19         Q.    All right.  You said you got some demo

20    reports from Jami Hill; is that right?

21         A.    Yes, sir.

22         Q.    Now, these demo reports, how did you

23    physically get them?  Did you get hard copies?  Were

24    they e-mailed to you on -- in the computer system?  How

25    did you physically get them?

                  BARTELT &amp; KENYON (602) 254-4111
       PAM SCHREINER - 5/25/05                          58


 1         A.    There were actually two separates areas

 2    that they were in.  One was an actual hard copy that

 3    they had from -- you know, that were given from

 4    training classes that were sent in by the agencies or

 5    somehow Jami was able to obtain them from these

 6    training classes.  Then there was another form of demo

 7    report that was actually online.

 8                  And I don't know.  They were actually in