9      a binder, the ones that were from online.  They had

10     already been printed and put in a binder.  So I don't

11     know where they came from or, you know, they were just

12     on a shelf.

13             Q.   Who had physical custody of these

14     binders?

15             A.   I believe it was --

16                  MS. REID-MOORE:  Foundation.  Go ahead.

17                  THE WITNESS:  I believe it was

18     Steve Tuttle's group.

19             Q.   BY MR. DILLINGHAM:  Okay.  Is that where

20     you got these hard copy documents from when you first

21     gathered the documents to produce to Renaud Cook that

22     were on the green CD?

23                  MS. REID-MOORE:  Form, foundation.

24                  THE WITNESS:  Without -- I, honestly, I

25     don't know which -- the demo reports that Jami gave to

1      me were what we had copied and scanned onto a CD.

2              Q.   BY MR. DILLINGHAM:  Okay.

3              A.   So those are the ones that I actually

4      took to Alphagraphics, had them copied and scan them

5      onto a CD.

6              Q.   Okay.

7              A.   And those are the ones from Jami that I

8      had found throughout the building.

9              Q.   All right.  Now, when you produced the

10     documents to -- that human volunteer spreadsheet which

11     I had you hold up a few minutes ago --

12      A.    Yes.

13      Q.    -- did you understand that you were

14  supposed to get all of the current information that

15  Taser had on their human volunteer spreadsheet to

16  produce?

17            MS. REID-MOORE:  Form.

18            THE WITNESS:  I was -- yes.  I mean, I

19  knew to get to, you know, up to whatever date it was.

20      Q.    BY MR. DILLINGHAM:  Which was May 4th of

21  2004, approximately?

22      A.    Right.  Yeah, around that time frame.

23      Q.    Okay.  Will you look at the last date on

24  that exhibit to see the last entry that's on there, and

25  tell me what the date is.

 1            A.    May 23rd, 2000.

 2      Q.    When you got that, did you -- was it part

 3  of your responsibility to look at it and see if it was

 4  up to date, or did you just presume that what Jami had

 5  sent you was up to date?

 6            MS. REID-MOORE:  Form.

 7            THE WITNESS:  I had -- I, being new, you

 8  know, in the company, I was just naturally assuming

 9  that things were -- which you should never assume

10  anything, but I assumed that it was up to date.

11      Q.    BY MR. DILLINGHAM:  Okay.  So you

12  didn't --

13            A.    I didn't even -- I honestly didn't even

14  look at it.

Page 54

15          Q.    You just forwarded exactly what Jami had

16    e-mailed you from her computer?

17          A.    Yes.

18                MS. REID-MOORE:  Form.

19          Q.    BY MR. DILLINGHAM:  All right.  At any

20    later date, did you ever have a discussion with Jami as

21    to why that data ends on May 23rd, 2000?

22          A.    Yes.

23          Q.    And what did she tell you?

24          A.    There was a point where they decided,

25    meaning -- they meaning Taser, that they decided to

                BARTELT &amp; KENYON (602) 254-4111
        PAM SCHREINER - 5/25/05                          61


 1    change the form or the -- the form just a little bit,

 2    or the worksheet, I'm sorry.  They wanted to change it

 3    just a little bit.  And Rick had asked her to stop

 4    inputting the information and change it.

 5          Q.    Okay.  And did she tell you that was the

 6    reason that the human volunteer data that she had

 7    e-mailed to you ended on May 23rd, 2000?

 8                MS. REID-MOORE:  Form.

 9                THE WITNESS:  No, I don't recall that

10    discussion.  I just -- I know that I had, you know,

11    wanted to find out why there was a change because it

12    was very noticeable that it had changed and --

13          Q.    BY MR. DILLINGHAM:  Did you ever see

14    another spreadsheet that had been generated by somebody

15    other than you containing information similar to what's

16    on that exhibit in front of you?

17                MS. REID-MOORE:  Form.

18          THE WITNESS:  I actually seen this

19   spreadsheet, but at the -- the end of, you know, this

20   spreadsheet, where it ends here, it actually changed.

21   It was all on the same spreadsheet or worksheet, but at

22   the end it was just different.  It had changed.  You

23   could definitely tell that the formatting had changed.

24          Q.    BY MR. DILLINGHAM:  Okay.  Was that

25   document ever gathered by you and produced by you in

1    this case?

2          A.    As --

3                MS. REID-MOORE:  Form.

4          Q.    BY MR. DILLINGHAM:  In this case, did

5    you ever at any time before you left get this other

6    document that you're just talking about and produce it

7    to Renaud Cook for distribution to us in this case?

8          A.    Yes, I believe so.

9          Q.    Okay.  All right.  Where did that

10   document come from?

11               MS. REID-MOORE:  Form.

12         Q.    BY MR. DILLINGHAM:  I mean, you told us

13   about the screen that Jami Hill -- strike that.  You

14   told us about the e-mail that Jami Hill had sent you

15   that gave rise to that document which was produced.

16         A.    Yes.

17         Q.    Did Jami Hill ever e-mail you another

18   document on your screen that you printed out?

19         A.    Well, when I -- I went to her, and

20   when -- it was actually on the -- because we had a

21    network, and on our, I believe it was the P drive,

22    there was -- this document was out on the P drive, and

23    she had shown me where it was on -- you know, in the

24    computer.

25            Q.   Okay.

 1            A.   She had e-mailed me this, you know,

 2    something similar to this, and then told me where I

 3    could locate it on the P drive.  I believe it was the

 4    P drive.

 5            Q.   Okay.  And do you recall doing that at

 6    some point?

 7            A.   At some point I did, yes.

 8            Q.   Okay.  Do you recall when it was that you

 9    did that?

10            A.   No, sir, I don't.

11            Q.   Did you ever make any entries into that

12    particular spreadsheet?

13            A.   No, sir.

14            Q.   What was the file name under which this

15    spreadsheet was maintained?

16            A.   Oh, gee.  I believe, and, again, don't

17    quote me on this --

18            Q.   That's okay.

19            A.   -- because I believe it was something

20    along the lines of human volunteer data or something in

21    relation to that.

22            Q.   Okay.

23            A.   I just -- I don't really recall.

24         Q.   Okay.  I'm a little bit confused.

25         A.   Okay.

1         Q.   When you first produced that document

2   which was included in the -- on the green disc --

3         A.   Okay.

4         Q.   -- was it your understanding at that time

5   that that was all that Taser had on that issue?

6            MS. REID-MOORE:  Form, foundation.

7            THE WITNESS:  Yes.

8         Q.   BY MR. DILLINGHAM:  Okay.  At some later

9   date, did somebody tell you that there was another

10   spreadsheet floating around that you hadn't produced

11   the first time?

12            MS. REID-MOORE:  Form.

13            THE WITNESS:  It wasn't actually put to

14   me that way.

15         Q.   BY MR. DILLINGHAM:  How was it put to

16   you?

17         A.   It was basically -- because I -- I was

18   going through, you know, other cases.  And we were -- I

19   was trying to put together information so that it was

20   general, you know, so we always had a packet of

21   information, so that we knew, okay, you know, if this

22   lawsuit comes up, then we can send all of this

23   information, because they were generally the same, and

24   we would need to send the same general information.

25            I had actually looked at Jami's

1    spreadsheet and noticed at that time that there was

2    something different, that towards the end of it, the

3    scenario or the wording and the way it was had

4    changed.  I had went to Jami and asked her why that was

5    or why does it look so different, and we -- that's how

6    we came on to that topic.

7            Q.   Okay.  I'm going to show you another

8    document and have you hold it up.  And what it is is --

9    I don't have copies of this right now, but we've all

10   seen it a million times.

11           A.   Okay.

12           Q.   This is Taser's Response to Plaintiff's

13   Third Request for Production of Documents, and the date

14   of it is November the 19th, 2004.

15           A.   Okay.

16           Q.   All I would like you to do is hold up

17   that top sheet so that the camera can see it, first of

18   all.

19           Okay.  Now, if you can hand it back to

20   me, I'm going to take you to another document in here.

21           A.   Okay.

22           Q.   And ask you to hold this up.  And

23   it's --

24           MR. DILLINGHAM:  Again, Brent, I would

25   like you to focus in on the Bates label.

1            THE VIDEOGRAPHER:  Okay.

2          Q.   BY MR. DILLINGHAM:  And just hold that up
3    for a second.
4               MS. REID-MOORE:  Can I see?
5               Okay.  Go ahead, sorry.
6               MR. DILLINGHAM:  Tell me when you got
7    it, Brent.
8               THE VIDEOGRAPHER:  Where is the label?
9               MR. DILLINGHAM:  It's on the bottom
10   left.
11              THE VIDEOGRAPHER:  Bottom left?
12              MR. DILLINGHAM:  Yes.
13              THE VIDEOGRAPHER:  Okay.
14         Q.   BY MR. DILLINGHAM:  Now, could you take a
15   look at that sheet that's Bates labeled 3RFP2-0001 on
16   the bottom.
17         A.   Yes.
18         Q.   Is this the spreadsheet that you created
19   from scratch?
20         A.   No.
21         Q.   Okay.  Where did you get this spreadsheet
22   from?
23         A.   This is actually the end of this.
24         Q.   Okay.  When did you first physically see
25   that in any form?

1          A.   I, honestly, I don't remember date-wise
2    when it was, but I would say it was probably mid to end
3    of summer.
4          Q.   Of 2004?

    5            A.    Yes, sir.
    6            Q.    You had never seen it before you produced
    7   the documents that were contained on this green CD,
    8   right?
    9            A.    I knew of this one, the one --
   10            Q.    The first one we talked about?
   11            A.    The first one.
   12            Q.    But --
   13            A.    And this one, I just -- I didn't really
   14   notice it.  I mean, I knew that, you know, this one
   15   existed.
   16            Q.    Okay.
   17            A.    So -- and this is actually all of this.
   18   I mean, it's all really the same.
   19            MS. REID-MOORE:  This is making a bad
   20   mess on the record.
   21            MR. DILLINGHAM:  I know.  I'm going to
   22   clarify it.
   23            Q.    BY MR. DILLINGHAM:  "This" and "this"
   24   because --
   25            A.    I'm sorry.  Oh, I'm sorry.

    1            Q.    Let me -- stay with me.  Let's go slow.
    2            A.    Okay.
    3            Q.    All right.  Hold up the one that you had
    4   not seen before the documents were produced that were
    5   on the green disc.
    6            Okay.  That's the one that on the Bates
    7   label is 3RFP2-000001, right?

8          A.   Yes.

9          Q.   Okay.  Now, how did you first become

10   aware that this second spreadsheet that you just held

11   up existed?  How did you first become aware that it

12   even existed?

13          A.   Because I was trying to pull together

14   information, like I said before, I was trying to gather

15   information for other lawsuits, and I was compiling a

16   generic packet, if you would, to say, okay, here's our

17   press releases, here's our medical safety reports,

18   here's, you know, here's the demo reports, things like

19   that.  I was trying to compile, you know, get it all

20   together and have it so that we have CD's ready, we

21   have anything ready so that we just would have to send

22   it out.

23          Q.   Okay.  But how --

24          A.   And when I -- I went into the P drive,

25   because I believe that's where it was at, I think it

1   was on the P drive, and I went into this particular

2   spreadsheet of Jami's, which was the human volunteer

3   spreadsheet, I had went into it, and I looked at it and

4   noticed that the formatting, you know, was different.

5   And I had went to her, and at that time said, are these

6   the same or did you change the formatting midstream,

7   you know, what is the deal because it doesn't -- it's

8   not jibing to me, because there's different things that

9   show on one, and now all of a sudden it's different on

10   another.

Page 62

11          So I was just trying to figure out in my

12   own mind if it was the same or if they were different

13   or, you know, what the general process was.

14          Q.   Okay.  All right.  The document that you

15   just held up, 3RFP2-00001 --

16          A.   Uh-huh.

17          Q.   -- okay, to your best recollection, that

18   was on the P drive, correct?

19          A.   Yes.

20          Q.   Did you ever make any entries on that

21   document that was on the P drive?

22          A.   No.

23          Q.   Okay.

24          A.   Not at all.

25          Q.   You said that at a later date, you did in

1    fact generate an entire new spreadsheet from scratch;

2    is that right?

3          A.   Yes, that is correct.

4          Q.   And you did that at Doug Klint's

5    direction, right?

6          A.   Yes.

7          Q.   Okay.  Why did you do that?

8          A.   We were actually trying to have more

9    formality, I guess, in, you know, keeping these files

10   straight.  And because there were so many files

11   everywhere, the reports were just scattered throughout

12   the company that I -- you know, we needed to do

13   something to get some sort of a system in place and to

Pam Schreiner depo (AZ) Powers 05-25-05

14    make it more uniform.

15              Q.   So what you had to do, if I understand

16    your testimony correctly, you had to try to find the

17    individual demo reports from wherever you could find

18    them, and then you got them organized the way you

19    thought they should be organized, and then you started

20    from scratch an entire new spreadsheet in the form that

21    is before you that we were just talking about; is that

22    correct?

23              MS. REID-MOORE:  Object to form,

24    foundation.

25              Q.   BY MR. DILLINGHAM:  Go ahead.


BARTELT &amp; KENYON (602) 254-4111
      PAM SCHREINER - 5/25/05                          71

1              A.   Okay.  Yes and no.

2              Q.   Okay.  Go ahead and explain.

3              A.   It was a totally different format than

4    this.

5              Q.   It was a totally different format than

6    the one that's Bates labeled --

7              A.   3RFP --

8              Q.   -- 3RFP2-00001?

9              A.   Yes, sir.

10             Q.   Okay.  What was different about the

11   format?

12             MS. REID-MOORE:  I'm going to object if

13   you start getting into the content of it.  That's the

14   spreadsheet that we've labeled as attorney work

15   product.

16             MR. DILLINGHAM:  You've produced it.
                        Page 64

17            MS. REID-MOORE:  No, no, we have not.  We
18  produced a supplemental disclosure saying that she was
19  directed to create a spreadsheet for this case.
20  And it's --
21            MR. DILLINGHAM:  All I want to talk to
22  her about is the ones that have been produced in this
23  case.
24            MS. REID-MOORE:  Okay.
25            MR. DILLINGHAM:  Okay.  And --

1            MS. REID-MOORE:  That's not -- that is
2  not what -- I don't believe that's what she's talking
3  about.
4            Q.  BY MR. DILLINGHAM:  Well, that's what I'm
5  trying to find out.  The document that you generated
6  from scratch --
7            A.  Uh-huh.
8            Q.  -- did you at any time ever make a copy
9  of that, put it on a CD, and then produce it to Renaud
10  Cook in this case?
11            A.  Yes, but it was -- it was for work
12  product.  It was --
13            Q.  Okay.  All right.  Your system, I
14  presume, is like most computer systems, when there's a
15  document on the system, in that sense that if somebody
16  accesses the document, you can identify the date that
17  the document is modified and the identification of the
18  person that does the modification?
19            MS. REID-MOORE:  Form, foundation.

20          THE WITNESS:  I'm assuming so, yes.

21          Q.   BY MR. DILLINGHAM:  Okay.  Did you ever

22   talk to Jami directly to find out when she inputted the

23   data that is contained on the exhibit in front of you,

24   the one that's 3RFP2-00001?

25          A.   There was a discussion sometime, you

1    know, mid last year, toward -- you know, like in the

2    fall, early or late -- late summer, early fall, that --

3    because I had said to her, you know, if you're updating

4    this spreadsheet, you, please, let me know, notify me

5    somehow, either, you know, send me an e-mail, put a

6    note on my computer, something, just so I know that,

7    you know, you had added more information.  Because it

8    was either her or her -- I don't know if it was her

9    assistant or the person that worked with her in her

10   department would actually add this information.  And I

11   had asked them to please notify me if and when they

12   ever updated that spreadsheet.

13          Q.   And what happened after that?  What did

14   she -- did she ever get back to you and let you know?

15          A.   She did.  Occasionally they would let me

16   know that the spreadsheet was updated.

17          Q.   And this was after you first produced the

18   documents that are on green disc that we talked about?

19          A.   Yes, sir.

20          Q.   Did she ever give you any explanation of

21   the extent to which it was updated after the date you

22   produced the document that was on the green disc?
                        Page 66

23          A.   I don't --

24               MS. REID-MOORE:  Object to form.  Go

25     ahead.

1                THE WITNESS:  I don't recall.

2          Q.   BY MR. DILLINGHAM:  Okay.  The document

3     that was on the -- that's in front of you, 3RFP2-00001,

4     that was produced on November the 19th, 2004, because I

5     had you hold up that cover sheet that shows that was

6     the date that it was produced.  Okay?

7          A.   Yes sir.

8          Q.   Now, if I understand your testimony

9     correctly, you think that you first had discovered the

10    existence of that document sometime in the summer of

11    2004?

12         A.   Summer to -- yeah, it was, I would say,

13    you know, late summer, mid July, August something.

14         Q.   Do you know why it took until November

15    before that was produced, provided to us in this case?

16         A.   I --

17               MS. REID-MOORE:  Form, foundation.

18               THE WITNESS:  I truly don't recall, sir.

19    I'm sorry.

20         Q.   BY MR. DILLINGHAM:  Okay.  Can I have

21    that document back for just a second.

22         A.   This one?

23         Q.   Yes, thanks.

24               When you first produced the documents

25    that were on this, the green CD, in May of 2004 --

1          A.   Yes.

2          Q.   -- you attempted to produce all of the

3    individual demo report forms that you were able to

4    locate as of that time; is that correct?

5          A.   Yes, sir.

6          Q.   And your efforts to locate those

7    documents consisted of talking to Mr. Klint initially,

8    talking to Jami Hill, and then talking to Steve Tuttle?

9          A.   Yes, that is correct.

10         Q.   Okay.  Now, sometime after you produced

11   the green disc --

12         A.   Yes.

13         Q.   -- or sometime after defendant produced

14   the green disc, you went back again and tried to find

15   more of these individual demo report forms; is that

16   right?

17              MS. REID-MOORE:  Form.

18              THE WITNESS:  That is correct.

19         Q.   BY MR. DILLINGHAM:  Okay.  And who

20   directed you to do that, if anybody?

21         A.   Nobody.  I just did that on my own to try

22   and find any, you know, anything else that I may have

23   missed.

24         Q.   Okay.  And were you able to find

25   additional of these demo report forms?

1          A.    Yes.  I believe we did find more.

2          Q.    Where?

3          A.    In a warehouse in the back, one of the

4    warehouses.

5          Q.    Okay.  Where was the warehouse located?

6          A.    Well, we had different ones.  We had the

7    accounting warehouse, we had the shipping and receiving

8    warehouse, and then we also had engineering.  And I

9    believe we found some in the accounting warehouse and

10   we also found some in our shipping and receiving.  And

11   then we have, in our production area, it was a loft

12   type area above production, and we found some

13   information up there as well.

14         Q.    Okay.  What I want to do is focus simply

15   on the demo reports.  Okay?

16         A.    Okay.

17         Q.    Did you find some of the demo reports in

18   each of the locations that you just described?

19         A.    Yes.  I would say so.

20         Q.    So there wasn't a centralized location

21   where these demo reports were maintained?

22         A.    No, sir.

23         Q.    Okay.  Were the demo reports organized in

24   any way?

25         A.    No, sir.

1          Q.    Were they maintained in any sort of

2    logical filing system that you could see when you first

3  discovered them?

4          MS. REID-MOORE:  Form.

5          THE WITNESS:  To me, no.

6          Q.   BY MR. DILLINGHAM:  Okay.  Did you ever

7  ask anybody if anybody had ever looked at them before?

8          A.   Yes.  I had asked Jami, you know, what --

9  you know, if she did anything with these.  And the ones

10  that we, you know, we were finding, she said were

11  possibly in the spreadsheet that we've been looking at.

12          Q.   00001?

13          A.   Correct.

14          Q.   Did she -- could she tell you for sure

15  whether they were --

16          A.   No.

17          Q.   -- in that spreadsheet?

18          A.   No, sir.

19          Q.   Okay.  Did she tell you that once -- what

20  she did with the demo reports once she did enter the

21  information into the spreadsheet?

22          A.   Yeah.  There were several things that may

23  have happened or could have happened.

24          Q.   What did she tell you?

25          A.   There were things where they actually

1  sometimes they'd file them.  You know, some of them

2  possibly were thrown away, you know, things of that

3  nature.

4          Q.   And that's what she told you?

5          A.   Yes.

6          Q.   Did she tell you there was any formal

7    procedure in place to make sure that certain people in

8    the company actually saw those demo reports?

9          A.   No.

10         Q.   Did you ever ask Mr. Tuttle whether he'd

11   ever actually seen any of those demo reports?

12         A.   Well, I had actually asked Doug if -- you

13   know, I did ask Doug at one point, you know, if -- to

14   me, these things that, you know, may have been thrown

15   away or whatever, you know, is there a process for

16   shredding, you know, things of that nature.  And he

17   said, you know, no, but that we were trying to get

18   something in place.

19              I had asked Steve if he had ever seen any

20   of the -- the form itself, if there was anything else

21   that he knew of.  The only other things that they knew

22   of, but they weren't necessarily from training, it

23   could have been from, you know, an actual use of the

24   Taser, it was a use-of-force form that looked very

25   familiar or very similar to the demo report, and he

              BARTELT &amp; KENYON (602) 254-4111
     PAM SCHREINER - 5/25/05                          79

1    showed me those.

2          Q.   Okay.  Did Jami ever tell you that there

3    was a procedure set up that before she would input the

4    information in the spreadsheet they would have been

5    routed through Mr. Tuttle so that he could have looked

6    at them?

7          A.   No, sir.

8              MS. REID-MOORE:  Form.

9          Q.    BY MR. DILLINGHAM:  Did she ever tell you

10   that after she entered the information into the

11   spreadsheet that the procedure was that she was to

12   forward them to Mr. Tuttle so he could look at them

13   before they were put some place?

14          A.    No, sir.

15          Q.    Okay.  Has anybody at Taser ever told you

16   that they had such a procedure in place?

17          A.    No, sir.

18          Q.    Okay.  Have you ever seen any documents

19   at Taser since you were there that in written form

20   established a protocol for the routing of these types

21   of documents?

22               MS. REID-MOORE:  Form.  Go ahead.

23               THE WITNESS:  No, sir.

24          Q.    BY MR. DILLINGHAM:  Did you at any time

25   while you were at Taser ever shred any documents?

1          A.    No, sir.

2          Q.    Did you, when you were at Taser, ever

3    produce any documents that -- well, strike that.  Never

4    mind.

5               Did anybody ever explain to you -- strike

6    that.

7               Did anybody ever tell you that there was

8    certain information on certain demo reports that were

9    not being included in the spreadsheet?

10               MS. REID-MOORE:  Form.  Go ahead.

11               THE WITNESS:  No, sir.

 12          Q.   BY MR. DILLINGHAM:   Okay.  You never

 13    personally studied the spreadsheet -- the demo reports

 14    themselves to understand the information on them, did

 15    you?

 16          A.   No.

 17          Q.   Okay.  On the spreadsheet that we were

 18    looking at, the 00001, there is a, at the very top,

 19    there is a number 4,300 and -- what is that 26?

 20          A.   Yes.

 21          Q.   And then it says, "Don't touch."  Do you

 22    see that?

 23          A.   Yes.

 24          Q.   Do you know what that means?

 25               MS. REID-MOORE:   Foundation.

  1               THE WITNESS:  I believe, and I'm only

  2    speculating, I believe it's because there was a formula

  3    in there.  And they didn't want somebody to manually go

  4    in and try and put a number on there creating the

  5    formula to go away.  That's all I can speculate.  I

  6    don't know why it's there.

  7          Q.   BY MR. DILLINGHAM:  Did you ever ask

  8    Jami Hill why it's there?

  9          A.   No.

 10          Q.   The software program that this database

 11    is maintained on is what?

 12          A.   Excel.

 13          Q.   Okay.  Is there a -- and you'd dealt with

 14    Excel before you went to Taser, right?

 15          A.   Yes.

 16          Q.   And you understand that when you deal

 17   with Excel if you modify the document, you can actually

 18   figure out, going into the properties portion of the

 19   information in the computer, the date that someone last

 20   modified a document?

 21          A.   Yes.

 22               MS. REID-MOORE:  Foundation.

 23          Q.   BY MR. DILLINGHAM:  Okay.  And you know

 24   that that's also available at Taser where you can do

 25   that if you wanted, right?


               BARTELT &amp; KENYON (602) 254-4111
     PAM SCHREINER - 5/25/05                          82


  1               MS. REID-MOORE:  Foundation.

  2               THE WITNESS:  Yes.

  3          Q.   BY MR. DILLINGHAM:  Did anybody at Taser

  4   ever tell you that this document that you were just

  5   looking at, 3RFP2-000001, identified all officers that

  6   received hits that allegedly were injured during

  7   training?  Did they tell you that that was the purpose

  8   for maintaining this document?

  9               MS. REID-MOORE:  Form.

 10               THE WITNESS:  It was told to me that

 11   that would -- the spreadsheet was so that they could

 12   gather information on the training as to, you know, if

 13   someone was injured or something of that nature.

 14          Q.   BY MR. DILLINGHAM:  Okay.  When you put

 15   together the spreadsheet that you were asked to put

 16   together --

 17          A.   Yes.

18        Q.    -- did you include in the spreadsheet

19   that you put together information in the file you had

20   on officers who had reported injuries by letter format?

21                MS. REID-MOORE:  Object to form.  I'm

22   going to instruct her not to answer.

23                MR. DILLINGHAM:  No.

24                MS. REID-MOORE:  You're getting into the

25   content of the spreadsheet itself.

 1                MR. DILLINGHAM:  No.  I'm entitled to

 2   find out whether this spreadsheet includes all of the

 3   officer reported injuries.

 4                MS. REID-MOORE:  This one.

 5                MR. DILLINGHAM:  Yeah, but I'm also

 6   entitled to ask her to find out what the policy at

 7   Taser was in keeping this documentation.  I'm not going

 8   to ask you for the document, Tina.

 9                MS. REID-MOORE:  Yeah, well, but that

10   documentation was made for purposes of this lawsuit,

11   not for fitting in with a policy that you want to try

12   to inquire about.  We're talking about two different

13   things here.

14                MR. DILLINGHAM:  Well, let me start --

15                MS. REID-MOORE:  We truly are.

16                MR. DILLINGHAM:  Let me start the other

17   way.

18        Q.   BY MR. DILLINGHAM:  You know, from

19   looking at this spreadsheet, that this doesn't include

20   the information that you had in your file of officers

21  who reportedly sustained injuries?

22              MS. REID-MOORE:  Form, foundation.

23              THE WITNESS:  That is possibly correct,

24  yes.

25              Q.   BY MR. DILLINGHAM:  All right.  As a

1   matter of fact, when you talked to Jami about this

2   spreadsheet, you discussed with her the fact that those

3   types of reported injuries aren't contained in this

4   spreadsheet, right?

5              MS. REID-MOORE:  Form.

6              THE WITNESS:  I believe so, if I -- if I

7   understand the question correctly.

8              Q.   BY MR. DILLINGHAM:  Right.  In other

9   words, if you got a letter from an officer or from an

10  attorney for an officer that says they were injured as

11  a result of a Taser exposure in a training incident, it

12  doesn't get incorporated into this spreadsheet,

13  3RFP2-000001?

14             A.   That is correct.

15             Q.   And you learned that from Jami Hill,

16  right?

17             A.   Yes, sir.

18             Q.   You also learned it from Steve Tuttle?

19             A.   And at one point, Rick Guilbault actually

20  came on board with Taser, he is -- I don't know what

21  his title is now, but he was something in training,

22  so --

23             Q.   Okay.

24        A.   But he was brand new, so I didn't really

25   go to him too much.

 1        Q.   Okay.  At any point in time when you were

 2   there, did you ever gather the information that was in

 3   either the single file that you had or the complaints

 4   of -- the formal complaints of injuries --

 5        A.   Uh-huh.

 6        Q.   -- and provide that to HECOE, the

 7   Human Effects Center of Excellence, as far as you know?

 8             MS. REID-MOORE:  Her personally?

 9             MR. DILLINGHAM:  Well, I'm going to get

10   there.

11        Q.   BY MR. DILLINGHAM:  Did anybody ever

12   tell you to gather information in that file on officer

13   reported injuries or the separate files where

14   complaints had been filed and tell you you needed to

15   gather that information so they could deliver it to the

16   Human Effects Center of Excellence for that

17   investigation?

18             MS. REID-MOORE:  Form, foundation.

19             THE WITNESS:  Not that I recall.  I

20   mean, I don't -- I didn't even know that there was

21   anything, no.

22        Q.   BY MR. DILLINGHAM:  Okay.  All right.

23   You at one point, from time to time, did gather copies

24   of these types of spreadsheets that we're looking at,

25   3RFP2-000001, and give them to somebody at Taser that

 1   you understood was going to be sending them to HECOE,

 2   though, right?

 3                    MS. REID-MOORE:  Form.

 4                    THE WITNESS:  I honestly don't know.

 5   You know, there were times where people would ask me to

 6   give them information, and I didn't know what they were

 7   doing with it.

 8            Q.   BY MR. DILLINGHAM:  I gotcha.  Okay.

 9                 I'm going to take a five-minute break and

10   we'll be back, and I don't think you have too much

11   more.

12                    THE WITNESS:  Okay.

13                    MR. DILLINGHAM:  Thank you.

14                    THE VIDEOGRAPHER:  Off the record at

15   10:28.

16                    (WHEREUPON, a break was taken.)

17                    THE VIDEOGRAPHER:  On the record at

18   10:34.

19            Q.   BY MR. DILLINGHAM:  Okay.

20            A.   Okay.

21            Q.   I'm going to have the court reporter hand

22   you an exhibit which is going to be marked as Exhibit 1

23   to your deposition, and I want you to take a look at

24   it.

25            A.   Okay.

 1                    (Deposition Exhibit No. 1 marked
                              Page 78

2    for identification.)

3            Q.   BY MR. DILLINGHAM:  And Exhibit 1 --

4    Exhibit 1 is a letter dated December 5th, 2003, which

5    is a demand letter that was forwarded in this case.

6            And can you tell me, Pam, whether or not

7    you recall putting this document in the Powers file?

8            MS. REID-MOORE:  Object to form.

9            THE WITNESS:  I can honestly tell you I

10   know I did not put this in there.

11           Q.   BY MR. DILLINGHAM:  Okay.  Have you ever

12   seen that document before?

13           A.   No, sir.

14           Q.   Okay.  When you went back and started

15   putting -- creating your own spreadsheet, you had to

16   gather the various demo report forms that you were able

17   to find to begin that process; is that right?

18           A.   Yes, sir.

19           Q.   Okay.  When you found those additional

20   demo report forms that you've talked about a few

21   minutes ago, did you then generate that second CD that

22   I had you hold up and send it to Renaud Cook for

23   distribution to us?

24           MS. REID-MOORE:  Object to form.

25           THE WITNESS:  Yes.

1            Q.   BY MR. DILLINGHAM:  All right.  Why did

2    you start from scratch as opposed to simply add to or

3    supplement the document that you had received from

4    Jami Hill on the -- that you found out about on the
                    Page 79

5    P drive?

6              MS. REID-MOORE:  Object to form,

7    foundation.  I'm going to have to ask her -- instruct

8    her not to answer.

9              MR. DILLINGHAM:  You know, Christina, I'm

10   going to call Chris because --

11             MS. REID-MOORE:  No, that's fine.  I

12   mean --

13             MR. DILLINGHAM:  Well, let me finish.

14   Let me just give you --

15             MS. REID-MOORE:  I mean --

16             MR. DILLINGHAM:  Doug Klint specifically

17   waived the privilege.  He discussed with her what he

18   asked her to do and told her exactly what to do.  It's

19   in his deposition.  He specifically --

20             MS. REID-MOORE:  There are no specifics

21   on that attorney work product document, I can tell you

22   that, in his deposition.  There are no specifics on

23   what's contained in there --

24             MR. DILLINGHAM:  No, I didn't ask her

25   what was contained.

1              MS. REID-MOORE:  -- and what she was

2    asked to put in there and how to create it.

3              MR. DILLINGHAM:  No.  He testified what

4    he told her to do with creating that document.  I'll

5    give you the page and line.

6              MS. REID-MOORE:  Well, you'll have to --

7    go ahead and call Chris.  I'm not going to open this

8    up.
9           MR. DILLINGHAM:  Okay.  You may have to
10   be here a little longer than we thought.
11          THE VIDEOGRAPHER:  Do you want to go
12   off, John?
13          MR. DILLINGHAM:  No.  We can stay on.
14          Tom, why don't you find that in his --
15   and we'll continue.  I don't want to make her stay here
16   unnecessarily, but --
17          (WHEREUPON, a discussion was held off the
18   record.)
19          Q.   BY MR. DILLINGHAM:  When you left
20   Taser --
21          A.   Yes.
22          Q.   -- did you take your file cabinet with
23   you?
24          A.   No.
25          Q.   Why did you leave it?


        BARTELT &amp; KENYON (602) 254-4111
     PAM SCHREINER - 5/25/05                         90


1           A.   I was not allowed to go back and get
2    anything.
3           Q.   So they kept your own personal file
4    cabinet?
5           A.   Yes.
6           Q.   Did you ever ask them to return it?
7           A.   No.
8           Q.   So the files that you maintained on these
9    complaints that you talked about and the single file
10   where other reports of injury came in were in the exact

11    same location when you left as during the time when you
12    were maintaining them?
13         MS. REID-MOORE:  Form.
14         THE WITNESS:  Yes, sir.
15         MR. DILLINGHAM:  Christina, just for the
16    record, on Page 99 of Doug Klint's deposition, I asked
17    him this question referring to Pam.  I said, "what you
18    did was you told her to take those forms that you found
19    and then bring the database current?"
20         That is a -- and his answer was
21    "Correct."  There wasn't even an objection on
22    attorney-client privilege, and that's all I'm asking
23    her about, is whether the database was -- why she
24    didn't maintain the -- bring it current as -- why she
25    just didn't bring it current as opposed to start over.

1          He said he told her to bring it current.
2     She said she started over.  All I'm trying to find out
3     is why she didn't just bring it current as opposed to
4     start over.  That's exactly the question I asked him.
5          MS. REID-MOORE:  Is that all you're going
6     to ask her?
7          MR. DILLINGHAM:  That's all I'm going to
8     ask.
9          MS. REID-MOORE:  Okay.
10         Q.   BY MR. DILLINGHAM:  All right.  Why did
11    you start over with the database as opposed to simply
12    bring the database that you got on the P drive from
13    Jami Hill current?
                    Page 82

14        A.    I -- truly when we found additional forms

15   or, you know, the demo reports, honestly Jami and I,

16   neither one of us knew if it had already been added to

17   the spreadsheet.  So it was a matter of not knowing if

18   it had already been added.

19        Q.    I gotcha.  So when you went back and

20   talked to Jami, she wasn't able to tell you whether all

21   of the human demo report individual forms that you

22   found had ever been included on the database that she

23   sent you on the P drive that we talked about,

24   RFP-00001, and so in order to make sure you got

25   everything, you just started from scratch, right?

1              MS. REID-MOORE:  Form.

2              THE WITNESS:  That is correct.

3         Q.   BY MR. DILLINGHAM:  All right.  So as

4    far as you knew, they didn't even have a process for

5    making -- for checking off or identifying the

6    individual demo reports once those were entered into

7    the system?

8              MS. REID-MOORE:  Form and foundation.

9              THE WITNESS:  That is correct.

10        Q.   BY MR. DILLINGHAM:  I assume you created

11   such a protocol when you created yours?

12             MS. REID-MOORE:  Form.

13             THE WITNESS:  That is true.

14        Q.   BY MR. DILLINGHAM:  All right.  Did

15   anybody ever give you any indication how many of these

16   demo reports had been thrown out that you talked about

17    earlier?

18              MS. REID-MOORE:  Form.

19              THE WITNESS:  No, sir.

20         Q.   BY MR. DILLINGHAM:  Did anybody ever tell

21    you why they were thrown out?

22         A.   I was just told that they didn't need

23    them.

24         Q.   Okay.

25         A.   That the information had been entered

1    into this, so --

2         Q.   Okay.

3              MS. REID-MOORE:  I'm sorry, "this"

4    being?

5              THE WITNESS:  I'm sorry, into -- I'm

6    sorry, into the spreadsheet RF -- I don't have the

7    number here.

8              MS. REID-MOORE:  The 3RPF2-000001?

9              THE WITNESS:  Yes.

10              MS. REID-MOORE:  The five zeros.

11              THE WITNESS:  I'm sorry, I don't have

12    the number.

13         Q.   BY MR. DILLINGHAM:  So the 3RFP2-00001,

14    you don't even know if all the demo reports that you

15    later sent to us are reflected in that 3RFP2-00001

16    spreadsheet, right?

17              MS. REID-MOORE:  Foundation.

18              THE WITNESS:  That is correct.

19         Q.   BY MR. DILLINGHAM:  And you don't even

20    know if some of the demo reports that are identified

21    and summarized in that spreadsheet even exist?

22              MS. REID-MOORE:  Form, foundation.

23         Q.   BY MR. DILLINGHAM:  Correct?

24         A.   That is correct.

25         Q.   At any point in time before you left,

1     were you ever asked to gather any information that

2     Taser had concerning officers' reports of injury other

3     than what we've talked about in terms of the demo

4     reports or the human volunteer data spreadsheets?

5          A.   Not to my knowledge.  I don't believe

6     so.

7          Q.   Okay.  These -- this file that you

8     maintained, the single file, where you had reports of

9     injury that were not formal complaints, was that

10    maintained in the same file drawer as the other files

11    on the individual files that were maintained when

12    complaints were filed?

13         A.   Yes, sir.

14         Q.   So if somebody that understood how you

15    maintained your files went to your file cabinet and

16    opened up that drawer, they would be able to get not

17    only the individual files of the complaints, but also

18    that file that had the various letters and documents on

19    injuries that hadn't resulted in a formal complaint

20    being filed?

21              MS. REID-MOORE:  Form, foundation.

22              THE WITNESS:  That is correct.

23          Q.    BY MR. DILLINGHAM:  While you were at
24   Taser, did you ever hear anybody from Taser claim that
25   no officer has ever sustained a significant injury

1    during training?
2                    MS. REID-MOORE:  Form.
3                    THE WITNESS:  I, honestly, I don't know.
4    I mean, there was always discussions about different
5    topics.  So to single out something said, I can't
6    honestly answer that.
7          Q.    BY MR. DILLINGHAM:  Okay.  Did you ever
8    hear them discuss the Powers case, anybody?
9          A.    Not really.  I mean, Doug would -- you
10   know, I would talk to Doug about things if I needed to
11   get together information or something.
12         Q.    Okay.  Were you ever asked to do anything
13   by anybody at Taser that you felt wasn't honest or on
14   the up-and-up?
15                   MS. REID-MOORE:  Object to form.
16                   THE WITNESS:  Not really.  I mean, I had
17   my own opinions of things.
18         Q.    BY MR. DILLINGHAM:  What do you mean you
19   had your own opinions of things?
20         A.    Well, I just -- I -- I felt that there
21   were things that should have been done differently.
22         Q.    Like what?
23         A.    You know, from working in a law firm, I
24   just felt that there needed to be more -- a larger
25   sense of urgency or confidentiality or things of that
                         Page 86

1    nature.

2              Q.    Okay.  And did you express that to

3    anybody while you were there?

4              A.    Yes, on many occasions.

5              Q.    Who?  Who did you express it to?

6              A.    Doug Klint, Rick, the upper -- the upper

7    powers.

8              Q.    And what type of response did you get?

9              A.    There was really never any actual

10   response.  I -- you know, they would listen -- well,

11   Doug would listen more than Rick, but Doug would listen

12   and I would just -- you know, we would talk about it

13   later or, you know, something along that line.

14             Q.    Do you feel like your comments were

15   falling on deaf ears?

16                   MS. REID-MOORE:  Form.

17                   THE WITNESS:  I would say yes.

18             Q.    BY MR. DILLINGHAM:  And while you were

19   there, did they ever change their protocol of keeping

20   track of information as it was coming in?

21                   MS. REID-MOORE:  Form.

22                   THE WITNESS:  As far as -- are we talking

23   of the 00001 or just in general?

24             Q.    BY MR. DILLINGHAM:  Just in general.

25                   MS. REID-MOORE:  And what was -- I'm

1   sorry, what was the question?

2         Q.  BY MR. DILLINGHAM:  Did their policy or

3   procedures change at all with respect to how they dealt

4   with incoming communications or documents?

5         MS. REID-MOORE:  Form, foundation.

6         THE WITNESS:  There were some things that

7   were changing.  As, you know, as far as if someone

8   called in, you know, who they might want to talk to,

9   you know, things of that nature.  Towards the end of

10   the year, they brought somebody in to handle

11   documentation in the production area as far as how

12   training would be handled, you know, how the work bees

13   would be trained or things of that nature.

14         They also, towards the end of the year

15   last year, all of a sudden, they were concerned

16   about dumpster diving and brought in these big huge

17   containers that were locked so that people could put

18   documents in it to be shred at some point.

19         Q.  BY MR. DILLINGHAM:  And that began

20   towards the end of 2004?

21         A.  Yes, sir.

22         Q.  Okay.  But in terms of maintaining a

23   procedure for date stamping incoming mail, routing it

24   to certain people, did that ever change?

25         A.  No, sir.

1         MS. REID-MOORE:  Foundation.

2         Q.  BY MR. DILLINGHAM:  Did you have the

3    responsibility for maintaining Rick Smith's calendar?

4            A.   Yes, sir.

5            Q.   So, for example, if he was scheduled to

6    give a deposition in a particular case, it would be

7    your responsibility to calendar it and make sure he was

8    aware about it?

9            A.   Yes, sir.

10           Q.   Are you aware of any other cases that

11   Mr. Smith has been deposed in, other than this case,

12   relating to an injury sustained by an officer in

13   training?

14           A.   I do recall him being deposed.  whether

15   or not it was an injury, honestly I don't know that.  I

16   just know that it was a case that I think may have

17   started before I started.  I don't recall.

18           Q.   Do you remember the name of the case?

19           A.   I believe the last name, and, again, I'm

20   just speculating, I think it was Torres, T-O-R-R-E-S, I

21   believe.

22           Q.   Okay.

23           A.   It was in California.

24           Q.   Okay.  Did anybody at Taser ever discuss

25   with you how many stock options they had and how much

1    money they'd made since they've been associated with

2    this business?

3            A.   They never actually discussed how much

4    money they made, but they would, you know, share with

5    me things that they were doing in their, you know,

6    personal life that was in, you know, regards to what

7    they did stock-wise.

8              Q.    And who were some of the people that

9    shared that with you?

10             A.    Well, Jami Hill, and then there were

11   several that would be very open about it within the

12   company, that you could hear them talking about their

13   new cars or house or, you know, whatever.

14             Q.    What did Jami Hill talk with you about?

15             A.    That she, you know, that because she's so

16   young, because I believe she's early 20's, that, you

17   know, since she had been working at Taser that she did

18   very well for herself and that she -- because she was

19   building, or she had bought a condo and that she was

20   remodeling it and because of the money that she had

21   made with Taser.

22             Q.    Okay.  Did she talk about the stock

23   options that she had at all?

24             A.    No.  We really never got into that.

25             Q.    Okay.

1              A.    But, you know, everybody -- you know, I

2    mean, everybody would talk about it.  You know, all the

3    people that were there that had been there for a while

4    had always, you know, they'd pull up in their brand new

5    Hummers or, you know, whatever.

6                    And that -- but that was good.  I mean, I

7    praised them.  I thought, you know, that was great.

8    You know, if you can -- if the company is doing that

9    well, then I think that's a great thing.

10           Q.   Okay.  Have you ever spent any time to

11   really take a look at what this weapon does, how it

12   works, anything like that?

13                MS. REID-MOORE:  Form.

14                THE WITNESS:  No, sir.

15           Q.   BY MR. DILLINGHAM:  Have you ever spent

16   any time analyzing how frequently officers report

17   injuries during training or anything like that?

18           A.   No, sir.

19           Q.   At any point in time while you were

20   there, were you ever asked to gather any information on

21   any animal testing that Taser had conducted?

22           A.   I don't recall.  I mean, I may have been,

23   you know, asked to pull together any kind of studies

24   which would have -- that would have fallen into that

25   realm, but I don't recall just specifically on an

1    animal, no.

2            Q.   Did you ever at any time while you were

3    at Taser go to Max Nerheim and ask Mr. Nerheim whether

4    he had any contemporaneous field testing data regarding

5    any animal studies conducted by Taser?

6            A.   I don't recall.  I went to Max and asked

7    him if, you know, I had an e-mail or something from

8    somebody, because I honestly don't know the terminology

9    or the lingo.  And I had showed it to him and asked him

10   if he knew of this study or something along that line.

11           Q.   And how did he respond?

12          A.   He actually -- he didn't -- he really

13   didn't respond to me.  He just was -- had said that he

14   would get me a copy of whatever it was that I was

15   looking for.

16          Q.   From time to time, did Mr. Klint

17   actually hand you a copy of our request for production

18   of documents and tell you to gather those specific

19   documents that were requested?

20          A.   Yes, at times he would do that.

21          MR. DILLINGHAM:  Okay.  I'm going to

22   have to take a break.  We're going to have to go off

23   the record for a second.

24          THE VIDEOGRAPHER:  Off the record at

25   10:51.

1          (WHEREUPON, a break was taken.)

2          (Deposition Exhibit No. 2 marked

3   for identification.)

4          THE VIDEOGRAPHER:  On the record at

5   10:56.

6          Q.   BY MR. DILLINGHAM:  Okay.  Pam, I've just

7   handed you what's been marked for your deposition as

8   Exhibit Number 2, which is Plaintiff's Third Request

9   for Production of Documents in this case.

10          A.   Yes, sir.

11          Q.   Just take a couple of minutes and just

12   skim through it.  And I'm going to just ask you whether

13   or not this document looks familiar to you.

14          A.   Yes, sir.

15          Q.   Okay.  Was this one of the documents that

16   you had been given at some point by Doug Klint and

17   asked to go gather the documents that had been

18   requested on?

19          A.   Yes, sir.

20          Q.   Okay.  Would you take a look at

21   Exhibit -- at Paragraph 6 on Page 4.  And I'm going to

22   read it out loud and just tell me if I'm reading it

23   accurately.

24               "Copies of all documents evidencing the

25   testing, including test protocol, test parameters, and

1    test results, relating to the anesthetized pig test,

2    dog tests, and pig tests designed by Mr. (sic) McDaniel

3    and Dr. Leslie Geddes, as testified to by Rick Smith in

4    his September 29th, 2004 deposition."

5          A.   Yes, sir.

6          Q.   Did I read that accurate?

7          A.   Yes, sir.

8          Q.   Okay.  Did you in fact try to gather

9    those documents?

10         A.   Yes, I did.

11         Q.   And who did you go to to get those

12   documents?

13         A.   I went to Steve Tuttle and Mark Johnson.

14         Q.   Okay.  And did you produce to

15   Renaud Cook all the documents you got from them?

16         A.   Yes, anything that I was able to locate.

17         Q.   Did they ever tell you that you needed to

18    go to Rick Smith or to Max Nerheim in order to get

19    other documents that may fall within the scope of that

20    request?

21          A.   Someone, and I, honestly, I don't recall

22    what it was about, but someone had mentioned to me to

23    go to Max for something, but, again, I don't recall

24    what it was actually pertaining to.

25                And, also, I was -- someone had asked

1     me to go to Rick regarding, I think it was the

2     Leslie Geddes, I believe that's how you pronounce it,

3     for something that he may have had.

4           Q.   Okay.

5           A.   And that would be it, but --

6           Q.   And did you in fact gather all the

7     documents that they had given you and then produce them

8     to Renaud Cook for production in this case?

9           A.   Anything that I was able to obtain, yes.

10          Q.   Okay.  You didn't withhold anything or

11    nobody told you inside Taser not to produce anything?

12          A.   Not to my recollection.

13          Q.   But you don't -- you certainly don't know

14    whether they gave you everything they had that fell

15    within that category, do you?

16                MS. REID-MOORE:  Form, foundation.  Go

17    ahead.

18                THE WITNESS:  That I can honestly say I

19    don't know.  I mean, I asked for it.  And, you know,

20    whatever I was given or was able to obtain is what I

Page 94

21    gave.

22                 (WHEREUPON, a discussion was held off the

23    record.)

24          Q.   BY MR. DILLINGHAM:   Okay.  Does the name

25    Burt Robinson sound familiar?  Was that the Chandler

1    officer that talked to you before your termination?

2          A.   I don't know what his last name was.

3          Q.   Okay.

4          A.   I just know his name was Burt.

5          Q.   Were they making any notes during any

6    period of time that you were talking to them?

7          A.   Yes.

8          Q.   Did they ever tell you you had the right

9    to have counsel present during any of that?

10         A.   No.

11         Q.   Were you physically escorted off the

12    property?

13         A.   I was -- as for these investigations,

14    yes.  I was -- I was asked to leave with someone.

15         Q.   I just want to make sure I've covered

16    everything that you understood was their bone of

17    contention with you.  And the one thing was opening up

18    the letter from the Securities and Exchange Commission.

19         A.   Yes.

20         Q.   And the other had to do with sending a

21    wrong order form in or something.

22         A.   There was something -- they kept asking

23    me questions about some purchase order that came from

24    somebody at the end of the year that was received by

25    fax or something.  I honestly don't know because I


            BARTELT &amp; KENYON (602) 254-4111

 1    didn't do anything with purchase orders, so --

 2           Q.   Was there anything about your

 3    relationship with anybody at Taser that you believed in

 4    any way contributed to this dismissal?

 5                MS. REID-MOORE:  Form.

 6                THE WITNESS:  I don't understand.  I --

 7           Q.   BY MR. DILLINGHAM:  In other words, was

 8    there anything going on, that, you know, you weren't

 9    getting along with anybody at Taser for some reason or

10    another that precipitated this?

11           A.   I thought I was getting along with

12    everybody very well.  I -- you know.

13                MR. DILLINGHAM:  Okay.  That's all I

14    have.

15                MS. REID-MOORE:  I just have a few

16    questions and I truly do have a few.

17                          EXAMINATION

18    BY MS. REID-MOORE:

19           Q.   Early when you talked about the filing of

20    complaints for suits that were filed, do you know if

21    those complaints were ones that were actually served on

22    Taser?

23           A.   I can only -- I can only speculate that I

24    thought that they were served.  I never accepted

25    service on them.


                          Page 96

1          Q.   The file cabinet that you say you kept in

2     your area -- because I don't believe you had an office

3     there.

4          A.   Right.

5          Q.   The file cabinet that you said that you

6     kept in your area you said that there was information

7     in there relating to Rick Smith and Phil Smith,

8     correct?

9          A.   Yes.

10         Q.   Did Rick Smith and Phil Smith also have

11    access to that file cabinet while you were there if

12    they wanted to have access to it?

13         A.   Yes.

14         Q.   You were also asked earlier whether or

15    not Jami Hill ever told you that after she entered the

16    human volunteer demo reports whether she gave them to

17    Steve Tuttle to look at.

18              Let me ask you this.  Do you have any

19    knowledge either way whether Steve Tuttle reviewed

20    human volunteer demo reports before you worked at

21    Taser?

22         A.   No, no.

23         Q.   When you first provided Renaud Cook

24    Drury with information in this case relating to

25    requests for production, was that information provided

1     to us, the first production of it, in a hard copy?  Do

 2   you recall?

 3        A.   Yes.

 4             MS. REID-MOORE:  Those are all the

 5   questions I have.

 6             MR. DILLINGHAM:  Couple of questions and

 7   then I'm done.

 8                  FURTHER EXAMINATION

 9   BY MR. DILLINGHAM:

10        Q.   Any of the demo reports that you ever

11   reviewed that you ever entered into the spreadsheet

12   that you entered in -- I'm talking about the demo

13   reports themselves.

14        A.   Okay.

15        Q.   Did you bother to take notice of whether

16   or not any of those demo reports identified injuries or

17   the nature of the injuries or anything like that?

18        A.   I'm not following you.  Did you -- do you

19   mean --

20        Q.   Did you pay attention to whether or not

21   the information on the demo report themself identified

22   a report of an injury, or did you just input the data

23   without really paying attention to that detail?

24        A.   I just input the information off of the

25   form.  I really didn't pay too much attention to, you

 1   know, what the specifics were.  I just went -- you

 2   know, if it said "yes," I put "yes" on the spreadsheet.

 3        Q.   Okay.  And there were some that did and

 4   some that didn't?

    5          A.   Yes.

    6          Q.   Can you give me any idea, in terms of

    7   percentage of total forms that you reviewed, that had

    8   "yes" for injuries as opposed to "no?"

    9          A.   Ah.

   10          Q.   Just an approximate.

   11               MS. REID-MOORE:  Form.  Go ahead.

   12               THE WITNESS:  I don't know.  It's hard

   13   to say because, you know, there were -- there were, you

   14   know, a handful of everything.  I wouldn't even want to

   15   speculate because that would be just an unfair

   16   statement because I truly don't recall.

   17          Q.   BY MR. DILLINGHAM:  Okay.  But you do

   18   know there were some of the demo reports that you

   19   looked at that had the injury box circled "yes"?

   20          A.   Yes.

   21          Q.   When you look at the one we were talking

   22   about earlier, 3RFP2-00001, you see in the percent

   23   injuries from Taser 0.00 percent in that line item,

   24   right?

   25          A.   Yes.


            BARTELT &amp; KENYON (602) 254-4111
      PAM SCHREINER - 5/25/05                          110


    1          Q.   That certainly wasn't your knowledge

    2   based upon your review of the demo reports you saw,

    3   correct?

    4               MS. REID-MOORE:  Form.

    5               THE WITNESS:  That would be correct.

    6               MR. DILLINGHAM:  That's all I have.

    7   Thank you very much.

8                    FURTHER EXAMINATION

9   BY MS. REID-MOORE:

10          Q.   I do have a follow-up -- it's not a

11  follow-up.  It's actually separate, but with respect to

12  the -- I may need you to pull out the CD because it

13  wasn't an exhibit, the one that has all of the RFP's

14  listed with each -- the VD reports.

15                  MR. WILMER:  The white one.

16                  MS. REID-MOORE:  Yeah, the white one.

17          Q.   BY MS. REID-MOORE:  Okay.  Earlier you

18  were shown a CD, it's not marked as an exhibit, but on

19  it is says Taser field reports, and on there it says no

20  dates and then it shows the years 2000 through 2004.

21  Do you recall being shown that earlier today in your

22  deposition?

23          A.   Yes.

24          Q.   Okay.  Now, with respect to this CD, and

25  all the information that is contained on it, I believe

1   you testified that you provided Renaud Cook with CD's?

2          A.   Yes.

3          Q.   Did you provide Renaud Cook with more

4   than one CD with this information on it regarding

5   field -- actually Taser demo reports?

6          A.   Yes.

7          Q.   Okay.  Well, the reason being, this CD

8   right here, the single one, is this one you created?

9          A.   No.

10          Q.   Okay.

11          A.   I did not create that one.

12               FURTHER EXAMINATION

13  BY MR. DILLINGHAM:

14          Q.   Okay.  So that we're clear, the white CD,

15  and hold it up again for the camera, the white CD that

16  says Field -- Taser Field Reports, no dates and then

17  calendar years, you didn't put that information on the

18  label, right?

19          A.   No.

20          Q.   Somebody else did that?

21          A.   Yes.

22          Q.   Your CD that you forwarded to Renaud Cook

23  has a different form?

24          A.   Yes.

25          Q.   And a different label?

 1          A.   Yes.  So I apologize if I misspoke

 2  before.  I --

 3          Q.   No, no, you didn't misspeak at all.  We

 4  were just -- we just need to get this squared away.

 5          A.   Okay.

 6               MR. DILLINGHAM:  Okay.  That's all I

 7  have.

 8               MS. REID-MOORE:  Sorry, one more.

 9               FURTHER EXAMINATION

10  BY MS. REID-MOORE:

11          Q.   The separate CD's that you provided to

12  Renaud Cook which relate to the human volunteer demo

13  reports for 2000 through 2004, do you know when those

14     were provided to Renaud Cook?

15              A.    I don't recall when.

16              Q.    Okay.

17              A.    I don't -- I don't recall.

18                    MS. REID-MOORE:  That's all I have.

19                    MR. DILLINGHAM:  That's all I have.

20     Thank you very much.  You're done.

21                    THE WITNESS:  Wow.

22                    THE VIDEOGRAPHER:  This concludes the

23     deposition of Pam Schreiner.  We are off the record at

24     11:08.

25                    (WHEREUPON, a discussion was held off the

1      record.)

2                     THE VIDEOGRAPHER:  On the record at

3      11:09.

4                     MR. DILLINGHAM:  You have the right to

5      read and sign this deposition if you want to make sure

6      that everything was transcribed accurately and

7      correctly.  You can waive that right, or the court

8      reporter will send you a deposition to read and sign.

9                     Now, one of the problems we do have is

10     that we have a trial date of June 28th right now.  So

11     if you want to read and sign, we'll try to get it to

12     you as soon as possible, but we would request that if

13     you do do that and you do make any changes, that you

14     get it back to us before June 28th.  Okay?

15                    THE WITNESS:  I understand.

16                    MR. DILLINGHAM:  All right.

17                    THE WITNESS:  And that's fine.  I -- if
18     I -- if you need it -- whatever I need to do.  I don't
19     care.
20                    MR. DILLINGHAM:  Do you want to read and
21     sign or are you willing to waive it?
22                    THE WITNESS:  I'm willing to waive it.
23                    MR. DILLINGHAM:  Okay.  Thank you.
24                    THE VIDEOGRAPHER:  Off the record at
25     11:10.


                BARTELT &amp; KENYON (602) 254-4111
        PAM SCHREINER - 5/25/05                              114


 1                    (WHEREUPON, the deposition was concluded
 2     at 11:10 a.m.)
 3
 4                             (Signature waived.)
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19

20

21

22

23

24

25

1    STATE OF ARIZONA        )
                            )  ss.
2    COUNTY OF MARICOPA      )

3

4              BE IT KNOWN that the foregoing deposition

5    was taken by me, SHELLEY HAVERMANN, a Certified Court

6    Reporter, in the State of Arizona; that the witness

7    before testifying was duly sworn to testify to the

8    whole truth; that the questions propounded to the

9    witness and the answers of the witness thereto were

10   taken down by me in shorthand under my direction; that

11   the witness waived reading and signing said deposition;

12   that the foregoing pages are a true and correct

13   transcript of all proceedings had upon the taking of

14   said deposition, all done to the best of my skill and

15   ability.

16              I FURTHER CERTIFY that I am in no way

17   related to any of the parties hereto, nor am I in any

18   way interested in the outcome hereof.

19              DATED at Phoenix, Arizona, this 1st day of

20   June, 2005.

21

22

23

24

25

SHELLEY HAVERMANN
Certification #50432

BARTELT &amp; KENYON (602) 254-4111
</PRE></BODY></HTML>