# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ROME DIVISION

FILED IN CLERK'S OFFICE
U.S.D.C. Rome

SEP 2 5 2007

JAMES N. HATTEN, Clerk
By: ＿＿＿＿＿ Deputy Clerk

David R. Wilson and
Charlene Wilson,

      Plaintiffs,

v.

                          CIVIL ACTION FILE
                          NO. 4:06-CV-0179-HLM

TASER International, Inc.,

      Defendant.

## ORDER

This case is before the Court on Defendant's Motion for

Summary Judgment [37], on Defendant's Motion to Strike

Affidavit of Pam Schreiner [61], and on Defendant's Motion

to Stay Ruling on Motion for Summary Judgment [62].[1]

---

[1]Defendant has requested that the Court stay any ruling on the pending Motion for Summary Judgment to allow Defendant an opportunity to depose Pam Schreiner and Tom Wilmer. Defendant complains that Plaintiffs never disclosed Ms. Schreiner or Mr. Wilmer as witnesses during the discovery period, and argues that it should receive an opportunity to depose those witnesses prior to the Court entering a ruling on the Motion for Summary Judgment.

## I.  Issues Concerning Admissibility of Evidence

Defendant has raised several issues as to the admissibility of certain evidence presented by Plaintiffs in opposition to Defendant's Motion for Summary Judgment. The Court addresses those issues before discussing the merits of Defendant's Motion for Summary Judgment.

---

The Court has not considered either Ms. Schreiner's affidavit or Mr. Wilmer's affidavit in connection with the Motion for Summary Judgment. Consequently, no need exists for the Court to stay its ruling on the Motion for Summary Judgment to allow Defendant to depose those individuals and to allow the Court to receive the transcripts from those depositions.

Certainly, if Plaintiffs plan to introduce testimony from Ms. Schreiner or Mr. Wilmer at trial, Defendant would be entitled to depose those witnesses. The Court directs Plaintiffs to notify Defendant and the Court within fifteen days as to whether Plaintiffs plan to present testimony from Ms. Schreiner and Mr. Wilmer at trial. Defendant may depose Ms. Schreiner and Mr. Wilmer within thirty days after Plaintiffs notify Defendant and the Court that Plaintiffs intend to present testimony from those witnesses.

2

## A.  Motion to Strike Affidavit of Pam Schreiner

Defendant has moved to strike the Affidavit of Pam Schreiner, which Plaintiffs submitted in response to Defendant's Motion for Summary Judgment. Defendant argues that Ms. Schreiner's affidavit is a sham affidavit because it contradicts deposition testimony that Ms. Schreiner gave in a previous case, and that Ms. Schreiner's testimony, as contained in the affidavit, is not credible.

To the extent that Defendant argues that Ms. Schreiner's testimony, as contained in her affidavit, is not credible, the Court simply observes that it may not address issues concerning credibility in connection with a summary judgment motion. To the extent that Defendant contends that Ms. Schreiner's affidavit contradicts her previous deposition testimony, under Eleventh Circuit law, "a party

3

cannot give 'clear answers to unambiguous questions' in a deposition and thereafter raise an issue of material fact in a contradictory affidavit that fails to explain the contradiction." Rollins v. TechSouth, Inc., 833 F.2d 1525, 1530 (11th Cir. 1987) (quoting Van T. Junkins & Assocs., Inc. v. U.S. Indus., Inc., 736 F.2d 656, 657 (11th Cir. 1984)). If this contradiction occurs, the court may disregard the contradictory affidavit as a sham affidavit. Id. The Eleventh Circuit has instructed district courts to apply the sham affidavit rule sparingly "because of the harsh effect this rule may have on a party's case." Id. The Eleventh Circuit also has stated: "To allow every failure of memory or variation in a witness's testimony to be disregarded as a sham would require far too much from lay witnesses and would deprive the trier of fact of the traditional opportunity to determine

4

which point in time and with which words the witness (in this case, the affiant) was stating the truth." <u>Tippens v. Celotex Corp.</u>, 805 F.2d 949, 953-54 (11th Cir. 1986) (parenthetical in original).

The Court thus must find "some inherent inconsistency between an affidavit and a deposition before disregarding the affidavit." <u>Rollins</u>, 833 F.2d at 1530. If no such inherent inconsistency exists, then the Court must apply the general rule of allowing an affidavit to create a genuine dispute, even though the affidavit conflicts with a party's earlier deposition testimony. <u>Id.</u> Under those circumstances, the jury may consider any conflict or discrepancy between the affidavit and the deposition testimony at trial.

Applying the above rule, the Court cannot find that Ms. Schreiner's affidavit testimony and her previous deposition

5

testimony are inherently inconsistent so as to allow the Court to disregard Ms. Schreiner's affidavit under the sham affidavit rule.[2] Any discrepancies that may exist between Ms. Schreiner's affidavit testimony and her deposition testimony in the prior case thus are for the jury to consider. In any event, the Court has not considered Ms. Schreiner's affidavit for purposes of this Order, and any challenges to the affidavit that Defendant may raise thus are moot.

## B. Objections to Previous Incidents

In its reply brief, Defendant also objects to evidence presented by Plaintiffs pertaining to other injuries allegedly caused by TASER devices, including the Affidavit of Wilma Collins, complaints of injuries raised by two other

---

[2]The Court has not considered the Affidavit of Tom Wilmer in making this conclusion. Instead, the Court simply has reviewed Ms. Schreiner's previous deposition testimony, and has compared that testimony to Ms. Schreiner's affidavit.

AO 72A

(Rev.8/82)

individuals, Samuel Powers and Melissa Allen, and a report by Anthony M. Bleetman, Ph.D. Defendant argues that Plaintiffs have not shown that any of the alleged injuries suffered by Ms. Collins, Ms. Allen, and Mr. Powers are substantially similar to the injury allegedly suffered by Plaintiff David Wilson, and that evidence pertaining to those injuries consequently is inadmissible.

"[B]ecause of the potential prejudicial impact of prior occurrences or accidents, such evidence is only admissible if conditions substantially similar to the occurrence caused the prior accidents, and the prior incidents were not too remote in time." Hessen v. Jaguar Cars, Inc., 915 F.2d 641, 649 (11th Cir. 1990). "Evidence of similar occurrences may be offered to show a defendant's notice of a particular defect or danger, the magnitude of the defect or danger

7

involved, the defendant's ability to correct a known defect, the lack of safety for intended uses, the strength of a product, the standard of care, and causation." Id. at 650.

At this point, and solely for purposes of Defendant's Motion for Summary Judgment, the Court finds that Plaintiffs have demonstrated that the conditions of the previous injuries allegedly suffered by Ms. Collins, Ms. Allen, and Mr. Powers are sufficiently similar to the injury allegedly suffered by Plaintiff David Wilson, and sufficiently close in time to Plaintiff David Wilson's alleged injury, to allow the Court to consider those alleged previous injuries for purposes of determining whether Defendant had notice that its TASER products could cause bone fractures. Defendant, of course, remains free to renew its objections to this evidence at trial.

AO 72A
(Rev.8/82)

## C.  Testimony of Dr. Edward Meier

Finally, Defendant has objected to the testimony of Dr. Edward Meier, Plaintiff David Wilson's treating physician. Defendant contends that Plaintiffs failed to disclose Dr. Meier as an expert witness, and that Plaintiffs never provided an expert report for Dr. Meier. Defendant therefore urges the Court not to consider Dr. Meier's expert testimony. Alternatively, Defendant requests that the Court require Dr. Meier to comply with the requirements of Federal Rule 26(a)(2)(B), that the Court allow Defendant to depose Dr. Meier after Dr. Meier produces an expert report, and that the Court allow Defendant to file a Daubert Motion pertaining to Dr. Meier's testimony.

Federal Rule of Civil Procedure 26(a)(2) governs disclosure requirements for expert testimony.  Fed. R. Civ.

9

P. 26(a)(2). Rule 26(a)(2)(B), in particular, provides that an expert witness must produce an expert report that meets certain requirements. Fed. R. Civ. P. 26(a)(2)(B). The Advisory Committee's notes pertaining to Rule 26(a)(2)(B) state, in relevant part:

> For convenience, this rule and revised Rule 30 continue to use the term "expert" to refer to those persons who will testify under Rule 702 of the Federal Rules of Evidence with respect to scientific, technical, and other specialized matters. The requirement of a written report in paragraph (2)(B), however, applies only to those experts who are retained or specially employed to provide such testimony in the case or whose duties as an employee of a party regularly involve the giving of such testimony. A treating physician, for example, can be deposed or called to testify at trial without any requirement for a written report.

Id. advisory committee's note.

AO 72A
(Rev.8/82)

Courts in this Circuit have held that treating physicians are not considered retained or specially employed experts "to the extent that they deliver expert opinions relating to their care or treatment of a party to the lawsuit." Leathers v. Pfizer, Inc., 233 F.R.D. 687, 688 (N.D. Ga. 2006). The analysis for determining whether a treating physician should be required to comply with Federal Rule of Civil Procedure 26(a)(2)(B) "'focuses not on the status of the witness, but rather the substance of the testimony.'" Id. (quoting Brown v. Best Foods, 169 F.R.D. 385, 388 (N.D. Ala. 1996)).

The portion of Dr. Meier's affidavit that Defendant challenges provides, in relevant part:

> Based upon my review of the records from the Monroe County Hospital Emergency Room, the records from physical therapy, the radiologist report, Dr. Bowerman's consultation, and my treatment of Mr. Wilson which began the day

11

following his injury and continued for more than two months afterward, and based upon my professional training and experience, and to a reasonable degree of medical certainty, the cause of Mr. Wilson's compression fracture and his severe back pain was due to exposure to the TASER during the training exercise on September 7, 2004. It has been documented in the medical literature that fractures may be caused by electrical shock.

(Aff. of Edward Meier, M.D. ¶ 8.) This portion of Dr. Meier's affidavit "has nothing to do with the care or treatment of" Plaintiff David Wilson, but instead "is an opinion relating to general causation." Leathers, 233 F.R.D. at 688. Although Dr. Meier is Plaintiff David Wilson's treating physician, the substance of this portion of Dr. Meier's affidavit "is not [a statement] of a treating physician–it is the statement of a retained or specially employed expert under FRCP

12

26(a)(2)(B)." Id. at 688-89. Consequently, Plaintiffs should have complied with Federal Rule of Civil Procedure 26(a)(2), including disclosing Dr. Meier as an expert witness and producing an expert report from Dr. Meier.

Although Plaintiffs failed to comply with Rule 26(a)(2)'s requirements with respect to Dr. Meier, the Court finds that this failure does not warrant excluding Dr. Meier's testimony. Instead, the Court directs Plaintiffs to comply with Rule 26(a)(2) with respect to Dr. Meier. Specifically, Plaintiffs must amend their initial disclosures and discovery responses within ten days of the date of this Order to disclose Dr. Meier as an expert, and must produce an expert report from Dr. Meier within thirty days. Defendant may depose Dr. Meier within thirty days after receiving Dr. Meier's expert report, and may file a Daubert Motion within

13

thirty days after Dr. Meier's deposition. <u>If Plaintiffs fail to comply with this Order, Defendant may renew its Motion for Summary Judgment as to causation. Similarly, Defendant may renew its Motion for Summary Judgment as to causation in the event that the Court grants a Daubert Motion pertaining to Dr. Meier's testimony</u>. The Court will, however, consider the affidavit for purposes of the Motion for Summary Judgment.

## II.  Summary Judgment Motion

### A.  Background

Keeping in mind that when deciding a motion for summary judgment, the Court must view the evidence and all factual inferences in the light most favorable to the party opposing the motion, the Court provides the following

14

statement of facts. <u>Harris v. Coweta County, Ga.</u>, 433 F.3d

807, 811 (11th Cir. 2005), <u>rev'd on other grounds</u>, 127 S. Ct.

1769 (2007). This statement does not represent actual

findings of fact. <u>Jones v. Am. Gen. Life Ins. Co.</u>, 370 F.3d

1065, 1069 n.1 (11th Cir. 2004) (citing <u>Wooden v. Bd. of

Regents of Univ. Sys. of Ga.</u>, 247 F.3d 1262, 1271 n.9 (11th

Cir. 2001)). Instead, the Court has provided the statement

simply to place the Court's legal analysis in the context of

this particular case or controversy.

### 1. Factual Background

#### a. The Parties

Plaintiffs reside in Aragon, Georgia. (Compl. ¶ 1; Dep.

of David Wilson at 5.) Plaintiff Charlene Wilson is Plaintiff

David Wilson's wife. (Compl. ¶ 1; Dep. of Charlene Wilson

at 43.)

15

Plaintiff David Wilson was employed as a trooper for the Georgia State Patrol ("GSP") for approximately twenty years. (Compl. ¶ 1; D. Wilson Dep. at 14.) In June 1985, Plaintiff joined the GSP, and was promoted to trooper in March 1990. (Def.'s Statement Material Facts ("DSMF") ¶ 29; Pls.' Resp. DSMF ("Resp. DSMF") ¶ 29; Pls.' Answers. Def.'s First Interrogs. Pl. David Wilson No. 6; D. Wilson Dep. at 14.) On October 1, 2004, Plaintiff David Wilson took a medical disability retirement from the GSP. (D. Wilson Dep. at 7, 99, 105.)

Defendant is a Delaware corporation with its principal place of business in Phoenix, Arizona. (Compl. ¶ 2.)

### b.  The TASER Product

Defendant manufactures a series of electronic control devices known as TASERs. (Dep. of Richard Guilbault at

16

23.) The TASER devices operate by using propelled wires to conduct electrical energy to a remote target. (Pls.' Resp. Def.'s Mot. Summ. J. Ex. G at 3-4.) The devices use electrical energy to cause noise, or interference, to affect motor neurons, resulting in involuntary muscle contractions capable of incapacitating focused and aggressive subjects, many of whom may not otherwise be affected by mere pain stimuli. (DSMF ¶ 2; Resp. DSMF ¶ 2; Guilbault Dep. at 28.)

Before the introduction of TASER's first law enforcement model, early stun gun devices in the marketplace used electricity simply to cause strong and painful shock sensations. (DSMF ¶ 3; Resp. DSMF ¶ 3; Dep. of Patrick Waller Smith at 29.) Those devices, however, were unable to incapacitate focused or pain-

17

insensitive subjects. (DSMF ¶ 3; Resp. DSMF ¶ 3; P. Smith Dep. at 29.)

In late 1999, Defendant introduced the ADVANCED TASER® M26. (DSMF ¶ 4; Resp. DSMF ¶ 4; P. Smith Dep. at 11; Guilbault Dep. at 23.) This device was the first product of its kind designed to incapacitate subjects through muscle contractions that rendered the subjects unable to make voluntary movements. (DSMF ¶ 4; Resp. DSMF ¶ 4; P. Smith Dep. at 12, 29; Dep. of Steve Tuttle at 20-21.)

Defendant marketed the ADVANCED TASER M26 to law enforcement. (P. Smith Dep. at 23-24.) As part of its marketing strategy, Defendant hosted training sessions for law enforcement, where officers could experience first hand the effects of TASER exposure. (Id. at 25-26.) Defendant

18

recommended that officers be subjected to TASER exposure. (Id. at 28.)

In May 2003, Defendant introduced the TASER X26. (DSMF ¶ 6; Resp. DSMF ¶ 6; P. Smith Dep. at 29-30.) Defendant built certain improvements into the X26, including Shaped Pulse™ technology. (DSMF ¶ 7; Resp. DSMF ¶ 7; Pls.' Resp. Def.'s Mot. Summ. J. Ex. G at 5.) Shaped Pulse™ technology allows for a more efficient power supply, powered by a battery of two three-volt power cells, and enables the X26 to be sixty percent smaller, and sixty percent lighter, than the ADVANCED TASER M26. (DSMF ¶ 7; Resp. DSMF ¶ 7; Guilbault Dep. at 24; Tuttle Dep. at 19-20.) The X26 also was designed to cause muscular contractions that are five percent stronger than those caused by the ADVANCED TASER M26. (DSMF ¶ 8; Resp.

DSMF ¶ 8; P. Smith Dep. at 30, 82; Guilbault Dep. at 24.)

### c. TASER Training

Defendant trains and certifies TASER instructors. (DSMF ¶ 11; Resp. DSMF ¶ 11; Pls.' Resp. Def.'s Mot. Summ. J. Ex. N at 6.) Those certified instructors, in turn, train personnel at their own agencies to be certified as end users of the TASER devices. (DSMF ¶ 11; Resp. DSMF ¶ 11.)

Defendant also provides TASER Master Instructor training. (DSMF ¶ 13; Resp. DSMF ¶ 13; Guilbault Dep. at 11; Dep. of Tami LaChapelle at 12.) Through this training, Defendant trains Master Instructors who, upon certification, may present the TASER instructor course and certify

20

attendees as TASER certified instructors. (DSMF ¶ 13; Resp. DSMF ¶ 13.)

To become a TASER certified instructor, an individual must complete the TASER instructor course. (DSMF ¶ 14; Resp. DSMF ¶ 14.) During the TASER instructor course, prospective instructors receive a wide range of information about TASER devices, including a technical overview of electronic control device technology, information concerning electricity in general, information concerning the effects TASER devices have on the human body, and warnings concerning the risks associated with use of, and exposure to, TASER devices. (DSMF ¶ 14; Resp. DSMF ¶ 14.) Prospective instructors must take, and pass, a written examination to become certified as TASER instructors. (DSMF ¶ 15; Resp. DSMF ¶ 15.) Each prospective

AO 72A
(Rev.8/82)

instructor also receives an opportunity to volunteer to be exposed to the TASER device. (DSMF ¶ 15; Resp. DSMF ¶ 15.)

As of September 7, 2004, Defendant recommended, but did not require, exposure to the TASER device for both certified trainers and end users. (Guilbault Dep. at 12-13.) As of that date, Defendant required exposure to the TASER device for master instructors. (Id.)

Defendant provides recommended training materials for use in end user training at law enforcement agencies. (Pls.' Resp. Def.'s Mot. Summ. J. Ex. N at 6.) Those materials included lesson plans and forms. (Guilbault Dep. at 17.) In 2004, purchasers of the X26 received the device, an operating manual, and a "Version 11 Training CD" that contained information about the weapon and lesson plans

AO 72A
(Rev.8/82)

for training users. (Guilbault Dep. at 32-33; P. Smith Dep. at 67; Pls.' Resp. Def.'s Mot. Summ. J. Exs. G-H, O.) The operating manual and the training CD both contained a warning stating that the X26 caused "muscle contractions that may result in athletic exertion type injuries to some people." (Pls.' Resp. Def.'s Mot. Summ. J. Ex. G at 3, Ex. H at 12, Ex. O at 6; Smith Dep. at 95-98.) The training materials contained a section titled "Training Review Questions" that informed users that TASER weapons "are non-destructive to nerves, muscles, and other body elements," and that the TASER weapon "does not cause permanent damage or long-term aftereffects to muscles, nerves, or other body functions. (Pls.' Resp. Def.'s Mot. Summ. J. Ex. H at 15-16.)

The training materials also included a form known as a

AO 72A
(Rev.8/82)

volunteer exposure report, or "demo report." (Pls.' Resp. Def.'s Mot. Summ. J. Exs. H & Q; LaChapelle Dep. at 18; Guilbault Dep. at 18.) Instructors were supposed to have individuals who were exposed to the TASER devices complete the demo reports, and return the demo reports to Defendant. (Guilbault Dep. at 19; LaChapelle Dep. at 18.)

During the end user training, instructors provide an overview of the technology and corresponding medical research, information concerning electricity and the devices, information concerning why exposure to the TASER device is recommended, and a list of known risks associated with TASER exposure. (Guilbault Dep. at 15-16.) The course participants receive an opportunity to handle the TASER devices. (Id. at 16.)

Defendant did not produce to Plaintiffs' counsel a demo

AO 72A
(Rev.8/82)

report for all of the individuals believed to have been exposed to the TASER device prior to fall 2004. (Guilbault Dep. at 19 (estimating at least 70,000 volunteer exposures to TASER devices had occurred by fall 2004); P. Smith Dep. at 34-35 (estimating between 60,000 and 120,000 volunteer exposures to TASER devices had occurred by end of 2004); LaChapelle Dep. at 19.)

### d. Reports of Injuries and Related Concerns

According to Defendant's chief executive officer, prior to Plaintiff David Wilson's September 7, 2004, injury, Defendant knew about "maybe a handful of fall or exertion type injuries." (P. Smith Dep. at 33.) Before September 2004, however, Defendant had no policy for investigating allegations of injuries to law enforcement personnel that occurred during TASER training. (Id. at 43-44.) Defendant

25

also did not monitor individuals who volunteered for TASER exposures to determine whether the individuals suffered lasting or later effects from the exposures. (Id. at 74.) Although one of Defendant's employees created a spreadsheet and database concerning data reported on the demo reports, the employee did not enter data concerning injuries reported on the demo reports. (Id. at 49; LaChapelle Dep. at 23-25.)

Defendant initiated a medical literature review concerning its products. (P. Smith Dep. at 118-19; Tuttle Dep. at 87.) Dr. Anthony Bleetman completed that review and released it on April 27, 2003. (Pls.' Resp. Def.'s Mot. Summ. J. Ex. L; P. Smith Dep at 118-19.) In his report, Dr. Bleetman observed that "[b]ones and joints can be damaged by tetanic muscle contraction." (Pls.' Resp. Def.'s Mot.

26

Summ. J. Ex. L at 13.)  Dr. Bleetman also noted that "[v]iolent muscle spasms caused by the tasering might conceivably cause fractures and dislocations."  (Id. at 13, 18.)  According to Defendant's chief executive officer, Defendant had Dr. Bleetman's report by April 27, 2003, at the latest.  (P. Smith Dep. at 119.)

In 2002, a police officer named Willie Collins, who was employed with the City of Phoenix, Arizona, Police Department, claimed to have suffered injury from exposure to a TASER device during a training.  (Aff. of Willie Collins ¶¶ 2-3.)  Ms. Collins contends that she informed one of Defendant's managers of her injury in 2002, and the manager gave her a shirt bearing Defendant's logo.  (Id. ¶ 4.)  By May 2003 at the latest, Defendant learned that a Maricopa County, Arizona, Sheriff's Deputy named Samuel

27

Powers had alleged that he suffered a fractured vertebrae from exposure to a TASER device during training. (P. Smith Dep. at 31-32; Tuttle Dep. at 30-31; Pls.' Resp. Def.'s Mot. Summ. J. Ex. F at 2-3, Ex. K.)

On or about January 22, 2004, Defendant received notification that an individual named Malissa Allen alleged that she had sustained a back fracture during a TASER training session conducted on January 23, 2003. (Pls.' Resp. Def.'s Mot. Summ. J. Ex. P at 4; P. Smith Dep. at 88.)

Frank Kramer, a police officer employed with the City of Grand Junction, Colorado, Police Department, attended a training seminar in May 2004. (Aff. of Frank Kramer ¶¶ 2-3.) According to Mr. Kramer, the training instructors required that each officer who attended the training be exposed to a TASER device. (Id. ¶ 4.) Mr. Kramer contends that he

28

suffered pain in his back immediately after TASER exposure, and that x-rays and a bone scan conducted several weeks later detected compression fractures at the T5 and T6 vertebrae. (Id. ¶ 5.) Mr. Kramer asserts that no one informed him that he could suffer a serious injury from TASER exposure, and that he would have refused to be exposed to the TASER device if he had known that exposure might cause a spinal fracture. (Id. ¶ 7.)

### e.  Plaintiff David Wilson's Training

At some point prior to September 7, 2004, the GSP began purchasing TASER devices manufactured by Defendant. (D. Wilson Dep. at 44-47.) The GSP mandates that all state troopers who carry a TASER device must become certified through a GSP-sponsored certification course. (DSMF ¶ 16; Resp. DSMF ¶ 16; Decl. of Lt. Paul

29

Cosper ¶ 4.) Although Defendant does not require that end users be exposed to the TASER device to be certified, the GSP maintains a policy requiring all troopers who wish to carry a TASER device be exposed to the device during user certification. (DSMF ¶ 17; Resp. DSMF ¶ 17; Cosper Decl. ¶ 11.) If a trooper refuses to be exposed to the TASER device, the GSP will not issue a TASER certification to the trooper. (Cosper Decl. ¶ 11.)

Plaintiff David Wilson told his Post Commander, Sergeant Steve Payne, that Plaintiff David Wilson did not want to carry a TASER device, and that he did not want to attend TASER training. (D. Wilson Dep. at 44, 47, 52.) Sergeant Payne, however, informed Plaintiff David Wilson that the captain had stated that GSP was not asking for volunteers, and that Plaintiff David Wilson should attend the

training. (Id. at 48, 53-54.) Plaintiff David Wilson believed that, if he refused to attend the training, the captain would have issued a direct order to him. (Id. at 50-51.) Plaintiff David Wilson understood that he could be fired if he failed to obey a direct order. (Id. at 36, 50-51.)

On September 7, 2004, the GSP held an end user certification course for the TASER X26 at the Georgia Public Safety Training Center in Forsyth, Georgia. (D. Wilson Dep. at 54; Cosper Decl. ¶ 6; DSMF ¶ 18; Resp. DSMF ¶ 18.) Plaintiff David Wilson attended that course. (D. Wilson Dep. at 46, 49.) None of Defendant's employees were present at the training. (DSMF ¶ 18; Resp. DSMF ¶ 18.)

During the September 7, 2004, training course, all attendees, including Plaintiff David Wilson, were shown a PowerPoint presentation that provided an overview of the

31

TASER device and its operation. (DSMF ¶ 19; Resp. DSMF ¶ 19; Cosper Decl. ¶ 9; D. Wilson Dep. at 57-58, 60-61.) The PowerPoint presentation also included video clips of individuals undergoing exposure to TASER devices. (DSMF ¶ 19; Resp. DSMF ¶ 19; Cosper Decl. ¶ 9.) The presentation also included a discussion of the safety aspects of the device, along with warnings that exposure to the device carried with it the risk of athletic exertion type injuries. (Cosper Decl. ¶ 9; D. Wilson Dep. at 64-65; DSMF ¶ 20; Resp. DSMF ¶ 20.)

The materials for the PowerPoint presentation include a slide titled "Volunteer Exposure" that compares injury rates from TASER exposure to certain athletic activities. (Cosper Decl. ¶ 7.) The slide states, "CAUTION," and then provides: "Subjecting yourself to the TASER involves

32

physical exertion similar to an athletic activity such as playing a game of basketball. The risk of injury from physical exertion or falling, while very low, is <u>not</u> zero. Volunteering is highly recommended, but is not mandatory." (<u>Id.</u>)

The record does not indicate that Plaintiff David Wilson received materials to review prior to the training. According to Plaintiff David Wilson, he believed, based on the training presentation, that injuries from TASER devices were due to falls. (D. Wilson Dep. at 62, 64-67.) Plaintiff David Wilson contends that he believed he would not suffer an injury because he was not going to be allowed to fall. (<u>Id.</u> at 66.) Plaintiff David Wilson also acknowledges that the instructors discussed the risk that those exposed to the TASER device might suffer pulled muscles; however, he contends that he

33

never thought that the exposure might cause him to break his back. (<u>Id.</u> at 64-66.)

Plaintiff David Wilson understood part of the TASER training course included undergoing a TASER exposure. (D. Wilson Dep. at 54, 68-69.) Based on information that Plaintiff David Wilson received from other troopers, Plaintiff David Wilson believed that if he refused to undergo a TASER exposure, he would be fired. (<u>Id.</u> at 49-50.) Plaintiff David Wilson therefore contends that he had no choice except to undergo TASER exposure if he wanted to keep his job. (<u>Id.</u>)

Following the initial presentation, Plaintiff David Wilson and others who attended the training were exposed to the TASER device. (Cosper Decl. ¶ 10; D. Wilson Dep. at 66.) Each attendee who elected to undergo exposure to the

34

TASER device received a TASER application to his or her back. (Cosper Decl. ¶ 10; D. Wilson Dep. at 66.) Plaintiff David Wilson recalls that he was fifth or sixth in line to receive a TASER application. (D. Wilson Dep. at 70.)

Plaintiff David Wilson recalls that, when he was exposed to the TASER, he felt severe pain. (D. Wilson Dep. at 73-79.) After exposure to the TASER, Plaintiff David Wilson complained of back pain and of a cold sensation in his hands and feet. (DSMF ¶ 24; Resp. DSMF ¶ 24; D. Wilson Dep. at 74.) Approximately ten minutes after Plaintiff David Wilson's exposure to the TASER, an ambulance was called to the training facility to transport Plaintiff David Wilson to the hospital. (DSMF ¶ 24; Resp. DSMF ¶ 24; D. Wilson Dep. at 75-77.)

At the hospital, doctors took x-rays and CT scans of

AO 72A
(Rev.8/82)

Plaintiff David Wilson's spine. (DSMF ¶ 25; Resp. DSMF ¶ 25; Wilson Dep. at 79.) Those x-rays and CT scans showed no fractures of any kind. (DSMF ¶ 25; Resp. DSMF ¶ 25.) The doctors initially diagnosed Plaintiff David Wilson as having a pulled muscle in his back. (DSMF ¶ 26; Resp. DSMF ¶ 26; D. Wilson Dep. at 79; Aff. of Edward E. Meier, M.D. ¶ 3.)

Plaintiff David Wilson began daily physical therapy sessions, including massage therapy. (D. Wilson Dep. at 87, 89-90; Meier Aff. ¶ 4.) Plaintiff David Wilson's physician placed him on limited duty status at work. (Meier Aff. ¶ 4.) Plaintiff David Wilson used sick days for a period of time. (D. Wilson Dep. at 84.)

On October 5, 2004, Plaintiff David Wilson's physician observed that Plaintiff David Wilson's condition had

36

improved, but that Plaintiff David Wilson was still experiencing tenderness in his back. (Meier Aff. ¶ 5.) Plaintiff David Wilson's physician recommended work hardening to determine whether Plaintiff David Wilson could return to regular duty. (Id. ¶ 5.)

On October 28, 2004, Plaintiff David Wilson returned to his physician's office for a visit, and was seen by a partner in his physician's practice (Meier Aff. ¶ 6.) That doctor recommended that Plaintiff David Wilson have an MRI of his thoracic spine. (Id.) The doctor placed Plaintiff David Wilson on work restrictions. (Id.)

On November 9, 2004, medical personnel conducted an MRI of Plaintiff David Wilson's spine. (Meier Aff. ¶ 7; D. Wilson Dep. at 85.) The MRI showed a T6 and T8 wedge compression fracture of Plaintiff David Wilson's vertebral

37

spine. (Meier Aff.¶ 7; D. Wilson Dep. at 89.) Plaintiff David Wilson's treating physician has opined that exposure to the TASER caused the compression fracture. (Meier Aff. ¶ 8.)

In November 2004, Plaintiff David Wilson began working as a radio dispatcher for the GSP while on light duty. (D. Wilson Dep. at 93-94.) Plaintiff David Wilson kept his trooper rank, however, and continued to receive the same salary. (Id. at 95-96, 102.)

Plaintiff David Wilson applied for a medical disability retirement. (D. Wilson Dep. at 99-100.) The GSP approved that disability retirement effective October 1, 2005. (Id. at 100, 102.)

## 2.    Procedural Background

On July 31, 2006, Plaintiffs filed this lawsuit. Plaintiff David Wilson asserts a product liability claim against

AO 72A
(Rev.8/82)

Defendant, based on Defendant's alleged failure to warn Plaintiff David Wilson of a known risk of injury from the use of the TASER. (Compl. ¶¶ 10-12.) Plaintiff Charlene Wilson asserts a claim for loss of consortium. (Id. ¶¶ 13-14.) Plaintiffs seek an award of punitive damages, (id. ¶¶ 15-18), as well as an award of attorneys' fees and expenses, (id. ¶¶ 19-20).

On June 25, 2007, Defendant filed its Motion for Summary Judgment. Defendant argues that no genuine dispute remains with respect to any of Plaintiffs' claims. The briefing process for the Motion for Summary Judgment is complete, and the Court therefore finds that the Motion is ripe for resolution by the Court.

## B. Summary Judgment Standard

Federal Rule of Civil Procedure 56(c) authorizes

AO 72A

(Rev.8/82)

summary judgment when "there is no genuine issue as to any material fact" and "the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party seeking summary judgment bears "the burden of demonstrating the satisfaction of this standard, by presenting 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any' that establish the absence of any genuine, material factual dispute." Bochese v. Town of Ponce Inlet, 405 F.3d 964, 975 (11th Cir. 2005) (quoting Fed. R. Civ. P. 56(c)), cert. denied, 126 S. Ct. 377 (2005). Once the moving party has supported its motion adequately, the non-movant has the burden of showing summary judgment is improper by coming forward with specific facts that demonstrate the existence of a genuine issue for trial.

40

Castleberry v. Goldome Credit Corp., 408 F.3d 773, 786 (11th Cir. 2005).

When evaluating a motion for summary judgment, the Court must view the evidence and all factual inferences in the light most favorable to the party opposing the motion. Harris, 433 F.3d at 811. The Court also must "construe 'all reasonable doubts about the facts in favor of the non-movant.'" Michael Linet, Inc. v. Vill. of Wellington, Fla., 408 F.3d 757, 761 (11th Cir. 2005) (quoting Browning v. Peyton, 918 F.2d 1516, 1520 (11th Cir. 1990)). Further, "[i]ssues of credibility and the weight afforded to certain evidence are determinations appropriately made by a finder of fact and not a court deciding summary judgment." McCormick v. City of Fort Lauderdale, 333 F.3d 1234, 1240 n.7 (11th Cir. 2003). Finally, the Court does not make factual

41

determinations. <u>Jones</u>, 370 F.3d at 1069 n.1 (citing <u>Wooden</u>, 247 F.3d at 1271 n.9).

## C. Discussion

### 1. Failure to Warn Claim

A plaintiff asserting a products liability claim based on a failure to warn must establish that: (1) the defendant had a duty to warn; (2) the defendant breached its duty; and (3) the breach of that duty caused the plaintiff's injury. <u>Baker v. Smith & Nephew Richards, Inc.</u>, No. CIV. A. 1:97-CV-1223-RWS, No. CIV. A. 1:97-CV-1234-RWS, No. CIV. A. 1:98-CV-1540-RWS, 1999 WL 1129650, at *6 (N.D. Ga. Sept. 30, 1999). Here, Defendant argues that Plaintiff David Wilson has failed to create a genuine dispute with respect to any of the elements of his failure to warn claim. The Court addresses Defendant's arguments in turn.

42

### a. Whether Defendant Had a Duty To Warn Plaintiff David Wilson

Defendant first contends that it had no duty to warn Plaintiff David Wilson of the risk of injury arising from the use of a TASER. According to Defendant, law enforcement professionals such as Plaintiff David Wilson either know, or objectively should know, that use-of-force training involves risks of injury, and that those risks cannot be eliminated completely.

"The duty to warn an end user of a risk associated with product use arises when the manufacturer knows or reasonably should know of a danger arising from product use." Baker, 1999 WL 1129650, at *6 (citing Chrysler Corp. v. Batten, 264 Ga. 723, 724 (1994)). When determining whether a duty to warn exists, a court "should consider the

43

AO 72A
(Rev.8/82)

foreseeability of the use in question, the type of danger involved, and the foreseeability of the user's knowledge of the danger." Id. Whether a duty to warn exists generally is a matter for a jury to determine. Wabash Metal Prods. Co., 258 Ga. App. 884, 887, 575 S.E.2d 683, 685 (2002).

A manufacturer has no duty to warn of an open and obvious danger of a product. Powell Duffryn Terminals, Inc. v. Calgon Carbon Corp., 4 F. Supp. 2d 1198, 1203 (S.D. Ga. 1998), aff'd, 176 F.3d 494 (11th Cir. 1999). A manufacturer also has no duty to warn "when the person using the product 'should know of the danger, or should in using the product discover the danger.'" Id. (quoting Whirlpool Corp. v. Hurlbut, 166 Ga. App. 95, 303 S.E.2d 284, 288 (1983)). "A user of a product need not know 'the precise, physical nature of the hazard presented by his 'use'

of the product; it is sufficient if he is aware generally that the 'use' being made of the product is dangerous.'" Id. (quoting Whirlpool Corp., 166 Ga. App. at 101, 303 S.E.2d at 288) (internal quotation marks omitted).

A manufacturer also will not ordinarily have a duty to warn members of a trade or profession against risks that are generally known in that trade or profession. Powell Duffryn Terminals, Inc., 4 F. Supp. 2d at 1203 (quoting Niles v. Bd. of Regents of Univ. Sys. of Ga., 222 Ga. App. 59, 473 S.E.2d 173, 175 (1996)). Courts use an objective standard when determining whether a risk is generally known within a trade or profession. Id. (quoting Morris v. Clark Equip. Co., 904 F. Supp. 1379, 1383 (M.D. Ga. 1995)).

Here, the Court cannot find, as a matter of law, that Defendant had no duty to warn Plaintiff David Wilson that

45

exposure to the TASER device carried with it a risk of compression fractures. Although Defendant argues that training concerning use-of-force devices, by its very nature, carries with it a risk of physical injury, this argument ignores the fact that the risk of the injury claimed here--a fracture caused by exposure to the TASER device--would not necessarily be readily apparent to a law enforcement officer. The Court further cannot find that the fact that law enforcement officers may know that training concerning a use-of-force device carries with it some risk of physical injury in general relieves Defendant of any duty to warn that exposure to the TASER device carried with it a risk of stress fractures.

Indeed, the evidence in the record, viewed in the light most favorable to Plaintiffs, indicates that Defendant knew

AO 72A
(Rev.8/82)

prior to September 7, 2004, the date of Plaintiff David Wilson's exposure, that certain individuals exposed to the TASER device had complained of stress fractures. The evidence further demonstrates that Defendant knew prior to that date that at least one medical expert had opined that exposure to electrical currents such as those emitted by the TASER devices could cause fractures. Consequently, a genuine dispute exists as to whether Defendant knew, or had reason to know, that exposure to the TASER device posed a risk of stress fractures.[3]

For the reasons discussed above, the Court finds that a genuine dispute exists with respect to whether Defendant

---

[3]The fact that some of the individuals who complained may have been exposed to the M26, rather than the X26, also does not compel entry of summary judgment for Defendant. The evidence in the record indicates that the X26 used the same general principles as the M26.

47

knew, or had reason to know, that exposure to the TASER devices could cause stress fractures. A genuine dispute also remains as to whether a law enforcement officer would have known, or reasonably should have known, of that risk. Consequently, a genuine dispute remains as to whether Defendant had a duty to warn Plaintiff David Wilson.

### b. Whether Defendant Provided Adequate Warnings to Plaintiff David Wilson

Alternatively, Defendant argues that the warning that it provided was adequate, because Plaintiff David Wilson received information during training that exposure to the TASER device was not risk free, and that exposure carried with it a risk of "athletic exertion type injuries." Defendant further points to Plaintiff David Wilson's testimony, in which Plaintiff David Wilson stated that the instructor provided that

48

warning to the training participants, and also informed the participants that exposure to the TASER device could carry with it a risk of falling and of experiencing pulled muscles. An individual who received that information, however, would not necessarily understand that he could suffer stress fractures simply from being exposed to the TASER device, rather than from falling. Under those circumstances, a genuine dispute exists as to whether the warning Defendant provided was adequate.

### c. Whether Plaintiff David Wilson Has Adduced Sufficient Evidence of Causation

Defendant also contends that Plaintiff David Wilson has failed to present medical expert testimony indicating that exposure to the TASER device caused Plaintiff David Wilson's stress fractures. Plaintiff David Wilson has

49

provided an affidavit from his treating physician, who has opined that exposure to electrical shock can cause fractures, and that, to a reasonable degree of medical certainty, exposure to the TASER device caused Plaintiff David Wilson's stress fractures. (Meier Aff. ¶ 8.) The Court finds that this evidence is sufficient to create a genuine dispute as to whether exposure to the TASER device caused Plaintiff David Wilson's stress fractures. Consequently, the Court cannot grant summary judgment to Defendant based on this argument.

### 3. Whether Plaintiff David Wilson Has Presented Sufficient Evidence Concerning Punitive Damages

Defendant also argues that Plaintiffs have failed to adduce sufficient evidence for their punitive damages claim to survive summary judgment. The question of whether

50

punitive damages are warranted ordinarily is a matter for the jury. Petrolane Gas Serv., Inc. v. Eusery, 193 Ga. App. 860, 862, 389 S.E.2d 355, 357 (1989). O.C.G.A. § 51-12-5.1(b) provides: "Punitive damages may be awarded only in such tort actions in which it is proven by clear and convincing evidence that the defendant's actions showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences." O.C.G.A. § 51-12-5.1(b). "Georgia defines 'conscious indifference' as 'an intentional disregard of the rights of another, knowingly or willfully disregarding such rights.'" Hutcherson v. Progressive Corp., 984 F.2d 1152, 1155 (11th Cir. 1993) (per curiam) (quoting Gilman Paper Co. v. James, 235 Ga. 348, 219 S.E.2d 447, 450 (1975)).

51

AO 72A
(Rev.8/82)

"Negligence, even gross negligence, is insufficient to support [a punitive damages] award." Bartja v. Nat'l Union Fire Ins. Co., 218 Ga. App. 815, 818, 463 S.E.2d 358, 361 (1995).

> "Something more than the mere commission of a tort is always required for punitive damages. There must be circumstances of aggravation or outrage, such as spite or malice, or a fraudulent or evil motive on the part of the defendant, or such a conscious and deliberate disregard of the interests of others that the conduct may be called wilful or wanton."

Cullen v. Novak, 201 Ga. App. 459, 460, 411 S.E.2d 331, 332 (1991) (quoting Colonial Pipeline Co. v. Brown, 258 Ga. 115, 121, 365 S.E.2d 827 (1988)) (internal quotation marks omitted).

For the following reasons, the Court finds that Plaintiffs

AO 72A

(Rev.8/82)

have adduced sufficient evidence to allow their punitive damages claim to survive summary judgment. Plaintiffs have adduced evidence that, if believed, demonstrates that Defendant knew, or had reason to know, of dangers presented by its TASER products, yet consciously chose not to warn of those dangers. Under those circumstances, a genuine dispute remains with respect to Plaintiffs' punitive damages claims.[4] See Ford Motor Co. v. Sasser, 274 Ga. App. 459, 470-73, 618 S.E.2d 47, 56-59 (2005) (finding plaintiffs had presented sufficient evidence to raise presumption of conscious indifference to consequences where, among other things, defendant was aware of safety problems inherent in unlatched back seat and acknowledged

---

[4]The Court has not considered Ms. Schreiner's affidavit, Mr. Wilmer's affidavit, or the materials presented by Plaintiffs concerning the Securities and Exchange Commission's investigation of Defendant in reaching this conclusion.

AO 72A

(Rev.8/82)

those problems as very important safety issue, yet chose not to warn customers about problems).

### 4. Whether Plaintiff Charlene Wilson's Loss of Consortium Claim Survives Summary Judgment

Finally, Defendant argues that Plaintiff Charlene Wilson's loss of consortium claim must fail because that claim is derivative of Plaintiff David Wilson's claims. A claim for loss of consortium is derivative of a spouse's injury claims, and, therefore, if the spouse's injury claims do not survive summary judgment, the loss of consortium claim also cannot survive summary judgment. Behforouz v. Vail, 281 Ga. App. 603, 604, 636 S.E.2d 674, 676 (2006) (finding trial court properly granted summary judgment on loss of consortium claim where trial court had granted summary judgment on spouse's personal injury claims; loss of

54

consortium claim was derivative of spouse's personal injury claims). Here, for the reasons discussed <u>supra</u> Parts III.A-C., summary judgment is not appropriate for Plaintiff David Wilson's products liability claim. Consequently, the Court cannot grant summary judgment to Defendant on Plaintiff Charlene Wilson's loss of consortium claim.

## III. Conclusion

ACCORDINGLY, the Court **DENIES** Defendant's Motion for Summary Judgment [37], and **DENIES AS MOOT** Defendant's Motion to Strike Affidavit of Pam Schreiner [61]. The Court **ORDERS** the parties to file their proposed consolidated pretrial order within thirty days, and **ORDERS** Plaintiffs to comply with the Court's instructions concerning Dr. Meier's testimony, as provided in the body of

AO 72A
(Rev.8/82)

this Order. The Court also **DENIES AS MOOT** Defendant's Motion to Stay Ruling on Motion for Summary Judgment [75], and **ORDERS** Plaintiffs to comply with the Court's instructions concerning any anticipated use of Ms. Schreiner and Mr. Wilmer as witnesses at trial, as provided in the body of this Order. The Court will **DIRECT** the Clerk to place this case on the Court's next available trial calendar following the Court's resolution of Defendant's anticipated <u>Daubert</u> Motion relating to Dr. Meier.

All motions in limine are due no later than seven business days prior to the date on which the trial of this case first is scheduled to begin. Absent a showing of good cause, the Court will not consider untimely-filed motions in

AO 72A
(Rev.8/82)

limine.

IT IS SO ORDERED, this the 14 day of September, 2007.

_____

UNITED STATES DISTRICT JUDGE

57