# EXHIBIT "A"

Deposition of Jeffrey Burt
<u>J.J. and J.B. v. DGG TASER, Inc., et al</u>
Leon County, FL Second Judicial Circuit
Case No. 37-2005 CA 001569

1

1

2          IN THE SECOND JUDICIAL CIRCUIT
           IN AND FOR LEON COUNTY, FLORIDA
3

4          CASE NO. 37-2005 CA 001569

5  J.J. and J.B.,
           Plaintiffs,
6  vs.

7  DGG TASER, INC., a Florida For Profit Corporation,
   and TASER INTERNATIONAL, INC., a Delaware For
8  Profit Corporation,
           Defendants.
9  _____

10
   DEPOSITION OF:       JEFFREY BURT
11
   TAKEN AT THE INSTANCE OF: The DEFENDANT
12
   DATE:                April 13, 2006
13
   TIME:                Commenced at 12:05 p.m.
14                      Concluded at 2:26 p.m.

15  LOCATION:           822 North Monroe
                        Tallahassee, FL
16
   REPORTED BY:         JUDY CHIN
17                      RPR, CRR

18

19

20

21

22

23

24

25

                                    2

1    APPEARANCES:

2

3        REPRESENTING PLAINTIFF:

4

         STEVEN A. ANDREWS, ESQUIRE
5         ANDREWS & MOYE
         822 North Monroe Street
6         Tallahassee, Fl  32303
         681-6416
7

8        REPRESENTING Defendant:

9

         MICHAEL J. ROPER, ESQUIRE
10        BELL, LEEPER & ROPER, P.A.
         2816 East Robinson Street
11        Orlando, Florida  32803

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1

2        INDEX

3  WITNESS                    PAGE
   JEFFREY BURT
4

5  Direct Examination by Mr. Roper          4
   Cross Examination by Mr. Andrews          107
6

7  CERTIFICATE OF OATH              109
   CERTIFICATE OF REPORTER              110
8  ERRATA SHEET              111
   READING AND SIGNING LETTER              112
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

1        STIPULATIONS

2           The following deposition of JEFFREY BURT

3  was taken on oral examination, pursuant to notice,

4  for purposes of discovery, and for use as

5  evidence, and for other uses and purposes as may

6  be permitted by the applicable and governing

7  rules.  Reading and signing is not waived.

8          * * *

9    Thereupon,

10             JEFFREY BURT

11    was called as a witness, having been first duly

12    sworn, was examined and testified as follows:

13             DIRECT EXAMINATION

14    BY MR. ROPER

15        Q    Would you state you your full name and

16    residence address for the record, please.

17        A    Jeffrey Burt.  6501 Cresent Lake Drive,

18    Lakeland, Florida.  33813.

19        Q    Mr. Burt, my name is Mike Roper.  I'm an

20    attorney from Orlando.  I represent Taser

21    International, a company called DGG Taser in

22    connection with a civil lawsuit that's been filed

23    on your behalf here in Leon County.  I'm here

24    today to take your deposition in that case.  Do

25    you understand that, sir?

                        5

1     A    I do.

2        Q    I assume given your prior employment as

3     a law enforcement officer you had occasions in the

4     past where you have given depositions?

5      A    Correct.

6      Q    I won't then go through the standard

7    rules following depositions.  The one thing I will

8    ask for you to do for me, if you would, if at any

9    time I ask a question that for some reason you

10   don't understand, don't hear what I'm asking you,

11   please let me know and I will be happy to repeat

12   the question.  Okay?

13     A    Okay.

14     Q    I will assume that you heard and

15   understood the question if you answer it, is that

16   fair?

17     A    That's fair.

18     Q    How old are you, sir?

19     A    Thirty-three.

20     Q    Your date of birth?

21     A    11/5/72.

22     Q    And your Social Security number?

23     A    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.

24     Q    Do you have a Florida driver's license?

25     A    I do.

6

1    Q   Do you happen to have that here with you

2  today?  May I take a quick look at it, please?

3    A   (Witness complies).

4    Q   Thank you, sir.

5        For the record, the witness has provided

6  me with a copy of a Florida driver's license, B

7  630-421-724050, expiration date 11/5/09.

8        Thank you, sir.

9        MR. ANDREWS:  We can a agree to redact

10    personal information?

11      MR. ROPER:  No problem.

12  BY MR. ROPER

13    Q   How long have you lived at your present

14  address, sir, in Polk County?

15    A   I think we bought it in April last year,

16  so about a year.

17    Q   And you and your wife live there?

18    A   My children.

19    Q   And your kids.  How old is your wife?

20    A   Shoot.  Twenty-nine.

21    Q   And what is her name?

22    A   Angela.

23    Q    Is she employed?

24    A    She works one day a week.

25    Q    And what kind of work does she do?

                        7

1    A    Dental hygienist.

2    Q    How old are your kids?

3    A    My son is five.  My little girl is two.

4    Q    It is my understanding before you moved

5    down to Lakeland last year you lived up here in

6    the Tallahassee, north Florida area?

7    A    Right.

8    Q    Were you born and raised up here?

9    A    I was born and raised in -- born in

10    Tampa, but I was raised in Suwannee County,

11    Bradford.

12    Q    Where did you go to high school?

13    A    Bradford High School.

14    Q    What year did you graduate?

15    A    1990.

16    Q    And your folks live in Bradford still?

17    A    Yes.

18    Q    For the record, what are your mom's and

19   dad's name?

20      A   Robert and Caroline Burt.

21      Q   And what is their address?

22      A   2623 South 83rd Road, Bradford.  32008.

23      Q   After you graduated from Bradford High

24   School, did you continue your education?

25      A   I did.

                              8

1      Q   And where did you do that?

2      A   Lake City Community College, Florida

3   State University.

4      Q   Did you obtain an AA Degree from Lake

5   City?

6      A   I did.

7      Q   What years did you attend Lake City

8   Community College?

9      A   '90 to '93.  Florida State, from '93 --

10   I am sorry, '94 to '95.

11      Q   Did you obtain a degree from Florida

12   State?

13      A   Bachelor's.

14      Q   What subject?

15      A    Criminology.

16      Q    Have you ever served in the military in

17   any capacity?

18      A    No.

19      Q    When did you commence your law

20   enforcement career?

21      A    Went to the academy in '95, began

22   Tallahassee Police Department in February '96.

23      Q    Where did you attend the police academy?

24      A    Pat Thomas, here in --

25           Well, actually in Quincy.

9

1       Q    And the name of the academy is Pat

2   Thomas?

3       A    Pat Thomas Law Enforcement Academy.

4       Q    Is that in Leon County?

5       A    It was Lively back then, but they

6   changed the name.  Yes, I believe it was Leon.  It

7   might be Gadsden County.

8       Q    And what year did you graduate from the

9   police academy?

10      A    December of '95.

11    Q    And you did the law enforcement program

12  as opposed to the correctional program?

13    A    Correct.

14    Q    And then your first law enforcement job

15  was with Tallahassee Police Department?

16    A    Yes.

17    Q    When did you start working with them?

18    A    February of '95.

19    Q    And were you hired as a road patrol

20  officer?

21    A    I was.

22    Q    What were your duties and

23  responsibilities with Tallahassee Police

24  Department as a road patrol officer?

25    A    Primary duty was answering calls for
                              10

1  service, and just criminal activity in the

2  specific neighborhood you are working, whatever

3  the problem is that we focused on, so crack

4  cocaine.  It varied from investigations.  Mostly

5  my activity was with drugs.

6    Q    How long did you remain in that capacity

7   with Tallahassee Police Department?

8      A   About two years patrol, and then I went

9   to a street-crime unit.

10      Q   What is a street-crime unit?

11      A   Basically we were assigned to a certain

12   neighborhood, like I said.  The problem in our

13   neighborhood happened to be crack cocaine, and

14   that's what we focused on, and 90 percent of the

15   time was focused on combatting that.

16      Q   What neighborhood were you assigned to?

17      A   Frenchtown.

18      Q   How long did you continue to serve on

19   the street-crimes unit?

20      A   Two years.  I was there four years, two

21   on patrol and two on --

22      Q   Is that the assignment you had right

23   before leaving Tallahassee Police Department?

24      A   Yes.

25      Q   And who was your supervisor when you

                              11

1   left TPD?

2      A   Glenn Sap, S A P.

3    Q    And is he a sergeant?

4    A    Yes.  He is a lieutenant now.

5    Q    Have you ever worked for or with a

6    sergeant by the name of April Doubrava?

7    A    She is not a sergeant.  I did work with

8    her.  I went to the academy with her.

9    Q    Why did you leave Tallahassee Police

10    Department?

11    A    I think it was more I wanted to live

12    somewhere else.  I thought I did at the time.  I

13    figured state law enforcement would give me that

14    latitude.

15    Q    Where did you want to live?

16    A    I applied to Florida Department of Law

17    Enforcement and I applied to the State Fire

18    Marshall's Office.  I got the State Fire

19    Marshall's Office job where I was eight months

20    there, Department of Insurance.

21    Q    And were you stationed here in

22    Tallahassee?

23    A    Actually, Live Oak.

24      Q    And you remained at that employment for

25   eight months?

                                12

1      A    Right.

2      Q    Let me back up with you for a second.

3   You graduated from high school in 1990, right?

4      A    Right.

5      Q    Did you play sports in high school?

6      A    I did.

7      Q    What did you play?

8      A    I played JV football.  I never did go to

9   the varsity squad.  I played baseball and

10   basketball.

11      Q    Did you play baseball and basketball on

12   the varsity team?

13      A    Yeah.  But not my senior year.  I did

14   10th and 11th.

15      Q    Why didn't you play your senior year?

16      A    I was just into other things.  I was

17   working on a farm.  I just wasn't into it.  We

18   didn't have a real winning year the year before,

19   and just nothing drew me back to it.

20     Q    So baseball and basketball you played on

21   the varsity team for two years and JV football

22   what year?

23     A    7th, 8th, and maybe 9th, that I

24   remember.

25     Q    After high school, did you play any

                              13

1   organized sports?

2     A    Men's softball.

3     Q    Where did you do that?

4     A    Bradford.

5     Q    Like a league there?

6     A    Yeah.  Just a little town league.

7   Nothing serious.

8     Q    Anything else?

9     A    No, sir.

10        (Discussion off the record.)

11   BY MR. ROPER

12     Q    As Mr. Andrews was saying, did you play

13   any sort of leagues or whatever associated with

14   your work at all?

15     A    No.

16    Q    While you were playing football or

17    baseball or basketball, did you ever get injured

18    in any way?

19    A    Yeah.  I broke my finger in football.  I

20    ripped -- tore a cartilage in my knee playing

21    softball.

22    Q    Which knee did you injure?

23    A    I have to look for the scar.  I can't

24    remember.  I think it was my right knee.

25    Q    Did that require surgery?

14

1    A    Yes.

2    Q    And was there a period of time that you

3    were out of work -- out of school, rather?

4    A    I'm trying to think what I was doing

5    then.  I was at Lake City Junior College.  I went

6    to school, but I had to be on crutches.

7    Q    How long was your recovery from that?

8    A    I think about five or six months.

9    Q    In addition to playing sports as a kid

10    and young adult, you also enjoy watching sports?

11    A    Oh, yeah.

12      Q    What kind of sports are you a fan of?

13      A    I like baseball.  I watch football,

14   Nascar.  I don't have much time any more with

15   kids, and I kind of got out of most of it.  I

16   haven't kept up with it.

17      Q    Are you a college football fan?

18      A    I'm a Florida State fan, but I'm not a

19   diehard.

20      Q    How about college or basketball fan, do

21   you enjoy that?

22      A    No, not really.

23      Q    Basketball?

24      A    I'm not really into basketball.

25      Q    Let's talk about continuing your
                              15

1   education -- excuse me -- your employment.  You

2   worked for the State Fire Marshall's Office.  Why

3   did you leave that employment?

4      A    FDLE was where I wanted to be.  It took

5   a little bit longer to hire me.  They basically

6   offered me a job.

7      Q    What were you doing at the State Fire

8   Marshall's Office?

9       A   I was an arson investigator.  I took

10  that job to get on the state retirement.  The

11  longer I stayed with the city, the longer my city

12  retirement would be in.  I wanted to go on state

13  retirement, and they offered it first, and that's

14  why I went with them.  My ultimate goal was FDLE.

15      Q   The Tallahassee Police Department, did

16  you leave that job voluntarily?

17      A   Oh, yeah.

18      Q   As far as you know, were you eligible

19  for rehire with that agency?

20      A   Right.  Right.

21      Q   Did you have any disciplinary action

22  against you at Tallahassee Police Department?

23      A   No.

24      Q   The same question with respect to the

25  Fire Marshall's Office.  Did you leave voluntarily
                              16

1   there?

2       A   Yes.

3       Q   Did you have any disciplinary action

4    against you there?

5        A   No.

6        Q   When did you start working with the

7    Florida Department of Law Enforcement?

8        A   December of 2000.

9        Q   And what position did you hold with

10   that?

11       A   Special agent assigned to Governor's

12   protective detail.

13       Q   Is that what you started out doing?

14       A   Yes.

15       Q   Is that the job --

16       A   No.  I started out doing that.

17       Q   How many agents were on that detail?

18       A   Probably 13, 14.

19       Q   And I have a general idea what that

20   involves.

21           Would you tell me a little bit about

22   what your job duties or responsibilities were in

23   that capacity?

24       A   My primary function was protection of

25   the Governor, which means we -- 24/7 operation.

1   We had midnight shifts when we rotated on and off,

2   and we traveled wherever he went.  We drove him.

3   We did advances to locations he was going to be

4   going to.  A lot of travel.

5      Q   Ultimately you resigned your employment

6   with FDLE?

7      A   Right.

8      Q   Was that in part because of the travel

9   that you were having to do?

10      A   No.  I was happy with FDLE, but it was a

11   money issue.  I had applied to ATF, which is

12   federal law enforcement.  Higher salary, and

13   that's why I accepted that job.

14      Q   Who was your supervisor with FDLE when

15   you resigned your employment there?

16      A   William Butler, or Bill Butler.

17      Q   What is his title?

18      A   He is a chief.

19      Q   His title is chief?

20      A   Chief Bill Butler.

21      Q   And is he still employed at FDLE?

22    A   He is.

23    Q   Is he stationed here in Tallahassee?

24    A   I believe he is still at the Mansion,

25  actually.

                          18

1    Q   What sort of training did you undergo

2  with FDLE as it relates to defensive tactics or

3  any sort of combat techniques or anything like

4  that?

5    A   You know, we all go through the stuff,

6  which I think I had a couple days of DT, just

7  baton strikes, you know, striking bag, nothing

8  real intense.

9         I went through a SWAT school, which was

10  a week long at Camp Landing.  Not much defensive

11  tactics as far as hand to hand, but more shooting

12  and technical, tactical, invasions of a house,

13  more that speed.

14    Q   What year did you go to the SWAT school?

15    A   It may have been 2002.

16    Q   And what was the purpose of going to the

17  SWAT school?

18    A    I was accepted on the FDLE special

19    operations team, which conducts, you know, search

20    warrants and fugitive apprehension.

21    Q    Now, would that be an assignment that

22    was in addition to your other duties on the

23    protective squad?

24    A    Right.

25    Q    And tell me what those responsibilities

                              19

1    would have entailed.

2    A    Basically any high-risk operation being

3    conducted by an agent in the field, especially

4    operations team to do it for them, like if he

5    needed to conduct a search warrant on the house,

6    we would do the entry, clear the house, and then

7    he would do his thing.  Sometimes we would go out

8    after fugitives or sometimes we would be

9    protection for the Governor, if it was a high-risk

10    event.

11    Q    Who was your supervisor on the SOT team?

12    A    Well, when I began it was Tal Whiddon.

13    Q    T A L --

14      A   T A L, Whiddon.

15      Q   How do you spell has last name?

16      A   W H I D D O N.

17      Q   Okay.

18      A   At the end it was Tommy Ford.

19      Q   Are both of those gentlemen still with

20   FDLE?

21      A   I believe.

22      Q   Are they both here in the Tallahassee

23   area?

24      A   I think Tommy is in Panama City.

25      Q   What about Tallahassee?
                           20

1      A   He is still in Tallahassee.

2      Q   And did you continue to serve on the SOT

3   team until your resignation from --

4      A   I did.

5      Q   Did you have any other special

6   assignments or special squads that you served on

7   when you worked for the FDLE?

8      A   No.

9      Q   During the time that you worked for the

10   FDLE, did you ever miss any time from work as a

11   result of your back injury that you claim to have

12   sustained in October of 2004 -- 2003, rather --

13      A   No.

14      Q   -- resulting from the Taser exposure?

15      A   No.

16      Q   Have you missed any time from work since

17   you started working with the ATF as a result of

18   that back injury?

19      A   No.  There were a couple times I had to

20   go to rehab during work, but I don't know if

21   that's what you are asking.

22      Q   If you took off time, it was to go to a

23   specific appointment?

24      A   Yeah.  Right.  I would be at work, and I

25   had an appointment, I would go over there for a
                              21

1   couple hours and come back.  As far as being at

2   the house for a week, no.

3      Q   Either while you worked with the FDLE or

4   when you worked for ATF, there have been no days

5   since October of '03 where you simply were unable

6  to go to work because of back pain?

7      A   Right.

8      Q   During the time that you worked with the

9  FDLE, did you have periodic training on different

10  police or law enforcement procedures?

11      A   I did; once a month for the SOT.

12      Q   What did that entail?

13      A   A lot of shooting, a lot of tactics,

14  going over, you know, how we operate, and actually

15  going through it, you know, entries, arrest

16  techniques.

17      Q   When you say entries and arrest

18  techniques, what are you talking about

19  specifically?

20      A   Just how we would react, the team, as

21  far as entering in the house, and who would cover

22  what areas of responsibility.

23      Q   And then you would actually go

24  through --

25      A   Simulation.

                          22

1      Q   -- an actual simulation of that tactic?

2    A    Correct.

3    Q    Where there ever any occasions since

4  October of 2003 where you either could not

5  participate in that event or were restricted in

6  any way from participating in any way from that

7  type of training?

8    A    No.

9    Q    In addition to the SOT training, is

10  there any other training that you underwent on a

11  periodic basis that involved any sort of physical

12  exertion or physical activity on your part?

13    A    Other than SOT training?

14    Q    Yes.

15    A    No.

16    Q    Let's talk about your current employment

17  with ATF.

18         What is your job title with that agency?

19    A    Special agent.

20    Q    And you began that employment in March

21  of '05?

22    A    February of '05, I believe.

23      Q    Your interrogatory answers indicate

24   February 12, 2005, is that right?

25      A    Yeah.

                            23

1      Q    What are your job duties and

2   responsibilities with ATF?

3      A    Our primary function is violent crime,

4   so anything to do with violent crime with a

5   firearm or explosives is 90 percent of what we

6   work on.

7      Q    And what is your role with respect to

8   the investigation of those types of crimes?

9      A    Well, we assist local agencies or we

10   develop our own cases in which I will work from

11   the beginning to the end.  It involves a lot of

12   undercover work with informants and things like

13   that.

14      Q    Do you work with a team?

15      A    We have a squad, but for the most part,

16   unless you need help, you are doing your own

17   thing.

18      Q    Who is your supervisor there?

19    A    Keith Heizerling, but he has only been

20  there a week.

21    Q    How do you spell his last name?

22    A    H E I Z E R L I N G.

23    Q    And what is his job title?

24    A    Group supervisor.

25    Q    How many folks are on your squad?
                              24

1    A    I think nine or ten.

2    Q    And who was your supervisor before

3  Mr. Heizerling?

4    A    We really haven't had one.  We had

5  acting supervisors.  People in the group step up

6  and just rotate.  Nobody specifically.

7    Q    Give me an idea, if you would, of your

8  day-to-day activities?  What does an average day

9  at work involve for you?

10    A    Usually 11, 12 hours on a long day; nine

11  hours on a short day.  In the vehicle, traveling

12  from county to county, cover six, seven counties.

13  It depends where you have a case going.

14  Interviews with suspects, witnesses, you know,

15    informants, and organizing undercover deals that

16    you plan on doing.

17        Q    Okay.

18        A    And a lot of typing.

19        Q    Have there been any occasions since you

20    began working with the ATF in February of '05

21    where you had to actually physically take somebody

22    into custody?

23        A    You know, we do it as a group.  I mean,

24    I have assisted.  I haven't done anything on my

25    own.  We have taken people into custody.

                              25

1         Q    Is that part of your job?

2         A    Right.

3         Q    You have arrest powers?

4         A    Right.

5         Q    You carry a firearm?

6         A    I do.

7         Q    Are you issued a Taser?

8         A    The group has one, but I specifically --

9     me, no.

10        Q    But there is one available for use to

11   members of the group?

12      A   Yeah.

13      Q   And has that been the case since you've

14   been there?

15      A   Yeah, I believe so.

16      Q   Where is that Taser weapon kept?

17      A   In our vault.

18      Q   And is that an approved item of

19   equipment that was issued to you by the ATF?

20      A   It wasn't issued to me.  I don't know if

21   I can use it, because I haven't been trained.  I

22   don't know what the policy is.

23      Q   But it is an item of equipment that's

24   made available for use by the agents of the ATF?

25      A   Right.  Right.

                          26

1      Q   Since you began working there in

2   February of '05, have you had any occasion to use

3   the Taser?

4      A   No.

5      Q   Has any other agent there at the ATF

6   used that Taser weapon since you started working

7    there?

8        A    They carry it, but nobody -- I don't

9    think anybody has used it.

10       Q    Who carries the weapon?

11       A    I wouldn't even know who.  I just know

12   it has been on operations.  I don't know who had

13   it on.  It rotates.  There's not one specific

14   person.  Sometimes we pull people in from all the

15   groups, and just whoever might throw it on, you

16   know.

17       Q    So there have been operations that you

18   have been on with the ATF or one of the agents

19   involved has been carrying a Taser weapon?

20       A    Right.

21       Q    Do you know for how long your group has

22   had that Taser weapon issued to the group?

23       A    I do not.

24       Q    Do you know whether the ATF has a

25   written policy or procedure with respect to the

                         27

1    use of a Taser?

2        A    I would be almost positive they do, or

3   they wouldn't have it out in the field.

4       Q   Have you ever reviewed that policy?

5       A   No.  I don't carry it with me, so it

6   wouldn't be something that I would pick up.

7       Q   Other than your firearm --

8           Incidentally what sort of weapon are you

9   issued by the ATF?

10      A   A SIG, SAUER, and a Colt AR-15, and a

11  12-gauge shotgun.

12      Q   Are you issued any other weapons such

13  ASP batons?

14      A   ASP baton.

15      Q   And are you certified to use an ASP

16  baton?

17      A   Yes.

18      Q   How long have you been certified to use

19  that weapon?

20      A   Ten years.

21      Q   Is that the same one that you used with

22  TPD?

23      A   The same type, but, you know, each

24  department issues their own.

25    Q    The same type?

                              28

1    A    Right.

2    Q    And presumably over the years you have

3    had training on the ASP baton?

4    A    I have.

5    Q    Have you ever participated in any

6    training classes regarding the ASP baton where

7    someone has been injured in some fashion?

8    A    Not that I recall.

9    Q    Do you know that that's happened in the

10    past, just from hearing about it?

11    A    I don't.

12    Q    In any of the agencies that you have

13    worked with, have you also had periodic training

14    regarding the use of force?

15    A    Yes.

16    Q    And that would involve not only when to

17    use force but also the type of force to use and

18    how to use it?

19    A    Correct.

20    Q    Would you agree with me, sir, that

21  generally that there is some inherent risk of

22  injury either to the suspect or to the officer

23  involved in any use of force?

24      A   Yeah, I would agree.

25      Q   Is that something that you have known

                          29

1  over the years as a law enforcement officer?

2      A   Yes.

3      Q   Let's talk about the area that you cover

4  with the ATF.  You said there were a number of

5  counties that you worked in.  What are those

6  counties?

7      A   Hillsborough County, Polk County, Pasco

8  County, Hardee County, Pinellas County, Hernando

9  County.  I believe that's it.

10      Q   And you work primarily in plain clothes,

11  correct?

12      A   Correct.

13      Q   The weapons that you described for me

14  earlier that you have been issued, you generally

15  don't carry those on you when you are working, do

16  you?

17     A   I carry a pistol.  I also have another

18  pistol I forgot.  It is a 357 Smith and Wesson.

19     Q   But --

20     A   No.  No.  That's for operations.

21     Q   And then when you are doing operations,

22  do you wear like a BDU, or something like that?

23     A   Most of the time jeans.  Sometimes BDUs.

24     Q   What is your current salary or hourly

25  pay with the ATF?

                          30

1     A   Yearly salary, I believe it is $55,000 a

2  year.

3     Q   And are you paid on a salary basis or

4  are you paid hourly?

5     A   Hourly.

6     Q   What is your hourly rate?

7     A   I don't even know.

8     Q   Do you know what your --

9     A   I mean, it is hourly, but yet it is

10  broken down into annual salary for us, because we

11  are required to work so many hours a week.  So I

12  don't know what my hourly rate is.  I just know

13  what the annual salary is.

14      Q   Do you know what your pay grade is?

15      A   GS 9.

16      Q   And how many hours a week are you

17  required to work?

18      A   Fifty.

19      Q   Do you get compensated for overtime?

20      A   It's already built in; so, no.  I mean,

21  we get compensated to begin with, so if you work

22  over, it's just one of those things.

23      Q   Since you started working at ATF, have

24  you received any pay raises?

25      A   Yes.

                                31

1      Q   Do you recall what your starting salary

2  was with ATF?

3      A   $48,000.

4      Q   And how many pay raises have you

5  received since then?

6      A   One.

7      Q   And have you also received promotions in

8  your pay grade?

9    A    Yeah.  Basically I started out as GS 7.

10    I became a GS 9 when the pay went up.

11    Q    In addition to your salary, obviously

12    you have all the standard governmental benefits in

13    terms of health insurance and retirement and all

14    that, right?

15    A    Correct.

16    Q    Do you have any other benefits like a

17    take-home car or anything like that?

18    A    A take-home car.

19    Q    Anything else along those lines?

20    A    No.

21    Q    Who hired you with ATF?

22    A    Good question.  I don't know.  It came

23    out of Washington, D.C.  I interviewed in Tampa.

24    I guess Ralph Ostroski.

25    Q    That's the special agent in charge?
                              32

1    A    Yes.

2    Q    Ralph --

3    A    O S -- I'll butcher that name -- T R O,

4    maybe, S K I.

5     Q   Is he still the special agent in charge

6   down there?

7     A   Yes.

8     Q   And that's the individual that you

9   interviewed with?

10     A   I believe he sat on the board.  But the

11   offer comes out of D.C., so I don't know who you

12   would say hired me.

13     Q   That was probably too broad of a

14   question.  I think you gave me what I need on

15   that.

16       Did you have to take a physical

17   examination in order to be employed?

18     A   I did.

19     Q   And where did you have that physical

20   examination?

21     A   Orlando.

22     Q   And do you recall the name of the

23   facility where you were checked out?

24     A   I don't.  I know it was in -- the

25   government has the health specialist in place at

33

1  every big city.  I don't remember the name, the

2  location.

3      Q   Do you know what type of health care

4  professional examined you?  Is it a doctor?

5      A   It is a doctor.

6      Q   And did he or she pronounce you fit for

7  duty?

8      A   Yes.

9      Q   Are you --

10     A   This is way before --

11         I mean, this is before --

12         I can't remember the date when I got the

13  exam.

14     Q   Your physical exam --

15     A   Was way prior to me getting hired.  It

16  took two years to get hired.

17     Q   When was your physical exam in relation

18  to your exposure to the Taser in October of '03?

19     A   It was before the exposure.

20     Q   So you had your physical exam for the

21  ATF job before the exposure?

22    A    Yes.

23    Q    At any time between the exposure to the

24  Taser and October of '03, when you started working

25  for ATF in January of '05, did you have any

                                34

1  additional physical examinations?

2    A    No.

3    Q    Were you required to complete paperwork

4  in order to apply for the job at the ATF?

5    A    That had already been done.

6    Q    Were you required to immediately prior

7  to hire update any of that information?

8    A    Basically that occurred when I got out

9  of the academy.  You know, it was just a brief

10  medical history of -- it wasn't really detailed.

11  They gave like a 10-second blood pressure check,

12  and then we were out to the training.

13    Q    I'm not sure I'm understanding you.

14        You applied for a job with the ATF while

15  you were still at the police academy?

16    A    No.  No.  ATF sent me to another

17  academy.  The first day at the ATF academy, you

18   know, we did a little five-minute thing with the

19   nurses where they took our blood and height,

20   weight, and that sort of thing.  It wasn't really

21   anything detailed.

22        Q    Were you required to fill out any sort

23   of a medical questionnaire at that time?

24        A    Yes.

25        Q    And did that ask whether or not you had
                              35

1   any physical limitations or restrictions?

2        A    Yeah.

3        Q    Do you recall what you said in response

4   to that question?

5        A    I put no, I'm sure.

6        Q    Would it be fair to say, sir, that since

7   you started working with the ATF in December of

8   '05, up until the present, you have been able to

9   perform all of the physical requirements of that

10   job?

11        A    Yes.

12        Q    And your back injury, which you claim

13   occurred in October of '03 has not interfered with

14   your ability to do your job in any way?

15       A   No.  I mean, you know, it gives me

16   discomfort, but I'm not the type of guy to sit in

17   bed and whine about it.  It would have to disable

18   me to complain about it.  No, I get through the

19   day, you know.  It hasn't stopped me.

20       Q   And would it also be fair to say that

21   the back injury that you claim occurred on

22   October 23, 2003 didn't prevent you from doing

23   your job with FDLE either?

24       A   Correct.

25       Q   Where did ATF send you to another
                              36

1   academy?

2       A   Brunswick, Georgia.

3       Q   And how long was that academy?

4       A   Six months.

5       Q   Six months?

6       A   Um-hum.

7       Q   That's an academy?

8       A   Yeah.  It wasn't fun.  Being a way from

9   home I should say wasn't fun.

10     Q     And what period of time were you there

11  at the academy for ATF?

12     A     I believe I started in March or maybe

13  late February.  I came home in September.

14     Q     So really the job that you are doing now

15  you really only have been doing it since September

16  of '05?

17     A     Correct.

18     Q     Since October of '03, have you ever

19  requested that any employer make any special

20  accommodations for you in connection with your

21  back injury?

22     A     No.

23     Q     Now, have you received performance

24  evaluations since you started working at ATF?

25     A     A couple.  I think we are way behind in
                              37

1  doing them.

2     Q     How were your performance evaluations?

3     A     Good.

4     Q     Did any of your supervisors note any

5  deficiencies in your performance?

6    A    No.  No.

7    Q    And prior to today's deposition --

8         Mr. Andrews provided me with some

9    records which I believe were your employment

10   records from FDLE.  I had a chance to look through

11   those.  I do see that there were a number of

12   performance evaluations that you had at FDLE

13   during the time that you were employed there,

14   correct?

15   A    Right.

16   Q    The employment evaluations that I

17   reviewed in here appear to go up through October

18   of 2002.

19   A    Okay.

20   Q    There don't appear to be any after that.

21        Do you recall receiving performance

22   evaluations after October of 2002?

23   A    It's required.  I received them right up

24   until when I left.

25   Q    And this is just a housekeeping matter.

                              38

1    We are going to need to follow up on that to get

2    those evaluations.

3        Do you recall after October of '03

4    receiving any criticisms regarding your job

5    performance at FDLE?

6    A   No.  No.

7    Q   The training that you participated in in

8    October of '03, regarding the Taser, what was the

9    purpose for that training?

10       A   The purpose was we were -- our team, I

11   think we had been trying to get them, but our team

12   was being activated to go to Miami for FTAA, as a

13   security measure, and we wanted to carry them down

14   there in case we needed them, so we had to take

15   the training to be certified.

16       Q   And you were being certified as a user

17   as opposed to an instructor?

18       A   Well, it was an instructor's course, but

19   I wasn't certified to be a state instructor.  If I

20   would have had the certification, I could have

21   been an instructor.  It wasn't an instructor's

22   course, I believe.

23       Q   Your purpose in doing it was to become

24  certified as a user?

25     A   Right.

                        39

1     Q   And the conference that you referenced

2  down in Miami, that was Free Trade of the Americas

3  Conference?

4     A   Right.

5     Q   When you said we were trying to get

6  them, first of all you are referring to the Taser,

7  correct?

8     A   The team was trying to acquire a couple

9  Tasers to use on operations.

10     Q   And why was the team interested in

11  acquiring the Tasers?

12     A   Just another tool to use, you know.  The

13  more tools you have, the more successful an

14  outcome.

15     Q   Was there anyone in particular that was

16  interested in getting the Taser weapons?

17     A   Nothing pops in my mind.

18     Q   Do you recall anyone that suggested --

19     A   I don't.  I was just told be at this

20   training, this day.  So no.

21      Q   Do you know who at FDLE made the

22   determination that your team should receive that

23   training?

24      A   I do not.

25      Q   How were you notified of the need to

                        40

1   appear for the training?

2      A   I would assume by email.  That's how we

3   are usually notified.

4      Q   Who would that email have come from?

5      A   Probably the team leader, Tal Whiddon.

6      Q   Tal?

7      A   Tal.

8      Q   There wasn't a separate training

9   coordinator or something like that?

10      A   No.  There is, but our team was led by

11   Tal.

12      Q   After the training that you received

13   regarding the Taser weapon in October of '03, were

14   you issued a Taser?

15      A   No.

16    Q    Was your team issued a Taser?

17    A    Yes.

18    Q    After October of '03, did you ever have

19  occasion to use a Taser?

20    A    No.

21    Q    As you sit here today, have you ever

22  utilized a Taser?

23    A    No.

24    Q    Did you use it during the training?

25    A    I did.

                        41

1    Q    Did you actually shoot it?

2    A    Yes.  We had dummies or something set up

3  where we fired into the dummy.

4    Q    And how many times did you do that?

5    A    Probably two.

6    Q    But you never, since October of '03, had

7  occasion to use it in the field?

8    A    No.

9    Q    Have you ever been present when the

10  Taser weapon has been used in the field by another

11  law enforcement officer?

12    A    No.

13    Q    If I refer to Taser training, you know

14    what I'm talking about, the incident in October of

15    '03 where you were injured; okay?

16    A    Okay.

17    Q    Let's talk about first of all the Taser

18    training.  Where was it located?

19    A    Pat Thomas Law Enforcement Academy.

20    Q    And what time of day did the training

21    start?

22    A    Morning, probably 9:00 o'clock.

23    Q    When were you notified of the need to go

24    to training in relation to when you actually went?

25    A    Probably weeks before.

                              42

1    Q    Prior to going there that morning for

2    the training, had you reviewed any materials that

3    related to the Taser?

4    A    No.

5    Q    Had you visited the Taser web site, for

6    example?

7    A    No.

8     Q    Did you speak with anyone else about the

9   Taser weapon, their experience with it, anything

10   like that?

11     A    No.  I just, you know, shot around with

12   some guys on the team, what's this about, we have

13   to go get shocked by it, and we will be certified,

14   and that's basically what our conversation was

15   about.  Nobody with experience with it.

16     Q    When you worked with the Tallahassee

17   Police Department, did the agency have Taser

18   weapons?

19     A    No.

20     Q    At any point in your life have you been

21   present when the Taser weapon has been utilized on

22   a suspect?

23     A    No.

24     Q    What happened once you got to the

25   training on October 28, 2003?

                          43

1     A    Basically it was just a classroom for

2   the majority of the day.  We handled the Taser.

3   The instructor showed us different parts of it.  I

4    believe there was a Power Point presentation.  He

5    gave us some paperwork, and then we went to the

6    hands-on, you know, loading, unloading the

7    batteries, you know, how it operated.  Then we did

8    the -- we may have been exposed, and then did the

9    outside, where we shot a dummy.  I can't remember.

10   It wasn't a real long course.

11       Q    What time of day were you exposed to the

12   Taser?

13       A    I'm thinking it was around mid-day,

14   around lunch.

15       Q    Do you recall approximately how many

16   other people were in the training class?

17       A    Probably 12 people.

18       Q    And some of those folks were from your

19   agency?

20       A    Yeah.  It was only us.

21       Q    It was only your agency?

22       A    FDLE.

23       Q    Who else was present during the

24   training?

25      A   Do you want names?

44

1      Q   Yes.  Brian Falstrom, F A L S T R O M.

2      A   F A L S T R O M.  Jim Biddle.

3      Q   How do you spell his last name?

4      A   B I D D L E.

5          Eric Yopp, Y O P P.  Jason Knowles, K N

6   O W L E S, Randy Barnes.

7      Q   N E S?

8      A   Yeah.

9          Other members of my SOT team; I just

10   can't remember their names right now.

11      Q   I saw your interrogatory answers that

12   you think that Jason Knowles may have been

13   videotaping the training?

14      A   Yeah.  I know it was videotaped.

15      Q   Does he still have possession of that

16   videotape?

17      A   I'm not sure.  I can find out.

18      Q   Is he still with FDLE?

19      A   Yeah.

20      Q   Have you ever seen the videotape?

21    A    Yes.

22    Q    When is the last time you saw the video?

23    A    Probably a couple weeks after we did it.

24  You know, everybody emails it around, laughs at

25  everybody screaming, you know, in pain.  After

                        45

1  that, I just -- I deleted it.  It was sent out in

2  an email.

3    Q    It was sent out as an email attachment?

4    A    Correct.

5    Q    Sent out to all the members of your

6  team?

7    A    Yeah.

8    Q    And was it Jason Knowles that did that?

9    A    Yeah.  Because I think it was his

10  camera.

11    Q    So you haven't seen the video since

12  early 2004, at least?

13    A    Right.

14    Q    And was it actually a videotape or was

15  it a CD?

16    A    It was a camera with a video, Mpeg, one

17   of the cameras that can take video footage, I

18   believe.

19      Q    And you recall that your exposure was

20   actually depicted on that film, footage?

21      A   Yes.

22      Q    Do you recall the name of the instructor

23   that was teaching the class?

24      A   I don't.

25      Q    Do you know who he or she was affiliated

                              46

1   with?

2      A   I don't.

3      Q    Could you describe physically what the

4   instructor looked like?

5      A    Maybe 6-foot, kind of stocky build,

6   blonde hair, if I recall right, and that's about

7   it, middle age.

8      Q    What is middle age to you?

9      A    Well, he was probably late 30s, early

10   40s.

11       MR. ANDREWS:  That's not middle age

12    anymore.

13    BY MR. ROPER

14        Q    Was he wearing any kind of a shirt with

15    an insignia or anything like that on it?

16        A    I don't know.  I can't remember.

17        Q    Was there only one instructor?

18        A    Yes.

19        Q    As we sit here today, do you know for a

20    fact, one way or the other, whether anybody from

21    Taser International was present at your training?

22        A    He was the only instructor.  I do not

23    believe he was affiliated with the actual company.

24    He may have been a contractor that comes and

25    trains, but he was the only one there representing

                                47

1    the device.

2        Q    Before the actual training session

3    commenced, did you get some written materials that

4    were given to you?

5        A    Yes.

6        Q    And did you look through those

7    materials?

8        A    Yeah.  I mean, probably flipped through

9   them.  If he said go to page so-and-so, I would

10  look at it.  I'm not in the habit of sitting there

11  reading through stuff.  I mean, he was going to

12  give us what we needed in my mind.  I didn't sit

13  there and read through it, no.  But I glanced

14  through it.

15      Q   As he was going through the Power Point

16  presentation, there were times that he would make

17  specific reference to certain portions of the

18  materials?

19      A   Possibly.  I can't say for sure one way

20  or the other.

21      Q   What do you recall about the Power Point

22  presentation?

23      A   I'm sorry.  Nothing.  It's been so long

24  ago, I've been to so much training.  I just

25  remember there was a Power Point.  I remember
                            48

1   hands-on with the device.  Other than that --

2       Q   Do you recall any of the specific slides

3   that you were shown during the course of the Power

4   Point presentation?

5     A   I know we were shown some videos of the

6  actual device being used, like from in-car

7  cameras.  I do remember that, because it was --

8  that stands out in my mind.  As far as like, you

9  know, writing, no, I don't remember the content.

10     Q   Some of the slides that you were shown

11  did have written content on there, correct?

12     A   Yes.

13     Q   But it's just that you can't recall what

14  was on there?

15     A   Right.

16     Q   Did you keep the written materials that

17  you were given?

18     A   Yes.

19     Q   You took those home with you?

20     A   Yes.

21     Q   Do you still have those?

22     A   I think I could find them if I dug

23  through my boxes.  I found the certificate a while

24  back.

25     Q   At the end of the training you were

49

1  issued a certificate?

2     A   Right.

3     Q   Did that certify you as a user?

4     A   I believe it says instructor.  Like I

5  said, I wasn't state certified to be an

6  instructor, so it was kind of useless.

7     Q   You still have the certificate, though,

8  that you received?

9     A   Yes.

10     Q   Now, generally you would provide that

11  certificate to your employer, right, so it could

12  be kept as part of your training file?

13     A   No.  I don't think I provided that to

14  ATF.

15     Q   I saw some other training certificates

16  in there, but I didn't see the one from the Taser.

17     A   If they were in there, it's probably

18  stuff I have done with FDLE.  The TPD stuff

19  wouldn't transfer over.  They know what I have

20  taken, but they wouldn't have the actual

21  certificate.

22     Q   Did FDLE keep a record of the actual

23   trainings that you participated in?

24      A   Yes.  Yes.

25      Q   And was it the team leader's

                              50

1   responsibility to report that information to ATF?

2      A   Yes.

3      Q   Were records kept by FDLE of the

4   training?

5      A   Yes.

6      Q   And where are the records for your --

7   your personnel record for FDLE maintained?

8      A   At the human resources division; that's

9   where I picked those up.

10      Q   And the documents you brought for us,

11   that's your personnel file?

12      A   Right.

13      Q   Presumably then would you have a

14   separate training file?

15      A   Yeah.  I'm sure there is.  I've never

16   seen it.  I have never been tasked with keeping up

17   with one.

18      Q   The reason I ask, it doesn't appear that

19  we have all your training.

20     A   Yes.  I'm sure there is a training file

21  that kept track of everything I did, but I just

22  don't know who did it and where it is kept.

23        MR. ANDREWS:  I'm not sure that there is

24     a separate training file.  There may be.  The

25     representative of FDLE -- there may or may

                          51

1     not.  It is hit or miss.

2        MR. ROPER:  Off the record.

3        (Discussion off the record.)

4  BY MR. ROPER

5     Q   Going back to the video for a second.

6  You are not currently in possession of a copy of

7  the video?

8     A   No.

9     Q   Other than perhaps Jason Knowles, do you

10  know anybody else that might have that video?

11     A   No.

12     Q   Did you volunteer for the training with

13  the Taser or were you ordered to do it?

14     A   I would say neither.  I mean, I was just

15  told to go, and that's what you did.  I wasn't

16  ordered to go.  They didn't say if you don't do

17  this you are in trouble.  It is a training course,

18  and I got the email to go, so I went.

19      Q   Was it a requirement of your job to

20  participate in this training?

21      A   I would say yes.

22      Q   Did you have the option to say no?

23      A   That's a good question.  I don't know.

24  I never said no to training.  I don't know.  I'm

25  sure I could have said no.

52

1      Q   How long do you recall the Power Point

2  presentation lasting?

3      A   Like I said, the entire course was

4  short; so not very long.  Maybe an hour.

5      Q   Do you recall that the Power Point

6  presentation was broken up at all?

7      A   Right.  We would go through stuff, and

8  then he would demonstrate, or we would hold the

9  device.  We talked about the batteries.  He would

10  take the batteries out.  It wasn't continuous

11   going through it.

12       Q   Do you recall you having any questions

13   of the instructor as you went through the

14   training?

15       A   I don't recall.

16       Q   Do you recall anybody else in the class

17   asking any questions?

18       A   Oh, yeah.  There were many questions.  I

19   just don't recall what they were.

20       Q   Do you recall what, if anything, you

21   were told regarding the safety of the product?

22       A   I was under the impression from the

23   course that, you know, it was safe, no injuries

24   have been documented as far as law enforcement

25   officers taking the training.  That's the
                                53

1    impression I got.  It was safe, and you are hooked

2    up to it, and once it is over, it is over and you

3    are back to normal.  That's basically what was

4    conveyed.

5        Q   I understand that was your impression.

6            Do you recall actually what you were

7   told during the course --

8        A   I don't specifically, no.

9        Q   Do you recall whether you received any

10   warnings regarding potential for injury associated

11   with exposure to the Taser?

12       A   No.  I'm sure I didn't receive that.

13       Q   So your recollection --

14       A   At least not verbally.  There could have

15   been something in the pamphlet that I didn't see.

16       Q   Do you recall being shown any slide on

17   the Power Point presentation which addressed the

18   potential for injury?

19       A   I do not recall.

20       Q   Are you saying that you were not shown

21   that slide or that you just don't recall one way

22   or the other?

23       A   I'm saying I don't recall one way or the

24   other.

25       Q   What do you recall being told about the

                        54

1   manner in which the product worked?

2        A   Basically it was run on I believe a

3    double-A battery, and you fired it, and two prongs

4    were fired from the end of it into your subject,

5    and 50,000 volts of electricity was dispersed.

6        Q    Anything else?

7        A    Not right offhand, no.

8        Q    Do you recall being given any

9    instruction regarding the amount of voltage to

10    which the body itself is actually exposed to?

11        A    I remember talking about it, but like I

12    said, it's been so long since I went through it,

13    and I haven't had any exposure since.  I don't

14    remember.

15        Q    Do you recall being given any

16    instruction regarding the manner in which the

17    electrical pulses from the weapon controls parts

18    of the body?

19        A    I remember talking about muscle

20    contraction.

21        Q    Do you recall being told prior to your

22    exposure that the device would cause muscle

23    contractions in the body to a person that was

24   exposed to the Taser?

25   A   Yes.

55

1   Q   Now, my understanding of your lawsuit is

2   that your claim is that you were not properly

3   warned about potential dangers associated with the

4   product?

5   A   Right.

6   Q   And it's my understanding your testimony

7   is that as we sit here today you don't recall

8   being given any warning at all about potential

9   dangers, correct?

10   A   Right.

11   Q   Would you agree with me, sir, that it's

12   not possible for a manufacturer of a product to

13   warn of every single possible injury that could

14   result from the use of a product?

15       MR. ANDREWS:  Object to the form.

16       Go ahead.

17       THE WITNESS:  I would agree.

18   BY MR. ROPER

19   Q   And as we sit here today, do you know

20   whether prior to October 28, 2003 Taser was on

21   notice of any injury that was similar to the one

22   that you claim in this case?

23      A   No, I don't know.

24      Q   Do you know whether prior to October 28,

25   2003 any injury similar to the one you are

                             56

1   claiming in this case had ever been documented or

2   reported to Taser?

3      A   There was some research done through

4   talk that it had happened before.  I don't know --

5         I think I saw some on the internet.  I

6   know a fellow down in Lake City that had broken

7   vertebras about the same area that I did.

8      Q   You are talking about the fellow that is

9   the co-plaintiff in this case?

10      A   Right.

11      Q   Do you know when his incident occurred?

12      A   I don't.  I don't know anything about

13   the fellow.

14      Q   Let me ask you to assume that his injury

15   didn't happen until after yours.

16    A   You are asking prior to mine if I knew

17  of any?

18    Q   Yes.

19    A   I don't.

20    Q   What I'm asking, and I want to make sure

21  that we are communicating, whether you know that

22  prior to your injury any similar injury to yours

23  was ever documented or reported to Taser.

24       MR. ANDREWS:  Object.  Are you asking

25       whether he knows today or whether he new
                          57

1   before?

2       MR. ROPER:  Whether he knows today.

3       MR. ANDREWS:  Let me interpose an

4   objection here.

5       I object to the extent, Mr. Burt, that

6   if you learn anything from what we have told

7   you in connection with your case, don't

8   answer.

9       But if there's any other information you

10   have away from talking to your lawyers, then

11   by all means answer.

12          THE WITNESS:  I found on the internet a

13     police forum.  I was trying to research the

14     Taser injuries.  I typed in Taser injuries to

15     see if anything else happened, like what

16     happened to me.  And I did read some, you

17     know, paragraphs in that police forum of

18     other vertebrae fractures.

19  BY MR. ROPER

20     Q    That occurred prior to yours?

21     A    I don't recall that.  I don't know the

22  date.

23     Q    Do you know the names of any of those

24  officers that allegedly sustained --

25     A    I know somewhere in Arizona.  I don't
                              58

1   recall the names.

2      Q    If we agree that it is not possible for

3   a manufacturer of a product to warn of every

4   potential risk associated with the use of a

5   product, what sort of a warning do you think would

6   have been appropriate in this case to warn you?

7          MR. ANDREWS:  Let me interpose an

8        objection.  Object to the form.

9            Go ahead, Jeff.

10           THE WITNESS:  If they were aware of the

11       injury before my training?  If they were

12       aware that other people were claiming this

13       before mine or if no such injuries have been

14       reported.

15   BY MR. ROPER

16       Q    Let's assume that no such injuries have

17   been reported.

18       A    I guess they wouldn't know what to warn

19   about if any hasn't been reported.

20           Maybe a potential --

21           I don't know.

22       Q    What sort of a warning do you think

23   would have caused you to reconsider whether you

24   were exposed to the Taser?

25           MR. ANDREWS:  Object to the form.  Go
                              59

1        ahead.

2            THE WITNESS:  Well, definitely if broken

3        bones would have been involved, especially a

4      broken back, I would have bowed out.  I can

5      deal with a pulled muscle or sprain, if I

6      fell, but broken vertebrae are pretty

7      serious.

8    BY MR. ROPER

9      Q    You think if a warning that you might

10   sustain a broken bone had been given that would

11   have been sufficient?

12      A    For me, yes.

13      Q    Now --

14      A    Caused by the device, not caused by,

15   hey, I fell on the floor and broke my finger.

16   Let's put it in perspective.  You know, if I'm

17   standing on my feet and I fell to the ground and I

18   received a broken bone, yeah.

19      Q    You know that in the past, and in fact

20   experienced it yourself, that sometimes when you

21   are involved in sporting events you sustain

22   injuries; correct?

23      A    Correct.

24      Q    And even though it may not be what you

25   want, sometimes you sustain either pulled muscles

1    or damaged ligaments or broken bones from sporting

2    activities?

3        A    Right.

4        Q    And you have known those folks that you

5    have played with, and also on TV, you have seen

6    folks involved in athletic events that have

7    suffered broken bones?

8        A    Correct.

9        Q    Injuries to their spine?

10       A    No.  Never.  I have never known of

11   anybody.

12       Q    You never heard of anybody?

13       A    I heard of it, but I never have known

14   anybody personally.

15       Q    Let me change the question a little bit.

16           Certainly just in your general

17   experience both in participating in sports and

18   watching sports, you heard over the years about

19   folks in athletic activities sustaining injuries

20   to their spine?

21       A    Sure.

22    Q    A couple of well publicized ones, Nick

23  Bonafonte's son who injured his neck playing

24  football?

25    A   Right.

61

1    Q    Folks playing baseball or basketball

2  that may have injured their spines or necks,

3  correct?

4    A   Right.

5    Q    In light of that, if you had been warned

6  that exposure to the Taser could cause injuries

7  similar to ones sustained in athletic activities,

8  do you think that would have been sufficient to

9  warn you of the potential for the danger?

10    MR. ANDREWS:  Object to the form.  Calls

11    for a legal conclusion.

12    Go ahead.

13    THE WITNESS:  You know, I think if there

14    had been warnings like that, I think it would

15    have been questioned a little bit more as to,

16    hey, do we really have to do this, or is this

17    required to carry this thing.  I don't think

18     it would have been so much everybody going in

19     without any questions about it, put it that

20     way.

21  BY MR. ROPER

22     Q   Do you think a warning to the effect

23  that you could experience injuries similar to

24  athletic injuries would have put you on notice for

25  the potential for an injury like the one you

                          62

1  sustained?

2        MR. ANDREWS:  Objection.

3        THE WITNESS:  No.

4        MR. ANDREWS:  Go ahead.  On this line,

5     if I need to interpose objections -- you have

6     a police officer's habit of presupposing the

7     question.

8        Mr. Roper is being very deliberate and

9     slow.  To the extent that I can interpose

10     objections -- I don't mean to interfere with

11     the deposition.

12        THE WITNESS:  No.  In my mind a sporting

13     injury would be a pulled muscle, broken arm,

14    leg.

15          I mean, my back, I consider it a pretty

16    serious break, because it will affect you the

17    rest of your life.  So I think that would be

18    on the very top range of a sporting injury,

19    maybe even out of the realm.  It is not a

20    very common injury.

21          You hear about sporting injuries, pulled

22    muscle, broken arm.  You never hear of two

23    broken vertebras, at least I don't.

24  BY MR. ROPER

25    Q   Are you saying that in order to warn you

                          63

1   of your potential for injury, that the

2   manufacturer had an obligation to tell you

3   specifically that you might injure your T4/5

4   vertebra?

5    A   No.  But you asked --

6          Can you ask that question again?

7    Q   I guess what I'm trying to ask you, what

8   sort of a warning do you think would have been

9   sufficient to place you on notice of the potential

10  for the type of injury that you sustained?

11     A   You know, I don't know.  Maybe --

12        It all goes if they knew that other

13  injuries had been documented.

14     Q   If, in fact, Taser did not know of prior

15  similar injuries to the one you were claiming, do

16  you believe they had any obligation to warn you of

17  the type of injury you sustained?

18        MR. ANDREWS:  Object to the form.  To

19        the extent that it is a hypothetical, and

20        calls for facts not in evidence.

21        Go ahead.  Answer it if you can.

22        THE WITNESS:  I really don't know what

23        you are looking for here.  I don't know how

24        to answer your question.

25  BY MR. ROPER

                        64

1     Q   Short of saying exposure to this product

2  could result in an injury to your T4/5 vertebra,

3  is there anything else that Taser could have done

4  to warn you of the potential for your injury?

5        MR. ANDREWS:  Object to the form.

file:///E|/4-13-06%20JJJB%20(FL)%20Deposition%20of%20Jeffrey%20Burt.txt

6        Go ahead.

7        THE WITNESS:  Is there anything else --

8   BY MR. ROPER

9        Q    To warn you personally of the potential

10   for your injury.

11        A    Well, for me I had to hear it from the

12   instructor verbally.  I cannot have it in a packet

13   of paperwork where I probably won't read it.  It

14   has to be verbal and from the instructor, and I

15   never heard anything like that coming out of the

16   man's mouth.

17        Q    Even if it was in writing as part of the

18   Power Point presentation, you don't think that

19   would have been sufficient?

20        A    Maybe not.  I mean, if he is flipping

21   through and I'm looking at the device, maybe I

22   missed it.  It has to be verbal.

23        Q    What verbal warning do you think would

24   have been sufficient to place you on notice for

25   the potential for your injury?

                          65

1        MR. ANDREWS:  Same objection.

2        Go ahead.

3        THE WITNESS:  Potential for broken

4    vertebras during the training; I probably

5    would have got up and walked out.

6  BY MR. ROPER

7    Q    If you were warned as a potential for

8  broken bones --

9    A    I would have probably stopped and said I

10  have two kids, a wife at the house that doesn't

11  work, my job is everything to me, I can't afford

12  to be injured.

13    Q    Were you ever told at any point in time

14  during the training that the exposure to the Taser

15  was completely without risk?

16    A    I just remember them saying once it is

17  off, you are completely back to normal.  Basically

18  saying you get zapped, the gun is off, you are

19  back to normal, 100 percent.

20    Q    Did anyone during the training, though,

21  ever tell you that the exposure to the Taser was

22  completely risk free?

23     A   I can't recall.

24     Q   Did anyone tell you during the training

25   that you absolutely would not be injured as a

                                66

1   result of exposure to the Taser?

2     A   That I would not be injured?

3     Q   Yes, sir.

4     A   Those specific words, no.

5     Q   Do you ever recall seeing a slide or

6   being told verbally that there was a potential for

7   injury associated with being exposed to the Taser?

8     A   I don't.

9        MR. ANDREWS:  Object to the form.  It is

10       a little repetitive.  I think you got an

11       answer, so --

12   BY MR. ROPER

13     Q   Did you volunteer to be exposed to the

14   Taser?

15     A   Yes and no.  I mean, I didn't call

16   somebody and say I'm volunteering.  I was told to

17   be at a class where we are taking Taser training,

18   and I attended it.  I mean, I was given the email

19   to attend.

20      Q   Did anyone tell you that in order to be

21   certified to use the Taser you had to be exposed

22   to the Taser?

23      A   Nobody sat me down and said to do this

24   you have to be exposed.  But that was the --

25   that's what everybody thought.  I don't know where

                        67

1   that came from, but it was -- it was thought that,

2   hey, and nobody ever questioned it.  But I never

3   specifically heard anybody say that.

4      Q   Do you recall being told that exposure

5   to the Taser was not mandatory?

6      A   I was never told that.

7      Q   Do you recall seeing a slide as part of

8   the presentation that --

9      A   I do not.

10      Q   To your knowledge, did your agency

11   require you to be exposed to the Taser in order to

12   be certified?

13      A   I don't know.  Not to my knowledge.  I

14   don't know if they required us to be hit by it.

15    Q    Let's talk about the actual exposure to

16    the Taser weapon itself.

17         Were you shot with the probes or were

18    the probes attached to you in some fashion?

19    A    Attached.

20    Q    Was anyone in your group shot --

21    A    One person.

22    Q    -- with the probes?

23    A    Right.

24    Q    Tell me in your own words how the

25    exposures were handled that day at your training?

                        68

1    A    Handled as far as person receiving?

2    Q    Yes.

3    A    I mean, it's painful, and there was a

4    lot of screams.  I don't know what you are getting

5    at.

6    Q    Poor question on my part.  Let me back

7    up.

8         Take me through and describe to me --

9         First of all, were there people exposed

10    to the Taser before you?

11    A   Yes.

12    Q   Take me through that and describe for me

13   what happened with respect to the exposure before

14   you were exposed to the Taser.

15    A   Well, basically we were put in a line,

16   and two guys on each side to make sure that the

17   person didn't fall to the ground.  He would take

18   the probes -- he would tape some to some people's

19   legs and had them hold arms.  For the most part,

20   they were taping people's backs, one on this

21   shoulder and one on the hip.  He would give them I

22   think three seconds -- three or four seconds

23   worth.

24    Q   Was the first person actually shot with

25   the probes?

69

1    A   The first person, and then the rest of

2   us they were just attached.

3    Q   Do you know the person that was shot

4   with the probes?

5    A   I don't remember his name.

6    Q   And you were indicating that with

7   respect to your exposure the leads were taped one

8   to your left shoulder and one to your left hip?

9       A   Correct.  No.  Left shoulder, right hip.

10      Q   Left shoulder, right hip?

11      A   Yeah.

12      Q   Your interrogatory answers indicated

13  left shoulder, left hip.

14      A   They crossed.  That's a mistake.  They

15  came across my back.  They didn't go straight

16  down.

17          If you drew a line from where one was

18  placed and the other one, that's where the

19  fractures were, if you drew a straight line.  It

20  came down through the middle of my back.

21      Q   And you are certain about that, as far

22  as the location of the probes?

23      A   Yeah.

24      Q   Were the probes still attached when you

25  were exposed or had they been removed from the

                        70

1   leads that came out of the gun?

2       A   I don't understand your question.

3     Q    The weapon shoots two probes that are

4   attached to the weapon by a wire or a lead?

5     A    Right.  Right.

6     Q    When you were exposed to the weapon, had

7   the probes been removed or --

8     A    I'm not sure.  They were taped.  I think

9   they had duct tape or something that made it stick

10  to you.  I didn't look at it.  He stuck it to me.

11  I didn't examine the pad that he was sticking in

12  my back.

13    Q    Did you have a shirt on?

14    A    I did.

15    Q    What kind of shirt did you have on?

16    A    Polo-type shirt (indicating).

17    Q    Any undershirt or anything?

18    A    No.

19    Q    And you are indicating so I can see, as

20  I sit here across, where you are pointing to, but

21  for the record I need to be a little bit more

22  specific where you are indicating where the probes

23  are attached.

24         You are indicating your left shoulder,

25   along the back of your left shoulder, along the

71

1   scapula area here?

2       A   Right.

3       Q   About midway on your shoulder?

4       A   Right.

5       Q   Were you left with any sort of a mark on

6   your body after?

7       A   Slight.  You know, just really hard to

8   see.  It looked like I had been pricked by a pin

9   or something like that.

10      Q   Like a little red area?

11      A   Right.

12      Q   Was your skin penetrated in some way

13   or --

14      A   If I recall there was a slight -- just a

15   little indention.  I don't know if it was an

16   actual little hole.

17      Q   Do you have any photographs of that?

18      A   No.

19      Q   And then the other probe was -- or lead

20   was taped to your right hip?

21      A   Lower back.

22      Q   Lower back?

23      A   Here (indicating).

24      Q   You are indicating --

25      A   Low right back.

                              72

1       Q   You are indicating waistline?

2       A   Just above waistline.  It was taped to

3   my shirt.

4       Q   But on the low-back area?

5       A   Right.

6       Q   On the right side of your body?

7       A   Right.

8       Q   Outer part of your body?

9       A   Outer, as in --

10          I mean, just lower back, facing back.

11      Q   Closer towards the outside of your body

12   than to your spine?

13      A   No.  Closer to my spine.

14      Q   Closer to your spine.  Okay.

15   Approximately how far away from the midline area

16   there?

17      A    Maybe 4 or 5 inches.

18      Q    And you are certain that the leads were

19   taped to you as opposed to you actually being shot

20   with the probes?

21      A    Yes.

22      Q    And you were exposed for three seconds?

23      A    That's what he said.

24      Q    Who said?

25      A    The instructor.

                              73

1      Q    Do you have any information that would

2   be contrary to that?

3      A    No.

4      Q    Now, when you were exposed, was someone

5   holding you?

6      A    Yes.

7      Q    Who was holding you?

8      A    Jim Biddle I believe is one.  I don't

9   know who was on the other side.

10      Q    Were the folks that were holding you

11   giving you any instructions about what they should

12   do while you were under power?

13          If I use the term under power, you will

14   know that I'm talking about the three seconds that

15   you were being exposed to the electricity from the

16   Taser weapon?

17       A   Sure.

18       Q   Were the folks holding you given any

19   instructions as to what they should do while you

20   were under power?

21       A   Just to make sure that we didn't fall,

22   just hold us up.

23       Q   Prior to you being exposed to the Taser,

24   did you express any reservations about doing it?

25       A   Not reservation.  I was a little worried

                              74

1   about what it was going to be like.

2       Q   And tell me what you recall about the

3   period of time that you were under power?

4       A   Your mind knows what is going on, but

5   your body is not reacting to what your body is

6   telling it.  Every muscle in my body contracted.

7   I remember my back contracted bad because I curved

8   back like this (indicating).

9     Q    First of all, you have both --

10    A    My arms came up like this (indicating).

11    Q    Your arms came up so that your hands

12  were about shoulder level?

13    A    Yes.

14    Q    And your hands --

15    A    My back arched back, stomach forward,

16  top of my body went back (indicating).

17    Q    And that all happened at the same time?

18    A    Oh, yeah.

19    Q    And how were you able to bring your arms

20  up if those two folks were holding your arms?

21    A    Well, because every muscle in your body

22  contracts.  They weren't really holding me so I

23  couldn't move.  They were just holding me so I

24  wouldn't fall to the ground.

25    Q    Did you feel muscles in your body
                              75

1  contracting other than muscles that were between

2  the areas where the probes were located?

3    A    It felt like my whole body was

4  contracting, actually.

5      Q    That would include your legs?

6      A    I just remember the upper body, a lot of

7   pain, and I really couldn't move it, and that my

8   back had arched like this and I couldn't come out

9   of it (indicating).

10     Q    You are indicating that when you were

11  under power you flexed backwards?

12     A    Right.

13     Q    And your back was bent backwards?

14     A    Right.

15     Q    Do you know if you flexed more to one

16  side than the other?

17     A    I don't know.

18     Q    On the video that you saw, could you see

19  that motion of your body?

20     A    Yes.

21     Q    And could you tell whether you were

22  flexing more to one side or the other?

23     A    I could not.

24     Q    Did both guys still have a hold of your

25  arms?

76

1    A   Right.

2    Q   Neither one of them let go for any

3  reason?

4    A   No.

5    Q   Other than both arms coming up so

6  that your hands were about shoulder level and your

7  back was flexing backwards, was there any other

8  movement of your body while you were under power?

9    A   No.

10    Q   Did you say anything while you were

11  under power?

12    A   I'm sure I made some noises.  I don't

13  know if they were actually words.

14    Q   Was anyone saying anything to you?

15    A   No.  I'm sure people were laughing and

16  whatever, you know, at the situation.

17    Q   The instructor wasn't giving you any

18  instructions or anything like that?

19    A   No.

20    Q   You didn't lose consciousness, correct?

21    A   No.

22      Q    You knew what was going on at the time

23   that you were under power?

24      A    Yes.

25      Q    Do you recall experiencing any

                                77

1   discomfort in your body?

2       A    After it was over?

3       Q    No; while you were under power.

4       A    Oh, yeah.  Yeah.  A lot of discomfort.

5       Q    Where were you experiencing discomfort

6   while you were under power?

7       A    My whole body.

8       Q    Your whole body?

9       A    Yes.

10      Q    What happened once the power was turned

11   off?

12      A    My muscles relaxed.  You know, I still

13   had pain in my back.  It felt like somebody stuck

14   a knife in my back, and they just pulled the tape

15   off, and the next person jumped up there and went.

16      Q    Where were you experiencing pain in your

17   back specifically?

18    A    My midback.

19    Q    Midback area?

20    A    Yes.

21    Q    Where in the midback, right on the

22  spine --

23    A    Dead center back.  Yeah.

24    Q    You started out in a standing position

25  before you were exposed, correct?

78

1    A    Yes.

2    Q    And then when the power was turned off,

3  you were still in a standing position?

4    A    Same spot.

5    Q    How did you go down to the ground after

6  that?

7    A    I didn't go down to the ground.

8    Q    You did not go down to the ground?

9    A    No.

10    Q    You stayed standing?

11    A    I did.

12    Q    And the two fellows that were holding

13  you, they just let you go?

14      A    Yeah.  Basically once it was turned off,

15   you can stand there on your own.  They kind of

16   relax your hold, and they take the tape off, and I

17   was able to walk around.

18      Q    Do you recall any forward motion of your

19   body after the power was turned off?

20      A    Forward motion would be me coming out of

21   that arch.  My body was coming back to the normal

22   position, but no stepping forward.

23      Q    When the power was turned off, did you

24   move forward?

25      A    I came back to the normal position.

                                79

1      Q    Was there anything in particular that

2   you felt was particularly violent about the way

3   that you came back into a normal standing

4   position?

5      A    No.

6      Q    On the video, did it appear that you

7   made any sort of sudden or violent movements

8   forward after the power was turned off?

9      A    No.

10      Q    After the two spotters had let go of

11   your arms, what did you do next, sir?

12      A   I believe I just kind of stood there and

13   caught my breath, and just basically tried to walk

14   it off.

15      Q    Did you tell anyone at that time that

16   you were injured?

17      A   I told them my back hurt, you know, but

18   I didn't make a big deal about it, which I usually

19   don't.

20      Q    Who did you tell that your back hurt?

21      A    Nobody specifically.  I mean, everybody

22   was just talking about how it hurt and how they

23   still kind of hurt.  I don't remember the person I

24   said it to.

25      Q    Do you recall ever making any report to
                                80

1   the instructor that you thought you were injured?

2      A    Not that day.  I assumed it was a

3   muscle, so I figured I could work through it.

4      Q    Did anyone other than you sustain any

5   injury during the course of this training?

6       A    Brian Falstrom complained of back pain.

7   I don't know whatever came about it.

8       Q    Now, after you had been exposed to the

9   Taser weapon, the training class continued?

10      A    Yeah.  Like I said before, I can't

11  remember -- after that we went outside and did the

12  scenarios.  I'm kind of thinking after that we

13  were done.  I may have gone back in the classroom

14  for a brief moment.  I think that was the

15  conclusion.

16      Q    And you don't recall if you actually

17  fired the weapon before or after your exposure?

18      A    Right.  I don't recall.

19      Q    Other than the written materials that we

20  already discussed, was there any other information

21  that you were given at the meeting?

22      A    It seems like we were given a DVD-type

23  deal.  I could tell you I remember it contained

24  footage of officers using the weapon.  I don't

25  remember what else it contained.

                        81

1       Q    Do you still have the DVD?

2     A   Probably.  I usually don't throw stuff

3   away when I attend classes.  It is probably in the

4   box somewhere.

5     Q   Presumably at that time you were not

6   given an actual Taser weapon, correct?

7     A   No.

8     Q   At any point in time did anyone from

9   Taser International ever tell you that you had to

10   be exposed to the Taser in order to be certified

11   as a user?

12     A   No.

13     Q   Let's talk about your medical treatment

14   then.

15         When is the first time that you sought

16   medical treatment for any injuries that you are

17   asserting were caused on October 28, 2003?

18     A   I would have to check my paperwork.  I

19   don't remember.

20     Q   How about this, instead of the actual

21   day, do you recall the name of the facility that

22   you were initially seen at?

23     A   Yes.  I had to fill out state paperwork,

24   and they sent me to Physicians First on North

25   Monroe Street.  Joy was the physician's assistant,

82

1   was her name.  I can't remember her last name.

2       Q   You said Physician's --

3           Patients First --

4       A   They changed it.  It used to be

5   Physicians.  It is Patients First.

6       Q   The same place, though?

7       A   Right.

8       Q   You first went to that facility on

9   December 9, 2003?

10      A   Right.

11      Q   It would have been about six weeks after

12   the training?

13      A   Right.

14      Q   During that six-week interval period of

15   time, had you received medical treatment from any

16   other source?

17      A   No.

18      Q   Describe for me, if you would, what sort

19   of symptoms or complaints were you experiencing

20   during that six-week interval of time?

21      A   Sharp pain in my middle back.  It felt

22   like a knife was in my back, especially when I

23   breathed, sneeze, or turned my body.  Just

24   anything -- other than just walking down the road

25   straight, any movement, picking something up,

83

1   breathing deep, it would aggravate it.

2         I assumed it was a pulled muscle.  You

3   know how it is before it will go away, but it

4   never did.  It eventually got worse, as I would

5   try to work through it, do some push-ups or pick

6   my kids up, it would get worse.

7         At that point I didn't think it was a

8   pulled muscle anymore, so I went to Patients

9   First.

10      Q   During that six-week period of time, you

11   were continuing to exercise?

12      A   No.  I mean, I couldn't.  The morning

13   after I couldn't even get out of bed.  I don't

14   know how I ended up getting out of bed, because I

15   was in that much pain.  I was able to just work

16  through it.  It was worse in the morning after I

17  laid on my back all night.  Every morning it was

18  hard for me to get up.  Once I got up, I couldn't

19  run, work out.  If I did, I was in pain.  I did

20  try, because I thought it was a pulled muscle and

21  I could just work it out.  But the pain never

22  subsided.

23      Q   In that six-week period of time, from

24  the time of the training up until the time you

25  went to Patients First, did you notice any change

                           84

1  in either the severity or frequency of the

2  symptoms that you were having?

3      A   The pain was still as great as day one

4  when I went to Physicians First.  It wasn't

5  getting any better.

6      Q   Were you having constant pain?

7      A   Yes.  But like I said, when I would

8  breathe deep, it would aggravate it, and more

9  pain.

10      Q   What did they do for you at Physicians

11  First?

12      A   She just basically --

13           I gave her the story about what

14   happened.  She assumed it was a pulled muscle

15   also, as I did.  She sent me to Innovative Rehab

16   for rehab on my pulled muscle.

17      Q   That was for physical therapy, right?

18      A   Physical therapy.

19      Q   And how long --

20      A   She gave me pain medication and all that

21   stuff.

22      Q   Was Joy the only health-care provider

23   you saw at Patients First?

24      A   Yes.

25      Q   And she is the one that recommended or

                          85

1   prescribed the physical therapy for you?

2      A   Yes.

3      Q   And how long were you in physical

4   therapy?

5      A   Shoot.  It was months.  I know there

6   were 12 visits.

7      Q   Did the physical therapy help at all?

8      A   No.  Well, I don't know if it was that

9   helping or if it was starting to heal.

10         The pain never subsided fully.  They had

11   me doing all kinds of things.  It was like one day

12   it would feel better, and the next day it would be

13   back to where it was.  So it was day by day.  One

14   day it may not hurt, and the next day it would be

15   hurting just the way it did on the first day.

16      Q   Do you recall ever telling the folks

17   there at Innovative Rehab that you thought

18   that your problems were resolving?

19      A   I mean, like I said, gradually as time

20   went on the pain started subsiding.  It didn't go

21   away totally.  It was becoming something I could

22   live with.

23         It feels better today, and the next day

24   it is kind of hurting again.  Like I said, it was

25   on and off.

                         86

1      Q   Was the pain that you were experiencing

2   always in your midback area?

3      A   Yes.  I mean, it would move around a

4  little bit.  Sometimes I would have a cramp

5  somewhere; I guess it was being caused by that.

6      Q   Did you complete your course of physical

7  therapy?

8      A   Yes.

9      Q   Do you recall that there were periods of

10  time that you would miss appointments when you

11  were in physical therapy?

12      A   Yes.  Like I said, I did a lot of

13  traveling.  I just didn't have time to go up there

14  and -- I mean, I just didn't have time to do it.

15  Sometimes I had to cancel, I had to re-do it.

16  Sometimes I would be out of town with the

17  Governor.

18      Q   Do you recall telling the physical

19  therapist as of the last time that you saw her

20  that you were feeling good?

21      A   I don't recall.  But it might be

22  something that I would say.

23      Q   And do you recall them trying to get you

24  back in there for a final evaluation and not being

25   able to get you back in?

87

1     A    Like I said, I'm a busy man.  My job is

2   the number one priority.  It was just taking too

3   much time away from my job, my kids.  It became a

4   point where it didn't really seem to be helping me

5   any more.  I think my last appointment --

6           Maybe I was done and they just wanted to

7   close me out.

8     Q    During that period of time, when you

9   were seen at Patients First or when you were in

10   physical therapy, did anyone recommend that you

11   have x-rays or an MRI done of your back?

12     A    Yeah.  Actually after I had stopped

13   going, I don't know how much time had passed, but

14   there was just discomfort.  The pain had subsided,

15   and I would sneeze and I would still feel the

16   pain.  But just discomfort.  I could tell my back

17   wasn't the same as it was prior.

18           So I went back to Joy, and I just said,

19   you know, whatever they did, I don't know if it is

20   still a pulled muscle, but it's still there, I

21    need something extra.  She's like, you know, let's

22    do an MRI to make sure.  Neither one of us thought

23    it could be a broken vertebrae, because I hadn't

24    fallen, or whatever.  That's when she ordered the

25    MRI.

                              88

1      Q    Had you told Joy about your Taser

2    exposure?

3      A    Yes.

4      Q    And did you tell her about the movements

5    that your body made?

6      A    Yes.

7      Q    And she didn't think it was a broken

8    vertebra initially?

9      A    Not initially.

10     Q    Where did you go have the MRI?

11     A    Dr. Wingo at the Tallahassee Orthopedic

12    Center.

13     Q    You actually had the MRI done there?

14     A    Um-hum.

15     Q    And who was it that referred you to

16    Dr. Wingo?

17    A   Joy.

18    Q   And --

19    A   Or maybe she told the state workers'

20   compensation.  I don't know if they always use

21   him.  They were covering my visits.

22    Q   Now, the first time you saw Dr. Wingo

23   would have been in November of 2004, right?

24    A   Yeah.  Correct.  That sounds familiar.

25    Q   And when is the last time you saw

                        89

 1   Dr. Wingo?

 2    A   I'm not sure.  That may have been the

 3   second time for the evaluation.  I went in for the

 4   MRI and I had to come back to have it read.  So

 5   that may have been when he read it to me.  There

 6   was a pretty good amount of time in between.

 7    Q   You actually had the MRI on July 29,

 8   2004?

 9    A   That sounds better.

10    Q   You didn't go back to see Wingo until

11   November 10, 2004?

12    A   That sounds like a long time.

13    Q    Do you remember if that's true, do you

14   recall why there was that gap in time?

15    A    I don't recall, really.  That doesn't

16   seem right, though.  It wasn't that long.

17    Q    Did you see Wingo more than one time?

18    A    Like I said, they did the MRI.  I didn't

19   see him that day.  When I came back, I saw

20   Dr. Wingo, when he read the results.

21    Q    Was it the occasion in which he read the

22   results the only time you have been examined by

23   him?

24    A    Right.

25    Q    What did he tell you?
                              90

1    A    He basically showed me and told me that

2   I had two broken vertebras that had healed, and he

3   briefed me on the compression fractures and how

4   you lose height when that happens.  He was talking

5   about don't lift anything more than 50-pounds,

6   don't lift stuff up like this with your back

7   (indicating).  He said I could keep working out,

8   just be careful about what I lift.

9        Then he gave me an impairment rating, I

10   remember that.

11      Q    Did he tell you whether he thought you

12   might need any future surgery?

13      A    He said he couldn't tell 100 percent.

14   But he didn't think so.  He said he can't say what

15   is going to happen in the future.

16      Q    Did he prescribe any medication for you?

17      A    No, I don't believe at that point.

18      Q    Did he place any restrictions on your

19   work activities?

20      A    No.

21      Q    Did he tell you to come back and see him

22   if you felt like you needed to?

23      A    I don't recall.

24      Q    What sort of symptoms or problems were

25   you having with your back in November of 2004 when
                            91

1   you saw Dr. Wingo?

2        A    Just discomfort.  I mean, the extreme

3   pain had subsided.  Some days were good, some days

4   were discomfort.  You know, when I sit in a chair

5   a long time, like today, my back will start

6   cramping.  It never did that before.  As far as

7   the sharp pain, constant, it was gone.

8       Q   Do you recall telling Dr. Wingo in

9   November of '04 that your back pain had decreased

10  to the point of only an occasional ache?

11      A   Yeah.

12      Q   And when you saw Dr. Wingo in November

13  of '04, did you have full flexibility and strength

14  in your back?

15      A   I seemed to.

16      Q   Do you currently have any appointments

17  to go back and see Dr. Wingo?

18      A   No.

19      Q   And then I understand most recently you

20  saw a doctor by the name of Kirk Mauro, M A U R O?

21      A   Correct.

22      Q   You were referred to Dr. Mauro by Mr.

23  Moye?

24      A   Correct.

25      Q   And you saw him on November 14, 2005?

92

1    A    That sounds right.

2    Q    Is that the only time you have seen him,

3  that one-time evaluation?

4    A    Right.

5    Q    Do you have any appointments to go back

6  and see him?

7    A    No.

8    Q    Do you have any appointments to treat

9  with any physician at this time?

10    A    No.

11    Q    You recall telling Dr. Mauro in November

12  of '05 that your pain associated with your back

13  was minimal?

14    A    Minimal.

15    Q    Is that correct?

16    A    Correct.

17    Q    And you were working for the Department

18  of Justice, Tobacco and Firearms greater than 40

19  hours a week?

20    A    Correct.

21    Q    At your home that you are at now

22  presently, do you do the yard work?

23    A    Yard work?

24    Q    Yes.

25    A    Yes.

93

1    Q    And your back actually feels better with

2    exercise?

3    A    It doesn't really feel any different.  I

4    mean, there's discomfort.  It comes and goes.  I

5    mean, there is no rhyme or reason when it comes

6    and goes.  It seems to come when I sit in the

7    chair a lot.

8    Q    Do you recall telling Dr. Mauro on

9    November 14, 2005 that you can exercise and you

10    actually feel better with exercise?

11    A    Yeah.

12    Q    And do you recall telling Dr. Mauro in

13    November of '05 that your back did not interfere

14    with any of your physical activities?

15    A    Right.

16    Q    You are 6-foot tall, weigh 186 pounds?

17    A    Right.

18    Q    Did Dr. Mauro tell you on November 14,

19  2005 that your physical examination was completely

20  normal?

21     A   Yes.

22     Q   And did he tell you that he agreed with

23  Dr. Wingo that there was no need for any further

24  medical treatment, care or intervention?

25     A   Yes.

                        94

1     Q   Did he also tell you in his opinion that

2  you would not require surgery in the future?

3     A   Yes.

4     Q   Have all your medical expenses been paid

5  by the workers' compensation carrier?

6     A   Yes --

7     Q   You don't know?

8     A   No, they were not covered by the state.

9     Q   Have you paid any money out of your own

10  pocket for medical treatment?

11     A   No.

12     Q   Prior to October 28, 2003, had you ever

13  injured your back in any way, sir?

14     A   No.

15      Q    Prior to October 28, 2003, had you ever

16   been involved in an automobile accident?

17      A    No.

18      Q    Have you ever been involved in an

19   automobile accident?

20      A    I am sorry.  I was in a fender-bender

21   when I was with the city.  Somebody rear-ended me.

22      Q    What year was that?

23      A    2000.

24      Q    Did you receive any medical attention

25   following that accident?

                              95

1      A    He hit me like 5-miles an hour.

2      Q    Did you go to the hospital and get

3   checked out or anything?

4      A    No.

5      Q    Is that the only automobile accident you

6   were ever involved in?

7      A    Yes.

8      Q    Have you had any other work-related

9   injuries other than this incident?

10      A    I hurt my hand in a fight one night when

11   I was a cop, but I never reported it.

12        Q    Is that with the Tallahassee Police

13   Department?

14        A    Yeah.

15        Q    Have you had any incidents since

16   October 28, 2003 where you have re-injured your

17   back in any way?

18        A    No.

19        Q    Have you ever been a plaintiff or a

20   defendant in any civil lawsuits?

21        A    No.

22        Q    Have you ever made a workers'

23   compensation comp claim other than the claim

24   associated with this incident?

25        A    No.  Well, nothing that I received care
                              96

 1   for.

 2        But sometimes if you were in an

 3   altercation with the city and you received a cut,

 4   they would make you fill out paperwork, just in

 5   case down the road it got infected.  As far as

 6   going and receiving care and being out of work,

file:///E|/4-13-06%20JJJB%20(FL)%20Deposition%20of%20Jeffrey%20Burt.txt

7    no.  You had to fill out paperwork any time you

8    got injured.  I think that went to workers'

9    compensation.

10       Q    Have you ever been treated by an

11   orthopedic surgeon at any time in your life other

12   than the doctors that we've discussed here today?

13       A    Just the knee, that's it.

14       Q    Tell me again, who was your doctor for

15   the knee?

16       A    Oh, shoot.  That was about 1990.  It was

17   out of Shands.  Shands in Gainesville.

18       Q    Have you ever had any surgery at any

19   time in your life?

20       A    Just the out-patient knee surgery.  It

21   wasn't Shands.  It was North Florida Regional, out

22   of Gainesville.

23       Q    And who were you working for at the

24   time?

25       A    I was right out of high school.  I was

                           97

1    working on a ranch.

2        Q    This is the injury sustained in

3   softball?

4      A   Right.

5      Q   Have you ever been hospitalized at any

6   time?

7      A   No.

8         I remembered another injury.  I got in a

9   fight.  I can't remember the details of it.  I

10  broke my hand, and I went to TOC.  It was like in

11  '93.

12     Q   When you say --

13     A   Maybe '94.

14     Q   When you got in a fight, was that a

15  work-related matter?

16     A   I was working in college, and I worked

17  on a ranch, and it was just an incident that

18  occurred and my hand was broke.  I went to TOC in

19  Tallahassee.

20     Q   What is TOC?

21     A   Tallahassee Orthopedic Center.

22     Q   And that was in 1992?

23     A   No.  '94.

24      Q   Have you ever been diagnosed with any

25   condition like osteoporosis or degenerative disk

98

1   disease, anything like that?

2      A   No.

3      Q   Has anyone in your family ever suffered

4   from that condition?

5      A   No.

6      Q   Have you ever taken any medication for

7   back pain associated with this injury?

8      A   Yes.

9      Q   When did you take medication?

10      A   After my initial visit with Patients

11   First.  I can't remember the name.  She gave me

12   some back pain medicine.

13      Q   How long did you take that for?

14      A   I took it --

15         I finished the bottle, but by that time

16   I was in rehab, and the pain started to come and

17   go, so I didn't get it refilled.  I'm not big on

18   taking medication and all that stuff.

19      Q   Was that the last time you took any

20  medication?

21     A   I take Tylenol if something is bothering

22  me.

23     Q   How often do you take Tylenol?

24     A   Not often.  Like I said, I'm not big on

25  pain.  It has to be pretty bad for me to take

                           99

1  medicine for it.

2     Q   What do you do for social activities?

3     A   Play with my kids.  That's it.  I really

4  don't have a life outside of work and my kids.  I

5  play baseball with my son.

6     Q   Tell me again how old your son is.

7     A   Five.

8     Q   Do you work out at the gym?

9     A   I try to, if my schedule permits.

10     Q   Where do you go to the gym?

11     A   Life Styles in Lakeland.

12     Q   How often do you make it to the gym?

13     A   I haven't made it in the last two weeks.

14  I try to make it three times a week.

15     Q   What sort of exercises do you do?

16      A   I lift weights.

17      Q   And how much weight are you lifting?

18   Are you benching, I guess?

19      A   Yeah.  I try to go middle range where I

20   do more reps.  The highest I may go is 70-pound

21   dumbbells doing a bench.

22      Q   Do you do squats?

23      A   Not often.

24      Q   When you do squats, how much weight do

25   you use?

                        100

1      A   145 each side -- 135.

2      Q   And these are with free weights?

3      A   Yes.

4      Q   Other than weight lifting, is there

5   anything else like aerobic exercise that you do?

6      A   I run every now and then.  It is not a

7   great passion of mine.

8      Q   How far do you go?

9      A   A mile and a half is my average.

10      Q   Has this back injury interfered with

11   your lifestyle in any way?

12    A   It hasn't stopped me.  I mean, there's

13  discomfort when I do things, like I said,

14  different times.  Sometimes it is fine, sometimes

15  it is not.  It doesn't stop me from doing what I

16  used to do, it just makes it a little bit more

17  unpleasant.

18         MR. ANDREWS:  Can I take a two-minute

19     break.

20         (Brief recess.)

21  BY MR. ROPER

22    Q   Mr. Burt, let me just run over a couple

23  areas with you that I need to cover.

24         The first area relates to allegations

25  that have been made regarding negligence on the

                            101

1  part of Taser in terms of representations that

2  they made or didn't make.

3    A   Okay.

4    Q   I don't know that you have any personal

5  information relating to these allegations, but if

6  you do, I need to find out what it is.

7    A   Okay.

8      Q    What I will do, I will read to you the

9   allegations that have been made about Taser and

10   ask you if you have any personal knowledge, and if

11   you do, please tell me.  If you don't, let me know

12   that as well.

13          The first allegation that has been made

14   is that Taser was negligent in overstating the

15   safety of the Taser weapons based upon actual

16   medical studies.  Do you have any information

17   about that?

18      A    No.

19      Q    It is also alleged that Taser was

20   negligent in providing misleading and/or

21   misrepresenting information regarding the nature

22   and extent of medical studies performed to support

23   the conclusion that the Taser weapons do not cause

24   death or permanent injury.

25          Do you have any information about that?
                        102

1      A    No.

2      Q    The next allegation is that Taser

3   misinformed law enforcement agencies concerning

4    conclusions reached by other independent bodies

5    which have considered the potential injuries which

6    could be inflicted by weapons utilizing electrical

7    current.

8        A    No.

9        Q    The next allegation, overstating the

10   number of volunteers who actually received a hit

11   from a Taser weapon without injury.

12       A    No.

13       Q    The next allegation is misrepresenting

14   actual information known by Taser and DGG Taser,

15   Inc. regarding hits from Taser weapons received by

16   volunteers in a training setting which actually

17   caused significant or permanent injury.

18       A    No.

19       Q    The next allegation is falsely reporting

20   information regarding the alleged role of Taser

21   weapons in causing or contributing to the injuries

22   and deaths of individuals receiving hits from

23   Taser weapons.

24       A    No.

25       Q    It is alleged that Taser knowingly and

1   intentionally failed to inform law enforcement

2   agencies and their personnel of their inherent and

3   known risks associated with utilizing weapons

4   utilizing electrical current. Do you have any

5   information about that?

6       A   No.

7       Q   The witnesses that you listed here in

8   your interrogatory answers, Angie Burt, that's

9   your wife, correct?

10      A   Um-hum.  Yes.

11      Q   And then you have your mother and

12  father.

13      A   Right.

14      Q   Are you and Mr. Knowles friends?

15      A   Yeah.  We are friends.

16      Q   And then you have Joy, the physician's

17  assistant --

18      A   What was it in reference to, just the

19  incident?

20      Q   Knowledge regarding the incident.

21      A   There would be a lot more people.

22        I'm not one to run around complaining

23  about my stuff.

24     Q   As far as the folks that were actually

25  at your training session, do you recall the names

                                104

1  of anybody else that was there?

2     A   Mark Perez, I know the name.

3     Q   And to your knowledge, are all of these

4  people still employed with --

5     A   Yeah.  Mark is here in Tallahassee.

6     Q   Do you know the model or serial number

7  of the Taser weapon that was utilized during your

8  exposure?

9     A   I'm not 100 percent sure.  I think it

10  was a 26 -- something 26.

11     Q   Do you know if it was an M26 or X26?

12     A   I don't.

13     Q   Do you recall what it looked like?

14     A   Yeah.  I thought they all looked alike.

15  Is one smaller?  I think this was the larger

16  model.

17     Q   Can you describe what it looked like for

18   me?

19      A   It seemed like a handgun, actually.  It

20   was square.

21      Q   It looked like an automatic pistol?

22      A   Yeah.  It was just larger and more boxy.

23      Q   Do you recall what color it was?

24      A   Black, with yellow designs.

25      Q   And it was more boxy, you say?
                              105

1      A   Yeah.  Rather than a handgun, it was

2   more boxy.  A handgun would be more rounded.

3      Q   Was the weapon that was being used for

4   the exposures a device that had been brought by

5   the instructor or was it one owned by FDLE?

6      A   The instructor brought it, I believe.

7      Q   Did he have more than one there?

8      A   I can't recall.

9      Q   Your current employment with ATF, that's

10   a federal agency, right?

11      A   Right.

12      Q   What are your opportunities for

13   promotion there with ATF?

14    A    Well, I don't even know when I qualify

15  to be one, because it is not in my interest.  I

16  don't want to be one.  I know down the road you

17  can apply to be a supervisor, which is GS 14

18  level.  I'm sure you have to be on probation and

19  work some cases with them and go through a

20  process.

21    Q    What is your career goal with ATF?

22    A    Doing it.  Just being a special agent.

23  See, to be a supervisor you have to move out of

24  the state, and I don't want to do that.  I'm

25  content with just being an agent and working
                              106

1  cases.

2    Q    Is it your plan to continue your

3  employment with the ATF?

4    A    Yes.

5    Q    To your knowledge, does the FDLE still

6  issue Taser weapons to their agents?

7    A    To my knowledge they don't issue them to

8  specific agents.  They just have Tasers in each

9  office that anybody can use if you have been

10  through the course.

11      Q    Was there a Taser located in the

12  Mansion, Governor's Mansion?

13      A    I think we did have one.  I don't know

14  for sure, though.

15      Q    And we were talking briefly off the

16  record, but after this training incident, you did

17  go to that assignment down in Miami?

18      A    I did.

19      Q    And were you able to complete that

20  assignment without any difficulty?

21      A    All we did was sit around.  Nothing ever

22  happened.  We never had to do anything, so we kind

23  of sat in a room and waited.

24      Q    You guys were the interior perimeter?

25      A    Right.

                        107

1      Q    In addition to your duties currently as

2  special agent with ATF, do you have any specific

3  assignments or special assignments that you do,

4  like the special operations team?

5      A    I haven't been there long enough to

6    apply for that.  Basically all I'm doing now is

7    working cases.

8        Q    Does the ATF have those types of special

9    assignments?

10       A    They do.

11       Q    Do you plan on applying for those types

12   of units?

13       A    Probably not.  With children, it

14   requires a lot of traveling.  I mean, I could

15   change my mind in the next few years, but --

16       Q    And right now you are working in Tampa

17   but live in Polk County?

18       A    It is part of our district, so I kind of

19   go back and forth.

20       Q    Do you have an office somewhere?

21       A    I do.  Tampa.

22       Q    Tampa?

23       A    Tampa.

24           MR. ROPER:  That's all the questions I

25   have.  Thank you.

108

1            CROSS EXAMINATION

2   BY MR. ANDREWS

3     Q   You said that when Taser was put on you,

4   you said it was put on your left shoulder, right

5   hip, correct?

6     A   Yes.

7     Q   And in the interrogatories there was a

8   typographical error that said your right shoulder,

9   right hip; or left shoulder, left hip.

10       Your recollection is that it went from

11   one -- your left shoulder to your right hip across

12   your back, correct?

13     A   My best recollection, yeah.  If I can

14   find the video, I can tell you 100 percent.

15       MR. ANDREWS:  That's all I have.

16       He will read.

17       (The proceedings concluded at 2:26 p.m.)

18

19

20

21

22

23

24

25

109

1          CERTIFICATE OF OATH

2

3

4

5   STATE OF FLORIDA        )

6   COUNTY OF LEON          )

7

8

9          I, the undersigned authority, certify

10   that said designated witness personally appeared

11   before me and was duly sworn.

12

13

14          WITNESS my hand and official seal this

15   17th day of April, 2006.

16

17

18

19

20

_____

21

        JUDY CHIN, RPR, CRR

22        1-800-934-9090

       850-878-2221

23

24

25

            110

1

2      CERTIFICATE OF REPORTER

3

4 STATE OF FLORIDA   )

5 COUNTY OF LEON    )

6

7     I, JUDY CHIN, Registered Professional

8 Reporter, certify that the foregoing proceedings

9 were taken before me at the time and place therein

10 designated; that my shorthand notes were

11 thereafter translated under my supervision; and

12 the foregoing pages numbered 1 through 108 are a

13 true and correct record of the aforesaid

14 proceedings.

15

16          I further certify that I am not a

17   relative, employee, attorney or counsel of any of

18   the parties, nor am I a relative or employee of

19   any of the parties' attorney or counsel connected

20   with the action, nor am I financially interested

21   in the action.

22          DATED this 17th day of April, 2006.

23          _____

24             JUDY CHIN, RPR, CRR
             Notary Public
25              1-800-934-9090
             850-878-2221
                  111

1   I have read the transcript of my deposition, pages

2   1 through 108, and hereby subscribe to same,

3   including any corrections and/or amendments listed

4   below.

5   _____          _____

6   Date:       JEFFREY BURT

7

8   Page/Line  Correction/Amendment  Reason for Change

9   _____    _____  _____

10  _____    _____  _____

11  _____   _____   _____

12  _____   _____   _____

13  _____   _____   _____

14  _____   _____   _____

15  _____   _____   _____

16  _____   _____   _____

17  _____   _____   _____

18  _____   _____   _____

19  _____   _____   _____

20  _____   _____   _____

21  _____   _____   _____

22  _____   _____   _____

23  Date of Deposition: April 13, 2006

24  Reporter:  Judy Chin, RPR, CRR

25

                              112

1

2

3        ACCURATE STENOTYPE REPORTERS, INC.
              2894 Remington Green Lane
4          Tallahassee, Florida  32308
                (850) 878-2221
5

6  April 17, 2006

7

   Steve Andrews, Esquire

8  Andrews & Moye

   822 North Monroe Street

9  Tallahassee, Florida  32303


10


11  Dear Mr. Andrews:


12  Re:  J.J. v Taser


13  This is to advise you that your witness did not

   waive reading and signing of his deposition.

14


15  Please have your witness read his copy of your

   transcript, noting corrections/changes on the

16  errata sheet, or date and sign the errata sheet,

   and return the  original errata sheet to MR. ROPER

17  within the next 30 days or before the final trial

   in this matter, whichever comes first.

18


19  Sincerely yours,


20


21  JUDY CHIN, RPR, CRR


22  Enclosures (Errata Sheet and Transcript.)


23  cc Counsel of Record


24


25