# EXHIBIT "B-1"

Deposition of John Jewett (Vol. I)
<u>J.J. and J.B. v. DGG TASER, Inc., et al</u>
Leon County, FL Second Judicial Circuit
Case No. 37-2005 CA 001569

IN THE CIRCUIT COURT OF
THE SECOND JUDICIAL CIRCUIT,
IN AND FOR LEON COUNTY, FLORIDA


J.J. and J.B.          VOLUME I: Pages 1 - 80

    Plaintiffs,

vs.          CASE NO.: 37-2005-CA-001569

DGG TASER, INC., a Florida
For Profit Corporation, and
TASER INTERNATIONAL, INC., a
Delaware For Profit Corporation,

    Defendants.
_____/



THE DEPOSITION OF:          J.J.


TAKEN AT THE INSTANCE OF:     The Defendant


DATE:          Wednesday, April 12, 2006


TIME:          Commenced at 11:15 a.m.
               Recessed at 1:06 p.m.


LOCATION:          822 North Monroe Street
               Tallahassee, FL

REPORTED BY:          Tracy L. Brown
                Certified Registered Reporter

_____

APPEARANCES:


REPRESENTING THE PLAINTIFFS:


DAVID W. MOYE, ESQUIRE
ANDREWS MOYE
822 North Monroe Street
Tallahassee, FL  32303


REPRESENTING THE DEFENDANTS:


MICHAEL J. ROPER, ESQUIRE
BELL LEEPER & ROPER
2816 East Robinson Street
Orlando, FL  32803
407-897-5150

INDEX


WITNESS                          PAGE

    J.J.


    Direct Examination by Mr. Roper          4



CERTIFICATE OF ADMINISTERING OATH          79

CERTIFICATE OF REPORTER          80

4

1            STIPULATIONS

2        The following deposition of J.J. was taken on oral

3    examination, pursuant to notice, for purposes of

4    discovery, for use as evidence, and for such other uses

5    and purposes as may be permitted by the applicable and

6    governing rules.

7    Thereupon,

8              J.J.

9  was called as a witness, having been first duly sworn, was

10  examined and testified as follows:

11              DIRECT EXAMINATION

12  BY MR. ROPER:

13      Q    Sir, would you state your name?

14      A    Jon Hugh Jewett, IV.

15      Q    And your current residence address, Mr. Jewett.

16      A    422 Southwest Cross Point Port, Lake City,

17  Florida 32025.

18      Q    Five or four?

19      A    You know what, they just changed it in Lake

20  City.  It will get there either one of those; it's all

21  Lake City.

22      Q    All right.  And your date of birth, sir?

23      A    September 25th, 1970.

24      Q    And your social security number?

25      A    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.


              ACCURATE STENOTYPE REPORTERS, INC.

                          5

1      Q    Okay.  Mr. Jewett, my name is Mike Roper.  I'm

2    the attorney that's been hired to represent both Taser

3    International and DGG Taser, Inc. in connection with

4    litigation that's been filed on your behalf here in Leon

5    County.  And I'm here today to take your deposition in

6    connection with that case.  Do you understand that, sir?

7        A   Yes.

8        Q   I assume that given your employment as a law

9    enforcement officer you've had your deposition taken a

10   number of times?

11       A   That's correct.

12       Q   And be fair for me to assume that you are

13   familiar with the rules of depositions and procedures that

14   are followed?

15       A   I believe so.

16       Q   Okay.  I won't belabor that in that case, but

17   the one thing I will ask you to do for me is if at any

18   point in time today I ask you a question that you don't

19   understand or haven't heard for some reason, please let me

20   know.  I'll be happy to repeat or rephrase the question.

21   Okay?

22       A   Will do.

23    Q    If you answer a question I've asked you, I'm

24   going to assume that you heard the question, understood

25   the question and you're answering it accordingly; is that

ACCURATE STENOTYPE REPORTERS, INC.

6

1   fair?

2    A    That's fair.

3    Q    All right.  As we sit here today, are you taking

4   any medications?

5    A    What do you mean by taking medications?  Like

6   right now, did I take some this morning?

7    Q    Yes.

8    A    I'm not under the influence of any medication.

9   I haven't taken any medications I want to say four or five

10   days.

11    Q    Okay.  Are you feeling okay today?

12    A    My back hurts.

13    Q    Okay.  As far as your mental faculties, you're

14   able to --

15    A    Fine.

16    Q    -- concentrate, listen to my questions,

17   understand them?

18      A   Correct.

19      Q   All right.  Has a physician currently prescribed

20   you medication?

21      A   Yes.

22      Q   What medication has been prescribed for you at

23   this time?

24      A   Tramadol.

25      Q   Okay.


ACCURATE STENOTYPE REPORTERS, INC.

7

1      A   And Ultracet.

2      Q   Anything else?

3      A   No.

4      Q   What sort of medications are Tramadol and

5   Ultracet?

6      A   Both of them are pain medications.

7      Q   All right.  And what dosage have you been

8   prescribed in both those medications?

9      A   As far as the like take so many per so many

10   hours, is that what you're asking?

11    Q    Like how many milligrams?

12    A    I have no idea.  I would have to look at the

13  bottle and I don't have it with me.

14    Q    Who prescribed that medication for you?

15    A    It was out of a Dr. Puente's -- I think that's

16  P-U-E-N-T-E.  Now it was his physician's assistant who

17  actually wrote the -- I don't know her name, it was a

18  female.

19    Q    And where is Dr. Puente located?

20    A    Lake City.

21    Q    Is that the family doctor?

22    A    No, he's a physical therapist, pain management,

23  something along that line.

24    Q    Okay.  And how often do you take that

25  medication?

ACCURATE STENOTYPE REPORTERS, INC.

8

1    A    It varies.  One week I might have to take a

2  couple a day.  The next week I might go three or four or

3  five days where I don't absolutely have to have it.

4    Q    All right.  And this was medication that was

5   prescribed for you by Dr. Puente for the pain that you're

6   experiencing in your back?

7       A   Correct.

8       Q   And the pain that you relate to your exposure to

9   the Taser?

10      A   Correct.

11      Q   How long have you lived at your current address,

12  Mr. Jewett?

13      A   The house was finished in July of -- I'm sorry,

14  June of 2003, so it would be three years.

15      Q   And is that a home that you own?

16      A   Yes.

17      Q   And who lives there with you?

18      A   My wife and children.

19      Q   And for the record, what is your wife's name?

20      A   Sandra, middle name she uses as her maiden name,

21  Byrd, B-Y-R-D, Jewett.

22      Q   And then what are the names and ages of your

23  children?

24      A   Jessica, middle initial R, Rachel Jewett.

25      Q   How old is Jessica?

ACCURATE STENOTYPE REPORTERS, INC.

9

1    A   She is six and a half.  Alex Jon Jewett and Kyle

2  Hugh Jewett, they're twins and they will be three June 4th

3  of this year, so they're two and nine months.

4    Q   How long have you and Sandra been married?

5    A   It will be ten years in July.

6    Q   Does Sandra work?

7    A   Yes.

8    Q   Where does she work?

9    A   Columbia County School Board.

10   Q   And what's her position there?

11   A   She's a teacher.

12   Q   What grade does she teach?

13   A   She teaches pre-K handicapped children.

14   Q   Pre-K handicapped children?

15   A   Yes.

16   Q   How long has she been doing that?

17   A   It was right before we got married, so in the

18  vicinity of ten years.

19   Q   Okay.  I see from your interrogatory answers

20  that you have lived at least since 1995 in Lake City?

21    A   I've lived in Lake City since 1980.

22    Q   Okay.

23         MR. MOYE:  He was in the military and came

24    back.

25         THE WITNESS:  That's as a child now.  But

ACCURATE STENOTYPE REPORTERS, INC.

10

1    that's since when I got out of the military.  You

2    asked for the last ten years so that's what I put.

3  BY MR. ROPER:

4    Q   Right, right.  No, I understand.  So you moved

5  to Lake City when you were ten years old?

6    A   Yeah.

7    Q   And then you went to middle school and high

8  school in Lake City?

9    A   Un-huh.

10    Q   Did you graduate from -- is it Columbia High

11  School?

12    A   Columbia High School.

13    Q   And what year did you graduate?

14    A   1988.

15    Q    And when did you go into the military?

16    A    January of 1989.

17    Q    And what branch of the military did you go into?

18    A    The Army.

19    Q    How long were you in the Army?

20    A    I got out, I think it was late February of 1992,

21  so a little bit over three years.

22    Q    All right.  What was your rank at the time of

23  your discharge?

24    A    Specialist E4.

25    Q    And did you have an honorable discharge?

ACCURATE STENOTYPE REPORTERS, INC.

11

1    A    Yes.

2    Q    What was your job in the Army?

3    A    I was a military policeman.

4    Q    Anything else?  Did you have any other job as

5  far as training, anything like that?

6    A    No, I was labeled as a military policeman, now I

7  did a lot of things in the military under that, a military

8  policeman's duties, but I was a military policeman.  I

9   didn't have any other job designation.

10     Q    What were you duties then?

11     A    Everything from patrol work just like you would

12  see a civilian police officer to supplying security in war

13  zone, to processing prisoners of war, to site security on

14  nuclear reactors.

15     Q    Okay.

16     A    That's pretty much everything I did, I think.

17     Q    Was there a period of time that you were in

18  combat?

19     A    Yes, I'm a combat veteran.  I forget the actual

20  date, but yes.

21     Q    All right.  Where was that?

22     A    In Iraq.

23     Q    How long were you over there?

24     A    This is a guess now, about three months.

25     Q    Did you have any awards or decorations in the

ACCURATE STENOTYPE REPORTERS, INC.

12

1   military?

2      A    Yes.  I assume you want me to list what they

3  are?

4      Q    Yeah.  Just tell me briefly.

5      A    And I'm not sure, I'd have to look on my DD214,

6  but I believe I had three on army achievement medals, I

7  had the Southwest Asia service medal.  Of course, there

8  were things like qualification badges.  I'd have to look

9  to be sure.  That's all I can remember right now.

10      Q    Okay.  And why did you decide to leave the

11  military in February of '92?

12      A    To pursue a civilian career as a law enforcement

13  officer.

14      Q    Had you completed your initial period of signing

15  up, I guess?

16          MR. MOYE:  Enlistment.

17  BY MR. ROPER:

18      Q    Enlistment, yes.

19      A    My initial enlistment was for four years.  At

20  the time they were going through -- and don't hold me to

21  the terminology that the Army uses -- but a reduction in

22  force, if you will.  And they basically asked is there

23  anybody that wants to get out.

24   Q   All right. And you volunteered to --

25   A   I found out there was a police academy starting

ACCURATE STENOTYPE REPORTERS, INC.

13

1   in my hometown soon so I decided to get out.

2   Q   Okay. You can tell obviously I didn't serve in

3   the military.

4   A   That's fine.

5   Q   Terminology doesn't come to me as easily so

6   much.

7        MR. MOYE: Reduction in force.

8        THE WITNESS: I'm using those words. I don't

9   know what -- I just know that the Army asked for

10   volunteers at that point, at least in my job

11   categorization, if anyone wanted to leave the

12   Army.

13        MR. MOYE: Okay.

14   BY MR. ROPER:

15   Q   All right. So after you got out of the Army you

16   went to the civilian police academy?

17   A   Yes.

18    Q    And where did you go?

19    A    Lake City Community College in Lake City

20  obviously.

21    Q    And did you graduate from that institution?

22    A    Yes.

23    Q    And what year did you obtain your certificate?

24    A    1992.

25    Q    Did you then enter employment as a law

ACCURATE STENOTYPE REPORTERS, INC.

14

1  enforcement officer?

2    A    Yes.

3    Q    Where did you start working?

4    A    The Lake City Police Department.

5    Q    And how long did you work there?

6    A    I started there in December of 1992 and I left

7  there, I believe it was, middle of May 1993, so six

8  months.

9    Q    All right.  And what were your duties at Lake

10  City PD?

11    A    As a general patrol officer.

12    Q    Do you recall who your supervisor was when you

13  left that employment?

14    A    I know -- I can tell you some names of people

15  that worked there that were supervisors.  I just don't

16  remember who my actual supervisor was.

17    Q    Okay.  Who was the chief of police there back in

18  '93?

19    A    Frank Owens.

20    Q    Frank Owens.  Is he currently the chief?

21    A    No, he was actually the sheriff for a while.

22    Q    Okay.  All right.  What were the circumstances

23  under which you left your employment with Lake City PD?

24    A    I wanted to go to work for someone that had

25  state retirement system.

ACCURATE STENOTYPE REPORTERS, INC.

15

1    Q    And that would then be the Columbia County

2  Sheriff's Office?

3    A    That's correct.

4    Q    Did you voluntarily resign your employment with

5  Lake City PD?

6      A    Yes.

7      Q    All right.  When did you start working with the

8    Columbia County Sheriff's Office?

9      A    It was immediately, May of 1993.  I believe,

10   22nd, I think was my employment date.

11     Q    All right.  This may just be a typo, but I just

12   want to make sure that I'm understanding you correctly.

13   Your interrogatory answers indicate that you started your

14   employment with Columbia County Sheriff's Office in May of

15   '92, but you think it was May of '93?

16         MR. MOYE:  That is a typo.

17         THE WITNESS:  That's a typo, yes.

18   BY MR. ROPER:

19     Q    All right.  And what was the initial position

20   you held with Columbia County Sheriff's Office?

21     A    As a deputy sheriff.

22     Q    All right.  And what were your initial duties as

23   a deputy sheriff?

24     A    As a patrol officer.

25     Q    Okay.  Were you assigned to any particular

ACCURATE STENOTYPE REPORTERS, INC.

1  sector at that time?

2      A   No.  It's a large county but relatively small as

3  far as population, so, no, it was not broken down into

4  sectors.

5      Q   All right.  And for how long have you remained

6  employed at Columbia County Sheriff's Office?

7      A   Until January 3rd of 2005.

8      Q   And why did you leave employment with the

9  sheriff's office in January of '05?

10     A   To accept the position with the state attorney's

11  office.

12     Q   Did you voluntarily resign your employment with

13  the sheriff's office?

14     A   Yes.

15     Q   And the time that you left the sheriff's office

16  you were earning $38,000 annually?

17     A   About that.

18     Q   And you had achieved the rank of sergeant?

19     A   Correct.

20     Q   And when you went to work for the state

21  attorney's office you went into the position of state

22  attorney investigator?

23     A    Correct.

24     Q    And you were earning $46,000?

25     A    Yes.

ACCURATE STENOTYPE REPORTERS, INC.

17

1     Q    Other than the approximately $8,000 increase in

2  pay, was there any other reason why you had an interest in

3  going to the state attorney's office?

4     A    Well, there's several reasons.  The most

5  predominant one was the problems I was having with my

6  back.  I was a uniformed patrol officer, you know, which

7  meant I put on my uniform, the gun belt, body armor every

8  day and it was causing me -- I was having significant pain

9  on a daily basis.

10     Q    How would going to the state attorney's office

11  alleviate that problem?

12     A    One, I didn't have the stuff on, all that gear,

13  the weight of it.  It's predominantly a desk job.  Plain

14  clothes, similar to how I'm dressed today.

15     Q    When you say it's predominantly a desk job, you

16   mean there's no patrol duties?

17       A   There's no patrol as per se like getting in a

18   patrol car and riding around.

19       Q   Right.

20       A   No.

21       Q   In your position as an investigator for the

22   state attorney's office, are you routinely required to

23   make arrests?

24       A   No.

25       Q   In your position as state attorney investigator,

ACCURATE STENOTYPE REPORTERS, INC.

18

1   are you routinely required to engage in any strenuous

2   physical activities?

3       A   No.

4       Q   Other than the problems with your back, the

5   increase in pay, what other reasons were you interested in

6   leaving Columbia County Sheriff's Office and going to the

7   state attorney's office?

8       A   That was the primary -- those are two main

9   reasons.

10     Q    Are you working in the same general area with

11   the state attorney's office as you were working with the

12   sheriff?

13     A    Yes, it's in Columbia County.

14     Q    And when you worked for the sheriff's office,

15   where did you report to work?

16     A    I was a patrol officer, so sometimes depending

17   on the day and the shift, kind of complicated, I would go

18   straight to the operations center in Lake City, other days

19   I would just go straight on the road is what we called it

20   to start patrolling.  I was a supervisor, so I didn't have

21   specific responsibilities as far as where I had to be.

22   Sometimes I would go straight to the brick and mortar

23   building of the sheriff's office, other times I would just

24   go out and start supervising patrol officers.

25     Q    Okay.  As an investigator with the state

ACCURATE STENOTYPE REPORTERS, INC.

19

1   attorney's office, where do you report to work?

2     A    Typically the Columbia County Courthouse where

3   our office -- where our satellite office is that I'm

4   assigned to.

5       Q   Obviously from time to time you may be called

6   out --

7       A   Other things.

8       Q   -- or something like that?

9       A   But generally that's where I go to work.

10      Q   And do you have an office there?

11      A   Yes.

12      Q   How many investigators are there with the state

13  attorney's office?

14      A   The Third Circuit?

15      Q   Yes.

16      A   There's a chief investigator and three other

17  investigators.

18      Q   And is Jerry Blair currently the state attorney?

19      A   Yes.

20      Q   Is Jerry a lady?

21      A   No.

22      Q   No.  Okay.

23      A   He's been the state attorney for 30 years.

24      Q   Okay.  How do the hours that you work as a state

25   attorney compare with the hours that you were working as a


ACCURATE STENOTYPE REPORTERS, INC.

20

1   deputy?

2      A    As a deputy I was working shift work which meant

3   we rotated.  Typically 12-hour shifts.  We rotated every

4   28 days between a day shift and a night shift.  Obviously

5   there were other times -- I was involved in a lot of

6   training, so -- predominantly those were my hours.

7   Predominantly the state attorney's office, again, I get

8   called out occasionally, but for the most part it's an

9   8:00 to 5:00 job.

10     Q    Monday through Friday?

11     A    For the most part.

12     Q    Okay.  Just back up for a second, make sure I

13  get a little bit more detail about your employment with

14  the Columbia County Sheriff's Office.  Your initial

15  position with that agency would have been as a road patrol

16  deputy?

17     A    Correct.

18     Q    How long have you remained in that position?

19    A    Again, do you mean -- because even as a sergeant

20  I still did road patrol.  I mean, I was supervising the

21  deputies in their zones, but I still did that.  So in that

22  sense up until the day I left.

23    Q    Okay.  That answers my question.  So really for

24  the entire time that you were with Columbia County

25  Sheriff's Office, whether it was a road patrol deputy or

ACCURATE STENOTYPE REPORTERS, INC.

21

1  as a sergeant, your primary duties were road patrol?

2    A    Yes.

3    Q    When did you become a sergeant?

4    A    I was promoted in January of 1998.

5    Q    Did you have any promotions prior to being made

6  the sergeant in January of '98?

7    A    Promotions as far as rank, no.

8    Q    Did you receive promotions as far as pay?

9    A    Well, of course, we got cost of living increase,

10  whatever.

11    Q    Right.

12    A    Well, the reason I said it that way is like I

13    was on some different units for the time being, but that

14    was just like temporary type things.

15        Q    These are specialized units?

16        A    Yes.

17        Q    What type of units are you talking about?

18        A    Like I was on SWAT for several years.  They had

19    a burglary unit they established at one time that I was on

20    just for a few months.  It was a temporary thing.  I was

21    on it when they established, then they dismantled it.

22    Some street level narcotic units.  Again, all temporary,

23    but my primary duties were always as patrol officer or

24    sergeant.

25        Q    Okay.  At the time that you left your employment

ACCURATE STENOTYPE REPORTERS, INC.

22

1    with Columbia County Sheriff's Office, who was your

2    supervisor?

3        A    My direct supervisor would be Lieutenant Ryan

4    Nydam.  That's R-Y-A-N, N-Y-D-A-M.

5        Q    Okay.  And is Lieutenant Nydam still employed

6    with the sheriff's office?

7    A    Yes.

8    Q    When did you serve on the SWAT unit?

9    A    I'm guessing now, from -- I was there -- I got

10    on it about a year after I joined the sheriff's office, so

11    in the spring of 1993.  That I'm fairly certain of -- I'm

12    sorry, the spring of 1994.  When I got off, I'd have to

13    look in the records.  I was on it about six or seven

14    years.  I know my daughter was born so that was in

15    November of '99, so my best guess would be sometime early

16    2000.

17    Q    Okay.

18    A    But I could be wrong about that.

19    Q    All right.  And who was in charge of the SWAT

20    unit when you left in 2000?

21    A    Sergeant David Wingate.

22    Q    And why did you elect to leave the SWAT unit?

23    A    My child had been born, I was getting into

24    training, teaching at the police academy, basically take

25    some things off my plate.

ACCURATE STENOTYPE REPORTERS, INC.

23

file:///E|/4-12-06%20JJJB%20(FL)%20Depo%20of%20John%20Jewett%20Vol.%201.txt

1    Q    Okay.  Tell me about your experience teaching at

2  the police academy.  When did you start doing that?

3    A    1998.

4    Q    And which academy were you teaching at?

5    A    The Lake City Community College.

6    Q    And for how long did you continue doing that?

7    A    Still doing it.

8    Q    What particular subject matter do you teach at

9  the Lake City Community College?

10    A    You name it.  I'm qualified to teach everything

11  at the police academy except for medical first responder

12  and I probably have taught at one time or another

13  everything but that.  But if you want -- are you asking me

14  what I spend most of my time teaching?

15    Q    Yeah, let's start with that.  Where do you spend

16  most of your --

17    A    Patrol, traffic stops.

18    Q    All right.  What else?

19    A    Well, currently I'm the coordinator for the

20  nighttime academy out there, sort of a supervisor if you

21  want to use that term for that.  I facilitate the smooth

22  running of the class, lining up instructors and such.  So

23   I do that, but again, any given day I might teach just

24   about anything out there.

25      Q    In the past, have you taught any sort of

ACCURATE STENOTYPE REPORTERS, INC.

24

1   defensive tactics?

2      A   Yes.

3      Q   Tell me about that.

4      A   Well, I used to be involved quite a bit in

5   defensive tactics.  Since my injury, I'm no longer able to

6   do that.  Occasionally I will be an instructor of record

7   of defensive tactics, but it's more of a supervisory role.

8   Any time you teach a high liability area, they have what's

9   called a lead instructor and then they have people

10   actually either on the mat or like a firearms on the

11   firing line.  In DT I'm not able to do the on-the-mat

12   stuff.  Sometimes -- and it's rare, but occasionally I

13   will do the lead instructor.

14      Q   When did you first become an instructor in

15   defensive tactics?

16      A   I'm trying to think.  I know it was in the

17  summer when I took the class.  I want to say -- again,

18  don't hold me to this, but I'm guessing 2001, maybe -- I'm

19  not 100 percent sure.  I want to say 2001.

20      Q    Okay.  And is that when you were certified as an

21  instructor here in the State of Florida?

22      A    Defensive tactics instructor.

23      Q    Defensive tactics instructor.  I'm sorry, yes.

24      A    Yes.

25      Q    Obviously you instructed in other areas prior to

ACCURATE STENOTYPE REPORTERS, INC.

25

1  that?

2      A    Prior to that, yes.

3      Q    But in 2001 you became a DT instructor

4  certified?

5      A    Yes, again, I'm guessing on that year.

6      Q    And the courses that you would have been

7  teaching in defensive tactics would have been in order to

8  qualify recruits who were going through the academy?

9      A    Correct.

10      Q    And your testimony is that up through January of

file:///E|/4-12-06%20JJJB%20(FL)%20Depo%20of%20John%20Jewett%20Vol.%201.txt

11   2004 you would have been doing all the hands-on training

12   and instruction with these recruits while you were a DT

13   instructor up through January 2004?

14      A   Not really sure what you're asking.  I wasn't a

15   primary -- what we do is we, you know, we have certain

16   guys that are good at certain things.  There's two or

17   three guys that do most of the defensive tactics that I

18   use.  Now I don't get involved in a lot of the defensive

19   tactics.  I have in the past, so I don't want to tell you

20   I was there every time the students were there I was there

21   because that's not true.  I really don't know -- again,

22   I'm not sure exactly what you're asking me as far as that

23   question.

24      Q   Who were the primary defensive tactics

25   instructors?

ACCURATE STENOTYPE REPORTERS, INC.

26

1      A   At the time Jack Craig was one, a police officer

2   named Keith Heston, another deputy named Howard Bothias

3   (phonetic).

4      Q   Okay.  And how often would you be the defensive

5  tactics instructor?

6     A   They received 80 hours of class hours of

7  instruction per -- each class does in DT, you're asking me

8  for a ballpark, I might be there -- and again, this could

9  change class to class.  This last class as the lead I had

10  to do quite a bit because of some instructor issues that

11  we couldn't get enough.  In the past though I would say

12  probably 20, a quarter of it.

13     Q   All right.  So prior to January of 2004 which is

14  my understanding of when you had your incident with the

15  Taser.  Prior to January 2004 on average you were there

16  about 20 hours --

17     A   That's an average now.  You might find a class I

18  was there 80 of it.  You might find another class that I

19  had something else going on and I did none.

20     Q   Okay.

21     A   But --

22     Q   Was there a particular area of defensive tactics

23  that you instructed on?

24     A   No, not anything in particular.

25     Q   And what you're telling me is that since January

ACCURATE STENOTYPE REPORTERS, INC.

27

1   of 2004 you still serve as a lead instructor, but you're

2   not able to do the physical training?

3       A   They have what's called a lead instructor for

4   defensive tactics, that's typically someone who's been

5   doing it a long time, that person is the lead instructor

6   irregardless of what function they may serve, whether

7   they're on the mat or supervising.  Typically the lead

8   instructor kind of stands back and watches the other

9   instructors who get on the mat.  But if I'm there, I can't

10  get on the mat.  I just can't do that stuff anymore

11  because of the injury.  So I have to function as the one

12  who kind of stands.  But I'm not necessarily the lead

13  instructor if I'm making sense.  There's a person who's in

14  charge of the class, he's the lead instructor.

15      Q   Okay.

16      A   Okay.  However, if I'm there, and they know I

17  can't get on the mat, the lead instructor may say, okay,

18  well, I'll go fill one of the roles on the mat.  But

19  they're still the lead instructor, not me.  You following

20    me?

21        Q    I do.

22        A    I just don't want to confuse you and think I'm

23    the lead instructor for defensive tactics because that's

24    not the case.

25        Q    What I'm getting from what you're telling me is

ACCURATE STENOTYPE REPORTERS, INC.

28

1    that -- that since January 2004 you're still able to

2    participate in defensive tactics training at the Lake City

3    Community College but you are not able to get down on the

4    mat with the recruits?

5        A    I'm not able to do any of the physical stuff.  I

6    can fulfill -- they have to have a ratio.  You have to

7    have a certain amount of instructors per students.  I can

8    go and you will see my name on sheets as doing defensive

9    tactics, but, no, I'm not able to get on the mat,

10    participate in the physical drills.

11        Q    All right.  And do you get compensated for the

12    time you spend as an instructor?

13        A    Yes.

14    Q   All right.  So you still get compensated the

15   same way that you did prior to January 2004, it's just

16   that the actual activities that you're doing are

17   different?

18    A   That would be fair to say, yeah.

19    Q   Okay.  You indicated that you are now serving as

20   the coordinator for the nighttime academy.  Is there a

21   person that's in charge of the overall police training at

22   the academy?

23    A   Yes.

24    Q   And who is that?

25    A   Again, that's not as easy -- they also do

ACCURATE STENOTYPE REPORTERS, INC.

29

1   corrections so they have a main guy, I'll give you his

2   name, his name is Ches -- I call him Ches, I think his

3   full name is Chesley, L-E-Y, I think, Robertson.  I don't

4   see him very often.  He's over all of it.  Now they have

5   what's called a director of law enforcement and that just

6   recently changed hands.  I worked for a gentleman named

7   Bill Thrift for years.  He just recently retired and a

8    gentleman named Doug Brown is currently doing that.

9        Q    Okay.  Director of law enforcement?

10        A    I believe that's his title.  Again, don't hold

11   me to that one.

12        Q    Are you certified to serve as instructor with

13   respect to any specialized weapons, like I'm thinking

14   PR24, anything like that?

15        A    No.  Not that I can think of right offhand.

16   Well, my Taser, that's expired.

17        Q    In the past, other than the Taser certification,

18   have you been certified with respect to the training on

19   any particular weapon?

20        A    Other than like your standard shotgun pistol

21   type things?  Oh, yeah, I am a AR15 instructor.

22        Q    What's an AR15?

23        A    An M16, it's a rival.

24        Q    All right.  Have you ever been certified as an

25   instructor with any baton at all?


ACCURATE STENOTYPE REPORTERS, INC.

30

1        A    As an instructor, no.

2    Q    As part of your training with recruits both at

3    the academy and perhaps in your agency, did part of your

4    defensive tactics training involve usage of a baton?

5    A    Yeah.  That's at the academy.

6    Q    Okay.  And that's part of the course that you

7    would sometimes serve as the instructor on?

8    A    Yes.

9    Q    How about pepper spray?

10    A    Am I an instructor?

11    Q    Yeah.

12    A    No.

13    Q    Have you instructed anyone at the academy

14    regarding the usage of pepper spray?

15    A    No.

16    Q    How about in your agency?

17    A    No.

18    Q    Have you ever been certified to use pepper

19    spray?

20    A    Yes.

21    Q    When were you certified to use pepper spray?

22    A    I would hate to even try to give you a year.  I

23    was a sergeant -- no, I wasn't a sergeant yet.  So it was

24  prior to 1998.  I couldn't even begin to try to give a

25  date or a year on that.


ACCURATE STENOTYPE REPORTERS, INC.

31

1      Q    Okay.  Do you serve as an instructor at any

2  other colleges or academies other than Lake City?

3      A    I have instructed for the Santa Fe Community

4  College and I'm probably still technically on contract

5  with them even though I haven't done so since my injury, I

6  don't believe.

7      Q    Have you served as an instructor for any of the

8  private law enforcement agencies like IPTM or any of

9  those?

10     A    I don't think I've ever done that, no.

11     Q    I may have just assumed this and if I did, I

12  apologize, but have you served as an instructor for the

13  Columbia County Sheriff's Office?

14     A    Yes.

15     Q    You've instructed --

16     A    In-service training type stuff?

17     Q    Yes.

18     A   Yes.

19     Q   How long have you been doing that?

20     A   We don't -- they don't have an official

21  designation per se.  The agency doesn't say basically

22  anoint you now as an agency instructor.  It depends on

23  your areas of expertise.  I couldn't even tell you the

24  first time I instructed something for the sheriff's

25  office.  I just don't know.


ACCURATE STENOTYPE REPORTERS, INC.

32

1     Q   At the time that you left the Columbia County

2  Sheriff's Office, did they have a deputy who was in charge

3  of the in-service training program?

4     A   No.  We did not have -- they have had in the

5  past.  They did not have one for the last few years,

6  someone that was in charge of in-service training.

7     Q   Okay.  Other than your high school education and

8  obviously the police training that you've had over the

9  course of your career, have you had any other formal

10  education?

11     A   Yes.

12    Q   Where else have you been in school, sir?

13    A   I have -- well, I have an associate of arts

14   degree from Lake City Community College.  Now in obtaining

15   that and being in the military I had taken classes at a

16   number of colleges through moving around with the

17   military.  I'd have to look at my transcripts.  I can

18   probably name a couple if you'd like.

19    Q   That's okay.  Those credits that you obtained --

20    A   Transfer.

21    Q   -- transferred to Lake City?

22    A   Yeah.

23    Q   And you got an AA from Lake City in what year?

24    A   '96, I think.  Again, I'm not sure.  Maybe '97.

25    Q   And was that in any particular area of study?

ACCURATE STENOTYPE REPORTERS, INC.

33

1    A   No.

2    Q   Have you had any formal education beyond that?

3    A   Yeah.  I have a bachelor's degree in criminal

4   justice from St. Leo University.

5    Q   And what year did you get that?

6    A    I think 1998.  Again, I'm not 100 percent sure

7  about that.

8    Q    Any further education?

9    A    No.

10    Q    In high school, did you play sports?

11    A    No.

12    Q    Have you ever participated in any sort of

13  organized sports activity?

14    A    When I was a child, yes.

15    Q    Okay.  What sort of sports did you participate

16  in?

17    A    Baseball, T-ball.  I don't think I ever played

18  contact football.  I do remember playing flag football.

19  Bowling.  And obviously I mean, that -- organized, I think

20  that's it.

21    Q    Baseball, is that little league?

22    A    I don't remember.  I mean, little league in

23  the -- you know, they have different labels for different

24  leagues.  I mean, as far as the general term, little

25  league, yes.

ACCURATE STENOTYPE REPORTERS, INC.

1    Q    Right.  I'm trying to -- how old were you when

2  you were playing organized baseball for the last time?

3    A   I want to say I was like in the sixth grade if I

4  remember right.

5    Q    Okay.  And while you were in high school you

6  didn't participate in any sort of varsity or club sporting

7  activities?

8    A   No.

9    Q    How about in the Army?

10     A   Organized, no.  I mean, obviously the Army's

11  physical, but I mean, as far as our organized sports, no.

12  I take that back, I was on their running team for -- one

13  of our company running teams for a while.

14     Q    How about at either Lake City PD or at the

15  Columbia County Sheriff's Office, did you all have any

16  sort of a softball team or football team or anything like

17  that?

18     A   Well, recently about -- well, I say recently,

19  about a year ago the sheriff's office formed a softball

20  team and I tried to participate in that and because of my

21  back I was unable to do so.

22      Q    Okay.  How about before that, any sporting

23  activity before that?

24      A    Other than like maybe just a pickup game at a

25  company picnic type thing, no.


ACCURATE STENOTYPE REPORTERS, INC.

35

1      Q    Do you enjoy sports?  Do you enjoy watching

2  sports?

3      A    Oh, sure.

4      Q    What sports do you like to watch?

5      A    Football, college basketball.  I watch a little

6  golf.

7      Q    Do you go to any of the -- like the Gator games

8  or anything like that, football games?

9      A    Occasionally.

10      Q    Are you aware, sir, that from time to time in

11  sporting activities, whether from you actually personally

12  participating in them or watching them on TV or in person,

13  that sometimes in sporting activities persons suffer

14  injuries?

15    A    Sure.

16    Q    And from time to time, you know, they suffer

17  either broken bones or injuries to ligaments or joints?

18    A    You ask me if I've ever read in the newspaper

19  about that?

20    Q    Sure.

21    A    Yeah, I mean, I've read in the paper or seen on

22  the news where athletes got hurt, sure.

23    Q    And that's common sense, right?

24    A    Yes.

25    Q    If you were living in this country and reading

ACCURATE STENOTYPE REPORTERS, INC.

36

1  the newspaper and interested in sports, you see that all

2  the time, correct?

3    A    I've seen it, yeah.

4    Q    Okay.  And you've seen it prior to January 2004?

5    A    Yes.

6    Q    Let's talk about your commencement of your

7  employment with the state attorney's office.  Were you

8  recruited to the state attorney's office in the sense that

9    someone come to you and say, you know, we have an opening

10   here, we think you'd be good for it, or was it simply a

11   job opening that you applied for?

12       A   I had a friend of mine whose wife is a

13   prosecutor with the state attorney's office.  He came to

14   me one day and said, hey, I don't know if you're aware of

15   it, but there's -- he knew I was having problems with my

16   back and he said, hey, I don't know if you're aware of it,

17   there's an investigator position open.  And I know that

18   he's having problems finding someone that meets his -- he

19   being the state attorney, having problems finding somebody

20   that meets his qualifications.  You know, he's basically

21   just saying, hey, I don't know if you're interested, but

22   there's this option.

23       Q   Okay.  And who was is it that actually hired at

24   the state attorney's office?

25       A   Well, of course, the state attorney.


ACCURATE STENOTYPE REPORTERS, INC.

37

1    Q   Mr. Blair?

2    A   Un-huh.

3     Q    Yes?

4     A    Yes.

5     Q    What did the application process for employment

6   with the state attorney's office entail?  What did you

7   have to do first of all?

8     A    I called Mr. Blair, expressed -- told him I'd

9   like to come talk to him about it, expressed my interest

10  in the job.  We set up a time, I went and met with

11  Mr. Blair, we discussed it.  I talked with some of the

12  investigators.  He asked me some questions obviously.

13  This wasn't a formal interview, it was just me and him.

14  There were some other people coming in and out of his

15  office while we were having this conversation.  I gave him

16  a resume and we basically ended the conversation with I

17  was going to think about it, he would be back in contact

18  with me at a later time.

19    Q    Okay.  And then subsequently he contacted you?

20    A    Yes.

21    Q    And offered you a job?

22    A    No.  He asked me to come in for what I could

23  call a formal interview.

24    Q    All right.  And who conducted the formal

25  interview?

ACCURATE STENOTYPE REPORTERS, INC.

38

1      A    Well, he was the state attorney, he was in the

2  room, so I'm assuming -- it wasn't like there was really

3  one person running it, I guess, but I guess him for lack

4  of a better term.  There were several other people in the

5  room.

6      Q    All right.  And did you actually have to fill

7  out a formal written application?

8      A    Yes.

9      Q    And did you have to take any type of tests to

10  get the job, a written test, oral test, anything like

11  that?

12      A    No.  Well, I guess you could say oral test with

13  the interview.

14      Q    Okay.  All right.  How long did the interview

15  last?

16      A    An hour.  I'm guessing now.

17      Q    Okay.  Did you have to do anything else in order

18  to be qualified for the job with the state attorney's

19  office?

20    A   I had to take a physical.  I had the urinalysis.

21  Of course, upper body, documentation of my education, lot

22  of the same stuff that's in my training record, filling

23  out the application, of course, filling out, you know,

24  typical documentation when you find a new job, W-2 forms,

25  you know, that kind of stuff.


ACCURATE STENOTYPE REPORTERS, INC.

39

1    Q   All right.  Who did the physical?

2    A   Dr. Raime.  Now I need to back up.  When I first

3  got hired, the human resources lady, she forgot to have me

4  do that.  So I actually did my physical after I was hired.

5  I just want to make sure that's clear.

6    Q   Okay.  And where is Dr. Raime?

7    A   She's in Lake City.  Don't even ask me how to

8  spell it.

9    Q   All right.  And she examined you and pronounced

10  you fit for duty?

11    A   I don't know if that's what the wording was on

12  the block she checked, but, you know, it's a state form

13  you bring, a standardized form, and basically in layman's

14  terms, yes, she said that there wasn't any reason she saw

15  I couldn't -- would not be fit for duty.

16      Q    When you met with Mr. Blair and when you had

17  your interview, did you discuss the situation with your

18  back with Mr. Blair and the other folks doing the

19  interview?

20      A    No.

21      Q    To your knowledge, do they know about your back

22  injury?

23      A    It was very widely known in the area especially

24  in the law enforcement circles when I hurt my back;

25  however, I can't say -- you'd have to ask them if they

ACCURATE STENOTYPE REPORTERS, INC.

40

1  specifically knew about it.

2      Q    Okay.  Have you had any evaluations since you

3  began your employment with the Columbia County Sheriff's

4  Office?

5      A    You mean state attorney's office?

6      Q    I'm sorry.  Let me restate that.  Have you had

7   any evaluations since you starred your employment with the

8   state attorney's office?

9       A    You mean like standard employee evaluation

10  performances, one, yes.  Well, one on paper that I've

11  signed.  You know, obviously your supervisor evaluates you

12  probably on a daily basis but one formal one.

13      Q    And did you receive a satisfactory evaluation?

14      A    Yes.

15      Q    Who actually evaluated your performance?

16      A    Who filled the form out?

17      Q    Yes.

18      A    Was Branson Fisher, the chief investigator.

19      Q    Branson Fisher?

20      A    Yes.

21      Q    Is that F-I-S-H-E-R?

22      A    Yes.

23      Q    Have you had any disciplinary action taken

24  against you since you started your employment with the

25  state attorney's office?

ACCURATE STENOTYPE REPORTERS, INC.

41

1    A   No.

2    Q   As far as you know, are they happy with the job

3  that you're doing?

4    A   I believe so.

5    Q   And is the job -- are you able to perform the

6  essential physical functions of the job?

7    A   Yes.

8    Q   Have you received any pay raises since you began

9  your employment with the state attorney's office?

10   A   Yes.  I received one cost of living or whatever

11  it was that they give you every year from the state.  I

12  think they do it in the summer sometime.  So, yeah, about

13  six months after I was there, I got -- we all had one.

14   Q   Okay.  And is it your intention to continue your

15  employment with the state attorney's office?

16   A   As far as going to work tomorrow, yeah.

17   Q   Is --

18   A   I don't know what the future holds, but I mean,

19  I --

20   Q   Sure, none of us do, but I thought -- in other

21  words, do you have any other career plans that you're

22   pursuing?

23      A   Yeah.

24      Q   Okay.  What are those?

25      A   That I'm pursuing right now?


                ACCURATE STENOTYPE REPORTERS, INC.

                              42

1      Q   Yes.

2      A   Well, no.  I mean, I don't -- my goals are to

3   eventually pursue if possible a command level position

4   with the sheriff's office.

5      Q   Okay.

6      A   If you ask if I'm actively doing anything to

7   accomplish those goals, you know, that's kind of a hard

8   question to answer.  I would probably say nothing

9   actively.

10      Q   When you say a career -- I'm sorry, a command

11   level position, are you talking about an elected position?

12      A   Not necessarily.  Just a goal line.  I mean, you

13   asked, so I'm --

14      Q   No, that's fine.  But as far as the immediate

15   future is concerned, it's your plan to continue working

16  with the state attorney's office?

17      A   Yes.  I couldn't go back in uniform right now.

18  I mean, my back wouldn't allow me to do that, so --

19      Q   Since you began your employment with the state

20  attorney's office in January 2005, have you had any

21  occasions which you were required to miss time from work

22  due to any symptoms of pain or discomfort that you're

23  having in your back?

24      A   There's been times that I've gone home early.  I

25  don't think there's been any full days that I've had to

ACCURATE STENOTYPE REPORTERS, INC.

43

1  miss because of that.  There's been times that I had to go

2  home early.

3      Q   Would those days that you had to go home early

4  be documented somewhere in the employment records?

5      A   Probably not because of the nature of my job.

6  Like I might work 12 hours this date, eight the next, 12

7  the next.  We did a lot of flexing out, so, no.

8      Q   Would it be fair to say you have not lost any

9  income because of the times that had you to go home early?

10      A   I don't think I've ever actually had to take

11   leave.  I think a lot of it has been flexed out.

12      Q   Okay.  Do you have to punch a time clock?

13      A   No.

14      Q   You just fill out your time sheets?

15      A   Once a month.

16      Q   Since beginning your employment with the state

17   attorney's office in January of 2005, have you ever had

18   any occasion where you had to physically restrain a

19   suspect or anything like that?

20      A   I've been in some situations like with other

21   officers, like if I've gone assisting with something where

22   that happened.  I can't do that.  I'd be afraid to do

23   that.  I've been -- I have not had to, no.

24      Q   Okay.  Have you ever requested that the state

25   attorney's office make any sort of special accommodations


ACCURATE STENOTYPE REPORTERS, INC.

44

1   for you?

2      A   No.

3      Q   Let's talk about the incident which occurred on

file:///E|/4-12-06%20JJJB%20(FL)%20Depo%20of%20John%20Jewett%20Vol.%201.txt

4  January the 16th, 2004, in which, as I understand it, you

5  were exposed to a Taser weapon, correct?

6      A   Yes, yes.

7      Q   Tell me if you would, how was it that you came

8  to be in a training class that day.

9      A   I was asked to go -- well, I was instructed

10  quite a bit different things for the sheriff's office.

11  Like I told you, I wasn't labeled a training officer or

12  anything, but they knew I was an instructor both for

13  in-service and the police academy, that I had some

14  experience doing that.  The agency asked me to basically

15  go and become an agency instructor for the Taser.

16     Q   Who at the agency asked you to do that?

17     A   I don't remember.  It would have been somebody

18  higher up.  I just don't remember.

19     Q   Was this a request that was made to you verbally

20  or in writing?

21     A   Well, it would have been approved in writing,

22  but I believe it was verbal.  I think and I'm not sure, I

23  believe it was a Lieutenant Brewington (phonetic) that

24  asked me to go.

25     Q   Prior to January 16th, 2004, was your agency,

ACCURATE STENOTYPE REPORTERS, INC.

45

1   the Columbia County Sheriff's Office, using Tasers?

2       A    On a limited basis, yes.

3       Q    How were they being used prior to January 16th,

4   2004?

5       A    There were very few people that had them.  I

6   want to say they had them in our jail.  I don't know how

7   many, I just know at least one was at our jail.  And there

8   was like three or four people out of everybody, law

9   enforcement officer wise that had them.  You would have to

10  ask the sheriff, but I believe it was kind of like a trial

11  type basis.

12      Q    All right.  When you say three or four people

13  had them, you're talking about being three or four people

14  that were on the road?

15      A    I know two people that I can remember by name

16  that had them before that.  I think there was a couple

17  more, but if you ask me their names, I just don't

18  remember.

19      Q    What are the names of the two deputies that you

20   recall that had been issued Tasers prior to January 16th?

21        A    I remember a Sergeant Pete Spurlock had one.

22        Q    How do you spell his last name?

23        A    S-P-U-R-L-O-C-K.

24        Q    Okay.

25        A    And the other one no longer works there, but his

ACCURATE STENOTYPE REPORTERS, INC.

46

1   name was Coley Campbell.  He was a sergeant when he left.

2   I think he might have been a corporal when he

3   actually -- during this time.

4        Q    Coley, C-O-L-E-Y?

5        A    Yes.

6        Q    Campbell.

7        A    I'm not sure where he's at right now.

8        Q    And there may have been others but you just

9   don't know their names?

10       A    There definitely wasn't many, I can tell you

11   that.  I don't know exactly how many or who else might

12   have had them.

13       Q    Do you know how many other Taser weapons had

14   been issued to the jail personnel?

15      A   No.

16      Q   Prior to January 16th, 2004, was there anyone at

17   the Columbia County Sheriff's Office that was certified as

18   an instructor with the Taser weapon?

19      A   I remember an initial training, it was someone

20   outside the agency, I don't remember who, I was not in the

21   training class, I just do remember there was somebody from

22   outside the agency.  I do not remember prior to

23   January 16th, 2004 if there was anybody employed by the

24   office that was a certified instructor or not.  I'm not

25   saying there wasn't, I just don't know.

ACCURATE STENOTYPE REPORTERS, INC.

47

1      Q   What sort of training do you recall prior to

2   January 16, 2004 from someone outside the agency?

3      A   I just was told.  Again, I have no first-hand

4   knowledge.  I wasn't there.  But I was told that the few

5   people that had them went through a certification course.

6      Q   That was provided by somebody that was from

7   outside the agency?

8    A   That's what I was told.

9    Q   Do you know who that person or entity was that

10  was from outside the agency that provided the training for

11  the initial employees of the sheriff's office?

12    A   I was told that someone -- employee of Taser or

13  a distributor for Taser.  I don't -- but I don't know

14  that.  I wasn't in the room.  I didn't see the person, I'm

15  just telling you what I was told.

16    Q   Is Sergeant Spurlock still employed with --

17    A   Yes.

18    Q   -- the Columbia County Sheriff's Office?

19    A   Yes.

20    Q   Prior to January 16th, 2004, had you ever been

21  issued a Taser by the sheriff's office?

22    A   No.

23    Q   Prior to January 16th, 2004, had you ever used a

24  Taser weapon?

25    A   No.


ACCURATE STENOTYPE REPORTERS, INC.

48

1    Q   Prior to January 16th, 2004, had you ever seen a

2    Taser weapon used?

3       A    I don't remember seeing it.  I can't swear to

4    you that I didn't, but I don't remember -- I've seen

5    several people be tased in my career as law enforcement or

6    since we started using them.  I can't say when -- I don't

7    want to tell you definitely no and then find a record

8    where I was at a scene and it happened.  I just don't

9    remember.

10      Q    Okay.  Prior to January 16th, 2004, had you ever

11   seen anyone exposed to the Taser weapon or, you know, news

12   footage or in a movie or anything like that?

13      A    I can't say either way.  I just don't remember.

14   Obviously I have since.  I don't remember when the first

15   time was, if it was before that.

16      Q    Okay.  Where did you go to get training

17   regarding the Taser?

18      A    The Valdosta Police Department.

19      Q    Did anyone else from your agency go with you?

20      A    Yes.

21      Q    Who else went with you?

22      A    I traveled up there by myself.  But I'm assuming

23   you mean in the class, who else was in the class?  Jeff

24   Coleman, who is now a lieutenant still with the sheriff's

25   office.  Robert Deas who is a sergeant with the sheriff's

ACCURATE STENOTYPE REPORTERS, INC.

49

1   office.  A gentleman named Ali Perbtani.  It's A-L-I and

2   then it's P-E-R-B-T-A-N-I.  He's a deputy sheriff.

3       Q   I'm sorry, P-E --

4       A   P-E-R-B-T-A-N-I.

5       Q   Okay.

6       A   I think that's it.  Let's see, those four.

7   There were some people from the jail.  I think it was

8   Melvin Shepherd.  And I think a correctional officer named

9   Cedric May was there.  That's all I remember from the

10   sheriff's office.  Again, I can't swear that there wasn't

11   anybody else there.  Now there's other people in the class

12   but you asked the question from the sheriff's office.

13       Q   Absolutely.

14       A   Right.

15       Q   Did you know any of the other people that were

16   in the class?

17    A   I'm sure I was introduced to them, I don't --

18   no.  But as far as know them, I couldn't tell you their

19   names now.  I think --

20    Q   And the training class was actually performed

21   there at the Valdosta Police Department?

22    A   Yes.

23    Q   Do you recall approximately how many people

24   total were in the class?

25    A   I'm guessing.  I know there were a couple of

ACCURATE STENOTYPE REPORTERS, INC.

50

1   officers, I think they were from the Perry Police

2   Department, that were there.  There was some Valdosta

3   police officers there.  And I'm guessing when I say about

4   five or six of those that that's a guess.  There could

5   have been another person from somewhere in there, I'm not

6   sure.

7    Q   So somewhere around 12, 15 people?

8    A   As an estimate, yeah.

9    Q   Okay.  Now I assume when you say that you were

10   asked to go to this training by your agency that you

11   volunteered for the training?

12       A   I did what they asked me to do.  If I had said

13   no, I don't want to, what would have happened?  I don't

14   know.

15       Q   Okay.  Did anyone order you to do the training?

16       A   Did they use those words, I order you, no.

17       Q   Okay.  And did you volunteer to participate in

18   the training in order to achieve your certification as a

19   Taser instructor?

20       A   Again, that word, I didn't protest it, I'll tell

21   you that.

22       Q   Were you looking forward to becoming certified

23   with respect to the Taser?

24       A   No, I can tell you I wasn't because I knew it

25   was going to hurt.  I've heard people tell me that it

ACCURATE STENOTYPE REPORTERS, INC.

51

1   wasn't a pleasant experience.  I wasn't looking forward to

2   that aspect of it.

3       Q   What were you concerned about?

4       A   The pain.

5      Q    Okay.  Did you ever voice those concerns to any

6   of your supervisors prior to participating in the --

7      A    Concerns like I don't want to go because it's

8   going to hurt, no, I didn't ever say anything like that.

9   I talked to some of the other officers that had already

10   been exposed to it and asked them what it was like.  And

11   of course, they told me it hurt.  So when you say

12   concerned, I was, you know, any time you know you're going

13   to experience pain, you're a little worried, so that's

14   what my concern was.

15      Q    Who did you speak with regarding the training

16   prior to --

17      A    I remember specifically talking to Coley

18   Campbell about it.

19      Q    Do you recall him telling you anything in

20   particular about the training?

21      A    We just talked about the -- you have to think it

22   was a new thing at the office.  The people, I don't

23   remember exactly who, was certified.  I just remember, you

24   know, a hot topic about that it hurt.  So I mean, I heard

25   those conversations.  The only one I specifically remember

ACCURATE STENOTYPE REPORTERS, INC.

52

1   having a conversation with was Coley Campbell.  I mean, I

2   can't say I didn't have one with anybody else, but that's

3   the only one I remember.

4       Q    Okay.  Prior to participating in the training,

5   did you review any materials yourself that related to

6   Taser?

7       A    No.

8       Q    Did you ever try and review any of the product

9   manuals or anything like that that had been given to the

10   prior -- the other deputies?

11      A    I never saw any of those, no.

12      Q    Did you ever request any from the deputies that

13  had already been issued a Taser weapon?

14      A    No.

15          MR. MOYE:  I object to that question.  I

16      don't know if they had any information.  Did we

17      establish that the others had any information?

18  BY MR. ROPER:

19      Q    Probably predicate.  Do you know whether any of

20  the deputies that had previously been -- deputies with the

21   Columbia County Sheriff's Office that had been previously

22   issued a Taser weapon had manuals, product manuals?

23      A   At the time, no.

24      Q   Do you know that now?

25      A   Well, because I went through the class I know

ACCURATE STENOTYPE REPORTERS, INC.

53

1   that you're handed stuff, but I didn't know at the time.

2      Q   Okay.  Did you ever visit the Taser

3   International website prior to participating in the

4   training in January 2004?

5      A   I don't believe so.

6      Q   Okay.  Did you ever review any newspaper

7   articles or magazine articles that related to the Taser?

8      A   Before?

9      Q   Yes.

10      A   I don't think so.  Again, there's been several

11   things in the news about it but I believe all that's been

12   since.

13      Q   Since you participated in the training?

14      A   Since I participated in the training.

15    Q    All right.  Were all of the employees from the

16  Columbia County Sheriff's Office that you named for me

17  that participated in the training in January 2004 there to

18  be certified as instructors?

19    A    I believe so.  It was an instructor course.

20    Q    Okay.  And at that point in time had the sheriff

21  made a decision about whether or not the agency was going

22  to be using the Taser weapons?

23    A    I can't tell you when he made that decision.  I

24  can tell you that ultimately they were mass issued to

25  officers at the Columbia County Sheriff's Office.  When he

ACCURATE STENOTYPE REPORTERS, INC.

54

1  made that decision, I don't know.

2    Q    Were the Taser weapons, as you say mass issued

3  to the deputies, after January 16th, 2004?

4    A    I don't know for sure.  I'm assuming since I

5  wasn't issued one and I was a road sergeant at the time,

6  that they had not been mass issued.  If they had been I

7  would have been issued one already.  So I'm assuming no,

8  but --

9    Q    Were you issued a Taser weapon after

10   January 16th, 2004?

11       A    When I was able to return to work, yes.

12       Q    And that was issued to you by the sheriff's

13   department?

14       A    Yes.

15       Q    Do you currently have a Taser weapon issued to

16   you with your job at the state attorney's office?

17       A    No.

18       Q    During the time that you were employed as a

19   deputy sheriff at the Columbia County Sheriff's Office,

20   did you ever have occasion to use your Taser?

21       A    Yes.

22       Q    Did you have occasion to use it on more than one

23   occasion?

24       A    Yes.

25       Q    How many times did you use your Taser?


ACCURATE STENOTYPE REPORTERS, INC.

55

1    A    That I can remember, twice.  Now I'm assuming

2    you say use, you know, we test them every day.  You mean

3   in a real life situation employing them against someone?

4       Q    That's true.  And let me be correct on that.

5       A    Yes.

6       Q    I'm talking about where you had occasions where

7   you had to utilize your Taser in the line of duty in order

8   to subdue a suspect.

9       A    Twice.

10      Q    Would you tell me about those two occasions,

11  please?

12      A    Dates and times, I don't remember.  One time was

13  a gentleman who was hiding two fugitives in his house.  We

14  made entry in his house to arrest the fugitives.  He was

15  on the couch.  He took a fighting position with us when we

16  told him to turn around, basically to submit to an arrest

17  and I -- I don't have my reports in front of me so as far

18  as what I said and how fast, I'm going off at least a

19  two-year-old memory here, year-and-a-half memory.  I

20  remember telling him several times to submit.  He wouldn't

21  and I Tasered him.

22      Q    Okay.  And did you prepare a report regarding

23  your involvement in that incident?

24      A    Obviously I don't have it.  I'm assume -- that

25   would be standard protocol that if you use force that I

ACCURATE STENOTYPE REPORTERS, INC.

56

1   would prepare a report, so -- but I don't know that for

2   sure.

3      Q    Okay.  Do you recall approximately when that

4   incident occurred?

5      A    Obviously it would have been between -- I came

6   back to work I think it was in March of '04.  Again, I'm

7   guessing on that.  And then, of course, I resigned from

8   the sheriff's office at the end of that year.  So

9   obviously it would have been in that time period, exactly

10   when, I couldn't tell you.

11      Q    Okay.  When was the second time that you had

12   occasion to use your Taser weapon after January of '04?

13      A    Again the, date, it was in between those time

14   frames.  I couldn't tell you exactly.  It was a

15   gentleman -- you want to know?

16      Q    Yes, please.

17      A    Not trying to -- it was in a hotel room, he was

18   causing disturbance.  We had received several calls there.

19   We had been there.  Basically it was like our third time

20   there.  Very intoxicated, ultimately wound up telling him

21   he was under arrest, we were in his room, he advanced

22   towards me in an aggressive manner and I winded up

23   Tasering him.

24       Q   Okay.  On both occasions was the Taser effective

25   in subduing the suspect?


ACCURATE STENOTYPE REPORTERS, INC.

57

1       A   Again, that's kind of a hard question to answer.

2   But I would -- it was at minimum helpful.  Like one of

3   them, he was already on a couch so he just seized up.  And

4   I told him after the Taser cycle ended, I said roll over

5   and they did.  The other one, he fell, kind of slumped --

6   stiffened up and slumped on a dresser that had a lot of

7   alcohol bottles on it.  And when did he that, other

8   officers grabbed him, so --

9       Q   Okay.  On those two occasions, did you consider

10   the use of the Taser to be appropriate?

11       A   Yes.

file:///E|/4-12-06%20JJJB%20(FL)%20Depo%20of%20John%20Jewett%20Vol.%201.txt

12    Q    Did you consider the use of the Taser to be the

13   most effective police tool that you had available to you

14   to subdue the two suspects in question?

15    A    Well, basically my options were hands on, pepper

16   spray, lethal force with my side arm or with a Taser, so

17   from what I had, yes, I considered it to be the safest and

18   most logical.

19    Q    Okay.  And --

20    A    For me.

21    Q    -- ultimately as I understand it, you have told

22   us that the Taser on both occasions did effectively subdue

23   the suspect and they complied once the Taser was utilized?

24    A    Again, I mean, that question -- obviously the

25   officers that put the handcuffs on him are the only ones

ACCURATE STENOTYPE REPORTERS, INC.

58

1   that actually subdue in my terminology.  But did it help,

2   was it helpful in the situation, yes.

3    Q    Was the Taser weapon effective in gaining the

4   suspect's compliance?

5    A    It was helpful in assisting us in gaining their

6  compliance, yes.

7    Q    Okay.  Were you using an X26?

8    A    M26?

9    Q    M26?

10    A    Un-huh.

11    Q    And when you resigned your employment with the

12  Columbia County Sheriff's Office did you have to return

13  the Taser weapon to them?

14    A    Yes.

15    Q    Do you know whether there's a record kept of the

16  model and serial number of the Taser weapon that would

17  have been issued to you by the sheriff's office?

18    A    There should be.  I can't tell you that it

19  hasn't been destroyed or that they could find it.  I know

20  that the whole sheriff's office just moved into a new

21  building.  But, yes, standard protocol anytime anything

22  with a serial number especially is issued that you sign

23  for it and there's a procedure.

24    Q    Is there a deputy sheriff there that's

25  responsible for keeping track of that information?


ACCURATE STENOTYPE REPORTERS, INC.

1    A    You'd have to ask them.  I don't know that for

2  sure.

3    Q    Is it like an equipment person or --

4    A    There is an equipment manager.  This equipment

5  manager was not employed there.  I don't even know if

6  there was an equipment manager at that time.  There is one

7  now.

8    Q    Okay.  Approximately how many road patrol

9  deputies and sergeants are there employed at the Columbia

10  County Sheriff's Office?  And let's just say as of January

11  of '04.

12    A    Okay.  Well, there's four shifts, there's eight

13  per shift, so that's 32.  There's two lieutenants, 34.

14  You're asking patrol now, right?

15    Q    Yeah.

16    A    Not talking about investigations or anything

17  like that.  The captain, 35, there was subsection

18  Ft. White, maybe three to four people were down there, so

19  call it 40.  Traffic unit that was under the patrol

20  umbrella, a couple people, our interstate interdiction

21  unit, I think they were under patrol.  And again, you know

22  how people get delegated out, they'll do this for a month,

23  so roughly 40, 45.

24     Q   Do you know approximately how many Taser weapons

25  the Columbia County Sheriff's Office purchased?

ACCURATE STENOTYPE REPORTERS, INC.

60

1     A   No.

2        (Brief recess.)

3  BY MR. ROPER:

4     Q   All right.  Mr. Jewett, were either of the two

5  suspects that you used your Taser on permanently injured

6  in any way as a result of the Taser?

7     A   Not that I know of.

8     Q   In between January of 2004 through January of

9  2005 when you left the Columbia County Sheriff's Office,

10  are you aware of anybody else that was exposed to a Taser

11  there at the sheriff's office, either a suspect or a

12  deputy, that was claiming to have been injured as a result

13  of the use of a Taser?

14     A   Vaguely it seems like I've heard of a couple

15  complaints.  I can't -- I couldn't tell you any specifics,

16   so --

17     Q    Okay.  Now the incident in which the -- the

18   training incident in which you were exposed to the Taser

19   occurred on January 16th, 2005, correct?

20     A    No.

21     Q    I'm sorry, 2004.

22     A    2004.  I believe it was the 16th, yeah.

23     Q    Was that the first day of training?

24     A    As far as I remember it was a one-day class,

25   so --

ACCURATE STENOTYPE REPORTERS, INC.

61

1     Q    All right.  And did you drive up to Valdosta

2   that morning or go up the night before?

3     A    That morning.

4     Q    And you said you went up there by yourself?

5     A    Yeah, in the vehicle.

6     Q    Tell me what happened when you first got up to

7   Valdosta as far as, you know, registering for the class,

8   getting settled, that kind of thing.

9     A    Found the police department.  Never been there

10  before.  Was directed to the training room.  I think I was

11  a little bit early.  Waited around for everybody to get

12  there and start class.

13      Q   Do you recall what time the training started?

14      A   I mean, I'm guessing 8 o'clock, but I don't

15  specifically remember that, no.

16      Q   All right.  Prior to the class beginning, were

17  you required to register or fill out any paperwork or

18  anything like that?

19      A   I'm sure I was.

20      Q   Have you ever seen that paperwork since that

21  day?

22      A   I don't know.  I don't -- I'm not sure.

23      Q   Do you recall reading any paperwork that

24  discussed what might occur in the class?

25      A   Beforehand?

ACCURATE STENOTYPE REPORTERS, INC.

62

1      Q   Yes.

2      A   I don't remember anything like that.

3      Q   Okay.  Who was the instructor for the class that

4   you had?

5       A   I think his name was Mitchell Gray.  Yeah, I

6   think that was it.

7       Q   All right.  Had you ever met him previously?

8       A   Not that I know of.

9       Q   Tell me what you recall about the training class

10  that day up till the point where you were exposed to the

11  Taser.

12       A   I remember he had a power point -- or a

13  presentation over a projector, I think it was a power

14  point presentation of some sort.  Just went over the Taser

15  with a weapon, the functionality of it, the nomenclature

16  of the weapon.  I think we -- I think we practiced

17  shooting it into like a -- that metal tinfoil target thing

18  they have or whatever.  And then right before lunch we

19  were going to do the exposures.  Again, it's been over two

20  years now so I'm going off memory.  That's the best I can

21  remember it.

22       Q   Okay.  Well, you said there was a power point

23  presentation.  Are you talking about actually literally

24  there were images that were being projected onto a screen?

25     A   I don't know if it was on a -- what the

ACCURATE STENOTYPE REPORTERS, INC.

63

1   technology was, I just remember he had some kind of

2   presentation up there that he was going from.  I don't

3   remember what it was.

4     Q   All right.  But there was -- information was

5   being projected onto a screen?

6     A   A screen or wall or whatever, yeah.

7     Q   Okay.  And the instructor was going over that

8   information with you?

9     A   Un-huh.

10    Q   Were you issued some type of written materials

11   that you were using as you were going through the class?

12    A   I think so, but I don't remember for sure.

13    Q   Do you recall being issued what's called a

14   lesson plan?

15    A   I think.

16    Q   And did you have that written material there

17   available with you when the power point presentation --

18    A   I don't remember at what point I got it.  I do

19   remember a packet.  Again, it's been two years.  I

20   remember that packet.  I don't remember exactly what point

21   he handed it out, but I do remember getting it.

22      Q   Okay.  Do you recall approximately how long the

23   power point presentation or the oral presentation took?

24      A   Well, there were breaks and all that and like I

25   said, we practiced shooting into that metal thing, so it's

ACCURATE STENOTYPE REPORTERS, INC.

64

1   not like he went all the way through.  If I remember

2   right, I want to say like -- you know, he would do some of

3   it and then we would like practice the reloading of it,

4   where he would stop, he wouldn't be going off the

5   presentation, then he might pick back up.  So as far as I

6   remember I don't even know that he actually finished it

7   when we were getting ready to start the exposures.

8      Q   You don't recall?

9      A   I don't remember.

10      Q   Were you issued a Taser weapon at that point in

11   time or did he have a couple in there that you were using?

12      A   There were some on the table that we could

13  practice when he was going over the nomenclature and the

14  parts that we could look at and handle.  I don't remember

15  if there was one for every student but I do remember that

16  there were some on the table that we could practice with.

17      Q   Okay.  And what are the types of functions that

18  you were practicing?

19      A   I specifically remember him having us practice

20  manipulating the -- I call it a safety, I don't know what

21  they call it.  The thingy, the little slide thing on the

22  side of it that turns the laser on and off.  I remember us

23  having to practice taking an old cartridge off and putting

24  a new one back -- reloading it basically.  I remember he

25  showed us how to take the batteries out and put them back

ACCURATE STENOTYPE REPORTERS, INC.

65

1  in.  That's all I can specifically remember.

2      Q   Did you practice doing the spark test?

3      A   I'm sure we did.  Yeah, yeah, we did the spark

4  test.

5      Q   Was there bookwork that you were required to do

6  as you were going through the training before the

7    exposures?

8       A    In what sense?  I don't --

9       Q    Well, in your interrogatory answers you say the

10   beginning of the course involved bookwork and lasted from

11   8:00 a.m. to 5:00 p.m.

12      A    I think -- yeah, what I'm talking about there is

13   I think it was that packet.  When you say bookwork, you

14   know, like when you're in high school and there's quizes

15   and stuff, I don't think it was anything like that or it

16   wasn't anything like that.  I think it was just following

17   along I think with that packet as you went through the

18   presentation.

19      Q    Okay.  Does that answer to interrogatory that

20   you provided help refresh your recollection that you did

21   have a written packet of materials that you were reviewing

22   as the oral presentation was being given?

23      A    Yes.

24      Q    Okay.  And it says here that the book -- the

25   beginning of the course involved bookwork and lasted from

ACCURATE STENOTYPE REPORTERS, INC.

66

1   8:00 a.m. to 5:00 p.m.  Does that help refresh your

2   recollection as to how long the power point presentation

3   and bookwork portion of the course lasted?

4       A   No, because it was still going -- you know, of

5   course, I never made it back -- well, I did come back

6   after lunch, but we broke for lunch, it was still ongoing

7   and then I got back from lunch and it was -- you know,

8   pretty much 15 minutes later I had to go.

9       Q   Your exposure to the Taser took place prior to

10  lunch?

11      A   Prior to lunch.

12      Q   Okay.  So the instruction that you would have

13  received prior to being exposed would have lasted from

14  approximately 8:00 till noon?

15      A   Well, we left to go to lunch at noon if I

16  remember right and I got exposed 15 minutes before that so

17  assuming we went at 12:00 and, you know -- I don't

18  remember the exact time we left for lunch but it was right

19  before we left for lunch.

20      Q   Okay.  During the course of the power point

21  presentation, do you recall the instructor saying anything

22  to you about the potential for injury associated with

23  exposure to the Taser?

24      A    No, I don't remember that.

25      Q    Are you saying he didn't say anything or you

ACCURATE STENOTYPE REPORTERS, INC.

67

1   just don't recall one way or the other?

2       A    I don't remember him saying anything like that.

3   I mean, obviously it's been two years.  I think I'd

4   remember it.  I'm pretty sure he didn't.

5       Q    Why do you think you'd remember that?

6       A    I mean, I just -- that's something that's

7   important.  I think I'd remember it if he would have stood

8   up there and said, you know, this thing has potential to

9   cause serious injury to you, I think I'd remember that.  I

10  remembered that because I think I would have reevaluated

11  whether or not I wanted to get shocked by this thing.  I

12  just think I'd remember that.

13      Q    And why do you think you'd remember that?

14      A    Because I think it would have made me reevaluate

15  or do I want to be exposed to it or not if it had the

16  potential to injure me.

17     Q   Okay.  All right.  And if you had been warned in

18   advance that exposure to the Taser could cause an injury,

19   you think you would have elected not to be exposed?

20     A   I mean, I would had to have been there.  It's

21   hard to say what you did two years before, but I mean,

22   could say that if he would have said it's a high

23   likelihood it's going to fracture two of your vertebra, I

24   wouldn't have done it, no.

25     Q   All right.

ACCURATE STENOTYPE REPORTERS, INC.

68

1     A   I mean, you know, you're asking me to --

2     Q   Well, what I'm asking is this, is if you had

3   been warned in advance that the Taser had the potential to

4   cause serious orthopedic injury, would you have still

5   volunteered to be exposed to the Taser?

6        MR. MOYE:  Object to the form.

7        THE WITNESS:  I mean, that's -- no, I mean,

8     I -- no.

9   BY MR. ROPER:

10     Q   Okay.

11    A    If I was going to class today for something and

12    you said there's a high likelihood that this could cause

13    this injury, I wouldn't do it.

14    Q    Did you volunteer to be exposed?

15    A    I believe it was -- we were told it was a

16    requirement.

17    Q    Who told you that it was a requirement?

18    A    I'm assuming the instructor.  I don't remember

19    exactly.  I mean, he was the instructor, he was the only

20    person in there that wasn't a student.

21    Q    Do you have a specific recollection as you sit

22    here today that the instructor told you that day that it

23    was a requirement that you be exposed to the Taser in

24    order to be certified?

25    A    Specific recollection, no.


ACCURATE STENOTYPE REPORTERS, INC.

69

1    Q    Could it in fact have been merely a

2    recommendation that you --

3    A    I remember sitting there knowing that if I

4    wanted to be a certified instructor that I -- you know, I

5   had to be exposed.  The exact words they used, obviously I

6   don't have a specific recollection to that.

7       Q    Did you ever see anything in writing that

8   required you to be exposed to the Taser in order to be

9   certified as an instructor?

10      A    I mean, I don't know if there's anything in that

11  packet or not.  If I remember, it's pretty thick.  And

12  you're using the word "require."  I can't say for sure

13  that I've seen something.

14      Q    Okay.  Did your agency require you to be exposed

15  to the Taser in order to be certified as an instructor?

16      A    I don't know if they had a policy as far as

17  getting certified as an instructor.  I believe you had

18  to -- or I know they required you to be exposed to be a

19  user.  That was after the fact.  I mean, all the people

20  who got certified as users later had to be exposed.  I

21  don't know that they issued a directive or it was in a

22  policy of any kind that specified as an instructor.  I

23  don't remember that or don't know if there was.

24      Q    As we sit here today, do you recall whether your

25  understanding that day, namely January 16th, 2004, that

ACCURATE STENOTYPE REPORTERS, INC.

70

1   you had to be exposed to the Taser in order to be

2   certified as an instructor came from what you understood

3   your agency's requirements were or what Taser's

4   requirements were?

5        A   No, typically if we go get certified for

6   something, it's the certifying agency.  You have to meet

7   the requirements of the certifying agency or company or

8   whatever it is in order to be certified as an instructor

9   and that's what you got to do.

10       Q   Okay.  So if Taser International didn't require

11   you to be exposed to the Taser in order to be certified,

12   would your agency have required that?

13       A   Oh, I don't know.  I don't write policy.

14       Q   Currently as we sit here today -- well, that's

15   probably not a fair question.  Let me ask you, as of the

16   day that you left Columbia County Sheriff's Office, did

17   the sheriff's office have a policy requiring users of the

18   Taser to be exposed to the Taser?

19       A   There was a Taser policy.  I don't have it in

20  front of me obviously.  I don't remember it verbatim what

21  it had and what it didn't.

22        MR. MOYE:  There was a question before --

23        after when it was used before or was it specific

24        at the time?

25        MR. ROPER:  I think it was as of

ACCURATE STENOTYPE REPORTERS, INC.

71

1    January 16th.  I'm sorry.  I understand the

2    objection.

3  BY MR. ROPER:

4    Q    As of the time you left the sheriff's office in

5  January of 2005, Columbia County Sheriff's Office had a

6  Taser policy, correct?

7    A    Yes.

8    Q    And is it your understanding that Taser policy

9  required users to be exposed to the Taser in order to be

10  certified as a user by --

11      A    I don't remember.  I know my injury was a big

12  deal and there was a lot of people that were concerned

13  when they went to get issued.  And I remember there were

14  people that didn't want to be exposed.  I don't remember

15  exactly what was in the policy as far as that.

16      Q   Okay.  Do you recall during the course of the

17  power point presentation the instructor informing the

18  class that exposure to the Taser could result in sports

19  type injuries?

20      A   Only thing I can remember is I remember him

21  telling us in the instruction what the Taser did, caused

22  massive muscle contraction and saying that the effects

23  lasted the five seconds and then it went away.

24      Q   Okay.

25      A   Again, there's a packet there and you're asking

ACCURATE STENOTYPE REPORTERS, INC.

72

1  me what I remember.

2      Q   Do you recall reading any information that

3  indicated that exposure to the Taser could result in

4  sports type injuries?

5      A   I've seen information on that since, I don't

6  remember whether I've seen that -- I saw that information

7  that day or after, but I know that -- or I've been told

8    that now you have to sign a waiver and it specifically

9    states fractures that it could cause, but again, that's

10   been since.  I don't remember then if I -- you know,

11   before that date or on that date if I saw anything like

12   that.

13       Q    Do you remember seeing any slide or reading

14   anything in the materials that you were provided that

15   indicated that exposure to the Taser was recommended but

16   not mandatory?

17       A    Could have been there.  I don't specifically

18   remember that.

19       Q    Do you believe that a warning to the effect that

20   exposure to the Taser could cause serious orthopedic

21   injury such as a separated shoulder or rotator cuff would

22   have been sufficient to inform you about the potential for

23   the type of injury you sustained?

24       A    Say that again now.

25       Q    Sure.  Would you agree with me that it's

ACCURATE STENOTYPE REPORTERS, INC.

73

1    impossible to warn of every possible injury that could

2  occur in a situation; would you agree with me on that?

3      A   I mean, yeah, a traffic signal could fall down

4  and you can't warn everybody in the world that -- yeah.

5      Q   And you're a defensive tactics instructor,

6  correct?

7      A   Un-huh.

8      Q   Right?

9      A   Yes.

10     Q   And sometimes when you're doing training,

11  whether it be, you know, with hand-to-hand combat or

12  whatever, sometimes unforeseen injuries occur, right?  I

13  mean, you take precautions but sometimes things happen?

14     A   Have I seen people injured in defensive tactics,

15  I have.

16     Q   Okay.  And even though you've taken adequate

17  precautions to try and prevent injury, correct?

18     A   Yes.

19     Q   I mean, any use of force necessarily involves

20  some risk of injury, right?

21     A   Yes.

22     Q   So if on January 16th, 2004 you had been warned

23  that exposure to the Taser could cause an orthopedic

24  injury, could cause, you know, serious orthopedic injury

25  such as a separated shoulder or injuries to bones, would

ACCURATE STENOTYPE REPORTERS, INC.

74

1  that have been an adequate warning to you in light of your

2  injury?

3      A   Well, that depends on what the person knew.  So

4  when you ask me if it's adequate, for those specific

5  injuries that they warned then it would be adequate.  I

6  mean, it depends on what the person -- you know what I

7  mean?

8      Q   If you had been warned that there was a

9  potential for a broken bone, would that have been

10  sufficient to --

11     A   Warn me about broken bones, yes.

12     Q   If you had been warned that exposure to the

13  Taser could result in a broken bone, would you have agreed

14  to be exposed to do the Taser?

15     A   Again, you're asking hypothetical but I think I

16  would probably want more information about, you know, how

17  that could happen or what's happened in the past.

18    Q    Do you recall anyone else in the class asking

19  questions about potential for injury from exposure to the

20  Taser?

21    A    I don't remember anything specifically.

22    Q    Describe for me how the exposures of the other

23  participants in the class were handled.

24    A    I only specifically remember one.  I don't

25  remember if they were all done before lunch, but for some

ACCURATE STENOTYPE REPORTERS, INC.

75

1  reason I can only remember the very first one who is Ali

2  Perbtani, he actually got shot with the probes.  Everybody

3  else had the leads taped -- or I had the leads taped to

4  me.  I remember I was one of the ones that were supporting

5  him.  They had somebody on each side from what I remember

6  so that they didn't fall.  You held them up.  And I

7  remember him getting shot.  I remember him going up on his

8  toes and the instructor told us to gently allow them to go

9  to their knees and then had us to lay him down and the

10   instructor showed us how to remove probes from him.

11    Q    Okay.

12      A   And I'm not sure if anybody went in between him

13   and me, but I remember going.  I don't remember for sure

14   if anyone went in between us.  And I can't specifically

15   remember anybody else getting exposed.  I'm not saying

16   they weren't, I'm just saying I don't remember.

17      Q   I understand from your answers to

18   interrogatories that you believe that the Taser weapon

19   that was being used during this exposure was the X26?

20      A   No, I was told it's the M26.

21      Q   Okay.

22      A   The X26 is the little one, the newer version,

23   right?

24      Q   Correct.

25      A   I believe it was the M26 and that's what I was

ACCURATE STENOTYPE REPORTERS, INC.

76

1   told it was.  You know, again, I was facing the other way

2   so I can't say for sure with absolute certainty what

3   weapon he used.  If it says X26, I think it's probably a

4   typo.

5      Q   All right.  Because here, let me show you this.

6    And in response to interrogatory number 26, and I'll let

7    you read this.  But the question asked you to identify

8    specific product which was utilized during the training.

9    And in response part of your answer is, "The lesson plan

10   given to the plaintiff is for the Taser X26 model and the

11   plaintiffs believe this is the Taser model used."

12       A   I think that's a typo.  We did all our practice

13   with -- you know, manipulating the parts with the M26 and

14   I believe, again, my back was to the instructor, but I

15   believe that it was the M26 and not the X.  I think the

16   confusion might be on the pamphlets -- on the cover.  I

17   think it has a picture of the X26 on that CD they give so

18   maybe that's where the confusion came in, but I'm almost

19   certain it was the M26.

20       Q   All right.  When you were issued a Taser weapon

21   by the sheriff's office, was it the M26 that you were

22   issued?

23       A   It was the larger version I believe is the M26.

24   As far as I know, the sheriff's office at the time anyway

25   did not even own an X26 that I know of.  I never saw any

ACCURATE STENOTYPE REPORTERS, INC.

1   of our officers with that one.

2       Q    Okay.  Who was actually performing the exposures

3   on January 16th?

4       A    In class?

5       Q    Yes.

6       A    I believe it was Mr. Gray that -- the

7   instructor.

8       Q    Okay.

9       A    I'm assuming that's his name.

10      Q    Did any of the other students expose any of the

11  other students to the Taser?

12      A    You're talking about the students doing the

13  exposure?

14      Q    Yes.

15      A    Not that I know of.

16      Q    Okay.  And how long were the exposures for?

17      A    I know Ali Perbtani's was five seconds and I

18  know mine was five seconds or what -- it was a full cycle

19  and we were told a full cycle was five seconds.

20      Q    And you believe that you received a full cycle?

21    A    I believe I did.

22    Q    Okay.  Do you know that for sure?

23    A    I was told it was.

24    Q    Who told you that?

25    A    I believe the instructor did.

ACCURATE STENOTYPE REPORTERS, INC.

78

1         MR. ROPER:  Okay.  All right.  Why don't we

2    take a break.

3         (Brief recess.)

4         (Deposition recessed at 1:06 p.m.)

5                    *   *   *

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

ACCURATE STENOTYPE REPORTERS, INC.

79

1          CERTIFICATE OF ADMINISTERING OATH

2

3

4

5  STATE OF FLORIDA:

6  COUNTY OF LEON:

7

8

9        I, TRACY L. BROWN, Registered Professional

10   Reporter and Notary Public in and for the State of Florida

11   at Large:

12          DO HEREBY CERTIFY that on the date and place

13   indicated on the title page of this transcript, an oath was

14   duly administered by me to the designated witness(s) before

15   testimony was taken.

16          DATED THIS    day of          , 2006.

17

18

19                    _____

20                    TRACY L. BROWN
                      2894-A Remington Green Lane
21                     Tallahassee, FL  32308
                      (850) 878-2221
22

23

24   My Commission Expires: July 24, 2008

25


              ACCURATE STENOTYPE REPORTERS, INC.

                              80

1                 CERTIFICATE OF REPORTER

2

3

4    STATE OF FLORIDA:

5    COUNTY OF LEON:

6

7         I, TRACY L. BROWN, do hereby certify that the

8    foregoing proceedings were taken before me at the time and

9    place therein designated; that my shorthand notes were

10   thereafter translated under my supervision; and the

11   foregoing pages numbered 1 through    are a true and

12   correct record of the aforesaid proceedings.

13        I FURTHER CERTIFY that I am not a relative,

14   employee, attorney or counsel of any of the parties, nor am

15   I a relative or employee of any of the parties' attorney or

16   counsel connected with the action, nor am I financially

17   interested in the foregoing action.

18        DATED THIS    day of         , 2006.

19

20

21        _____

22             TRACY L. BROWN
               2894-A Remington Green Lane
23             Tallahassee, FL  32308
               (850) 878-2221
24

25

ACCURATE STENOTYPE REPORTERS, INC.