# EXHIBIT "B-2"

Deposition of John Jewett (Vol. II)
<u>J.J. and J.B. v. DGG TASER, Inc., et al</u>
Leon County, FL Second Judicial Circuit
Case No. 37-2005 CA 001569

file:///E|/4-14-06%20JJJB%20(FL)%20Depo%20of%20John%20Jewett%20Vol.%202.txt

81

1          IN THE SECOND JUDICIAL CIRCUIT
           IN AND FOR LEON COUNTY, FLORIDA

2

3          CASE NO. 37-2005 CA 001569

4   J.J. and J.B.,
            Plaintiffs,

5   vs.

6   DGG TASER, INC., a Florida For Profit Corporation,
    and TASER INTERNATIONAL, INC., a Delaware For

7   Profit Corporation,
            Defendants.

8   _____

9          CONTINUED -- VOLUME II

10  DEPOSITION OF:      JOHN JEWETT

11  TAKEN AT THE INSTANCE OF: The DEFENDANT

12  DATE:            April 14, 2006

13  TIME:            Commenced at 1:30 p.m.
                     Concluded at 4:05 p.m.

14
    LOCATION:         822 North Monroe

15                    Tallahassee, FL

16  REPORTED BY:      JUDY CHIN
                      RPR, CRR

17

18

19

20

21

22

23

24

25

82

1   APPEARANCES:

2

3          REPRESENTING PLAINTIFF:

4
            DAVID W. MOYE', ESQUIRE
5           ANDREWS & MOYE
            822 North Monroe Street
6           Tallahassee, Fl  32303
            681-6416
7

8          REPRESENTING Defendant:

9
            MICHAEL J. ROPER, ESQUIRE
10           BELL, LEEPER & ROPER, P.A.
            2816 East Robinson Street
11           Orlando, Florida  32803

12

13

14

15

16

17

18

19

20

21

22

23

24

25

83

1

2                    INDEX

3  WITNESS                        PAGE
   JOHN JEWETT
4

5  Direct Examination by Mr. Roper        84
   Cross Examination by Mr. Moye          166
6  Redirect Examination by Mr. Roper      186

7

8                    EXHIBITS

9  NO. DESCRIPTION                      PAGE

10   1  Photo                    87
     2  Photo                    88
11   3  Photo                    88
     4  Volunteer Exposure              143
12   5  Lesson Plan                 154

13

14   CERTIFICATE OF OATH                    192
     CERTIFICATE OF REPORTER                    193
15   ERRATA SHEET                 194
     READING AND SIGNING LETTER                    195

16

17

18

19

20

21

22

23

24

25

84

1             STIPULATIONS

2             The following deposition of JOHN JEWETT

3   was taken on oral examination, pursuant to notice,

4   for purposes of discovery, and for use as

5   evidence, and for other uses and purposes as may

6   be permitted by the applicable and governing

7   rules.  Reading and signing is not waived.

8             * * *

9    Thereupon,

10              JOHN JEWETT

11   was called as a witness, having been first duly

12   sworn, was examined and testified as follows:

13              DIRECT EXAMINATION

14   BY MR. ROPER

15     Q   Mr. Jewett, we are back on the record.

16   I think when we stopped I was asking you about the

17   details surrounding your exposure to the Taser

18   weapon on January 26, 2004?

19     A   Yes.

20     Q   Let me recap a couple things.  First of

21   all, is your recollection that the person that was

22   exposed to the Taser immediately before you was

23   Ali Perbtani?

24     A   I can't say immediately, but he is the

25   only one that I remember that went before me.
                              85

1      Q   And for the court reporter, A L I, P E R

2    B T A N I.

3          Do you have a recollection of whether he

4    was the only person before you or were there other

file:///E|/4-14-06%20JJJB%20(FL)%20Depo%20of%20John%20Jewett%20Vol.%202.txt

5   people exposed as well?

6      A   I don't remember for sure.  I know he

7   went before me.  I know there wasn't like a bunch.

8   There may have been like one person between him

9   and me.  I just don't remember.

10      Q   Was this training session filmed or

11   recorded in any way, to your knowledge?

12      A   I don't remember.  I honestly don't

13   remember.

14      Q   You don't remember anyone there with a

15   video camera?

16      A   I'm not saying there wasn't.  I just

17   don't remember.

18      Q   Now, if you will explain to me, there

19   was a difference between the manner in which

20   Perbtani was exposed to the Taser as compared with

21   what you were exposed, correct?

22      A   In the way that the leads were attached

23   to the body, yes.

24      Q   In his instance, the weapon was actually

25   fired and the two probes went into his body?

86

1    A    Yes.

2    Q    Describe for me exactly how the probes

3    were attached to your body for your exposure.

4    A    As you are aware, there are two wires

5    that come out of the weapon or cartridge, and then

6    the barbs are on the end.

7         After Mr. Perbtani was exposed, those

8    barbs were cut, torn, however the bars were

9    removed, which left two wires with nothing on the

10   end.

11        The wires were subsequently taped, one

12   to my upper left shoulder -- or the back of my

13   left shoulder and one to the back of my left hip,

14   they were taped there (indicating).

15   Q    All right.  What I want to try to do as

16   carefully as possible is try to get the exact

17   location of where the probes were taped.

18        You were indicating for me as you were

19   testifying -- I can see where you were pointing

20   to.  Let's try to do it for the record, if we can.

21        First of all, you are indicating the

22   back of your left shoulder area?

23    A   Yes.  My left scapula, I guess it is

24  what it is called.

25    Q   Was the lead taped approximately in the

                                87

1  middle of your shoulder?

2    A   Well, I provided pictures.

3        MR. MOYE:  Off the record for a second.

4        (Discussion off the record.)

5  BY MR. ROPER

6    Q   What I'll do for the record, we will

7  mark copies of these as Exhibits 1, 2 and 3 to the

8  deposition.

9        Let me show you a photograph, sir, which

10  I will mark a copy as Exhibit 1 to your

11  deposition.

12        (Exhibit No. 1 marked for

13  identification.)

14  BY MR. ROPER

15    Q   First of all, the person in the picture

16  is you, correct?

17    A   Yes.

18    Q   And there are two little burn marks, one

19   on your left shoulder there and down on the left

20   hip area?

21      A   Yes.

22      Q   Is that the location in which the leads

23   from the Taser weapon were taped to your body?

24      A   Yes.

25      Q   When was that photograph taken?
                            88

1      A   It would have been within days of the

2   date I was exposed.  I couldn't tell you the exact

3   day.  That was a Friday, I believe, the training,

4   and I believe this would have been either the

5   Saturday or Sunday.

6      Q   Okay.

7           And this photograph here which I will

8   mark as Exhibit 2, that's a close up of the burn

9   mark?

10      A   On my hip.

11           (Exhibit No. 2 marked for

12   identification.)

13   BY MR. ROPER

14      Q   Exhibit 3 is the burn mark on your

15  shoulder?

16      A   Yes.

17          (Exhibit No. 3 marked for

18  identification.)

19  BY MR. ROPER

20      Q   Have these burn areas healed?

21      A   They don't look like that any more.

22          The one on my hip, you can still see it.

23  It is not as bad.

24          The one on my shoulder has kind of --

25  it's changed.  It is now a raised -- I don't know
                          89

1  what you call it.  You can definitely see it.

2  There is definitely a discoloration.  It looks

3  like a healed wound of some sort.

4      Q   They are still visible to some extent?

5      A   Yes.  The one on my shoulder especially.

6      Q   Do you recall who it was that taped the

7  leads to you?

8      A   I believe it was the instructor.  I'm

9  pretty sure.

10      Q   Who was holding you on your side when

11   you were exposed?

12      A   As best I can remember, it was Ali

13   Perbtani, who is a deputy sheriff, and then Jeff

14   Coleman, who is a lieutenant now.

15      Q   Do you recall being given any

16   instructions before you were exposed by the

17   instructor in terms of what you should or

18   shouldn't do?

19      A   Um-hum.

20      Q   What did he say?

21      A   I remember him telling us as a group --

22          From what I remember, it was more for

23   the instructions for the people holding them than

24   it was necessarily for the one getting exposed.

25   That the person was going to be standing up, the

                        90

1   person getting exposed, the person on the side

2   supports him by the arm, to grab him, to not let

3   him fall, hold him up, and once the cycle had run

4   its course, to gently let them go to their knees.

5      Q   So the instructions were to keep holding

6   them in a standing position during the five-second

7  cycle?

8      A   Yes.  And not let them fall.

9      Q   And then let them down to the ground

10  after the five-second cycle?

11     A   If I remember right, they said they are

12  going to naturally want to go to their knees, they

13  will kind of want to collapse, don't let them fall

14  after the cycle is done, let them go to their

15  knees.

16     Q   Now, you assisted in holding Mr.

17  Perbtani before you were exposed, correct?

18     A   Yes.

19     Q   And you were able to see and feel what

20  happened to his body, correct?

21     A   I could see.  I don't want to say feel.

22     Q   You felt him tense, right?

23     A   Yeah, I guess you could say I felt him

24  tense.

25     Q   And you felt him and saw him raise up
                        91

1  onto his toes?

2      A   He went up on his tiptoes, yes.

3    Q    Do you have a conscious recollection of

4    what your body did during the time that you were

5    being exposed to the Taser?

6    A    I just remember --

7        I don't think I went up on my tiptoes

8    like he did.  I just remember having everything

9    getting real tight.  I think I just tightened up

10    and just remember a God awful amount of pain.  I

11    mean, that's really all that I remember.  I didn't

12    lose conscious or anything.  I am not trying to

13    insinuate that.  I just remember immense pain.

14    Q    When you say you felt everything tighten

15    up, what part of your body are you talking about?

16    A    From toe to the top of my head.

17    Q    And why do you say that you don't think

18    you went up on your tiptoes?

19    A    I just don't specifically remember doing

20    it.  Somebody watching me would probably have a

21    better vantage point.  I just don't remember doing

22    it.

23    Q    During that five-second cycle, where

24   were you experiencing pain?

25      A   I mean, have you ever --

                       92

1         Everywhere.  I mean, it's like when you

2   kind of get shocked by a wall socket or something

3   along that line, it resonates through your whole

4   body.  There wasn't one area during those five

5   seconds that was worse or not as bad.  I just

6   remember --

7         It's hard to put in words.  It is a pain

8   I never felt before.  It was just over my whole

9   body.

10      Q   The pain or discomfort that you were

11   experiencing was not limited to the left side of

12   your body between the area of the two probes?

13      A   Not during the cycle.  Ugh-ugh.

14      Q   Do you have any recollection --

15         I know you told me that you felt your

16   whole body get tight, I think those were your

17   words; correct?

18      A   That's the best words I come up with.

19         Again, I want to stress it is hard to

20   explain.  It is not like a pain of getting burned

21   or someone punching you.  It is a pain that is

22   hard to explain.  That's the best I can explain

23   it.

24       Q   Do you recall any particular movements

25   that your body made during the time that you were

                           93

1   being exposed to the Taser?

2       A   As far as actually moving, I don't

3   believe I moved much at all.  One, I was being

4   held in place by those other two officers.  I

5   don't think --

6           I mean logic would tell you it is an

7   electrocution-type thing that your body would

8   probably -- but I don't remember any of that.

9       Q   That's what I'm after.  I'm after what

10   your actual recollection is from that day.

11       A   I don't remember ever moving, not until

12   they allowed me to go to my knees.

13       Q   Do you have any specific recollection of

14   either bending forward with your torso or bending

15   backward with your torso while you were being

16   exposed to the Taser?

17      A   No.

18      Q   And when I say exposed to the Taser, you

19   know I'm talking about the five-second cycle of

20   electricity?

21      A   Right.  I don't remember moving during

22   that five seconds.

23      Q   Do you remember saying anything during

24   the five-second cycle?

25      A   Impossible to even talk.

                            94

1      Q   Do you remember anyone saying anything

2   to you or hearing anything during the five-second

3   cycle?

4      A   They could have had a band playing

5   behind me and I don't think I would have heard it.

6      Q   What do you recall happening after the

7   five-second cycle was over?

8      A   I remember an immense pain in my back.

9   This was the first time that it was centralized in

10   my back -- in my whole back.  And it went down to

11   my knees, and I remember I couldn't breathe.  I

12   felt like I had -- had the wind knocked out of me

13   very, very badly.

14      Q   Do you recall experiencing all those

15   things while you were still being held up?

16      A   Well, you mean right as the cycle is

17   done, they are allowing you to go to your knees;

18   so, no.

19        I remember the pain as I was standing,

20   and then I remember on my knees when it started to

21   centralize itself toward my back, when I couldn't

22   breathe.

23      Q   Do you have a recollection of actually

24   going down to your knees and then down to the

25   ground after the cycle was over?

                           95

1      A   I don't think I went to the ground.

2      Q   So --

3      A   I went flat --

4        I remember being on all fours at one

5   point trying to catch my breath, but I don't

6   remember ever going like flat, prone on the

7   ground.

8      Q    So the two officers that were holding

9   you would have let you down to your knees?

10     A    Yes.

11     Q    And then they would have released your

12   hands -- your arms, rather?

13     A    At some point I think they did.  Yeah.

14     Q    At that point in time you would have

15   gone down to the ground on all fours?

16     A    I don't know if that was immediately

17   when they let go of me.

18        I just remember I couldn't breathe.  I

19   don't know if you ever had the wind knock out of

20   you; it's scary.  I remember trying to force

21   oxygen into my lungs.  I couldn't breathe.

22        I remember there were a lot of people

23   around me.  They kept asking me if I was all

24   right, if I was all right.  I remember telling

25   them -- I couldn't hardly talk.  I remember barely
                              96

1   getting out, "just give me a minute."

2        At the time I just thought I had the

3   wind knocked out of me, that when you get the wind

4    knocked out of you it would slowly come back.

5         I remember being on all fours and I

6    remember trying to breathe, and I remember hurting

7    bad, and I was having a real hard time breathing.

8    Q    And you say the pain was in your whole

9    back?

10   A    Yes.

11   Q    So it wasn't just limited to the area of

12   your spine, it was all through --

13   A    From what I remember I couldn't -- it

14   was throughout my back.  Again, I wasn't sitting

15   there trying to figure out, okay, where exactly is

16   this pain.  I just remember it hurting over my

17   whole back.

18   Q    What did you do next, sir?

19   A    I stayed on my hands and knees for -- I

20   hate to put a time on it, because it seemed

21   forever.  It probably wasn't that long.  A couple

22   minutes.  Again, they kept asking me if I was all

23   right.

24        From Deputy Perbtani who had gone

25   before, I had asked him what was it like.  He

1  said -- well, I don't remember his exact words,

2  but basically it hurt pretty bad for those five

3  seconds, but when it was over, it wasn't that bad.

4  I remember him saying something about his calf was

5  sore.  I remember that's what he told me.

6         So I just remember thinking, well,

7  either -- I remember him having this.  So I just

8  remember --

9         I initially had a thought that I pulled

10  a muscle in my back.  I don't know why I thought

11  that.  I just assumed at the time that I pulled a

12  muscle in my back.

13         After like the two minutes I stood up,

14  and I was able to breathe.  I mean, I was not dead

15  or anything.  I was able to get oxygen in.  I was

16  still sore.  I was able to force oxygen in, take

17  deep breadths to breath, and I started trying to

18  stretch out, because I thought the muscle had just

19  pulled itself or it was cramping real bad.

20         I was touching my toes, trying to

21  stretch that muscle.  Of course, the pain was

file:///E|/4-14-06%20JJJB%20(FL)%20Depo%20of%20John%20Jewett%20Vol.%202.txt

22  getting worse.  I was able to breathe, so that

23  part -- the scary part of not being able to

24  breathe was going away, but the pain in my back

25  was getting progressively worse by the minute.

                           98

1      Q    Did you tell the instructor that you

2  were having problems?

3      A    It was very obvious.  He asked me over

4  and over and over again if I was all right.

5      Q    After you were exposed to the Taser, was

6  anybody else exposed?

7      A    If there was, I was hurting bad, I

8  definitely would not have been paying attention.

9  I don't remember.  Then we went to lunch pretty

10  quick.  I don't remember.

11      Q    Did you ride to lunch with some other

12  officers?

13      A    Oh, yeah.  There was no way I drove.

14      Q    Who did you ride with?

15      A    I don't know for sure.  I think Robert

16  Dees.

17           The only reason I say that is I know I

file:///E|/4-14-06%20JJJB%20(FL)%20Depo%20of%20John%20Jewett%20Vol.%202.txt

18   rode with him back from the restaurant.  So I am

19   assuming that I rode with him.  For some reason I

20   remember the ride back, but I don't remember the

21   ride there.  I don't know why.

22      Q   And how long were you at lunch?

23      A   We just went to Wendy's.  I know it took

24   me a while to get in the car.

25         Again, I kept thinking it was a pulled
                                    99

1   muscle that was -- spasm muscle, it was going to

2   keep getting better.  I was not worrying about it

3   too much.  I remember being at Wendy's.  I went

4   and sat down.  They ordered for me.  I was sick to

5   my stomach it was hurting so bad.  They ordered my

6   food.  I couldn't eat it.  They ate.

7         The instructor was actually at Wendy's

8   with us.  I remember him asking me a bunch of

9   times if I was all right.  I kept telling him I

10   think I'm going to be fine, I think it is just a

11   muscle.

12      Q   This is the same Mitch Gray?

13      A   Mitch Gray; I think that's his name.

14  The instructor, whatever his name is, was there.

15      Q   I should have asked this before:  Was

16  there only one instructor there?

17      A   As far as I know, yes.

18          So back to your question, how long were

19  we there.  My best estimate, 20, 30 minutes at the

20  most.

21      Q   Where did you all go after lunch?

22      A   They all went back.

23          Robert Dees drove me to Wal-Mart.  I was

24  going to get some Domes, believe it or not.  We

25  were still operating under the assumption that I

                        100

1  pulled a muscle in my back.  They were going to

2  get me the strongest muscle relaxer they had

3  over-the-counter.

4          We got to Wal-Mart.  Robert Dees was

5  driving.  I think he was the only one in the

6  vehicle.  We were in his car.  I couldn't get out.

7  I tried to get out, and the pain was just

8  unbearable.

9          He went in, got the medicine.  I took

file:///E|/4-14-06%20JJJB%20(FL)%20Depo%20of%20John%20Jewett%20Vol.%202.txt

10    some of that.  Then we went back to the police

11    department.

12        Q    What happened next?

13        A    We got there.  Again, I had a lot of

14    trouble getting out of the car.  He asked me on

15    the way there if he wanted me -- if I wanted him

16    to take me to the hospital.  I told him no at that

17    point.  You know, again, I thought I pulled a

18    muscle.

19            We got back there.  I couldn't walk up

20    the stairs.  He went and found somebody.  We found

21    out there was an elevator.  We were on the second

22    floor.  At least we were above the ground floor.

23    I'm not sure if it was the second or third floor.

24            We got on the elevator, got back into

25    class.  I sat down.  I remember he went back into
                                101

1    some lecture.  I think it was on the projector and

2    he was talking --

3        Q    He being the instructor?

4        A    He being the instructor.  I remember

5    trying to pay attention to him and not wanting to

6   cause a huge ruckus, but the pain was getting bad.

7        I remember he asked me several more

8   times are you okay.  That was the first time I

9   told him I don't know.  I said, it's hurting very,

10   very bad.

11        I remember him telling me specifically

12   if I need to stand up or I need to move around,

13   feel free to do so.  I remember doing that several

14   times.  I remember standing, sitting, like every

15   minute, trying to relieve it in any way I could.

16   It wasn't getting better.

17        It wasn't very long after we got back

18   and he started class, I mean maybe ten minutes --

19   I am guessing ten, 15 minutes, and then I started

20   getting worried, and I said I'm going to the

21   hospital.

22        I said it, or he might have asked if I

23   was all right.  Anyway, at some point I said I

24   need to go to the hospital.

25     Q   Did you drive yourself to the hospital
                        102

1   or someone took you there?

2      A    No.  Jeff Coleman took me to the

3   hospital.

4      Q    Okay.  And do you recall the name of the

5   hospital that you went to?

6      A    No.  I actually went to two places up

7   there.  One was a full-blown large hospital.  The

8   other one was more like I would call it a clinic.

9   I went to the hospital first.

10     Q    This is in Valdosta?

11     A    Yes.

12     Q    And what happened at the hospital?

13     A    This angers me still to this day:

14  Anyway, I struggled to get up the stairs.  There

15  were these concrete stairs going to the emergency

16  room.  I'm in immense pain now.  I stand up there

17  it seemed like forever waiting on somebody.  She

18  finally comes over and basically tells me that

19  because it is a workers' compensation claim that I

20  couldn't come there.  She told me I had to go all

21  the way across town.  I was in a lot of pain,

22  angry.  I don't think -- I didn't say anything to

23   her, but Jeff Coleman came around and got all the

24   information about where the place was and where he

25   needed to take me.

103

1        Then we went back down the stairs, back

2   in the car, and went across town to this clinic.

3        Q   Do you remember the name of that clinic?

4        A   I have no idea.  I know it was in an

5   industrial area.  It was pretty small.  It wasn't

6   very big.

7        Q   What happened once you got to the

8   clinic?

9        A   I went in there.  Of course, they asked

10   me what was wrong.  I told them.  They put me back

11   in a room.  Again, the pain was just -- it was

12   unbearable.  And I'm begging them for something,

13   pain medicine, muscle relaxers, something to help

14   my pain go away.  Of course, the nurse wouldn't

15   give me anything until the doctor saw me.

16        The doctor came in, asked me what

17   happened.  I told him.  He asked me if I fell

18   down.  I explained to him, like I explained to

19   you, no, I was held up, and the electricity went

20   through.  The doctor had no idea pretty much what

21   a Taser was.  I had to explain to him what the

22   device was.  I explained basically everything that

23   I just explained to you.

24          He said, well, I don't see any reason

25   doing x-rays because you didn't fall.  Of course,

                              104

1   I'm not a doctor.  He said it is probably a pulled

2   muscle or muscle spasm or muscular.  Okay, is what

3   I told him.

4          At that point I was beginning to think

5   that maybe there was more to it, but again, I'm

6   not a doctor, so I trusted him.  He did give me a

7   shot.  I don't remember what it was.  I don't

8   think it was a pain reliever.  I think it was a

9   muscle relaxer of some sort.  I think he wrote me

10   a prescription and sent me on my way.

11       Q    And the name of that facility that you

12   were seen at was South Georgia Medical Center?

13       A    I don't know.

14       Q    Or Southside Medical Clinic?

15    A    All I know, there was a big hospital we

16  went to and then we went to the clinic across

17  town.

18    Q    South Georgia Medical Center is also

19  Convenient Care.  That sounds like the walk-in

20  clinic.

21    A    I mean, if I was to look at medical

22  records, I could probably tell you.  Offhand, I

23  don't remember the names.

24    Q    Did you receive any treatment at all at

25  the first hospital you went to?
                              105

1    A    No.  Other than to talk to the lady

2  behind the window, that was it.

3    Q    Did the doctor give you a physical

4  examination when you went to the clinic?

5    A    Well, I mean, it depends on what your

6  definition of physical exam is.

7         If I remember right, he touched my back

8  and asked me questions.  He was in there maybe

9  five minutes.

10    Q    You apparently told him that you had

11   muscle spasms in your back?

12      A   I told him what happened.  I told him my

13   back had a lot of pain.  Again, he asked those

14   questions.  I didn't know what it was.

15      Q   Do you recall him telling you that he

16   didn't think it was necessary to take x-rays?

17      A   He said --

18         I remember him saying, since you didn't

19   fall, I don't think we need to do x-rays.

20      Q   Did he prescribe medication for you?

21      A   He prescribed some medication, the nurse

22   gave me a shot, and then he gave me a

23   prescription.  I think that was for some pain

24   medicine, hydrocodone.

25      Q   The record indicates you got Valium and

                        106

1   Toradol, and you were given a prescription for

2   Flexeril and Darvocet.

3      A   It could have been.

4      Q   What did you do after you left the

5   clinic?

6      A   There was no way I could drive.  This

7    was getting to be later in the afternoon now,

8    3:00, 4:00 o'clock if I had to guess right.  Maybe

9    not that late.  Maybe 2:00, 3:00 o'clock.

10        I made a determination that I was not

11   going back to the class.  I couldn't.  I was

12   actually starting to feel a little bit better, I

13   am assuming because of the pain medicine they gave

14   me and the shot.  I was still hurting, but the

15   severity was starting to back off some.

16        Jeff Coleman, if I remember, I think we

17   were in my car, my patrol car.  I think he was

18   driving it -- it might have been his.  I'm not

19   sure.

20        Anyway, we both had vehicles in

21   Valdosta.  If he's going to drive me home, that

22   raises the issue -- it is not like we are across

23   town.  I remember him getting on the phone and

24   calling Robert Dees or somebody else in the class

25   and making some arrangements about the vehicle

                    107

1    issue.  We never went back there, not that I

2    remember.

3        And then he drove me to Lake City.

4     Q    About how far is the ride from Valdosta

5   to Lake City?

6     A    From the interstate, like in Valdosta,

7   45 minutes.  But I think, if I remember right, we

8   were all the way east through Valdosta.  I

9   remember it took a little bit longer than that, an

10   hour, hour and 15 minutes.

11     Q    What happened once you got back to Lake

12   City?

13     A    The pain started getting worse again.

14   At this point --

15        That's when I remember really believing

16   that it was more than just a muscle issue, that

17   something was wrong.  I didn't know what, of

18   course.  I felt like it was more than just a

19   muscle pull.

20        So I told him to take me to the

21   emergency room there.

22     Q    At Lake City?

23     A    Lake City Medical Center.

24     Q    What happened once you got there?

25    A   I sat down.  Of course, I waited for an
                              108

1    hour out in the emergency room.  Then I saw the

2    little nurse -- not nurse, the intake, the one

3    that wants your insurance information and all

4    that.  I told her what took place.  A nurse came

5    out, said, well -- basically told me since I just

6    seen a doctor I need to follow that doctor's order

7    and come back in a few days if it wasn't better or

8    to go see my primary care physician, which I

9    didn't have one.  They refused to see me.

10    Q   Do you know if a chart was actually

11    started for you at that time?

12    A   I have no idea.  I did not go back --

13        That emergency room, as a law

14    enforcement officer I have been in there a lot.  I

15    stayed out in the lobby.  Never went back.

16    Q   The doctor never examined you?

17    A   Not on that day.

18    Q   On January 16, 2004, did you explain to

19    the doctor what had happened?

20    A   Yes.

21    Q    You told him the whole story like you

22  told it to me today?

23    A    I mean, I can't say that I went --

24        We have been here for several hours now.

25  Of course, some of that wasn't about the injury.

109

1  But I can't say I went into the detail that we

2  were going into here.  Yes, I told him what took

3  place.

4    Q    All right.  Okay.  What happened after

5  that?

6    A    My wife came and --

7        Jeff Coleman left.  My wife came and

8  picked me up.  I remember we went and got

9  prescriptions filled at the pharmacy right near

10  there.  As far as I remember, we went home.

11    Q    And what did you do the following day?

12    A    Well, ate hydrocodone like it was going

13  out of style, because the back was hurting so bad.

14        The very next Saturday I remember I

15  tried to get up --

16        Well, I did get up.  My wife drove us to

17   our daughter's soccer game.  I remember standing

18   there for like ten minutes.  I couldn't do it.  So

19   I went back and sat in the van for the next 30, 40

20   minutes until the game was over.  Then we went

21   back home.

22        Q   When is the next time that you received

23   any medical treatment?

24        A   That Sunday morning I woke up, and I was

25   just in an immense amount of pain.  It was

                              110

1   literally all I could do to get out of bed.

2           I woke up laying on my back.  I remember

3   this like it was yesterday.  The pain was so bad I

4   could hardly roll over, get up.  My wife helped me

5   get out of bed.  We had just had our twins six

6   months before, so between my twins and my daughter

7   it was too much for my wife.  I couldn't drive

8   myself to the hospital.  There was no way I could

9   get her, load the kids up Sunday morning.  It was

10   6:00 o'clock.  It was early.

11           I called Coley Campbell, a road sergeant

12   at the time.  I think he was a sergeant.  I asked

13  him to come by and get me and take me to the

14  hospital.

15      Q   What happened during this hospital visit

16  on the 18th?

17      A   They took me back to Lake City Medical

18  Center.  He dropped me off.  He left.  He was

19  working, so he couldn't stay there with me.

20          We went through the same procedures,

21  insurance, all that typical stuff.  I finally got

22  back to see a doctor.  Basically he asked me the

23  same exact questions.  I told him the exact same

24  answers.  He ordered some x-rays.  I remembered

25  going and doing the x-rays.

111

1          I remember him coming in, and I remember

2  his exact words to this day, "you are not going to

3  believe this," and he said you have two

4  compression fractures in your vertebrae.  He

5  showed the x-rays to me.

6      Q   And so that was the first time that the

7  compression fracture injury was diagnosed by any

8  medical professional?

9    A   Yes.

10    Q   Do you recall the name of that doctor?

11    A   No.  I know his face.  I can definitely

12   know him if I saw him again.

13    Q   But he is one of the ER doctors there?

14    A   He is a doctor in the ER, Lake City

15   Medical Center on that Sunday morning.

16    Q   What did he recommend for you?

17    A   Since it was a workers' compensation

18   case, he recommended me --

19        Well, he recommended me to an orthopedic

20   specialist.

21        Since it was a workers' compensation

22   case, I had to go to a Dr. Sambey.  I guess he was

23   on the contract with the workers' compensation

24   carrier, or whatever.  So he set up an appointment

25   for him.  And that was Monday morning.  It was a

                         112

1   holiday.  I think it was Martin Luther King day, I

2   think.

3    Q   Where is Dr. Sambey located?

4    A   In Lake City.

5       Q    How do you spell his name?

6       A    I think it is S A M B E Y.  You know, I

7    say Dr. Sambey.  It was his office.  I'm not

8    100 percent sure it was him I saw.  It could have

9    been somebody that was in there with him.

10      Q    What did Dr. Sambey do for you?

11      A    I don't remember that visit a whole lot.

12   I remember basically looking at the x-rays again,

13   confirming, that, yes, I had the two compression

14   fractures.  I remember he gave me this brace thing

15   and told me to wear it and said that I needed to

16   go see a spine surgeon, or I think they used more

17   technical terms than that, in Gainesville.

18      Q    Was that the only visit you ever had

19   with Dr. Sambey or his office?

20      A    Well, it's kind of complicated.  Because

21   the guy in Gainesville that he sent me to also one

22   day a week comes to Lake City and operates out of

23   that office.  So I went back to that office, but I

24   think, if I remember right, every time I went back

25   to that office after that it was to see the other

113

1  guy.

2      Q   Was the orthopedic surgeon in

3  Gainesville that he referred you to Dr. Trimbel?

4      A   That is the orthopedic surgeon.  Dr.

5  Sambey referred me to Dr. Trimbel.

6      Q   And what you are telling me, on occasion

7  you would see Trimbel at Sambey's office?

8      A   Well, it's aggravating, too.  I didn't

9  find out that he came to Lake City once a week

10  until like two months into this.  So, no, I went

11  down to Gainesville like five or six times before

12  I found out that he came to Lake City.

13      Q   Do you recall when you saw Dr. Trimbel

14  for the first time?

15      A   Not exactly.  I remember it was like a

16  week -- it might have been longer before I could

17  get in to see him.

18      Q   What did he do for you initially?

19      A   Examined me, and I think he took more

20  x-rays.  No.  Someone ordered an MRI.  I don't

21  remember if Dr. Sambey ordered that and it was

22    already done when I went down there or if I went

23    down there and then they had me do the MRI.  I

24    can't remember what order.

25        Q    But did you have an MRI done?
                        114

1    A    Yes.

2    Q    Where did you have that done?

3    A    Southern MRI, I think is the name of it.

4    Q    Where is that located?

5    A    It's in Lake City.  They have like a

6    semitrailer looking like thing that had some

7    attachments on it.  It was next to -- it was on

8    Hall of Fame Drive in Lake City.

9        Q    Do you recall what Dr. Trimbel -- what

10    sort of treatment he provided for you ultimately?

11        A    Well, really no treatment, other than

12    prescribing medicine, pain medicine.  He basically

13    said that normally -- I remember him telling me it

14    is very rare to see that kind of injury in

15    somebody that is as healthy and young as I am.  He

16    said that was strange.  He said it is not unheard

17    of, but he said normally when he deals with

18   patients with that injury it is older people that

19   have fallen or been in car accidents.

20        He said normally he recommends

21   something-plasty, something where they insert the

22   balloon into the spine and fill it up with cement

23   to support it.  He said normally when it is

24   someone that is older, he recommends that, because

25   it gives them quality of life.  He said somebody
                              115

1   as young as me, while that was an option, he said

2   he wouldn't recommend it right away because it

3   could cause more complications than it could help.

4        So basically it was take it easy.  Of

5   course, he did the no lifting, nothing over

6   10-pounds, I think.  He gave me all those

7   restrictions.

8        He gave me all the medicines,

9   anti-inflammatories.  There might have been an

10   antibiotic in there even, and the pain medicine.

11   He told me to rest and see what happened at the

12   next visit.

13        Q   Did he give you any kind of brace?

14    A    I think the brace came from Dr. Sambey.

15    Q    Were you wearing a brace, though?

16    A    I wore it for --

17         I'm pretty sure what it was -- Dr.

18    Sambey gave it to me on my first visit.

19         I think when I went down there, I

20    remember Dr. Trimbel, I think he said that because

21    the compression fracture was so high that the

22    brace wasn't doing any good, that I didn't even

23    need to wear that.

24    Q    The compression fractures were at the

25    T5/T6 levels?

116

1     A    If that's what the medical records say.

2     Q    In looking through the records here,

3     obviously it appears that you followed up with

4     Dr. Trimbel for a number of visits?

5     A    Um-hum.

6     Q    Did you generally see him or did you see

7     somebody else in his office?

8     A    No; I always saw him.

9     Q    When is the last time you saw him?

10      A    I don't remember.  I went back to work

11  in March.  I know I saw him after that some.  I

12  couldn't tell you.  It hasn't been recent.

13      Q    The last record I have here, and I don't

14  mean this is the last time you saw him, it is just

15  the last record I have, the last one I have is

16  from December of '04.

17      A    That sounds about right.  Again, I can't

18  swear to that.  That sounds about right.

19      Q    And Dr. Trimbel released you to go back

20  to work in March of '04?

21      A    I think it was March.  He basically put

22  it on me.  He told me when I wanted to try it.  I

23  think it was like late March that I told him that

24  I wanted to see if I could do it.

25      Q    Did you initially go back to work on a
                         117

 1  light-duty status?

 2      A    No.  We did not have light duty.

 3      Q    You went back on full duty?

 4      A    Full duty.

 5      Q    Did you have any limitations or

6   restrictions on your activities at that time?

7      A   From the doctor or from --

8      Q   From the doctor.

9      A   No.  I would have not have been allowed

10  to come back to work if I had any.

11     Q   In between March of '04 and when you

12  left the Sheriff's Department in January of '05,

13  did you miss any time from work due to your back

14  injury?

15     A   Oh, yeah.  I mean, there were days I

16  couldn't go to work.  There were probably a lot of

17  days I had to go home early.  It is the same

18  situation, I had a lot of comp time.  They were

19  real good with us flexing our time.  I probably

20  wouldn't have any paperwork.

21     Q   So there would be no way to document

22  or --

23     A   I know there's people that work with me

24  that knew I went home, like my corporal, the one

25  underneath me who supervised the shift in my
                          118

1   absence, I know he would know I went home that day

2   because my back was hurting, or I had to go home,

3   or I didn't come to work because my back was

4   hurting.

5       Q    What is the name of that corporal?

6       A    Josh McCardle.

7       Q    And he would have reported to you at the

8   time?

9       A    Yes.  Of course, there is a chain of

10   command, but I was his direct supervisor.

11      Q    But as far as the sheriff's office is

12   concerned, there wouldn't be any --

13      A    Sick leave slip, no.

14      Q    Did Dr. Trimbel ever take you out of

15   work again for any extended period of time?

16      A    No.

17      Q    And since you were able to use flex

18   time, did you actually lose any income after going

19   back to work in March of '04 up until the time --

20      A    If you put a value on comp time or sick

21   leave, which I would have used, because not all of

22   it was able to be flexed out.

23      Q    Do you have an estimate as to the amount

24  of comp time or sick leave you used?

25      A   I really don't.

                           119

1      Q   Did Dr. Trimbel release you from his

2  care in December of '04?

3      A   I think so.

4      Q   Has he ever made any recommendations for

5  you with respect to future surgery or other future

6  medical treatment?

7      A   He said the big thing with me, because

8  there's not a lot of people my age that have had

9  this type of injury, that the future is kind of

10  like an unknown.  He said, you know, he doesn't

11  think I'm in any immediate danger, like of having

12  a major problem with it like soon.  He said he

13  doesn't know what the effects of it will be when

14  I'm 50, that kind of thing.  He told me since I'm

15  so young he didn't recommend that surgery.  He

16  didn't feel like the benefits would outweigh the

17  risks.  He left the decision up to me.

18          And since my major complaints were not

19  directly on the injury site but at the muscle

20  spasms that resulted from it, he said that there

21  were other physicians who could better help me,

22  physical therapists, et cetera, with that type

23  treatment.

24      Q    And is that why he referred you to Dr.

25  Puente?

120

1    A   Yes.  Yes.

2         Actually, I don't think he referred me.

3         He referred me to the physical

4  therapists.  Of course, I was going to the

5  physical therapists while I was seeing him.  I

6  kept seeing the physical therapists after that.

7         They did some good, not a whole lot, to

8  be honest with you.  So I quit going.  He referred

9  me to a massage therapist for a while, and that

10  was great while they were actually doing the

11  massage and getting all the spasms worked out.

12  Fifteen minutes after I would leave, it would be

13  right back.  I did that for eight weeks, I think.

14      Q    When did you have that massage therapy?

15      A   I don't know the name of the place.  I

16   could tell you where it is.  It is right on Duval

17   Street in Lake City.  I don't know if the place is

18   even there anymore.

19      Q    That was on a referral from Dr. Trimbel?

20      A    Trimbel.  Not directly to them.  He just

21   recommended that I get some massage therapy.  He

22   called it into my workers' compensation.  Workers'

23   compensation found the place.

24      Q    Are you currently treating with Dr.

25   Puente?

                         121

1      A    I only see him every so often.  More

2    than anything it is just an update on my

3    medications.  I guess you could say yes.

4      Q    Where is he located, again?

5      A    He is in Lake City.

6      Q    He is a doctor that is like the

7    rehabilitation or physical medicine doctor?

8      A    I think.  I don't actually see him all

9    that often.  It is more his physician's assistant.

10   Then he also has a physical therapy place in

11   there.  I am not actually doing physical therapy

12   anymore.

13          What happened is, I wasn't doing

14   anything for about six, eight months, because I

15   basically got told time is the only thing that's

16   going to heal with this, so I just dealt with it.

17          But it got so bad again.  I remember at

18   one point I just said I have to do something.  So

19   I called workers' compensation back, because I

20   wasn't under the care of any specific doctor at

21   that point.  I talked to them and said, listen,

22   I'm having problems.  So they set me up with Dr.

23   Puente or his office.

24     Q   When is the last time you had any kind

25   of physical therapy or massage therapy?

                      122

1     A   I'm guessing now.  The last physical

2   therapy, six months ago.

3     Q   Is it your understanding that the two

4   compression fractures at T4/T5 have stabilized?

5     A   Well, I don't know.

6     Q   The doctor didn't tell you that?

7     A   He may have.  I mean, I don't remember

file:///E|/4-14-06%20JJJB%20(FL)%20Depo%20of%20John%20Jewett%20Vol.%202.txt

8   that specific term.

9      Q   At least as of today's date no doctor

10  has recommended any future surgery for you?

11     A   Recommended, no.

12     Q   Have you seen any other health care

13  provider for treatment to your back since

14  January 16, 2004 up until the present?

15     A   Okay.  We talked about the hospital, the

16  two hospitals that I went to -- the three

17  hospitals that I went to on the day of the injury.

18  I went to the hospital on Sunday and saw the

19  doctor.  I went to Dr. Sambey, to Dr. Trimbel, the

20  MRI, Dr. Puente's office.  I don't know what the

21  credentials of the physical therapists are, if

22  they are doctors.  I don't think they are doctors.

23  I saw his physician assistant in the office.  I

24  don't think I have seen anybody else.

25     Q   And has all of your medical care been
                            123

1   paid for by the workers' compensation carrier?

2      A   Yes.

3      Q   And that's --

4    A    I mean, there has been an occasional

5    prescription to get filled, and they gave me a

6    hard time, and I just pay the $10 for my co-pay,

7    things like that.  But generally --

8    Q    And your workers' compensation is

9    a company called --

10    A    PCGS, Preferred Governmental Claim

11    Solutions.  They are out of Lake Mary, I think.

12    Q    Do you presently have any appointments

13    to see any physician for your back?

14    A    I have an update --

15         When I leave Dr. Puente's office, after

16    I see his physician assistant, they automatically

17    schedule me for a visit every three months.

18         Yes, I do.  I don't remember when it is.

19    That's when I go in there, are you having any more

20    problems, anything changed, how is your

21    medications, and that's pretty much it.

22    Q    Now, you mentioned earlier that the

23    problems that you were having are not directly in

24    your spine or related to your spine, but it is

25    muscle spasm on the side of your spine, is that

1    what you are saying?

2        A    That's the area --

3            The doctors told me it is directly

4    related to the injury.  I'm telling you what I

5    feel, it's not centralized pain right above the

6    spine.  It is off to one side.

7        Q    Which side are you having pain on?

8        A    The right.  My right.

9        Q    Is that where you are having the muscle

10    spasm, on the right side?

11        A    Yes.  Well, I will have one occasionally

12    on the left.  It is almost the exact same spot

13    symmetrical-wise, but that one doesn't happen all

14    that often.  The one on the right is the severe

15    one.

16        Q    Are you still having symptoms of muscle

17    spasm on the right side of your back?

18        A    I'm spasming right now.

19        Q    How often do you have that?

20        A    Every day.

21      Q    Do you have it every day?

22      A    No.

23      Q    How often during the course of the day

24   do you have it?

25      A    It totally depends on what I'm doing.

                              125

1    It depends on a lot of factors.  Some days I wake

2    up with it, go to sleep with it, and everything in

3    between.  Other days it's relatively not bad.

4    When I compare it to the days where I have it all

5    day --

6            It really just depends on different

7    factors.

8        Q    Is there anything that you do that seems

9    to either cause the symptoms to commence or cause

10   them to get worse?

11       A    There are some things that --

12           I've tried to figure that out over the

13   two years so that I don't do things that make it

14   bad.  I don't know that conclusively.

15           But some things that I kind of

16   associated with it is standing up for long periods

17   of time, more than like an hour, lifting anything

18   heavy, any kind of stress.  If I have a really

19   busy day at work, just generally like a stressful

20   day, that tends to aggravate it.  Those are just

21   some things I noticed.

22        There are other times when it flares up

23   very badly and I -- I can't put anything with it.

24   I haven't been on my feet, I haven't had a

25   stressful day at work, I have not lifted anything,

                          126

1   it is like there it is.  Like today, I got in the

2   car and drove here and I have been sitting in a

3   chair sitting down all day and it is hurting

4   fairly bad right now.

5       Q   Well, most people would say talking to a

6   lawyer would cause pain.

7       A   Yeah; but I have done that enough.

8       Q   How about medications, any medications

9   you take help?

10       A   They relieve it.  Yeah.

11       Q   When you say you lifted something heavy

12   and it causes you pain, how much weight are you

13   talking about?

14      A   Well, I try not to lift anything heavy.

15   Lifting my kids at times will aggravate it.

16         It is not like if you twist your knee,

17   you know the exact moment you did it, you felt it,

18   I twisted my knee.  With my back it might not --

19   it is not like the spasm comes on the split

20   second; it might be a half hour after I do

21   something.

22         That's why I say it is hard sometimes to

23   associate the spasm with did something trigger it.

24   I guess sometimes.  I will think my back is

25   hurting and think back over the last few hours and
                          127

1   try to think did I do anything.  A lot of times I

2   can't think of anything.  Other times I will think

3   I lifted the kid up a few times.  I don't know if

4   that's what caused it or what.  I just know that

5   now my back hurts.

6         Sometimes I know exactly what it is,

7   standing up.  If I stand up for more than an hour,

8   like when I teach, it becomes very painful.

9      Q    Prior to January 16, 2004, had you ever

10   had any injury of any nature whatsoever to your

11   back?

12      A    To my back, no.

13      Q    Have you ever had any pain or discomfort

14   in your back prior to January 16, 2004?

15      A    No.

16      Q    Have you ever had any instance in which

17   you may have aggravated or exacerbated the injury

18   in your back since January 16, 2004?

19      A    Not that I know of.

20      Q    Prior to January 16, 2004, had you ever

21   been diagnosed with any degenerative condition in

22   your spine?

23      A    No.

24      Q    At any point in time have you ever been

25   diagnosed with osteoporosis or deterioration of

                              128

1    the bone or ligaments in your body?

2       A    They did a bone density test, and she

3    did tell me that they did it two places, they did

4    it -- I guess where they always do it, the hip and

5    on my spine.  I remember Dr. Puente's physical --

6    what do they call it, physician assistant told me

7    that my hip was fine.  She said that my spine was

8    a little low.  She said there was nothing to be

9    worried about.  She characterized it still in the

10   normal range.  She said that it may have also been

11   because they did a scan where the injury was.  So

12   she told me I didn't have to do anything with it,

13   did not need to be worried about it.

14       Q    When was that bone density test done?

15       A    I'm guessing now.  Seven, eight months

16   ago. I'm thinking it was summer of last year.

17   No.  It might have been more toward the fall.  It

18   has been a while.

19       Q    Have either of your parents ever had any

20   problems with arthritis or degenerative conditions

21   of the spine or back?

22       A    No.

23       Q    Any of your parents ever had problems

24   with osteoporosis?

25       A    No.

129

1    Q    Do you have siblings?

2    A    Yes.  Two sisters.

3    Q    Have either of them ever had those types

4  of problems?

5    A    No.

6    Q    What are your sister's names?

7    A    Lori; her last name is Edwards.  Dawn;

8  and her last name is Vargo, V A R G O.

9    Q    Where does Lori live?

10    A    Lori lives in -- I call it Savannah.  It

11  is not actually in the city proper of Savannah.

12  It is in -- it is out like 15 miles straight west

13  of Savannah along the interstate that goes out of

14  there.  There is a small town Pembroke.  She

15  doesn't life in Pembroke, it is in that area

16  there.

17    Q    How about Dawn?

18    A    She lives in Lake City, Columbia County.

19    Q    Has Dr. Trimbel ever discussed with you

20  the mechanism of how you sustained the injury to

21  your spine or how he believes that occurred?

22    A    Yes.  He said due to his opinion it was

23  the extreme muscle contraction due to the shock

24  from the Taser that caused the collapse in the

25  vertebrae.

130

1      Q    Did he tell you how he came to that

2  conclusion?

3      A    Well, if he did, I don't remember.

4      Q    Would it be fair to say that you knew

5  prior to being exposed to the Taser that the Taser

6  was going to cause muscle contractions in your

7  body, correct?

8      A    Did I know that?  I wouldn't say I knew

9  that.  I mean, I kind of figured that, I mean,

10  using some common sense.

11      Q    Weren't you also told that

12  specifically --

13      A    By --

14      Q    -- by the instructor that day?

15      A    I don't recall specifically.  He could

16  have.  I don't remember, though.  I think I

17  remember in general him saying the effects of the

18  Taser and the pulse and all that cause muscle

19  contractions, if that's what you are getting at.

20  I remember him saying that.

21      Q   That was before you had been exposed to

22  the Taser?

23      A   Yeah.

24      Q   Prior to January 16, 2004, had you ever

25  sustained any sort of orthopedic injury?

131

1      A   I had a K-9 dog in training bite my

2  finger and break it.

3          When you say orthopedic, you mean bone,

4  right?  Are you talking about specifically on my

5  spine?

6      Q   No, whole body.  Bones or joints.

7      A   I had a finger broken.  I think I

8  sprained a knee one time wrestling with a kid up

9  on a bridge.

10         I can't think of anything else.  It has

11  just been bumps or scrapes or cuts.  I don't think

12  I had any joint or bone injuries.

13     Q   Other than this incident here, have you

14  had any other workers' compensation claims?

15    A    Oh, yeah.  I remember.

16        You have to remember I was a law

17    enforcement officer for 12 years.  Our policy any

18    time you receive an injury, you go get it looked

19    at.

20        So, yeah, I've been --

21        Most of them are very minor things.

22    Yes, I had workers' compensation claims.

23    Q    Where would you normally go to get

24    checked out if you had a workers' compensation

25    claim?

                    132

1    A    A hospital.  One of the local hospitals

2    if it was after hours and it was an emergency.

3        If it was something it could wait,

4    whoever the contracted provider was.

5    Q    What other hospital is there in Lake

6    City other than Lake City Medical Center?

7    A    Lake Shore Hospital.

8    Q    2002 through 2004, who was the

9    contracted medical provider back then?

10    A    It changed all the time.  I think most

11   of the time we would go to Lake Shore Hospital.

12      Q   Had you ever been involved in any

13   automobile accidents?

14      A   Yes.

15      Q   How many?

16      A   You want minor, right?

17      Q   Let's say any automobile accidents that

18   required medical attention.

19      A   Well, where I was seen by?  None of mine

20   actually required any treatment, but where I was

21   seen by a doctor, precautionary thing?

22      Q   Yes.

23      A   Just one.

24      Q   Okay.  Where was that?

25      A   First of all I have never been on one in
                              133

1   a privately owned vehicle, knock on wood.

2         I have been in three, I think, as a law

3   enforcement officer; one, two, three.  Yes.

4      Q   What was the nature of the injury that

5   you went to get checked out for?

6      A   I didn't have an injury.  It was just

7    policy.  It was a fairly severe accident, but I

8    walked away from it.  I was seat belted.  I had no

9    complaints of anything.  They just make you get

10   seen.

11      Q    When did that accident occur?

12      A    I think that was in '02 sometime.

13      Q    And where did you get checked out?

14      A    Lake Shore Hospital.

15      Q    Have you ever been a plaintiff in

16   another lawsuit?

17      A    No.

18      Q    Did you give any statement to anyone

19   associated with the Columbia County Sheriff's

20   Office regarding your injury?

21      A    Yeah.  You mean like an official or

22   somebody walking up and saying what happened?

23      Q    No.  Official statement.

24      A    It depends what you mean by official.  I

25   mean, my supervisor asked me what happened.  I
                         134

1    don't know that he wrote anything down, or part of

2    an investigation, I don't think.  It was out of

3    concern more than anything.

4          I mean, the sheriff asked me what

5    happened for that matter.  I think it was more out

6    of concern than an investigation or anything.  I'm

7    sure any time someone is injured, there is usually

8    an incident report written, and of course there

9    are workers' compensation forms filled out.

10    Q    Let me show you this notice of injury

11    form here.  Take a quick look at that.

12    A    Um-hum.

13    Q    That's the type of form that normally

14    would be filled out in connection with the

15    workers' compensation injury?

16    A    Yes.

17    Q    And then there is a lieutenant that

18    signed it there.  Who is the lieutenant?

19    A    Nydam.  Lieutenant Ryan Nydam.

20    Q    And then there's an incident report here

21    that appears to be prepared by Lieutenant Nydam on

22    January 17, 2004?

23    A    Yes.

24      Q    Do you know of any other formal

25   paperwork that was prepared by the sheriff's

                      135

1   office relating to this incident?

2      A    I'm sure there's some workers'

3   compensation documents.  I'm sure there's a lot.

4      Q    Was there ever a formal IA that you are

5   aware of?

6      A    No.

7      Q    Did you leave the Columbia County

8   Sheriff's Office on good terms?

9      A    Oh, yeah.

10      Q    Back in January of '04, did you have a

11   family doctor?

12      A    No.

13      Q    Was there any physician that you went to

14   see just for check-ups?

15      A    I'm still trying to get a decent family

16   doctor.  Half of them don't take new patients.  I

17   am a fairly healthy person.  I never had any major

18   illnesses.

19          For a flu-type thing, hurt knee, I went

20   to the Urgent Care clinic.

21      Q   You don't have an internist or family

22   physician that you go to?

23      A   No.  No.  No.

24      Q   Let me run through some of the names of

25   the folks that you mentioned here in your

136

1   interrogatory answers.  John Gootee, he is a

2   friend of yours that has taken you to the doctors?

3      A   Yes.

4      Q   Is there anything else that he knows

5   about this?

6      A   He can tell you different times that he

7   has seen my back hurting me, or something along

8   those lines.

9      Q   And you got Deputy Alfred Coley Campbell

10   listed here, Tallahassee Capitol Police.

11      A   He is not there anymore.  Now I think he

12   is doing --

13           I heard --

14           I heard he is not there anymore, and he

15   is in the pallet business in Citrus County

16   somewhere.

17      Q   The pallet business?

18      A   Yeah.  If you needed to get a hold of

19   him or find out where he is, you can find out.  I

20   know some people that are friends of his.

21      Q   There are some allegations in the

22   complaint regarding the Taser product and alleged

23   misrepresentation regarding the product, the

24   allegations in the complaint about that.  They are

25   also in the interrogatory answers, some

                       137

1   allegations about the product itself and

2   misinforming or overstating certain things on

3   behalf of Taser International.  Okay?

4      A   Um-hum.

5      Q   First of all, are you aware that those

6   statements are contained in the complaint and also

7   in the interrogatory answers?

8      A   Yes.

9      Q   What I want to do is cover those with

10   you to see what personal information you have.

11      A   Okay.

12    Q    I understand that there are going to be

13    other witnesses that your attorneys may plan on

14    calling relating to these matters.  I'm interested

15    in more personal information that you have.

16    A    Sure.

17    Q    There is a list of items that are

18    characterized as information defects.  It says

19    "overstating the safety of Taser weapons based on

20    actual medical studies."

21         Do you have any personal information

22    regarding that allegation?

23    A    I just believe that when we went to the

24    class that day, they dropped that pamphlet in

25    front of us.  He started talking, and he
                              138

1    emphasized that after the five seconds that there

2    would be no long-lasting effects, and that he just

3    kept selling that point.  It made me believe that

4    it was very safe.

5    Q    Do you know, though, for example, what

6    actual medical studies were performed?

7    A    Direct knowledge, no.  I heard some

8   things watching news reports or that sort of

9   thing, but no direct knowledge.

10      Q   And likewise, you wouldn't know the

11   results of those actual medical studies that were

12   performed?

13      A   No.

14      Q   The second item here is "providing

15   misleading and/or misrepresenting information

16   regarding the nature and extent of the medical

17   studies performed to support the conclusion that

18   Taser weapons do not cause death or permanent

19   injury."

20          Do you have any information about that?

21      A   Again, I don't know that Mitchell Gray

22   misrepresented.  He may have been -- people might

23   have misrepresented to him.

24          But I believe I was misrepresented to

25   the fact that -- of the safety of it and the no

                        139

1   long-lasting effects.

2      Q   This statement says that there was

3   misrepresentation or misleading information

4   provided regarding the nature and extent of

5   medical studies performed.

6       A   Okay.  I was told that there had been

7   medical studies performed.  There were no details

8   of that, but it had been deemed safe.

9       Q   Do you have any information regarding

10  the results from those medical studies?

11      A   No.

12      Q   Do you know what specific

13  misrepresentation or misleading information was

14  provided regarding those studies?

15      A   My opinion or just --

16          Just my opinion, I was told as a result

17  of the medical studies, that I was told that it is

18  a very safe product and that there would be no --

19  there would be no injury associated with it, that

20  after the five seconds are up that you don't feel

21  it anymore.

22      Q   Were you told that there was no

23  possibility for any injury?

24      A   I remember being told there would be no

25  long-lasting effects.  I just remember that.  I

file:///E|/4-14-06%20JJJB%20(FL)%20Depo%20of%20John%20Jewett%20Vol.%202.txt

140

1  don't remember if he used the words possibility.

2      Q   Were you told there was no chance that

3  you could be injured?

4      A   He didn't tell me there was a chance I

5  could be injured.  I don't think we even -- had

6  that conversation or that topic was brought up.

7      Q   When the issue of medical studies was

8  being discussed, did you ask any questions?

9      A   No.

10     Q   The next allegation here is that "Taser

11  misinformed law enforcement agencies concerning

12  conclusions reached by other independent bodies

13  which have considered the potential injuries which

14  could be inflicted by weapons utilizing electric

15  current."

16         Do you know what misrepresentations or

17  misinformation have been provided by Taser in that

18  regard?

19     A   I just have my opinions, the one I

20  already stated a couple times about that.

21     Q   Well, what I'm asking for is not

22   necessarily your opinion, but facts.

23       A   Do I have any hard facts or paperwork of

24   medical studies or things, no, I don't,

25   personally.

                              141

1        Q   What I'm asking for, there is an

2    allegation that Taser misinformed law enforcement

3    agencies about studies that other independent

4    bodies had done.  Okay.  That's the allegation.

5        A   I don't have any information about

6    independent body or studies that were done.

7        Q   "Overstating the number of volunteers

8    who actually received a hit from the Taser weapon

9    without injury," do you have any facts that would

10   support that?

11       A   I know they did tell us how many

12   volunteers.  I don't remember the exact number.  I

13   remember during the training him saying so many

14   law enforcement have been exposed to this and

15   there haven't been any injuries.  I don't know if

16   that number was false.  I just know that was the

17   number told to us.

18      Q    Do you have any indication that that

19   number was overstated?

20      A    No; I personally don't.

21      Q    The next allegation, "misrepresenting

22   actual information known by Taser and DGG Taser,

23   Inc. regarding hits from Taser weapons received by

24   volunteers in a training setting which actually

25   caused significant and/or permanent injury."

                              142

1       Do you know of any specific

2    misrepresentations in that regard?

3       A    No.  I just know that I was told that

4    there had been a significant number exposed in

5    training and there had been no significant

6    injuries.

7       Q    Exhibit F of your answers, "falsely

8    reporting information regarding the alleged role

9    of Taser weapons and causing or contributing to

10   the injuries or deaths of individuals receiving

11   hits from Taser weapons."

12      A    False report, no, I don't have personal

13   knowledge of that.

file:///E|/4-14-06%20JJJB%20(FL)%20Depo%20of%20John%20Jewett%20Vol.%202.txt

14    Q    Sub G is, "knowingly and intentionally

15   failing to inform law enforcement agencies and

16   their personnel of the inherent and/or known risks

17   associated with utilizing weapons utilizing

18   electrical current."  Do you have any personal

19   knowledge of that?

20    A    I believe that to be true.

21        Do I have any evidence, personal

22   evidence of that, I mean, I know I was injured

23   with it.  I don't know if Taser is telling other

24   law enforcement agencies about my injury or

25   anything along that line.  I have not been present

                           143

1   when someone from Taser has told somebody

2   something that I know is false.  So that would be

3   the only way I could say for sure that I know

4   that's true.

5        MR. ROPER:  Mark this as Defendant's

6     Exhibit 4.

7        (Exhibit No. 4 marked for

8   identification.)

9   BY MR. ROPER

10    Q    Take a look at Exhibit 4 and let me know

11    once you had a chance to read through it.

12    A    Okay.

13    Q    First of all, you see on Exhibit 4 that

14    there is -- up top there appears to be a box,

15    "volunteer exposure" at the top, and some

16    information below that.  Do you see that?

17    A    Um-hum.

18    Q    Do you recall on January 16, 2004 seeing

19    a Power Point picture with that information on it?

20    A    No, I don't.

21    Q    Do you recall specifically one way or

22    the other whether prior to your exposure a Power

23    Point picture with that information was shown to

24    the class?

25    A    I was in the class for all of the class
                              144

1    presentations up until I went to the hospital, so

2    I guess no.

3    Q    So your testimony is that this slide

4    regarding volunteer exposure was not shown to your

5    class prior to your exposure?

6    A   No.  My testimony is I don't remember

7   every single slide that was shown.  We were handed

8   this packet when we walked in there, and it was

9   40-pages long.  He started talking.  I didn't read

10   the whole packet.  I was listening to the

11   instructor.  I'm saying I don't remember seeing

12   this.

13    Q   So it could have been shown, but you

14   just don't remember one way or the other?

15    A   I don't remember seeing it.

16    Q   Do you see on the bottom of the slide,

17   it says volunteering is highly recommended but is

18   not manditory?

19    A   I see that on this sheet, yes.

20    Q   Do you recall seeing that on the day of

21   your injury?

22    A   I can't tell you I remember seeing --

23        I couldn't say any one of the slide.

24   It's been two years.  I don't remember seeing it

25   on the day of my injury.

145

1    Q   Once again, are you saying it wasn't

2    shown or you just don't remember?

3        A    I'm saying I don't remember.

4        Q    Do you recall being told that

5    volunteering is recommended but not mandatory?

6        A    Again, I'm not saying it wasn't.  I'm

7    saying I don't remember.

8            I was under the impression that I didn't

9    have an option.  I remember thinking that this is

10   something I had to do, but I don't remember the

11   specific language.

12       Q    And you cannot testify here today under

13   oath that on January 16, 2004 the instructor told

14   you that it was mandatory for you to be exposed to

15   the Taser device?

16       A    I don't remember specific words.  So, I

17   guess under oath I could not say that -- the

18   instructor said I had no choice but to do it.

19       Q    Do you see also there that there is a

20   caution statement associated with exposure to the

21   Taser?

22       A    Where are you referring to?

23    Q    The heading that says caution.

24    A    Yes.  Yes.  In the box.  Okay.

25    Q    And it states "subjecting yourself to
                        146

1    the Taser involves physical exertion similar to an

2    athletic injury such as playing a game of

3    basketball."

4    A    Yes.

5    Q    Do you recall being told that on

6    January 16, 2004?

7    A    I don't remember.  I could have been.

8    Q    Do you also recall being told the risk

9    of injury from physical exertion or falling while

10   very low is not zero?

11   A    Could have been.

12   Q    Would it be fair to say that if you had

13   seen this slide, which is Exhibit 4, on

14   January 16, 2004, prior to you being exposed to

15   the Taser, that you would have been on notice that

16   exposure to the Taser did involve a risk of

17   injury?

18   A    Well, I would have said -- I would have

19  read it and said it was similar to activities such

20  as playing a game of basketball.  I played

21  basketball a lot.  I would not assume from reading

22  that I would be subject to injury.  I mean,

23  anything is possible.  A spaceship could fall out

24  of the sky -- there is not one up now.  A rocket

25  could fall out of the sky and come in here and hit

147

1  us in the head, that's possible.

2          Saying a game of basketball, I wouldn't

3  assume a risk of injury, if I'm going to go out

4  and play a game of basketball.

5          Yes, if I fall, obviously if you fall,

6  it's possible you could get hurt.

7      Q   Well, it does say "the risk of injury

8  from physical exertion or falling while low is not

9  zero," correct?

10     A   That's what it says, yes.

11     Q   Would it be fair to say if you had seen

12  this slide then you would have known that there

13  was a risk of injury from being exposed to the

14  Taser?

15      A    No, I wouldn't assume that from seeing

16   the slide.  He told us we would not be falling,

17   that we would be held up.  I knew that wouldn't be

18   the case.  I wasn't worried about falling down.

19          And he is associating it or comparing it

20   to the game of basketball.  I played a lot of

21   basketball, never been hurt, never seen any of my

22   friends hurt playing basketball.

23      Q    Are you aware of anyone ever being hurt

24   playing basketball?

25      A    Personally, I've seen players on TV get

                             148

1   carried off of the basketball court.

2      Q    Would it be fair to say that prior to

3   January '04 you were aware that there was a

4   potential risk associated -- physical risk

5   associated with any sporting activity, including

6   basketball, correct?

7      A    Well, there is a risk of me walking out

8   to my car.  There is a risk getting up in the

9   morning, going to work, slipping in the bathtub.

10   There is a risk being alive, pretty much.  So,

11   yes, there is a risk in everything.

12      Q    At what point does that risk become

13   unreasonable?

14      A    Well, that's a hard question to answer.

15      Q    Is playing basketball an acceptable

16   risk?

17      A    I don't consider basketball a risk.

18           When you should have known or when you

19   knew it was likely that you would be injured or

20   good likelihood you would be injured if you do

21   this, that's to me when it becomes unacceptable.

22      Q    If the risks from Taser exposure are

23   approximately one eighth of what they would be

24   from reported injuries from basketball, would the

25   risk from being exposed to a Taser be an

                          149

1   acceptable risk to you?

2      A    That depends if you are asking me before

3   or after I get hurt.

4      Q    Before you get hurt.

5      A    If you play the odds game, it's unlikely

6   that it will happen to me.  I am not happy with

7    the word acceptable.  I really don't know how --

8         I am having trouble truthfully answering

9    your question.

10    Q    Let's back up a second.

11         You know generally, just in your scheme

12    of knowledge, that it's possible that someone can

13    get injured playing basketball, correct?

14    A    There's a small possibility.

15    Q    Sure.  And knowing that possibility and

16    that risk, you have in the past played basketball

17    voluntarily, correct?

18    A    Yes.

19    Q    Because from your perspective it is an

20    acceptable risk?

21    A    Well, it is an acceptable risk, because

22    the likelihood of -- I don't have statistics, but

23    injuries that I've ever seen playing basketball on

24    TV are pulled muscles, minor sprains, something

25    that you are fine with -- you get over in a few

                              150

1    weeks.

2    Q    You certainly know that there are

3    athletes who have been injured playing basketball

4    that have severe injuries, right?

5        A    Very, very rare.  I don't know of any.

6    I am assuming that there are probably a few out

7    there.

8        Q    And presumably the risk from exposure

9    from a Taser is less than those reported from

10    basketball injuries, you would agree with me, do

11    you not, that the risks associated with exposure

12    to Taser would be an acceptable risk?

13        MR. MOYE:  Object to the form.  Lack of

14        foundation.

15        Two, it's vague in terms of what

16        injuries we are speaking of.

17    BY MR. ROPER

18        Q    Let me change gears for a second.  Let

19    me ask a slightly different question.  I don't

20    want to argue with you over this point.

21        Do you know of anyone prior to

22    January 16, 2004 who was exposed to a Taser, was

23    in the same general physical condition as you that

24    sustained a similar injury to you?

25    A   No.  No.

                          151

1         Now, I know that now.  On that day or

2   now?

3     Q   Let's start with on that day.

4     A   No.

5     Q   Now, do you know anyone --

6     A   Not personally.  But I have heard --

7     Q   Let me finish.

8         Do you know of any person prior to

9   January 16, 2004 who was exposed to a Taser, was

10  in the same physical condition as you and

11  sustained a similar injury to you?

12    A   With all that criteria?

13    Q   Yes.

14    A   Prior to 2004, no.

15    Q   What information?

16        MR. MOYE:  Someone injured prior to '04.

17  BY MR. ROPER

18    Q   Injured prior to '04.

19    A   From the Taser?

20    Q   Yes.

21    A    I cannot say I wasn't watching a news

22    clip.  I don't remember anything in my situation,

23    similar physical stature to me getting injured in

24    the manner I did before my injury.  No, not that I

25    know of.  That's before me.

                              152

1    Q    Right.

2    A    I know of some of those injuries now,

3    but I did not know of them on that day, 2004, if

4    that's what you are asking.

5    Q    No.  It is a slightly different

6    question.  I will try to clarify it because the

7    question wasn't clear and I can understand your

8    confusion.

9        Do you know of anybody that was injured

10    before you were injured because of exposure to a

11    Taser involving the same type of injury that you

12    had?

13    A    I know from either the news or from

14    different -- the internet some people had similar

15    injuries to me.  I'm not certain on the dates that

16    they received their injuries.

17      Q    The first thing is you are not sure if

18   anybody was injured before you that had a similar

19   injury, correct?

20      A    Correct.  I know this now.

21      Q    I don't care about when you knew it.

22      A    Just period --

23      Q    You know it as of today?

24      A    As of today.

25      Q    As of your knowledge today?
                         153

1       A    Got you.

2       Q    You believe that there are other people

3    out there that have similar injuries to you?

4       A    Yes.

5       Q    You don't know if they occurred before

6    or after your injury?

7       A    Correct.

8       Q    And you don't know if they were in

9    similar physical condition to you or not?

10      A    Correct.

11      Q    What information do you have about other

12   people that sustained similar injuries?

13    A    I just know there was specifics.  I

14    heard there were several officers that received

15    similar injuries.  I heard of an officer in

16    Arizona.

17    Q    Mr. Powers?

18    A    I don't know the name.  I think that

19    sounds right, but I'm not sure.

20    Q    The one with the extensive osteoporosis?

21    A    I think so.

22    Q    The one that the jury found that the

23    Taser was not at fault for?

24    A    I saw that in a news article relating to

25    that.

                              154

1    Q    Who else?

2    A    The one that --

3         Whatever his name is.

4    Q    The co-plaintiff in this case?

5    A    The co-plaintiff in this case.

6    Q    Anyone else?

7    A    I heard there's other officers, but I

8    have no details or names or anything about that.

9      MR. ROPER:  Could you mark this as

10     Defendant's Exhibit Number 5 for me.

11        (Exhibit No. 5 marked for

12  identification.)

13     Q   Mr. Jewett, I have given to you a copy

14  of a document that I marked as Exhibit 5 to your

15  deposition.  It is a three-page document.

16        Let me ask you to look at the third

17  page.  Look back at the first page of the document

18  for me.

19     A   The very first page.

20     Q   Certification, lesson plan, version

21  10.1?

22     A   Mine says version X 1 or X.

23     Q   I may have given you the wrong one.

24  That's okay.  I think it is the same.

25        It says version ten?
                        155

1    A   Mine says version X.

2    Q   Roman numeral X?

3    A   I got you.  Version ten.

4    Q   If you can turn to page three of the

5   document; about halfway down.

6     A    Athletic exertion.

7     Q    Do you see there is a statement

8   regarding athletic exertion?  Do you recall being

9   told that on January 16, 2004?

10     A    No, I don't recall getting this or being

11   told.

12     Q    Once again the same question as before.

13          Are you saying that you were not told

14   that specifically or you just don't recall one way

15   or the other?

16     A    I don't recall hearing that.

17     Q    Have you ever spoken directly with any

18   employee of Taser at any time?

19     A    Other than --

20          Well, I don't think the instructor was a

21   direct employee.  I think he was a contractor with

22   DGG.  So my answer would be no.

23     Q    During the time that you were a

24   defensive tactics instructor, have you ever had a

25   student in your class injured in any way?

156

1    A   I don't think so.  I mean, I'm not

2   saying it is impossible.

3        Again, I'm not the lead instructor.  It

4   would not have been my responsibility to fill out

5   paperwork for the injury.

6        Aside from them coming in the next day

7   saying they are sore, but that's to be expected,

8   and we don't consider that an injury, so my answer

9   would be no, I don't remember any.

10    Q   Were you ever present in any training

11   where another person was injured during any sort

12   of training?

13    A   You have to remember I've been a law

14   enforcement officer for 13 years.  I have been to

15   a lot of training.  I can't think of any specific

16   incidents, but I wouldn't be surprised if there

17   wasn't.

18    Q   Was there anybody else other than

19   yourself that was injured in any way during the

20   training that took place on January 16, 2004?

21    A   I was present up until I left the

22   hospital, was the only time I was present, so not

23   that I know of.

24      Q   Have you heard through the grapevine

25   that anybody else was injured later on?
                          157

1    A   Not that I can remember.

2    Q   Since January 16, 2004, have you served

3   as an instructor for the Taser product?

4    A   No.

5    Q   You haven't instructed anybody at the

6   sheriff's office?

7    A   No.

8    Q   You were involved I believe tangentially

9   in the investigation regarding the use of a Taser

10   and a suspect by the name of Woolfolk, does that

11   ring a bell with you, Columbia County Sheriff's

12   Office took a gentleman by the name of Woolfolk

13   into custody?

14      A   Oh, I'm thinking about when I worked

15   there.  Yes, since I've been at the state

16   attorney's office.  Yes, very much on the fringes.

17         Yes, technically I was involved with

18   that.

19      Q   Tell me what your involvement was.

20      A   There was what could be construed as an

21   in-custody death in Columbia County.  I was

22   actually probably 70 miles away on the firing

23   range with the state attorney's office.  We

24   received a phone call that they wanted -- the

25   sheriff's office requested a state attorney come
                          158

1   due to there being a possible in-custody death.

2         As a result of that, it would be

3   protocol for me as the investigator to accompany

4   that prosecutor.  It took me an hour, maybe even a

5   little bit longer to get there.

6         When I got there, the sheriff's office

7   was on the scene.  There was Florida Department of

8   Law Enforcement officers there.  They were the

9   lead investigators on it.  I asked or offered my

10   assistance to the FDLE agents.  I'm trying to

11   think.

12         The only thing I did was they asked me

13   to go to the hospital and take some pictures.  I

14   think when I went to the hospital, I think there

15   was a detective there, and he was taking the

16   pictures.  I was there, but I didn't take the

17   pictures.

18         So I was in and around, but I really

19   didn't do anything that I would deem substantial

20   in the investigation.

21         What was his name?  One of the

22   investigators called me up and asked me if I knew

23   his girlfriend's name, the deceased guy's

24   girlfriend's name.  He just asked me that.  They

25   are in Live Oak.  I am in Lake City.  I think he

159

1   thought I knew it.  I said, no, I could probably

2   find out.  I don't remember how I found out.  I

3   think I got -- I think I made a phone call,

4   someone told me her name, and I called him back

5   and told him her name.

6         And then I believe our office -- someone

7   called our office -- an attorney called our office

8   and asked that I -- asked what I had done.  I told

9   my office supervisor basically what I just told

10   you.  They said something about don't contact the

11   girlfriend anymore, so I never contacted the

12   girlfriend.  Okay, I don't have a problem

13   contacting her anymore, because I never contacted

14   her to begin with.

15          I haven't heard anything about that

16   since.

17      Q    Did you prepare any kind of written

18   report?

19      A    No.

20      Q    And when you went to the hospital, did

21   you have any contact with any family member of

22   Mr. Woolfolk?

23      A    I am assuming since he was there, that

24   they were probably there.  No, I didn't talk to

25   any of them.  If you say contact, maybe, you know,

                              160

 1   coming in and out of the door possibly.  That I

 2   know of, no conversations.

 3      Q    And did you ever have any conversations

 4   with the medical examiner in that case?

 5      A    Not that I know of.

6      Q    Have you ever discussed that case with

7    any of the deputies that were on the scene and

8    involved in subduing Mr. Woolfolk?

9      A    The only thing is Jeff Coleman, who was

10    in the training class with me, he was one of the

11    officers that was on the scene.  I don't remember

12    or know if he fired his Taser or what his

13    involvement was.  I remember they were trying to

14    take this guy in custody for an ex parte order, if

15    I remember right.  That might not have been true.

16    It has been a long time.  I don't remember.

17          He was there and he was present.  He

18    asked me a few months ago if there had ever been a

19    final determination as a review by the state

20    attorney's office or criminal charges.  I told him

21    I thought they declined to file it on that a long

22    time ago.  I didn't know it was still pending.  He

23    said, I need to go to a deposition.  They said it

24    was still pending.  I said I didn't know anything

25    about it.

                        161

1          If you consider that a conversation

file:///E|/4-14-06%20JJJB%20(FL)%20Depo%20of%20John%20Jewett%20Vol.%202.txt

2   about it per se, but he asked me if I knew

3   anything about the possibility of a criminal

4   charge, and I said I have no clue.

5      Q   Did you ever do any sufficient

6   investigation to form an opinion one way or the

7   other regarding the role of the Taser in

8   connection with the death of Mr. Woolfolk?

9      A   I don't have enough facts to even make a

10   determination on that case.

11      Q   You don't know ultimately what the

12   medical examiner concluded?

13      A   I have no idea what toxicology showed.

14   I don't have enough facts.

15      Q   Have you had any conversation with

16   Mitchell Gray since January 16, 2004?

17      A   That I know of, I have not seen nor

18   spoken to him since when I walked out of that

19   classroom to go to the hospital.

20      Q   Did you speak with anyone other than

21   Lieutenant Brewington prior to going to the Taser

22   training in January of '04?

23      A   About going to the training?

24      Q   Did anyone else ask you to go?  Did the

25   sheriff ask you to go, anybody else ask you to go?
                                162

1      A   They just --

2          He just came up to me, and I knew they

3   were looking to bring the Taser program to the

4   sheriff's office and ask me to go.  I took that to

5   mean that I have been doing a lot of training with

6   the sheriff's office, and I took that to mean that

7   they needed me to go.  It was a request.  I can't

8   remember anybody else asking me or anything.  I

9   can't say no for sure.  I can't remember.

10      Q   Have you ever been exposed to the Taser

11   on any other occasion?

12      A   No.

13      Q   What do you do for recreational

14   activities for fun?

15      A   I have three kids, young kids.  That

16   pretty much eats most of my time up.

17      Q   Are you a fisherman, hunter?

18      A   I like to fish, that's something I have

19   not been able to do a lot of because of my back

20  because of standing up.  I used to go out on the

21  flats, like out of Horseshoe Beach.  I still go

22  occasionally, but it's limited, because it hurts

23  my back too bad.  I used to lift weights a lot.  I

24  still get in the gym some, but now it's more --

25       The doctors have told me that it is a
                        163

1  double-edge sword with it.  They said it is not

2  going to make it worse right now per se if I was

3  to go lift weights.

4       They told me I can't do any kind of

5  squats, nothing that will put direct pressure

6  straight down on my spine.  However, they told me

7  that the more I can get in exercise, not just into

8  a weightroom or gym, get that muscle stretched out

9  and work that muscle, it's going to hurt it more

10  now, in other words I will be sore from doing

11  that, but their hope is that in the long-term if I

12  do this now it won't hurt me as bad ten years from

13  now.

14       So what I have to do now, I go in the

15  gym, and it is more therapeutic stuff, a lot of

16   stretching, a lot of light weights to try to keep

17   that muscle from being all stove-up and

18   contracted.

19        Q    What kind of exercises do you do for

20   that purpose?

21        A    You name it.  Well, strictly for my

22   back, I do rows.  I do rows, lightweight rows,

23   where it stretches your back out pretty good and

24   contracts your back.  I can't do pull ups; that

25   hurts my back.  I can do the machines, pull down,
                              164

1   where you pull the bar down to you, again lighter

2   weights.  That's pretty much the two exercises I

3   do that help with that -- helps with the spasms.

4        Q    And how often do you go to the gym?

5        A    It varies.  It depends on work and

6   responsibilities at home.  When I say this, I will

7   give you an average; two times a week.

8        Q    Is there a particular gym that you go

9   to?

10        A    M&M Fitness.  It is just like the candy.

11            I'm sorry.  I changed.  I was having a

12   conversation with somebody about M&M Fitness

13   yesterday.

14        Future Fitness.

15     Q   Do you have a membership?

16     A   I have been at Future Fitness ever

17   since -- like seven years ago.

18     Q   Do you have a membership there?

19     A   Yes.

20     Q   And that's in Lake City?

21     A   Yes.

22     Q   What street?

23     A   1st Street, or Main.  I think they call

24   it Main now.

25     Q   Do you work out with a trainer there?
                              165

1      A   No.

2      Q   What else do you do for entertainment or

3    fun?

4      A   My kids.  I mean, occasionally, you

5    know, I'll go hunting.  I mean, twice a year I'm

6    lucky if I get to do that.

7          The weekends are, you know, yard work,

8    the kids.  I have a pool.  We spend a lot of time

9    in our pool out back in the summer.

10        Q    Do you carry a firearm as part of your

11    employment now?

12        A    Yes.

13        Q    Were you required to qualify with your

14    firearm?

15        A    Yes.

16        Q    It is my understanding you also had some

17    coverage with Afleck that paid some of your bills?

18        A    Yes.  Well, it's paid directly to you.

19            I'm not sure if you are familiar with

20    Afleck.  Depending on the injury, you get a

21    certain amount.  For an MRI you get a certain

22    amount.  For physical therapy, you get a certain

23    amount.  It wasn't a lot of money.

24            MR. ROPER:  That's all I got.

25            Thank you very much.
                              166

1            MR. MOYE:  I do have just a few

2    follow-up questions, if I may.

3                CROSS EXAMINATION

4   BY MR. MOYE

5      Q   Mr. Jewett, January 2005, you moved from

6   Columbia County Sheriff's Office to the state

7   attorney's office as an investigator?

8      A   Correct.

9      Q   When you left the sheriff's office, you

10   were a sergeant?

11     A   Yes.

12     Q   Your dress code was what when you were

13   on duty?

14     A   For the position I was in, full uniform,

15   green uniform with a badge, gun belt and body

16   armor.

17     Q   Is that a flat jacket or body -- some

18   kind of body protection, bullet-proof vest?

19     A   Yes.  It is a class-three bullet

20   resistant vest.

21     Q   You wear that uniform?

22     A   Yes.

23     Q   A duty belt, do you know what that is?

24     A   Yes.

25      Q    A duty belt for a law enforcement

167

1   officer at Columbia County Sheriff's Office when

2   you were there consisted of what?

3       A    Two and a half inch leather belt.  And

4   then I will tell you the manditory things was

5   obviously the weapon and holster, magazine holder

6   which held two magazines.

7       Q    Loaded?

8       A    Loaded.  Radio holder with radio.  A

9   handcuff, with handcuff.  A flashlight ring, and

10  then if you were certified in pepper spray, pepper

11  spray.  I think that was all that was manditory.

12  Now there are things like a pouch to hold my

13  cellphone that I had to have, a knife on my belt.

14      Q    How about the Taser weapon?

15      A    The Taser weapon, I forget that.  Yeah.

16  That made it real crowded, because it was big.  It

17  was on the belt.

18      Q    Did this belt have a double protrusion

19  of metal to keep it in place to buckle it with?

20      A    Yeah.  It was almost, for lack of a

21  better way to describe it, like a Santa Claus type

22  buckle.  There was like a metal bar and two prongs

23  that hook over the top.  From the front it looks

24  like it is buckled a normal way.  In reality, it's

25  not.

168

1      Q   Fully loaded as you were, how much did

2  that weigh?

3      A   An estimate, 20, 25-pounds.  It was

4  pretty heavy.  Fully loaded, radio, flashlight,

5  all that stuff, the Taser, and that's just a

6  guess.  I never actually loaded it.  I would say

7  25-pounds.

8      Q   How about the body armor, how much does

9  it weigh?

10      A   I would say 3 to 5 pounds.

11      Q   After your injury, after you returned to

12  work, were you able to make it through a complete

13  shift with this gear on?

14      A   I made it through some shifts.  Not

15  without it hurting.  Not without pain.

16      Q   When you left in January of '05, could

17    you make it through -- could you work five

18    straight days --

19          Did you work 12-hour shifts?

20    A   Twelve-hour shifts.

21    Q   Could you work full-week shifts,

22    whatever it was, with a full set of gear on and

23    get through without taking breaks?

24    A   No.

25    Q   By breaks, I don't mean lunch breaks --
                              169

1     A   No.  As a matter of fact, especially on

2     day shift, usually about 3 o'clock -- 5:00 in the

3     morning to 5:00 in the afternoon, 6:00 in the

4     morning to 6:00 in the afternoon; at 2:00 or 3

5     o'clock, it would not be uncommon, people would

6     see me in my office with my vest off having to sit

7     down in my office.

8     Q   And when is it that the pain was most

9     acute, riding in the car, standing?

10    A   It varies.  It's not --

11          Typically it's standing for long periods

12    of time, that's with that stuff on.

13        Again, stress.  It just depends on

14   what's going on.  But the longer I work, typically

15   the worse it would be.

16        Q   It had become worse over time between

17   March and December of '04.

18        A   It varies.  It's hard to say.  It got

19   worse, because it was pretty bad to begin with.  I

20   don't know.  It's really hard to say whether it

21   got worse or better.

22        Q   You provided testimony regarding the use

23   of the Taser gun yourself twice on apprehension.

24   Did you have the assistance of your subordinates

25   during those -- both of those instances?

                           170

1        A   Both instances there was at least one

2   other officer.  The incident with the guy that had

3   the fugitive in his office, I believe there was

4   like three other officers there.

5        Q   Now, your role in those arrests, I

6   believe you stated you fired your Taser weapon?

7        A   Yes.

8        Q   With regard to actually physically

9   handling the suspects, were you involved in that

10  part?

11      A   No.  No.  Backup did the handcuffing and

12  all that.

13      Q   When you left the sheriff's office in I

14  believe January of 2005, did you feel confident in

15  your abilities to take down a suspect in say a

16  crime scene, leaving the scene, burglary,

17  something of that nature?

18      A   No; I still don't.  I would be leery

19  about going to the ground or anything that

20  physical to fight with somebody.  I haven't done

21  it -- I couldn't tell you the last time I had to

22  actually physically take somebody to the ground.

23  I don't think I have done it since my injury.  I

24  would be afraid to do that.

25          If I had to, I would do it.  Who knows
                            171

1   what would happen afterwards.

2       Q   During that nine-month period following

3   your return to work after your injury, did you try

4   to avoid putting yourself in that position?

5      A   As much as I possibly could.

6      Q   Prior to your injury, on 1/16/04, what

7   were your plans as a law enforcement officer?

8      A   To ride up the ranks of the sheriff's

9   office.  You know, that was my -- at least the

10   plan right in front of me.

11         Especially when I finished my college

12   degree, I had looked at things like FDLE, Federal

13   Government, possibly.  I hadn't really made any

14   definitive this is it, this is all.  I was keeping

15   my options open.  But my immediate goal was ride

16   up through the ranks of the sheriff's office.

17      Q   Does each of those successively higher

18   ranks carry more pay and more responsibilities?

19      A   Of course.

20      Q   Now, where you are now with the state

21   attorney's office, can you rise through the ranks,

22   if you will?

23      A   No.  There is no ranks.  There's no

24   promotions there.

25      Q   Let me ask you, did you leave the

172

1   Columbia County Sheriff's Office because you

2   thought physically you needed to?

3       A   That was the majority -- the main

4   reason.

5       Q   Do you miss anything about being a

6   supervisory law enforcement officer?

7       A   Of course I miss it.  That's what I did

8   for 13 years.  That's what I did in the military.

9   I love doing the supervisory work in the streets.

10  That's what I like to do.  I'm not saying I hate

11  my job now, but that's what I like to do.  Yeah, I

12  miss it.

13      Q   I take it in your present job you don't

14  have subordinate troops, that type of thing?

15      A   No.

16      Q   You were asked about long-term plans.

17  You stated perhaps being able to one day return to

18  law enforcement in a command capacity?

19      A   Um-hum.

20      Q   Normally in law enforcement agencies

21  where does the --

22          Command is the wrong word.  Give me the

23   right word.  Where does that command level begin?

24      A   Lieutenant.  It depends on the agency,

25   what they consider command staff.  Generally

                            173

1   lieutenant and above is considered command staff.

2      Q   Would that be the progression from

3   sergeant to lieutenant?

4      A   Yes.

5      Q   And then to what?

6      A   Captain.

7      Q   Majors?

8      A   Yes.

9      Q   When you answered that question earlier

10   regarding becoming a member of the command staff

11   in the law enforcement agency, were you implying

12   working your way up through the ranks as a law

13   enforcement officer?

14      A   No, I don't work there anymore.

15         About the only way it will happen is if

16   either myself or -- either I will get elected to

17   sheriff or somebody else gets elected to sheriff

18   and then appoints me into a position.

19      Q   Elected or appointed position?

20      A   Correct.

21      Q   Is that what you meant when you

22  responded to the question earlier?

23      A   Yeah.

24      Q   About --

25      A   You asked me what my ultimate goal would

174

1   be; that's what it would be.  I don't know whether

2   it will happen or not.

3       Q   I take it one requirement is a ballot

4   box, correct?

5       A   One of them.

6       Q   Or very close friend it would take to

7   get that appointment?

8       A   Correct.

9       Q   With regard to Exhibit 1, these

10  photographs, have you seen -- when the wires were

11  attached to you, were you bare shirted, without a

12  shirt on?

13      A   No.  It was over my shirt.

14      Q   So that wire was actually taped to your

15   uniform shirt?

16      A   No.  I wasn't in uniform, I know that

17   for sure.  I believe I had on a standard polo

18   shirt, polo -- not the brand Polo, but to describe

19   the shirt.

20      Q   Pull-over cotton shirt?

21      A   Yeah.  With a collar.

22      Q   When did you first realize that you had

23   these burn marks?

24      A   When I got home, I think.  I don't

25   remember.  Well, I figured they were there,

                          175

1   because I saw other people -- I saw Ali get

2   Tasered, and then some other people at the

3   sheriff's office told me that it leaves a tiny red

4   mark that goes away in a few days.

5      Q   Ali was actually shocked with the gun?

6      A   Yes.

7      Q   That's where they provided a block of

8   instruction on how to remove the barbs?

9      A   Yes.

10      Q   Where did the barbs enter his body or

11  skin?

12      A   It was his back.  I don't remember

13  specifically.  I don't remember how far apart they

14  were or where exactly on his back that they hit.

15  I believe they were pretty close to the center,

16  maybe 12 inches apart.  But, again, it's been two

17  years.  I'm not sure.

18      Q   Now, have you seen the marks left on

19  other people having been Tasered in the fashion

20  that you were with the wires taped to the shirt?

21      A   Seen?  I don't think I've seen.  I've

22  never gone to the training.  I never went -- as an

23  instructor, I never instructed after this and was

24  never present at the training.  I can't say

25  anybody has ever showed me.  There were people
                        176

1  that told me what their injuries are.

2      Q   Has anyone seen your injuries who has

3  undergone the same kind of training and provided a

4  comparison?

5      A   Yeah.  There have been people that have

6  seen my photos.  They have not seen my injuries,

7    they have seen the photos.

8        Q    Photos of --

9        A    Of the burns.

10       Q    Of Exhibit 1 here?

11       A    And they said that there's nothing like

12   that, they had never seen anything like that.

13       Q    And did they describe the marks left on

14   their bodies?

15       A    They told me they were small, red --

16   just small and red, looked like a mild burn.

17       Q    The one on the upper left shoulder looks

18   like it actually penetrated the outer layers of

19   the skin.

20           So I don't misstate what's in the photo,

21   do you recall that wound to your shoulder, looking

22   at it in the mirror or otherwise?

23       A    My back was hurt, so I wasn't doing a

24   whole lot of looking over my shoulder for a long

25   time.  But I looked --
                            177

1           Pictures were taken, and then I looked

2    at the pictures.  So it's kind of a hard place to

3   actually see.  In the mirror I saw, yeah.

4       Q   It looks like a hole in your shoulder?

5       A   Yeah.  It bled.  It didn't bleed as much

6   that day, or at least that I remember, but it bled

7   for several weeks after that.

8       Q   And this photograph you think was taken

9   within no more than two or three days?

10      A   Maximum of 48 hours.

11      Q   Now, the Taser wire that's taped to the

12  shirt in your case, I'm not very husky, but I'm

13  wondering how is it that the -- is the wire

14  actually touching your skin in any way when you

15  underwent this testing?

16      A   Directly?

17      Q   Yes.

18      A   I don't see how.  I had a shirt on.

19  They didn't pull the shirt up.  I don't see --

20      Q   They didn't tape the wire through the

21  threads?

22      A   Not that I know of.  I think I would

23  have felt that.

24     Q   How about the shirt, was it burnt?

25     A   Not that I remember.

178

1     Q   Was the shirt tight against --

2          I can see on your shoulder, on your left

3   hip.  Was the shirt tight against your skin?

4     A   It is a standard shirt.  Not this type

5   of shirt.  It was a polo shirt.  It was a standard

6   fitting shirt.  It wasn't like a form-fitted

7   shirt.  It's hard for me to say that exact spot,

8   that exact moment.  I don't think it was tight up

9   there.  It shouldn't have been.

10     Q   The lieutenant that informed you about

11   the training class, I don't want to put words in

12   your mouth, you were instructed to attend this

13   training?

14     A   Yes.

15     Q   Is this the person that normally gave

16   you instructions if special assignments -- if you

17   were assigned -- given special assignments?

18     A   He was the lieutenant, so he routinely

19   told me to do things or things that needed to be

20   done.

21      Q   Was he routinely your supervisor that

22   gave you those kinds of instructions?

23      A   The way it is set up, there are two

24   lieutenants over the patrol division, Brewington

25   and Nydam.  They may overlap.  I could get

179

1   instruction from either one of them.  Who filled

2   out my evaluation, usually that was Lieutenant

3   Ryan Nydam.  It would not be uncommon for

4   Lieutenant Josh Brewington to also supervise me.

5      Q   How much before the actual training

6   session were you made aware that you would be

7   going to it?

8      A   It wasn't long.  Weeks maybe, if I

9   remember right.

10      Q   In a situation like that, would it be

11   training away from the department, or from the

12   sheriff's office -- who is responsible for sending

13   a list of attendees or things of that nature?

14      A   Whoever was --

15         It depends on the type of class and in

16   what area it falls under.  Probably one of the

17   patrol lieutenants.  I don't know.  I am assuming

18   since Lieutenant Brewington was the one getting

19   people to go and take care of the registration, I

20   am assuming it would be him.

21        Q    Were you provided any materials that you

22   could go through in preparation for the upcoming

23   training?

24        A    No.

25        Q    Now, the materials, and I think some of

                              180

1   them have been -- copies of materials have been

2   provided, Exhibits 4 and 5.  You were given those

3   materials at what point in the training, if you

4   recall?

5        A    I believe right at the beginning, when

6   we sat down he handed them out.

7        Q    What was the format of the training?

8   Were you in the classroom?

9        A    Yes.  Lecture for the majority of it.

10   There was also hands-on practicing, showing the

11   guns were on the table and manipulating the Taser,

12   showing us how to reload it, take the batteries in

13   and out.

14      Q   I take it there were several blocks to

15   this instruction?

16      A   Yes.

17      Q   After being given a block, would you

18   have a practical application?

19      A   Yes.  Like he would go over verbally how

20   to take the batteries in and out, and then we

21   would do it.  Yes.

22      Q   So during that time, where was your

23   attention directed?

24      A   Either at the instructor in front of us

25   or at the weapon doing -- or if we were standing
                          181

1   up doing something --

2      Q   Did anyone give you an opportunity to

3   read the materials, did you have like a reading

4   session, if you will, before the classes began to

5   familiarize yourself with the materials?

6      A   It was 30, 40-pages long.  We didn't

7   have time to read the whole thing.

8     Q   Did you go straight into instruction?

9     A   Yeah.  It went straight into

10  instruction.

11     Q   You were asked, and I believe this is

12  Exhibit Number 4, it is your testimony today you

13  don't recall having seen this exhibit before,

14  which is a page out of -- proffered to be some

15  kind of manual?

16     A   It was 30 or 40 pages of stuff.  I

17  didn't have a chance to read it all.  I am saying

18  I don't remember seeing it.

19     Q   Again, what was your impression with

20  regard to being exposed to the Taser weapon,

21  Tasered with it, if you will, what was your

22  understanding with regard to that evolution or

23  event as it related to getting your instructor

24  certification?

25     A   My understanding, you had to be exposed

182

1  to it in order to be an instructor.  There was

2  some people in the class that had already been

3  exposed that were refreshing their certificate and

4    they didn't have to be because they had been.  I

5    remember him telling them they didn't need to do

6    it because they had been.  I was under the

7    impression that as -- to get the instructor

8    certification that you needed to be exposed.

9        Q    Do you recall him stating if you have

10   done this before or been exposed to it before you

11   don't need to be exposed to it again?

12       A    Yes.  That might have been in response

13   to a question by one of the students that had been

14   exposed.  I remember him making a statement there

15   was no need in them having to do it again if this

16   had already been.

17       Q    You were asked whether or not you recall

18   being directly told you must attend -- you must be

19   exposed in order to get your certificate.  You

20   don't really recall those exact words?

21       A    No, I don't remember him saying that I

22   had to do it to get my certificate.

23       Q    Do you recall him stating that it was,

24   putting it the other way, that it was voluntary,

25   or if you would like to get Tasered, you may, but

1   it's strictly voluntary, you don't have to do it?

2      A   He definitely didn't say that.

3      Q   You were asked about what decision

4   process you might have gone through had you been

5   made aware of the potential or likelihood for a

6   injury.  It was compared to that of playing a

7   basketball game as set forth in Exhibit 4.  Have

8   you ever known anybody --

9           Have you ever been injured playing

10  basketball?

11     A   No.

12     Q   Have you ever known anyone to sustain

13  compression fractures to the thoracic vertebrae

14  while playing basketball?

15     A   No.

16     Q   Now, with regard to the likelihood of

17  making a decision with regard to whether or not to

18  participate in the activity and likelihood of

19  injury from that participation, would you also

20  consider the likelihood or the degree of injury?

21     A   Of course.

22    Q   Had you been informed that there was,

23   albeit a minor or remote possibility of sustaining

24   serious back injury but nevertheless that

25   possibility, would you have reconsidered your

                              184

1   involvement in this Taser exercise?

2    A   Yes.  Definitely.

3    Q   Do you have a yard at home?

4    A   Yes.  I own 5 acres.

5    Q   Do you mow it?

6    A   I keep --

7        Well, I have to mow it, yeah.  I can't

8   afford somebody else to do it, and my wife isn't

9   going to do it.  I keep about three and half,

10   maybe four of it mowed.

11    Q   I take it you have a riding lawnmower?

12    A   Yes.

13    Q   Since your injuries, has this become a

14   more difficult chore for you to accomplish?

15    A   Most definitely.  If I had to single out

16   one thing that really sends my back into a stint,

17   it is the lawn mower in the summer.

18    Q    Now, you are required to carry a firearm

19  in your present job?

20    A    Yes.

21    Q    You are still a sworn law enforcement

22  officer?

23    A    Correct.  Yes.

24    Q    Is there any concern with regard to

25  taking large amounts of pain medication and

                          185

 1  carrying a firearm?

 2    A    Yeah.  I mean, I don't --

 3        I won't take the pain medicine while I'm

 4  working, not while I'm carrying a gun.  You never

 5  know what could happen.  Even though it is

 6  unlikely, you still never know.

 7    Q    If the pain becomes one of those

 8  episodes where it is more severe and you are at

 9  work and you, of course, have your gun, what is it

10  that you do then?

11    A    If at all possible, I go home.

12    Q    Do you have an option with regard to

13  whether or not you carry a firearm at work?

14    A   There's no policy that says we have to.

15   There are some of the investigators that don't.

16   But my position on that is I worked in Columbia

17   County for 13 years, I put a lot of bad people in

18   jail, sent a lot of bad people in prison for a

19   long time, people that I routinely see, people

20   that know me, are routinely around, and I feel

21   like I need to for protection.  I am a law

22   enforcement officer and they know that.  I don't

23   feel like I have an option.

24         If you ask my boss if I had an option, I

25   don't know what he would say, probably that I did.

                              186

1    Q   When you are away from the office out in

2   the field investigating, are you required to carry

3   your firearm?

4    A   Again, I don't know if there is a policy

5   that says that I am, but I feel like I am.  I

6   don't feel -- most law enforcement officers I

7   think would say the same thing.

8    Q   Do you recall the state attorney's

9   office when they are in the field conducting

10   investigations, do they carry their firearms?

11      A   I believe they do.

12      Q   I take it you are plain clothes

13   capacity?

14      A   Yes.

15         MR. MOYE:  That's all I have.

16              REDIRECT EXAMINATION

17   BY MR. ROPER

18      Q   I have a couple follow-up questions.

19         Do you have arrest powers?

20      A   Yes.

21      Q   And what types of crimes or criminal

22   activity generally are you investigating?

23      A   Okay.  It depends on different circuits

24   do things different ways as far as it comes to the

25   state attorney investigators.

                         187

1          I have the same powers that the law

2   enforcement officer that drives a patrol car down

3   the street has.  If I see somebody committing a

4   crime outside, I have the power to arrest them.

5          For a practical matter, 99.9 percent of

6   my duties involve post-arrest investigation,

7   preparation for trial, witnesses that disappear I

8   try to find, things that come up after arrest that

9   we didn't know about before, they need somebody

10  interviewed, I do that kind of stuff.

11         Occasionally I will get involved in a

12  criminal investigation from the ground up; that's

13  rare.  If I do that, it is more of a paper crime,

14  frauds.

15         For instance, right now I'm working a

16  case where an old gentleman paid for a new engine

17  in his truck and they didn't put a new engine in.

18  I'm working on proving that.  So most of my stuff

19  is post arrest in the office.  Occasionally,

20  though, it depends on any given day.

21     Q   I got you.

22         With respect to the manner in which the

23  leads were attached to your shirt, were they just

24  taped on there with like medical tape or something

25  like that?

188

1     A   I want to say it is duct tape, but I'm

file:///E|/4-14-06%20JJJB%20(FL)%20Depo%20of%20John%20Jewett%20Vol.%202.txt

2   not 100 percent sure.

3       Q   You are saying that the instructor

4   actually cut the lead where the probe was?

5       A   I believe how they removed that, I don't

6   know.

7           I believe when he showed us, if I

8   remember right, how to remove them, then how to

9   dispose of them in the Sharp's container, or

10  whatever it may be, and then it was to bare the

11  wires with nothing on the end of them that were

12  then taped.  That's how I remember it.

13      Q   So the wires didn't have like an

14  alligator clip or something like that on it that

15  was attached to you?

16      A   I'm pretty sure taped.  Again, it's been

17  two years.  I thought I remembered it being taped.

18      Q   Was it taped so just the very end of the

19  lead was attached to your body or was it --

20      A   It was behind me.

21      Q   It was hard for you to tell?

22      A   Hard for me to tell.

23     Q    It was the instructor that taped it to

24  you?

25     A    I believe so.  Yeah.

                          189

1     Q    Now, I want to make sure I understand

2  exactly the circumstances.  I don't want to be

3  mistaken on this.

4          Were you asked if you would participate

5  in the training or were you instructed that you

6  had to participate in the training?

7     A    Well, it's not like, you know, there is

8  a general and I'm like a private in the Army and

9  they give out formal orders.  You know, around

10  there, or around obviously most places you have a

11  work relationship with your supervisors.

12          They come to me and they said, hey, we

13  need you to go to this Taser instructor class to

14  be a Taser instructor.  I said okay.  I took it as

15  they are telling me to go.

16          What would have happened if I said no, I

17  think they probably would have -- they asked me to

18  do things before and I have just done them.  I

19   think he asked me to do it and I did it.  You

20   know, I took it as they were telling me to go.

21      Q   But you were asked to go as opposed to

22   you contacting them and saying I would like to be

23   certified as a trainer?

24      A   I did not contact them.  They approached

25   me and asked me to go to the training.

                          190

1       Q   If I needed to get a copy of the

2    sheriff's office Taser policy, who would I contact

3    about getting that?

4       A   Probably the best thing to do would be

5    your office has already been in contact I believe

6    with a woman named Beverly Jackson, who is the

7    human resources records keeper for the sheriff's

8    office.  I believe she would be the best one to

9    contact.  She would either handle it for you or

10   she would put you in the right place.

11         Obviously they have a policy.  I don't

12   know that is the policy that was in effect a year

13   ago or two years ago.

14         A new sheriff took office.  You need to

15   be aware that the policy, while it may be the

16   same, it may also be different.  I have not

17   reviewed it.

18        MR. ROPER:  Those are all the questions

19   I have.

20        I guess the other thing is a

21   housekeeping matter.

22        Since I have not had a chance to go

23   through these records, if there's anything in

24   there that would necessitate me asking a few

25   more questions of Mr. Jewett, I would like to
                          191

1    reserve the right to do so.  I don't

2    anticipate it.  I haven't had a chance to go

3    through the employment records and there may

4    be something that I need to follow up with

5    you on, but it is unlikely.

6        I appreciate your time.

7        (Thereupon, the deposition was concluded

8    at 4:05 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

192

1          CERTIFICATE OF OATH

2

3

4

5  STATE OF FLORIDA          )

6  COUNTY OF LEON          )

7

8

9          I, the undersigned authority, certify

10    that said designated witness personally appeared

11    before me and was duly sworn.

12

13

14          WITNESS my hand and official seal this

15    19th day of April, 2006.

16

17

18

19

20

_____

21

                JUDY CHIN, RPR, CRR
22                1-800-934-9090
                  850-878-2221
23

24

25
                            193

1

2          CERTIFICATE OF REPORTER

3

4  STATE OF FLORIDA     )

5  COUNTY OF LEON       )

6

7         I, JUDY CHIN, Registered Professional

8  Reporter, certify that the foregoing proceedings

9  were taken before me at the time and place therein

10  designated; that my shorthand notes were

11  thereafter translated under my supervision; and

12  the foregoing pages numbered 1 through 191 are a

13  true and correct record of the aforesaid

14  proceedings.

15

16         I further certify that I am not a

17  relative, employee, attorney or counsel of any of

18  the parties, nor am I a relative or employee of

19  any of the parties' attorney or counsel connected

20  with the action, nor am I financially interested

21  in the action.

22         DATED this 19th day of April, 2006.

23         _____

24              JUDY CHIN, RPR, CRR

25              Notary Public
                      1-800-934-9090
                850-878-2221
                   194

1  I have read the transcript of my deposition, pages

2  1 through 191, and hereby subscribe to same,

3  including any corrections and/or amendments listed

4  below.

5  _____        _____

6  Date:      JOHN JEWETT

7

8  Page/Line  Correction/Amendment  Reason for Change

9  _____   _____  _____

10  _____   _____  _____

11  _____   _____  _____

12  _____   _____  _____

13  _____   _____  _____

14  _____   _____  _____

15  _____   _____  _____

16  _____   _____  _____

17  _____   _____  _____

18  _____   _____  _____

19  _____   _____  _____

20  _____   _____   _____

21  _____   _____   _____

22  _____   _____   _____

23  Date of Deposition: April 12, 2006

24  Reporter:  Judy Chin, RPR, CRR

25
                            195

1

2

3        ACCURATE STENOTYPE REPORTERS, INC.
            2894 Remington Green Lane
4           Tallahassee, Florida  32308
              (850) 878-2221
5

6  April 14, 2006

7
     DAVID W. MOYE',  ESQUIRE
8  822 North Monroe Street
     Tallahassee, Florida  32303
9

10  Dear Mr. Moye':

11  Re:  JJ and JB v DGG Taser

12  This is to advise you that your witness did not
     waive reading and signing of his deposition.
13

14  Please have your witness read his copy of your
     transcript, noting corrections/changes on the
15  errata sheet, or date and sign the errata sheet,
     and return the  original errata sheet to MR. ROPER

16   within the next 30 days or before the final trial
     in this matter, whichever comes first.

17

18   Sincerely yours,

19

20   JUDY CHIN, RPR, CRR

21   Enclosures (Errata Sheet and Transcript.)

22   cc Counsel of Record

23

24

25