Pamela J. Schreiner                     December 3, 2007

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
                  NORTHERN DISTRICT OF GEORGIA
 2                       ROME DIVISION
 3

     DAVID R. WILSON and CHARLENE      )
 4   WILSON,                           )
                                       )
 5                     Plaintiffs,     )
                                       )
 6         -vs-                        )  No. 4:06-CV-179-HLM
                                       )
 7   TASER INTERNATIONAL, INC.,        )
                                       )
 8                     Defendant.      )
     _____)
 9
10
11
12
               DEPOSITION OF PAMELA J. SCHREINER
13
14
15                    Phoenix, Arizona
                      December 3, 2007
16
17
18
19
20
21
22                              Reported by:
23                              PAUL GROSSMAN
                                Arizona Certified
24                              Reporter #50028
                                CA CSR #1487
25
```

Pamela J. Schreiner                                December 3, 2007

---

Page 2

```
1
               I N D E X
2
3
     Examination:                    Page
4
     BY MR. BRAVE                      6
5    BY MR. BRAVE                    120
     BY MR. REDHAIR                  179
6
7
8
9            E X H I B I T S
10   No.  Description                Page
11   1  (Affidavit of Pamela Schreiner.)       5
12   2  (Subpoena.)                             5
13   3  (Two letters produced by deponent.)   120
14   4  (VERS, 10-04 through 1-30-05.)        120
15   5  (1-5-05 VERS Backup.)                 120
16   6  (12-1-04 VERS Backup.)                120
17   7  (11-19-04 VERS Backup.)               120
18   8  (10-1-04 VERS Backup.)                120
19   9  (9-1-04 VERS Backup.)                 120
20   10 (7-31-04 VERS Backup.)                120
21   11 (Volunteer Exposure Spreadsheet, 8-2-04.) 120
22   12 (Volunteer Exposure Spreadsheet, 8-2-04.) 120
23   13 (Statement of deponent, 1-24-05.)     120
24   14 (Statement of deponent, 1-27-05.)     120
25
```

Page 3

```
1    15 (Alphagraphics Invoice No. 119331.)   120
2    16 (Alphagraphics Invoice No. 119716.)   120
3    17 (Volunteer Exposure Spreadsheet through
         9-7-04.)                             120
4
     18 (Volunteer Exposure Spreadsheet through
5        1-30-05.)                            120
6    19 (Spreadsheet prepared by Mr. Brave.)  120
7    20 (Deposition of deponent in Williams case,
         10-18-07.)                           120
8
     21 (Deposition of deponent in Powers case,
9        5-25-05.)                            120
10   22 (CD of deposition exhibits.)          120
11   23 (Employment, Confidential Information, etc.,
         Agreement.)                          157
12
13   24 (Deponent's handwritten resignation letter.) 158
14   25 (Notice of Termination of Employment,
         1-27-05.)                            159
15   26 (Taser check stub No. 3568.)          162
16   27 (Taser check stub and Abco Recycling
         invoice.)                            164
17
18
19
20
21
22
23
24
25
```

Page 4

```
1            THE DEPOSITION OF PAMELA J. SCHREINER,
2    taken at 10:10 a.m. on December 3, 2007, at the offices
3    of Coash & Coash, Inc., 1802 North 7th Street, Phoenix,
4    Arizona, before PAUL GROSSMAN, a Notary Public and
5    Certified Reporter #50028 in and for the State of
6    Arizona, pursuant to the Federal Rules of Civil
7    Procedure.
8
     FOR THE PLAINTIFFS
9
             CYNTHIA NOLES JOHNSON, ESQ.
10           JOHNSON LAW
             Downtown at 313 Wolfe
11           COHUTTA, GA 30710
             (706) 694-4298
12
13   FOR THE DEFENDANT
14           MICHAEL BRAVE, ESQ.
             HOLLY L. GIBEAUT, ESQ.
15           TASER INTERNATIONAL NATIONAL
             LITIGATION COUNSEL
16           17800 NORTH 85TH STREET
             SCOTTSDALE, AZ 85255
17           (800) 978-2737
18
19   FOR THE DEPONENT
20           MICHAEL S. REDHAIR, ESQ.
             REDHAIR LAW
21           33 NORTH STONE AVENUE
             SUITE 1600
22           TUCSON, AZ 85701
             (520) 622-0433
23
24       Also present was Mr. Scott Link and Mr. Silas
25   Kyler, videotape technician.
```

Page 5

```
1                    Phoenix, Arizona
2                    December 3, 2007
3                    10:10 a.m.
4
5
6            (Deposition Exhibits Numbers 1 and 2
7            were then marked for identification.)
8            MR. KYLER:  We're going on the record.  The
9    time on the video monitor is 10:10.  Here begins Volume
10   1, Video Number 1 in the deposition of Pam Schreiner in
11   the matter of David R. Wilson and Charlene Wilson versus
12   Taser International, Inc. in the United States District
13   Court for the Northern District of Georgia, Case Number
14   4:06-CV-179-HLM.
15           Today's date is December 3, 2007.  Our court
16   reporter is Paul Grossman.  My name is Silas Kyler,
17   certified videographer representing Coash & Coash, 1802
18   North 7th Street, Phoenix, Arizona 85006.  This video
19   deposition is taking place at 1802 North 7th Street,
20   Phoenix, Arizona 85006.
21           Counsel, please voice identify yourselves and
22   state whom you represent and the reporter swear in the
23   witness.
24           MR. BRAVE:  Michael Brave pro hoc for
25   defendant Taser International.
```

2 (Pages 2 to 5)

Pamela J. Schreiner                    December 3, 2007

Page 6

1      MR. REDHAIR:  Mike Redhair on behalf of the
2  witness, Ms. Schreiner.
3      MS. JOHNSON:  I'm Cindy Johnson, attorney for
4  the plaintiffs Wilson.
5      MR. BRAVE:  Also present are Holly Gibeaut,
6  who is a litigation counsel for Taser and Scott Link who
7  is a corporate representative of Taser.
8          PAMELA J. SCHREINER,
9  called as a witness herein, having been first duly
10 sworn, was examined and testified as follows:
11
12          EXAMINATION
13 BY MR. BRAVE:
14     Q.   Ms. Schreiner, good morning.  You've had your
15 deposition taken before?
16     A.   Yes, sir.
17     Q.   And also, if you haven't acquired it yet,
18 you're working towards being a paralegal if I remember
19 correctly?
20     A.   Yes, sir.
21     Q.   So you are familiar with the deposition
22 process?
23     A.   Yes, sir.
24     Q.   Do you believe it's necessary for me to go
25 through the usual deposition basics with you or are you

Page 7

1  fully aware of those?
2      A.   No, I'm aware.
3      MR. REDHAIR:  Object to form.
4      MR. BRAVE:  What do you object to, what
5  aspect of the form?
6      MR. REDHAIR:  What is the basics of a
7  deposition?  I mean, it's vague and confusing.
8  BY MR. BRAVE:
9      Q.   Ms. Schreiner, what do you believe the basic
10 parameters of a deposition are?
11     A.   I believe it would be stating my name, my
12 address, my employment, information about me.
13     Q.   Anything else?
14     A.   No.  That would be it for me.
15     Q.   Okay.  Basically you're aware that you're
16 here and you're under oath?
17     A.   Yes.
18     Q.   And you're subject to the laws of perjury?
19     A.   Yes.
20     Q.   And you understand that so at least myself
21 and probably several of the people in the room will be
22 asking you questions?
23     A.   Yes.
24     Q.   And you understand that you're to answer
25 those questions honestly and truthfully to the best of

Page 8

1  your ability?
2      A.   Yes.
3      Q.   In your opinion is a misstatement a
4  falsehood?
5      A.   Yes.
6      Q.   In your opinion is an embellishment of a
7  stated fact a falsehood?
8      MS. JOHNSON:  Object to the form.
9      MR. REDHAIR:  Join.
10     MR. BRAVE:  What is your objection?
11     MS. JOHNSON:  Vague.
12 BY MR. BRAVE:
13     Q.   What would be your opinion -- in your opinion
14 would be the definition of an embellishment or an
15 exaggeration, either one?
16     A.   Well, an exaggeration to me is just that,
17 where someone is exaggerating the truth.  They are not
18 speaking the full truth.
19     Q.   So if an exaggeration was made of a fact
20 would that be a falsehood?
21     MR. REDHAIR:  Object to the form.
22     MS. JOHNSON:  Objection.  Speculation.
23     THE WITNESS:  Yes.
24 BY MR. BRAVE:
25     Q.   Give you a hypothetical.  Withdraw the

Page 9

1  question.
2      Here's a hypothetical.  If the facts show as
3  an example that -- well, we'll use Taser and one of the
4  reasons we are here.  If the facts were to show that
5  there were, for example, 100 injuries recorded in
6  Volunteer Exposure Reports but in a statement that was
7  made somebody said it was 200 or 300, would that be an
8  exaggeration?
9      MS. JOHNSON:  Objection.  Vague and calls for
10 speculation.
11     MR. REDHAIR:  Join.
12     MS. JOHNSON:  I don't think it's a proper
13 question to ask a fact witness a hypothetical question.
14 BY MR. BRAVE:
15     Q.   You can answer.
16     A.   I believe that in a -- if it's a hypothetical
17 question like that, I myself believe that if there's 100
18 injuries and that's what shows but there's actually 200
19 it's just not showing complete.  It's not showing the
20 complete truth.  To me, if it's supposed to be -- if
21 there's two or 300 injuries then that's what should be
22 reported.
23     Q.   So, therefore, you totally agree that it's
24 the accuracy, the accurate facts that should be stated,
25 correct?

3 (Pages 6 to 9)

Pamela J. Schreiner                    December 3, 2007

Page 10

1    A.    Yes.
2    Q.    Just real briefly when you first were brought
3  into Taser one of the assignments -- and I believe
4  you've already testified to this -- that Doug Klint gave
5  you was to accumulate all Volunteer Exposure Reports and
6  then have them made into PDFs and then provided in the
7  Powers case, is that correct?
8    A.    Yes.
9    Q.    And I believe you've already testified that's
10 to the best of your ability?
11   A.    Yes.
12   Q.    Were all of the exposure reports that you
13 found included in those PDFs that were provided in the
14 Powers case?
15   A.    To my knowledge, yes.
16   Q.    Do you have any reason to believe that they
17 weren't?
18   A.    The reason why I believe that they weren't
19 was because there was no uniform -- uniformity to
20 anything in there.  You know, there were documents
21 scattered all throughout.  Nothing was in a file.  There
22 were -- you know, there were boxes upon boxes in
23 warehouses and then shoved in drawers and things like
24 that.
25   Q.    So, you believe, correct me if I'm wrong,

Page 11

1  that basically you did do your best efforts to
2  accumulate all those that were there and you did put
3  them into the PDFs, correct?
4    A.    Correct.
5    Q.    And you have no reason to believe at that
6  point in time that there's any allegation that anyone
7  removed any of them, intentionally shredded them, et
8  cetera, correct?
9          MR. REDHAIR:  Objection.
10         MS. JOHNSON:  Objection.
11         MR. REDHAIR:  Object to form.
12 BY MR. BRAVE:
13   Q.    You can answer.
14   A.    At that time, no.
15   Q.    Did Doug Klint also instruct you to do a
16 spreadsheet of those Volunteer Exposure Forms?
17   A.    At that particular time?
18   Q.    At any time.
19   A.    At one point, yes, but not at that time.
20   Q.    Do you recall when that -- when that time was
21 or an approximation of it?
22   A.    It was after the Powers case had started.  It
23 was probably some time mid, mid summer, like early
24 summer time-frame.
25   Q.    Of 2004?

Page 12

1    A.    Of -- yes, 2004.
2    Q.    Did you diligently work on that spreadsheet?
3    A.    Yes, I did.
4    Q.    Did you complete that spreadsheet with the
5  Volunteer Exposure Reports that you had?
6    A.    Yes.
7    Q.    When did you last work on that spreadsheet?
8    A.    Probably mid to late fall.
9    Q.    When you last worked on that spreadsheet had
10 you completed the spreadsheet for the Volunteer Exposure
11 Reports with unknown dates that you had accumulated?
12   A.    I believe so.  I don't recall what was
13 actually there but I believe I did.
14   Q.    Do you have any reason to believe that you
15 didn't?
16   A.    Just from, you know, lack of time of from
17 being there 'til now.
18   Q.    Did you complete the spreadsheet for the
19 Volunteer Exposure Reports that you had for the year
20 2000 as of the last time you worked on the spreadsheet?
21   A.    I don't recall that.  I don't recall what the
22 time-frame was, what the dates were.
23   Q.    Do you recall that there were several
24 categories and do you recall those categories were
25 unknown because there was no date on the Volunteer

Page 13

1  Exposure Forms --
2          MS. JOHNSON:  Objection.
3  BY MR. BRAVE:
4    Q.    -- 2000, 2001, 2002 and 2003 and 2004?  Do
5  you recall that?
6          MR. REDHAIR:  Object to form.
7          MS. JOHNSON:  Object.  Compound and vague.
8  BY MR. BRAVE:
9    Q.    You can answer.
10   A.    I don't recall what the dates were.  I don't
11 recall, you know, the tabs.  I remember that there were
12 some tabs on the spreadsheet or the worksheet, whatever
13 you want to call it, and they were for the different
14 types of forms because they had different forms
15 available to training and different things.  But I don't
16 recall the dates.  I'm sorry.  I don't recall that.
17   Q.    And this was an Excel spreadsheet?
18   A.    Yes, it was.
19   Q.    Do you recall the file name of the
20 spreadsheet?
21   A.    No, I don't recall the name.
22   Q.    But you do recall the last time you worked on
23 that spreadsheet that all of the forms that you had
24 acquired and accumulated had been put onto that
25 spreadsheet, correct?

Pamela J. Schreiner                            December 3, 2007

Page 14

1    A.   Yes.
2         MR. REDHAIR:  You know, just for the record,
3    could I make sure we're -- I'm operating under the right
4    assumption.
5         In Arizona we object to simply form whether
6    it's compound, argumentative, you know, whatever.  So I
7    just want to make sure that under the rule, or what
8    state law applies here, but I just want to make sure
9    that when I say "object to form" that's what we do in
10   Arizona and if you, like you did earlier, if you want
11   clarification on what the problem is or what I think the
12   problem is I'd be happy to give it to you.  I just --
13   we're kind of speaking different languages and I just
14   wanted to make sure that that was clarified.
15        MR. BRAVE:  Two things.  Number one, I fully
16   understand that and agree.
17        Number two, also the two of you -- this is
18   your call.  If one of you makes an objection I have no
19   problem with basically saying that applies to both of
20   you automatically so you don't have to join.
21        MR. REDHAIR:  Okay.
22        MR. BRAVE:  If you want that.  That's up to
23   you.
24        Ms. JOHNSON:  I don't think that would be
25   proper.

Page 15

1         MR. BRAVE:  Okay.
2         MS. JOHNSON:  I don't represent the witness.
3         MR. BRAVE:  Then the answer is no.
4    Q.   Ms. Schreiner, you have an attorney here
5    representing you today.  When was the first time that
6    you were in contact with him?
7    A.   I actually spoke with him last week.
8    Q.   Did you contact him directly?
9    A.   I actually spoke with him directly, yes.
10   Q.   Did anyone prompt you to contact him?
11   A.   No.
12   Q.   Did anyone suggest that you contact him?
13   A.   No.
14   Q.   Did anyone provide you with his name and/or
15   phone number or any other information about him?
16   A.   No.
17   Q.   Did you have a discussion with either
18   Ms. Johnson or your attorney either this morning or any
19   time from October 18th to today?
20        MS. JOHNSON:  Objection.  Attorney-client
21   privilege.
22        MR. BRAVE:  I'm not at attorney-client
23   privileged information yet.  I can ask her if she met
24   with him because my next question is going to be whether
25   or not the both of you were in the room because you --

Page 16

1    my understanding is that is not attorney-client
2    privilege, that would have done away with any
3    attorney-client privilege that would have been present.
4    So I'm entitled to ask the question.
5    Q.   So you can answer unless your attorney is
6    going to instruct you not to.
7         MR. REDHAIR:  Let me think about that for a
8    minute.  If we can come back to that.  At this point I
9    will instruct her not to.  Let me think about that and
10   if we can come back to that later on in the deposition I
11   would appreciate that.
12   BY MR. BRAVE:
13   Q.   At any point prior to -- at any point from
14   October 18, 2007, your prior deposition, to today have
15   you met with Ms. Johnson?
16   A.   Other than today?
17   Q.   Yes.
18   A.   I met with her, yes.
19   Q.   Other than today or today?
20   A.   I met with her today.
21   Q.   Did you have any communications with her from
22   October 18th through right now other than this morning?
23   A.   I did on the phone, yes.
24   Q.   Tell me everything you can remember about
25   that conversation?

Page 17

1    A.   We were just basically speaking about the
2    deposition and that she -- that there was a subpoena for
3    the deposition and that was really the -- the gist of
4    the conversation.  Nothing more, nothing less.
5    Q.   Nothing of substance?
6    A.   Nothing, unh-unh.
7    Q.   And you did receive -- did you in fact
8    receive a copy of the subpoena from Ms. Johnson?
9    A.   No.  I actually received it at my home from
10   your attorneys.
11   Q.   And that's the only copy that you received?
12   A.   Yes.
13   Q.   Do you recall when that was?
14   A.   No, I don't.  I believe it was -- it was one
15   night last week.  I was actually at home because I had
16   worked two jobs and I -- I don't recall the day.  I
17   think it was either Tuesday or Wednesday maybe.  I don't
18   know.  I'm sorry.  I don't recall which day it was.
19   Q.   And was there a check for your appearance
20   here today attached to the subpoena?
21   A.   Yes.
22   Q.   Did you read through the subpoena?
23   A.   Yes.
24   Q.   We'll get into the substance of it here in a
25   few minutes.

5 (Pages 14 to 17)

Pamela J. Schreiner                          December 3, 2007

Page 18

1       This morning what time did you meet with
2   Ms. Johnson?
3       A.   I arrived here 9:00, between 9:15 and 9:30
4   sometime.
5       Q.   Okay.  My question was what time did you meet
6   with Ms. Johnson?
7       A.   When I arrived here.
8       Q.   And what has been discussed between yourself
9   and Ms. Johnson so far this morning prior to this point?
10      A.   Nothing.  We were really just talking about
11  animals and just things of a personal nature.  It was
12  nothing about the case.  There was nothing about the
13  deposition.  It was strictly about personal things,
14  dogs, cats, horses.
15      Q.   So while Ms. Johnson was either discussing
16  with you or present you discussed absolutely nothing
17  substantive or substantial about this case, is that
18  correct?
19      A.   That is correct.
20      Q.   I'm showing you what's been marked as Exhibit
21  1, which is -- I'm sure you'll recognize it as a copy of
22  your affidavit in this case.  Do you recognize the
23  document?
24      A.   Yes, sir.
25      Q.   Is that in fact the copy of your affidavit

Page 19

1   that's been provided in this case?
2       A.   I'm sorry.  Could you repeat the question?  I
3   was coughing.
4       Q.   Is that in fact a copy of your affidavit that
5   you did provide in this case?
6       A.   Yes, sir.
7       Q.   Is it a true and accurate copy?
8       A.   Yes.
9       Q.   And looking at the last page, which is page 5
10  of 5, is that your signature?
11      A.   Yes.
12      Q.   And did you sign that in front of a notary?
13      A.   Yes.
14      Q.   Under penalties of perjury?
15      A.   Yes.
16      Q.   Okay.  Go back to page 1.
17      A.   Okay.
18           MR. REDHAIR:  And just for the record she
19  doesn't have the original, right, she has a copy of
20  it --
21           MR. BRAVE:  Correct.
22           MR. REDHAIR:  -- in front of her.
23           MR. BRAVE:  Yes.
24      Q.   Just go paragraph by paragraph.  Paragraph 1,
25  is there anything in that paragraph that is incorrect,

Page 20

1   wrong or exaggerated in any way?
2       A.   No.
3       Q.   Paragraph 2, is there anything in that
4   paragraph that is incorrect, wrong or exaggerated in any
5   way?
6       A.   No.
7       Q.   You reported directly to Tom Smith?
8       A.   I worked with Tom Smith.  I didn't report
9   necessarily to him.  I worked with him on things.
10      Q.   Okay.  Would you please --
11      A.   I did --
12      Q.   I'm sorry.  I didn't mean to interrupt.
13      A.   I did actually work on assignments or tasks
14  when he, you know, he would give me tasks and
15  assignments, so I felt as though being in the position I
16  was in that I actually did report to him as well since
17  he was an officer of the company.
18      Q.   Okay.  You just -- as I understand it, and I
19  might have to have it read back, you first said you did
20  not report to him, then at the end you said you did
21  report to him.
22      A.   I did -- I'm sorry.
23      Q.   Is there any document, either your --
24  anything in your employment or anything in your job
25  offer, et cetera that said you report to Tom Smith?

Page 21

1           MR. REDHAIR:  Object to form.
2           THE WITNESS:  Not -- not in my job -- not in
3   the letter that they had given to me, no.  But it did
4   actually say in my -- my letter that, you know, I would
5   be responsible for other tasks assigned to me or that it
6   would be, you know, just a normal standard everyday type
7   employment letter that, you know, you would report to or
8   as assigned, you know, tasks that were assigned to you
9   that you would be responsible for them.
10  BY MR. BRAVE:
11      Q.   Do you know of any Taser document that states
12  that you reported to Tom Smith?
13      A.   Not to my knowledge, no.
14      Q.   Paragraph 3.  It's listed at the top as page
15  3 of 5.  It's actually page two of the affidavit.  In
16  paragraph 3 is there anything that's incorrect, a
17  falsehood or an exaggeration?
18      A.   No.
19      Q.   Paragraph 4, is there anything in that
20  paragraph that is a falsehood, an exaggeration or a
21  misstatement?
22      A.   No.
23      Q.   Paragraph 5, the first sentence only, is
24  there anything there that is an exaggeration, a
25  falsehood or a misstatement?

Pamela J. Schreiner                                December 3, 2007

Page 22

1      A.    No.
2            MS. JOHNSON:  Object to the form.
3            MR. BRAVE:  To what aspect of the form?
4            MS. JOHNSON:  The word "exaggeration" is
5    vague.
6    BY MR. BRAVE:
7      Q.    What is your definition of the word
8    "exaggeration"?
9            MS. JOHNSON:  Asked and answered.
10           THE WITNESS:  As I stated earlier, to me it's
11   not the complete truth.
12   BY MR. BRAVE:
13     Q.    Okay.  Again let's go with this part.  "While
14   creating the spreadsheet I became aware that there were
15   hundreds, if not thousands."
16           What would be the upper end of the number
17   that you would speculate on that number, hundreds if not
18   thousands?
19           MR. REDHAIR:  Object to form.
20   BY MR. BRAVE:
21     Q.    You can answer.
22     A.    I would -- I would say it would be -- there
23   were several.  You know, I couldn't give you a number.
24   There were --
25     Q.    Sorry.

Page 23

1      A.    I honestly could not tell you.  I know that
2    there were -- there were probably close to, you know, a
3    thousand.  I mean, there had to have been.  There were
4    several.  But I -- I'm not -- I'm not here to analyze.
5    I wasn't here to -- I wasn't there to actually analyze.
6    I just know what I saw.
7      Q.    Okay.  So, just to be clear, I said the word
8    "thousands."  You said there were several.  So you're
9    saying there were several thousand?
10     A.    No.  Several hundred, if not a thousand.
11     Q.    If not a thousand?
12     A.    Thousands, uh-huh.
13     Q.    Okay.  A thousand or thousands?
14     A.    Thousands.  It's -- to me, it was -- there
15   were -- there were several hundred, if not a thousand.
16     Q.    What would be the lower end on that several
17   hundred?
18     A.    I -- I don't know.  I mean, I would say maybe
19   500.
20     Q.    Could there have been less than 500?
21     A.    There could be.
22     Q.    Could there have been less than 400?
23     A.    It could be.
24     Q.    Could there have been less than 300?
25     A.    It could be.

Page 24

1      Q.    Could there have been less than 200?
2      A.    It could be.
3      Q.    Could there have been less than 100?
4      A.    Possibly.
5      Q.    Could there have been less than 50?
6      A.    I don't know.  I mean, it could be.  I don't
7    know.
8      Q.    So when you make this statement "there were
9    hundreds, if not thousands" you really don't know how
10   many there were, do you?
11           MR. REDHAIR:  Object to form.
12           MR. BRAVE:  What aspect of it?
13           MR. REDHAIR:  The foundation.  I don't think
14   you've established her -- exactly what she's done and
15   what she's seen and -- at least in this deposition as
16   far as the accident reports and the information that
17   she's looked at and reviewed in preparation for what she
18   was asked to do.
19   BY MR. BRAVE:
20     Q.    You can answer the question.
21     A.    I'm -- I know that with all the information
22   that I saw that there was probably more than 50.  There
23   was probably more than 100.  That there were -- it
24   appeared to be hundreds.
25     Q.    But you don't know?

Page 25

1      A.    I don't know, that is correct.
2      Q.    Could there have been less than 40?
3      A.    Again I don't know.  There could have been.
4      Q.    Could there have been less than 30?
5      A.    Possibly, but I don't believe so.
6      Q.    Could there have been less than 20?
7      A.    Possibly.
8      Q.    Could there have been less than 10?
9      A.    Possibly.
10     Q.    Could there have been anywhere between zero
11   and 10?
12     A.    Possibly, but highly unlikely.
13     Q.    Okay.  But the point is you really don't
14   know, do you?
15     A.    No, I really don't know.
16     Q.    Would you please explain to me as I read this
17   first sentence, "While creating the spreadsheet I became
18   aware that there were hundreds, if not thousands, of
19   injuries noted on the volunteer exposure reports," since
20   this is under oath --
21     A.    Uh-huh.
22     Q.    -- please explain how that's not an
23   exaggeration if you really don't know how many there
24   were including less than 10?
25           MR. REDHAIR:  Object to form.

7 (Pages 22 to 25)

Pamela J. Schreiner                           December 3, 2007

Page 26

1        THE WITNESS:  Well, first of all, because
2    when I was going through all the reports it seems as
3    though, you know, as you're reading the reports and you
4    would see, you know, a burn or, you know, a muscle pull
5    or someone injured their back or, you know, a number of
6    different types of things, to me, even the most minor
7    even if it was a small, you know, a burn or something,
8    to me that was an injury.  That I considered that to be
9    an injury.  And most of which, you know, it was there.
10   There -- some had -- some had names on them, some did
11   not.  Some had the agency's name, some did not.
12       And I kept asking the question, you know,
13   does this need to be on there because I didn't see how
14   to, you know, how do we know what to put on there, what
15   not to put on there, things like that.  So I saw it,
16   physically saw it, but that doesn't necessarily mean
17   that it was actually ever on the -- the spreadsheet.
18       Q.   Okay.  This sentence doesn't say anything
19   about the spreadsheet.
20       A.   I know.
21       Q.   It says "volunteer exposure reports."
22       A.   But that's what I'm saying.  I do know that
23   there were, you know, several stacks of these papers
24   everywhere and as you go through them you would see --
25   it would mark "yes, injury," but maybe the injury wasn't

Page 27

1    there.  Or it would say "yes," you know, "slight burn on
2    finger" or "yes, muscle spasms in back" or, you know, so
3    on and so forth.  So there were several of those that
4    would say -- it would be marked, you know, "yes," there
5    was an injury.  Sometimes it would say what the injury
6    was, sometimes it would not say what the injury was.
7        Q.   But as you sit --
8        A.   But I didn't sit there and physically count
9    them, no.  I didn't physically, you know, put them in a
10   pile and start saying, okay, here's one, two, three,
11   four.  I didn't do that, no.
12       Q.   But as you sit here today you have no idea
13   how many there were including less than 10, correct,
14   because that's what you just testified to a moment ago?
15       MR. REDHAIR:  Object to the form.
16       THE WITNESS:  Well, that is -- that is
17   correct but I know that there were more than 10.  I
18   mean, I -- but I --
19   BY MR. BRAVE:
20       Q.   Eleven?
21       A.   Well, it could be 11.  It could be a 111.  It
22   could have been, you know, 1,500.  You know, without
23   seeing all the stacks in front of me again and
24   physically going through and counting them I cannot give
25   you a number.

Page 28

1        Q.   And you also --
2        MR. REDHAIR:  Sorry to interrupt.  You guys
3    are kind of talking over each other.  So --
4        THE WITNESS:  I'm sorry.
5        MR. REDHAIR:  No.  It happens all the time.
6    So just wait 'til he finishes his question.
7        THE WITNESS:  Okay.
8        MR. REDHAIR:  And then he'll wait --
9        THE WITNESS:  Okay.
10       MR. REDHAIR:  -- 'til you finish your answer.
11       THE WITNESS:  Okay.
12   BY MR. BRAVE:
13       Q.   And you also just stated the stacks were
14   everywhere.  Is that an exaggeration in your opinion?
15       A.   No.
16       Q.   Were they in Rick Smith's cubicle?
17       A.   They were in Rick Smith's cubicle and just,
18   you know, not -- not in huge stacks but he did have
19   some.
20       Q.   Were they in Ray Rivera's cubicle?
21       A.   He had -- he had some binders back by him but
22   they weren't actually on his desk.
23       Q.   Well, you said they were everywhere so I'm
24   trying to figure out if "everywhere" means just what it
25   says, the word "everywhere," and I personally just find

Page 29

1    it hard to believe that there were stacks of these
2    everywhere throughout the Taser company.
3        MR. REDHAIR:  Object to form.
4        MS. JOHNSON:  Object to the form.
5    BY MR. BRAVE:
6        Q.   So, therefore, were they everywhere?
7        MR. REDHAIR:  Same objection.
8        THE WITNESS:  Let me clarify that then.  They
9    may not have been everywhere.  They were in the
10   warehouse in boxes, they were in file cabinets, shoved
11   in file cabinets, back by the training area, they were
12   by Jamie Hill.  They were, you know, at Doug Klint's
13   office.
14       So, to me, everywhere is a broad spectrum I
15   guess and I'm sorry that I did not mean it to be
16   everywhere, but they were throughout the company in
17   different spots.
18   BY MR. BRAVE:
19       Q.   So in your opinion was the use of your word
20   "everywhere" an exaggeration?
21       A.   The word "everywhere" was a misstatement.
22       Q.   Which was larger than where they actually
23   were, so, therefore, it's an exaggeration, wasn't it?
24       MS. JOHNSON:  Objection.
25       MR. REDHAIR:  Object to form.

8 (Pages 26 to 29)

Coash & Coash                    602-258-1440

Pamela J. Schreiner                          December 3, 2007

Page 30

1  BY MR. BRAVE:
2     Q.    You can answer.
3     A.    I misstated a word.
4     Q.    Next sentence.  "When Doug Klint and Rick
5  Smith learned of the volume of injuries they became
6  visibly concerned and upset."  Is that a correct and
7  accurate statement that is not exaggerated?
8     A.    Yes, that is correct.
9     Q.    The next sentence states:  "At that time, the
10  SEC and the Department of Justice were investigating the
11  company concerning the" Taser device -- "the safety of
12  the device."  So, therefore, the time when Doug Klint
13  and Rick Smith became visibly upset was the time of the
14  SEC investigation, correct?
15           MS. JOHNSON:  Object to the form.
16           THE WITNESS:  Yes.
17  BY MR. BRAVE:
18     Q.    The next statement says -- the next sentence
19  states, "Mr. Klint and Mr. Smith told me to remove the
20  data from the spreadsheets for most of the injuries
21  which I had entered."
22           So, therefore, that was at the same time as
23  the SEC investigation, correct?
24           MR. REDHAIR:  Object to form.
25           THE WITNESS:  That is correct.

Page 31

1  BY MR. BRAVE:
2     Q.    How did Rick Smith and Doug Klint become
3  aware of the injuries if you do not know of the number
4  of injuries within pretty much any range?
5           MR. REDHAIR:  Object to form.
6           THE WITNESS:  Because as I was working on the
7  spreadsheet I would actually involve them in my work.  I
8  would ask them questions.  I would ask them, you know,
9  what they felt.  I mean, if it didn't say something, it
10  just said "an injury," how did they actually want me to
11  put that on the spreadsheet.
12  BY MR. BRAVE:
13     Q.    "Mr. Klint and Mr. Smith told me to remove
14  the data from the spreadsheets for most of the injuries
15  which I had entered."  Did you remove those entries?
16     A.    Yes, I did.
17     Q.    How many did you remove?
18     A.    There were probably, I would say on a
19  minimum, 50.
20     Q.    And a maximum?
21     A.    A maximum I would say maybe 75 to 100.
22     Q.    Could it have been 40?
23     A.    It --
24           MR. REDHAIR:  Object to form.
25           MR. BRAVE:  What's wrong with my question?

Page 32

1           MR. REDHAIR:  Speculation.  She gave you her
2  best estimate.
3           MR. BRAVE:  Her entire statement is
4  speculation so, therefore, I'm entitled to ask the
5  question.
6           MS. JOHNSON:  Object to the form.
7  Argumentative question.
8  BY MR. BRAVE:
9     Q.    Well, could it have been less than 40 data
10  entries that you removed from the spreadsheet?
11           MR. REDHAIR:  Object to form.
12  BY MR. BRAVE:
13     Q.    You can answer.
14     A.    That I removed from the spreadsheet?  Highly
15  unlikely.
16     Q.    Could it have been less than 30?
17     A.    It is highly unlikely.
18     Q.    Could it have been less than 20?
19     A.    Highly unlikely.
20     Q.    But could it have been less than 20?
21           MR. REDHAIR:  Object to form.
22           THE WITNESS:  It could have been it was
23  highly unlikely.
24  BY MR. BRAVE:
25     Q.    Could it have been less than 10?

Page 33

1           MR. REDHAIR:  Object to form.
2           THE WITNESS:  Possibly but highly unlikely.
3  BY MR. BRAVE:
4     Q.    Could it have been anywhere from 1 to 10?
5           MR. REDHAIR:  Continuing objection to this
6  line of questioning.  Go ahead and answer.
7           MR. BRAVE:  Accept the objection.
8           THE WITNESS:  It could have been but it was
9  highly unlikely.
10  BY MR. BRAVE:
11     Q.    But it could have been, so it could have been
12  as few as 1, correct?
13     A.    It could have been but highly unlikely.
14     Q.    The next sentence states:  "They then
15  shredded most of the reports showing injuries."
16           First who was "they" just to be clear?
17     A.    Rick Smith and Doug Klint.
18     Q.    And this was at the time or after the SEC
19  investigation, correct?
20     A.    It was during that time, yes.
21     Q.    And tell me how you know they shredded most
22  of the reports showing injuries?
23     A.    Because I physically -- I witnessed them
24  carrying the documents to the gray dumpsters for
25  shredding purposes.

Coash & Coash                          602-258-1440

Pamela J. Schreiner                                December 3, 2007

Page 34

1    Q.    Would you please describe your definition of
2    a dumpster?
3    A.    It was a canister about maybe three, three to
4    four feet tall, almost like the big recycling dumpsters
5    that you would have at your home with a slit in the top
6    and a lock.  It had two wheels on the back so you could
7    wheel it outside to the -- the truck that would come to
8    pick them up.
9    Q.    So was it more of a large trash container --
10   A.    Yes.
11   Q.    -- than a dumpster?
12   A.    Yes.  Definitely more of a type of a very
13   large trash receptacle.
14   Q.    And when you said they carried them to that,
15   is "they" Rick Smith and Doug Klint?
16   A.    Yes, sir.
17   Q.    Can you narrow down any more the exact time
18   or date that they did this?
19   A.    The date, I can't recall the date, but it was
20   in the evening, late afternoon, early evening.  We were
21   working there on compiling documents to send to the SEC
22   and the DOJ.
23   Q.    And how many of these documents do you allege
24   that they took to the shred bin?
25        MR. REDHAIR:  Object to form.

Page 35

1        MR. BRAVE:  What aspect of it?
2        MR. REDHAIR:  I don't think she's alleging
3    anything.  You're asking her questions of what she
4    observed, so --
5    BY MR. BRAVE:
6    Q.    How many documents did you see Rick Smith
7    and/or Doug Klint of the Volunteer Exposure Reports that
8    you're saying they shredded, how many of those Volunteer
9    Exposure Reports showing injuries did you see them take?
10   A.    I don't know an exact number of how many.
11   There was a stack on my desk that I would say was
12   maybe -- maybe 6 inches thick.  It was, you know, a
13   stack like this that was sitting on my desk.
14   Q.    Had that stack been processed by you?
15        MS. JOHNSON:  Object to the form.
16        THE WITNESS:  I don't recall if that stack
17   had actually been processed yet at that time.
18   BY MR. BRAVE:
19   Q.    Do you recall --
20   A.    There were --
21   Q.    I'm sorry.
22   A.    Oh, I'm sorry.  There were several stacks
23   that we were going through because of going to Kinko's
24   or Alphagraphics or somewhere to get the documents put
25   on CD and also mass produced so that way we had a copy

Page 36

1    for the -- the -- the binders that we were putting
2    together.
3    Q.    Those documents that were on the desk that
4    you said were approximately 6 inches, had those been
5    processed in any way by you?  Had they been brought in,
6    had they been numbered, anything like that?
7    A.    I don't recall that particular stack.  I
8    don't recall if they had numbers on them or not.  I
9    don't recall if they had actually physically been looked
10   at or what.
11        There were boxes that I had in that were
12   ready to go to Alphagraphics that I had already boxed up
13   that were ready to go.  So that particular stack I
14   honestly cannot tell you.  I don't recall.
15   Q.    How did those particular documents that we're
16   discussing right now get removed from the quantities of
17   Volunteer Exposure Reports?
18   A.    Because they were -- we were -- they were
19   going through things to try and figure out what would be
20   sent to the SEC and what would be sent to the DOJ and
21   they were physically going through all the documents to
22   see what they wanted to go and what they didn't want to
23   go.
24   Q.    And other than that stack, did they send all
25   of the other -- copies of all of the other Volunteer

Page 37

1    Exposure Reports to the SEC and the DOJ?
2    A.    To my knowledge, yes.
3    Q.    Approximately how many documents would that
4    have been?
5    A.    There were binders full.  There were -- to
6    the best of my recollection I think there were eight
7    binders.  They were the big like 4 to 5 inch binders,
8    but I don't recall how many.  I do recall that there
9    were -- there were several binders that they had sent.
10   Q.    So, just to be clear, to your knowledge that
11   6 inch stack that you've already mentioned were the only
12   documents as far as you know that you're stating were
13   not sent to the DOJ or the SEC, correct?
14   A.    As far as the injury reports to my knowledge,
15   yes.
16   Q.    Are there any other documents that you say
17   were not forwarded to the SEC or DOJ?
18   A.    There were some studies that were not sent.
19   Again I don't know the names of the studies, but there
20   were some studies that were also pulled out of the --
21   the gathering, you know, the information that they were
22   we were gathering that they had pulled out as well.
23   Q.    How many studies are you stating that they
24   pulled out?
25   A.    There were two or three.  Again I don't

Coash & Coash                                602-258-1440

Pamela J. Schreiner                               December 3, 2007

Page 38

1   recall the names of the studies.  I just -- I do recall
2   that there were some studies that they didn't -- by
3   maybe their counsel or something, they just did not feel
4   that were worthy to send and I don't know why.  I don't
5   know all the facts behind that.
6       Q.   Anything else that you're stating that was
7   not sent to the SEC or the DOJ other than what you just
8   discussed?
9       A.   There were -- I'm trying to think of
10  everything that we were compiling.  There was the -- the
11  Volunteer Exposure Forms.  There were --
12      Q.   Okay.  I don't mean to interrupt you, but all
13  I'm asking for is anything else that you specifically
14  know other than what you've already discussed was not
15  sent to the SEC or the DOJ.  I'm not asking what was
16  sent.
17      A.   Oh.  No, I know.  I'm trying in my mind to
18  remember everything that we were going through and of
19  all the things, all the documents that we were looking
20  at, and I know that the forms, the use forms were some
21  of the things that they didn't send all of those.  And I
22  know that there were some studies and I don't recall
23  some of the other things, but I do recall that there
24  were some other documents that they were going through.
25      Q.   On the use forms, what do you mean by -- what

Page 39

1   is your definition of the use forms?
2       A.   Well, there were different types.  There was
3   the volunteer use form and then there was the form that
4   the officers filled out when using it on a suspect.
5       Q.   And --
6       A.   So there were two different types.
7       Q.   And which ones specifically or both are you
8   saying that there were certain ones that were not sent
9   to the SEC or the DOJ, just the Volunteer Exposure Forms
10  or the Field Use Reports or both?
11      A.   It was both.  There were both.
12      Q.   And how many of the Field Use Reports are you
13  saying were not sent to the SEC or the DOJ?
14      A.   There weren't as many of the Field Use
15  Reports as there were the Volunteer Exposure Reports
16  only because we didn't get many of the Field Use Reports
17  in.
18          I don't know if it was agency specific or
19  not.  I don't recall that.  But we didn't get as many of
20  those in.  So that I just -- I can't really tell you one
21  way or the other which was -- how many of which -- of
22  which.  I can't tell you that.  I don't know.
23      Q.   So on the Field Use Reports that you're
24  saying were not sent to the SEC or the DOJ, could it
25  have been less than 10?

Page 40

1       A.   Possibly.  I don't know.
2       Q.   Could it have been less than 5?
3       A.   It could have been possibly.  I don't know.
4       Q.   Could it have been between 1 and 5?
5       A.   Possibly.  I don't know.
6       Q.   You stated that it was approximately a 6 inch
7   stack that Rick Smith and Doug Klint shredded at the
8   time of the SEC investigation.  How many Volunteer
9   Exposure Reports were in that stack that they allegedly
10  shredded -- rephrase -- that they shredded?
11      A.   I -- I don't know.  However many pieces of
12  paper I, you know, a stack this tall.  It could have
13  been a thousand, it could have been 1,500.  I don't -- I
14  don't know.
15      Q.   Could it have been less than 100?
16      A.   It could have been.
17      Q.   Could it have been less than 50?
18          MR. REDHAIR:  Object to form.
19          THE WITNESS:  It could have been.
20  BY MR. BRAVE:
21      Q.   Could it have been less than 40?
22          MR. REDHAIR:  Same objection.
23          THE WITNESS:  It could have been.
24  BY MR. BRAVE:
25      Q.   Could it have been less than 30?

Page 41

1           MR. REDHAIR:  Same objection.
2           THE WITNESS:  Yes.
3   BY MR. BRAVE:
4       Q.   Could it have been less than 20?
5           MR. REDHAIR:  Same objection.
6           THE WITNESS:  Yes.
7   BY MR. BRAVE:
8       Q.   Could it have been less than 10?
9           MR. REDHAIR:  Form.
10          THE WITNESS:  Yes.
11  BY MR. BRAVE:
12      Q.   Could it have been anywhere from 1 to 10?
13          MR. REDHAIR:  Same objection.
14          THE WITNESS:  Yes.
15  BY MR. BRAVE:
16      Q.   Reading that entire sentence it states:
17  "They then shredded most of the reports showing
18  injuries, bringing in dumpsters to dispose of the
19  paper."
20          First we've already, I think, established
21  that dumpsters were the shred bins you discussed,
22  correct?
23      A.   Yes.
24      Q.   Okay.  This leads one to believe that they
25  brought in those shred bins to dispose of this paper.

Coash & Coash                         602-258-1440

Pamela J. Schreiner                          December 3, 2007

Page 42

1  Is that why they brought them in?
2        MR. REDHAIR: Object to the form.
3        MS. JOHNSON: Objection.
4        THE WITNESS: I don't believe that that was
5  the specific reason for the dumpsters being -- being
6  brought in, no.
7  BY MR. BRAVE:
8        Q.   Why were the dumpsters brought in?
9        A.   I think that Rick was nervous because of
10  things that were getting out to maybe the media or
11  things that were being -- you know, the people were able
12  to get to documents that they shouldn't be getting to
13  through maybe dumpster diving or through, you know, just
14  being in the trash, just, you know, in a trash can.
15  That was my -- my understanding of why the dumpsters
16  were actually brought in.
17        Q.   So Rick Smith had a legitimate reason for
18  bringing in the shred bins because of his concerns of
19  dumpsters divers and people taking documents out of the
20  trash, correct?
21        MS. JOHNSON: Object to form.
22        MR. REDHAIR: Object to form.
23        THE WITNESS: I would believe so, yes.
24  BY MR. BRAVE:
25        Q.   Okay. So this sentence says, "They then

Page 43

1  shredded most of the reports showing injuries, bringing
2  in dumpsters to dispose of the paper." Please explain
3  why that's not misleading?
4        MR. REDHAIR: Object to the form. Go ahead.
5        THE WITNESS: Because at the time when we
6  were doing the SEC investigation and the DOJ, it was at
7  that same exact time that these dumpsters were being
8  brought in, so it was kind of hand in hand. They were
9  both -- the dumpsters were there at the same time that
10  we were actually compiling the -- all the information
11  for the investigations.
12        Or -- and I want to clarify something. The
13  SEC investigation and the DOJ, I'm not sure if that was
14  an investigation or an informal investigation. I don't
15  remember what the DOJ was actually looking for.
16  BY MR. BRAVE:
17        Q.   In reading this sentence it says, "They then
18  shredded most of the reports showing injuries, bringing
19  in dumpsters to dispose of the paper."
20        Does that not state that they brought the
21  dumpsters to dispose of the paper that they shredded
22  regarding these Volunteer Exposure Reports? Isn't that
23  what this says?
24        MS. JOHNSON: Object.
25        MR. REDHAIR: Object to form.

Page 44

1  BY MR. BRAVE:
2        Q.   You can answer.
3        A.   It does say that, yes. And --
4        Q.   I'm sorry.
5        A.   -- and the dumpsters were brought in at that
6  same time and at that same time that the same dumpsters
7  were there we were going through the information and
8  conveniently enough the documents were getting put in
9  the dumpsters.
10        Q.   And the only documents that you are alleging
11  were put in the dumpsters was this stack from your desk
12  of Volunteer Exposure Reports, is that correct?
13        MR. REDHAIR: Object to form. Go ahead.
14        THE WITNESS: And it was that and also there
15  were some other studies or some forms of studies that
16  were also in there.
17  BY MR. BRAVE:
18        Q.   And you've already stated that was two or
19  three studies and you do not know what they were or why
20  it was done, correct?
21        A.   That is correct.
22        Q.   The next sentence: "Many of the destroyed
23  documents contained reports of injuries to the back."
24        A.   Uh-huh.
25        Q.   Question one: What is your definition of the

Page 45

1  word "many"?
2        A.   Many could be 100 to 500. It could be 500 to
3  1,000. To me, many is more than even 2.
4        Q.   Could it be less than -- could "many of the
5  destroyed documents contained reports of injuries to the
6  back," could there have been less than 100 Volunteer
7  Exposure Reports that reported injuries to the back?
8        MR. REDHAIR: Object to form.
9        THE WITNESS: Yes.
10  BY MR. BRAVE:
11        Q.   Could there have been less than 50?
12        MR. REDHAIR: Continuing just so I don't have
13  to interrupt.
14        MR. BRAVE: I agree. Accepted.
15        MR. REDHAIR: Continuing objection. Okay.
16  BY MR. BRAVE:
17        Q.   Could there have been less than 50 Volunteer
18  Exposure Reports --
19        A.   Yes.
20        Q.   -- that contained injuries to the back?
21        A.   Yes.
22        Q.   Could there have been less than 40?
23        A.   Yes.
24        Q.   Could there have been less than 20?
25        A.   Yes.

Coash & Coash                          602-258-1440

Pamela J. Schreiner                    December 3, 2007

Page 46

1    Q.    Could there have been less than 10?
2    A.    Yes.
3    Q.    Could there be between 1 and 10?
4    A.    I would say possibly, but to me "many" means
5    multiple, so it would be more than at least 2.
6    Q.    More than 2.
7          Could it have been 2?
8    A.    It could have been 2.
9    Q.    Okay.  So, "many," as I understand it now, is
10   anywhere from 2 to thousands, correct?
11   A.    Correct.
12   Q.    Okay.  Please identify at least the 2 that
13   you're aware of that you took into consideration in
14   having this sentence written?
15   A.    Do you mean who they were or --
16   Q.    Anything you can identify about those 2
17   Volunteer Exposure Reports --
18         MS. JOHNSON:  Object to form.
19   BY MR. BRAVE:
20   Q.    -- that contained an injury to the back?
21         MS. JOHNSON:  Object to the form.
22         MR. REDHAIR:  Join.
23         THE WITNESS:  Well, I don't recall the
24   physical documents, but I know that there, you know, the
25   way they were marked and most of the injuries were to

Page 47

1    the back.  They weren't actually -- there were more
2    injuries to backs than there were the burns, and when
3    it's an injury to a back what I'm also referring to are
4    muscle spasms, back spasms, things of that nature.
5    BY MR. BRAVE:
6    Q.    So you -- of the 2 to thousands there's
7    nothing specific that you can identify for me regarding
8    those Volunteer Exposure Reports that contained reports
9    of injuries to the back, correct?
10   A.    Correct.
11   Q.    Do you know of any Volunteer Exposure Report
12   that you ever handled that stated anything regarding a
13   fracture to the back, a compression fracture to the back
14   or anything any kind of break to the back, et cetera?
15         MS. JOHNSON:  Object to form.
16         THE WITNESS:  I do recall seeing them.
17   However, I don't recall the agencies or, you know, what
18   part of the country they were from or anything like that
19   but I do recall seeing some, yes.
20   BY MR. BRAVE:
21   Q.    Okay.  And I think we've agreed now that that
22   "some" could be as few as 2 or as many as 1,000?
23   A.    Yes.
24   Q.    Or I'll rephrase.  Thousands, correct?
25   A.    Yes.

Page 48

1    Q.    But there's absolutely nothing you have to
2    more closely identify any of those reported back
3    injuries, correct?
4          MR. REDHAIR:  Object to the form.
5          THE WITNESS:  That is correct.
6    BY MR. BRAVE:
7    Q.    Paragraph 6, is there anything in that
8    paragraph that is inaccurate, untruthful, a falsehood,
9    an exaggeration?
10   A.    That is -- that is correct.  That's true.
11   Q.    There's nothing there that is inaccurate, is
12   that what you're telling me?
13   A.    That is very true, yes.  There is nothing
14   inaccurate about that statement.
15   Q.    In the sentence that begins with, "In
16   December of 2004, I was taken off Taser International's
17   premises to another location and confronted by two
18   Chandler, Arizona police officers who accused me of
19   leaking the investigation to the press."  Do you see
20   that paragraph?
21   A.    Yes.
22   Q.    Or I'm sorry, that sentence?
23   A.    That sentence, yes.
24   Q.    What were the dates in December of 2004?
25   A.    I don't recall the dates.  It was late in the

Page 49

1    year.  It could have been actually early January,
2    because I do know that I met with them also in January
3    prior to my leaving.
4    Q.    So the --
5    A.    I don't recall the dates.  I'm sorry.
6    Q.    So the date of December of 2004 could be
7    inaccurate?
8    A.    It could be.
9    Q.    Anything else in this paragraph that is
10   inaccurate, misleading or an exaggeration?
11   A.    No.
12         MR. REDHAIR:  Object to form.
13         THE WITNESS:  Without actually looking at
14   my -- my, you know, my letters that were given to me
15   from Taser, I -- no.
16   BY MR. BRAVE:
17   Q.    Could the dates that you met with the
18   Chandler -- rephrase -- the Taser investigators who did
19   happen to be Chandler, Arizona police officers, could
20   they have been January 14, 2005, January 24, 2005 and
21   January 27, 2005?
22   A.    Yes, sir, they could have been.
23   Q.    Do you have any reason to believe those are
24   not the correct dates?
25   A.    No.

Coash & Coash                          602-258-1440

Pamela J. Schreiner                        December 3, 2007

Page 50

1    Q.   Paragraph 7.  Is there anything in paragraph
2  7 that is an exaggeration, an embellishment or a
3  misstatement or a falsehood?
4         MS. JOHNSON:  Object to the form.
5         MR. REDHAIR:  Join.
6         THE WITNESS:  No.
7  BY MR. BRAVE:
8    Q.   Do you recall what date you left -- first
9  sentence, "Since leaving Taser International."  What is
10  the date that you're referring to about leaving Taser
11  International?
12    A.   My last hire -- you mean the date I was hired
13  would have been at the end of January.  I believe it was
14  the 27th or the 28th --
15    Q.   So --
16    A.   -- of January.
17    Q.   I'm sorry.
18         MR. REDHAIR:  Just to clarify, you said
19  "hired."
20         THE WITNESS:  Oh.  I meant fired.
21  BY MR. BRAVE:
22    Q.   So in the first sentence, "Since leaving
23  Taser International," the beginning date for that
24  statement would be January 27, 2005, correct?
25    A.   January, 2005.  Yes, that is correct.

Page 51

1    Q.   And if I assert to you at that it was
2  January 27, 2005 would you have any basis to disagree
3  with that?
4    A.   No, I would not.  It was some time at the end
5  of January.
6    Q.   The next sentence:  "I have been verbally
7  threatened by people hired by Taser to harass and
8  intimidate me."  How many times were you verbally
9  threatened by people hired by Taser?
10    A.   There were multiple occasions.
11    Q.   How many is "multiple"?
12    A.   Well, on occasions there were several.
13    Q.   How many are several?
14    A.   I would say probably 10 at least.
15    Q.   Could it have been 5?
16    A.   No, no, it could not have been 5.
17    Q.   Could it have been 9?
18    A.   No.
19    Q.   So it was at least 10?
20    A.   At least 10.
21    Q.   Could it have been 15?
22    A.   It could have been.
23    Q.   Could it have been 20?
24    A.   It could have been.
25    Q.   Could it have been 25?

Page 52

1    A.   Probably not.
2    Q.   Okay.  So it could have been as many as 20
3  but not as many as 25.
4         Could it have been 23?
5    A.   It could have been.
6    Q.   Could it have been 24?
7         MR. REDHAIR:  Can I have a continuing
8  objection --
9         MR. BRAVE:  Yes.
10         MR. REDHAIR:  -- to the questioning?
11  BY MR. BRAVE:
12    Q.   Could it have been 24?
13    A.   It could have been, yes.
14    Q.   Where did those verbal harassments, verbal
15  threatenings take place?  I'm sorry.  I'll withdraw the
16  question.
17         Within what time period -- we have the one
18  date, January 27, 2005.  When was the last time you were
19  verbally threatened by people hired by Taser to harass
20  and intimidate you?
21    A.   There was -- the one time that I can
22  actually --
23    Q.   I don't mean to interrupt you.  My question
24  was when was the last time?
25    A.   I don't know the date?  I don't recall.  It

Page 53

1  was after being deposed from the Sam Powers case.
2    Q.   Was it in 2000 -- was it in calendar year
3  2007 that you were last verbally threatened by people
4  from Taser?
5    A.   In 2007?
6    Q.   Yes.
7    A.   This year?
8    Q.   Yes.
9    A.   No, but --
10    Q.   Was it in 2006 the last time that you were
11  verbally harassed -- rephrase -- verbally threatened by
12  people hired by Taser to harass and intimidate you?
13    A.   There were some occasions in 2006, yes.
14    Q.   When the last time in 2006 that you were
15  verbally threatened by people hired by Taser to
16  intimidate you?
17    A.   There was a point where I was actually at
18  work in some -- it was in South Phoenix and I had --
19  there was a vehicle sitting outside in the parking lot
20  and they actually followed me down the I-10.  Every time
21  I changed lane, they would change lane.  And they were
22  two goons.  I couldn't tell you who they were.  And they
23  followed me.  They would pull up alongside of me.  They
24  would make comments.  They would try and run me off the
25  road.  They would do everything and anything.  Why, I

14 (Pages 50 to 53)

Pamela J. Schreiner                        December 3, 2007

Page 54

1  don't know.
2         I was sure I had put Taser behind me.  I
3  don't and I didn't want to be bothered.  I didn't want
4  to have anything to do with them.  I was done with them
5  and that's why I wanted to leave them, but they thought
6  obviously that there was something that I knew or
7  something that I was going to do and I wasn't going to
8  do anything.  And there were things that were going on
9  that I was involved with and, you know, I -- you know, I
10 was being investigated by everybody, and so I don't
11 know.
12        MR. REDHAIR:  I think he's trying to get a
13 date.
14        THE WITNESS:  But I don't actually have a
15 date and that's what I'm trying to say.  I don't have
16 the physical dates, you know, in my mind.  I'm trying to
17 put it behind me.  I'm trying to forget it.
18 BY MR. BRAVE:
19    Q.   Can you narrow it down any closer than 2006?
20    A.   No.  There was, you know --
21    Q.   For the last time that you --
22    A.   It would probably be late spring, you know,
23 early summer area.
24    Q.   You said you were being investigated by
25 everybody.  Please name everybody?

Page 55

1    A.   Well, the Chandler police, Chandler
2  detectives, whoever they were.
3         I was also investigated by the FBI.  I had,
4  you know, contact from, you know, the FBI.  And ever
5  since those two organizations it just seems as though I,
6  you know, all these things have been coming out of the
7  woodwork.
8    Q.   Okay.  When you say Chandler police are you
9  referring to the two investigators retained by Taser
10 back in January of '07 --
11   A.   Yes.
12   Q.   -- or are you referring to the Chandler
13 Police Department and other officers under their
14 official capacities?
15   A.   The two detectives.
16   Q.   So you're stating that -- when was the last
17 time you saw either one of them?
18   A.   They actually -- I saw them the last day
19 of -- that I was actually fired from Taser and that was
20 the end of January that I physically saw them.
21   Q.   So you haven't seen either one of them since
22 January 27th of 2005?
23   A.   I've physically seen them then, yes.  That
24 was the last time I've physically seen them.
25   Q.   What evidence -- upon what basis or what

Page 56

1  evidence do you have to state that the two goons, as you
2  stated, who followed you from your place of employment
3  were people hired by Taser?
4         MR. REDHAIR:  Object to form.
5         THE WITNESS:  It was --
6         MR. BRAVE:  What aspect?
7         MR. REDHAIR:  You're asking what evidence she
8  has.  I mean, she's not here to allege or make proving.
9  She's here to answer questions.  So I think it's
10 argumentative and not -- appropriately it would be, you
11 know, "Why do you think these two goons were hired by
12 Taser?"
13        MR. BRAVE:  That wasn't my question.  The
14 statement in paragraph 7 is "I have been verbally
15 threatened by people hired by Taser."  That means that
16 she has to have some kind of proof that those people
17 were hired by Taser.  I have a right to ask that
18 question.
19        MR. REDHAIR:  You have a right to ask it, but
20 I think it's argumentative.  You could say why do you
21 think she blah, blah, blah and I have no objection to
22 that.
23 BY MR. BRAVE:
24   Q.   What proof do you have that the two goons
25 that you say harassed you in the spring to summer 2006

Page 57

1  were people hired by Taser?
2         MR. REDHAIR:  Object to form.
3         THE WITNESS:  Statements that were made to me
4  that, you know, verbal statements that were made to me
5  and in most cases every time it was, you know, "You
6  really don't want to, you know, go up against Taser.
7  You don't want to testify against Taser.  You know, do
8  you really want to do this?  Do you really want to go
9  and do a deposition for Taser?"  And that's what I heard
10 from all of the people that approached me.
11        I'd be coming out of a grocery store.  There
12 would be, you know, I had two guys standing by my truck.
13 I'd come out of a grocery store and this was right
14 before the Powers case.  You know, "You better be
15 careful.  Do you really want to do this?  You know,
16 do you know you're going up against Taser and you really
17 better be careful.  Watch your back."  That's what I
18 would get from the people that were harassing me.
19        And in most cases it was always different
20 people.  It was not the same people.  The two guys that
21 were in the truck that were outside of my work, they
22 were goons.  They literally were these big guys that if
23 they would have ran me off the road they probably would
24 have been -- they probably would have injured me badly,
25 not just from causing an accident but they could have

Pamela J. Schreiner                    December 3, 2007

Page 58

1   caused me bodily harm. And they were screaming things
2   out the window at me about Taser.
3   BY MR. BRAVE:
4       Q.   So just --
5       A.   So --
6       Q.   Sorry.
7       A.   So, in my mind they obviously knew who I was.
8   They knew that I had something to do with Taser. Well,
9   there's only -- to me, there's only one way that they
10  would know that. So that's how I -- I gathered my
11  information.
12      Q.   But as you sit here today you have absolutely
13  no proof, none, physical evidence or any other type that
14  the people who threatened or harassed you were actually
15  hired by Taser, correct?
16          MS. JOHNSON:   Objection.
17          MR. REDHAIR:   Hold on. Object to form.
18  BY MR. BRAVE:
19      Q.   You can answer.
20      A.   I don't have the paperwork or the documents
21  showing that they gave them a check or stock options but
22  they, you know, I -- I am going by what was said to me
23  and the way I was harassed and intimidated.
24      Q.   Okay. But the people were different -- the
25  people who threatened you were different every time --

Page 59

1       A.   Uh-huh.
2       Q.   -- correct?
3       A.   Uh-huh.
4       Q.   And other than their statements you have no
5   basis upon which to say they were hired by Taser,
6   correct?
7           MR. REDHAIR:   Object to form.
8           THE WITNESS:   Correct.
9   BY MR. BRAVE:
10      Q.   Now, in the 2006 incident where were you
11  working at that time? Where is it they started
12  following you from?
13      A.   It was from -- it was in Laveen, Arizona
14  which is south of here.
15      Q.   And what's the name of the organization or
16  entity you were working for?
17      A.   It was -- it was Arnold Machinery.
18      Q.   Did you report that harassment to the police?
19      A.   I actually attempted to call the police from
20  my cellphone and when I was trying to call from my
21  cellphone I don't know if I had bad reception or what
22  but it was not going through. I actually had a
23  radio-type phone from my work and I actually contacted
24  one of the technicians that worked with me.
25      Q.   And who was that?

Page 60

1       A.   His name is Lee Andrew.
2       Q.   Does he still work at that location to your
3   knowledge?
4       A.   He does, yes.
5       Q.   Why didn't you follow it up with filing a
6   statement or report with the police?
7       A.   Because I was in fear of my life because
8   everybody that so far had come to me, they were
9   intimidating me and harassing me and I was afraid for my
10  life as well as my family. I didn't want anything to
11  happen. I didn't know who they were and I didn't know
12  who -- you know, Taser has a lot of influential, you
13  know, they have the cops behind them. They have the law
14  enforcement. They have all kinds of authorities that
15  respect them and I didn't know who these people were. I
16  didn't know who -- who was coming after me. I didn't
17  know who they were and I didn't know what was going to
18  happen.
19      Q.   In what geographical area did this incident
20  occur where the two goons were threatening you?
21      A.   It was 67th Avenue and Southern.
22      Q.   Do you know what city or village that's in?
23      A.   Laveen, Arizona.
24      Q.   So you did not contact the Laveen police?
25      A.   Okay.

Page 61

1           MR. REDHAIR:   Objection to form. Go ahead.
2           THE WITNESS:   I just wanted to make sure you
3   were done. I'm sorry.
4           I tried to call but my cellphone was not
5   working. I could not get out on my actual cellphone.
6   BY MR. BRAVE:
7       Q.   But you did not file follow-up or file a
8   report with the Laveen police, is that correct?
9       A.   No, I did not.
10      Q.   What county is that in?
11      A.   I believe it's Maricopa. I'm not sure. I
12  think it's Maricopa.
13      Q.   Do you file any kind of a complaint or
14  statement or anything else with the Maricopa County
15  Sheriff's Department or any of its subsidiaries?
16      A.   No, I did not.
17      Q.   In the state of Arizona did you file anything
18  with the state police?
19      A.   No, I did not.
20      Q.   Since you were in contact with or had been in
21  contact with the FBI, did you file anything with the
22  Federal Bureau of investigation?
23      A.   Not about -- not at that time, no.
24      Q.   Have you at any time?
25      A.   Not -- not saying that they needed to, you

Coash & Coash                    602-258-1440

Pamela J. Schreiner                     December 3, 2007

Page 62

1    know, press charges or anything like that but what I --
2    what I spoke to the FBI about was between the FBI and I.
3        Q.    When did you speak to the FBI last?
4        A.    I actually -- the last contact I had with
5    them was in 2006 but I don't recall the date.
6        Q.    Who made that contact, you to them or them to
7    you?
8        A.    Them to me.
9        Q.    What did they want?
10       A.    Again I think that that's between us.  They
11   contacted me for some discussions.
12       Q.    What did they want?  There's no privilege
13   there.  What did they want?
14       A.    Well, I -- I was told that I didn't have to
15   discuss that.  They told me I didn't have to discuss
16   what we talked about.
17       Q.    Unless your attorney is going to instruct you
18   not to answer, I want to know what the conversation was
19   about.  Why did they call you?
20           MR. REDHAIR:  Well, if the FBI told her not
21   to discuss it --
22           THE WITNESS:  Yeah.
23           MR. REDHAIR:  -- I don't think that she
24   should be discussing it because that privilege goes far
25   beyond me.

Page 63

1    BY MR. BRAVE:
2        Q.    You understand that any time the FBI
3    interviews someone you are aware that a specific form is
4    filled out regarding that discussion?
5        A.    Uh-huh.
6        Q.    So you understand that, therefore, the FBI
7    will have a copy of this report?
8        A.    Uh-huh.
9        Q.    You also, I assume understand that under
10   TFOIA, the Freedom of Information Act, I'm entitled to a
11   copy of that report?
12           MR. REDHAIR:  Object to form.
13           MS. JOHNSON:  Form.
14           THE WITNESS:  I was actually -- I was
15   actually told that that form will come to me because
16   there's information on the form that is needed in order
17   to obtain the information.
18   BY MR. BRAVE:
19       Q.    Who were the agents you spoke, agent or
20   agents, FBI agents or agents you spoke with?
21       A.    His first name was David.
22       Q.    What was his last name?
23       A.    I can't remember.
24       Q.    What FBI --
25       A.    He's out of New York.

Page 64

1        Q.    Out of New York.
2        Q.    Do you know which of the New York offices he
3    was out of?
4        A.    No, I could not tell you.
5        Q.    Do you have any -- sorry.
6        A.    I could not tell you.  I don't -- he's out of
7    New York.  I don't know -- I don't know how many offices
8    they have.  I don't know.
9        Q.    Can you narrow down when in 2006 you had this
10   conversation with the FBI agent out of New York?
11       A.    It was probably -- again it was probably
12   springtime, maybe early summer.
13       Q.    How long did the conversation last?
14       A.    Maybe fifteen minutes.
15       Q.    I'll come back to it, but how many other
16   conversations have you had with FBI agent or agents?
17       A.    Maybe five.
18       Q.    During what time period?
19       A.    From March, 2005 'til 2006.
20       Q.    Were they all from the same office?
21       A.    I believe they were.
22       Q.    Do you remember any of their names?
23       A.    No.  It was either Richard or Robert.  And
24   then there was a gentleman by the name of Bob.
25       Q.    Do you have any documents from any of these

Page 65

1    FBI agents, a business card, a letter, any document
2    whatsoever, an e-mail, regarding anything to do with the
3    FBI in these five contacts?
4        A.    I have some information that was given to me,
5    but again I was told I didn't have to discuss it.  I
6    was -- that's what they specifically told me in the
7    meeting that I had with them.
8        Q.    What form was this information that you have
9    in?
10       A.    I had a -- I had a business card for David
11   and I also had a subpoena for grand jury at one point.
12       Q.    Do you still have those documents?
13       A.    I don't know if I do or not.  To be honest
14   with you I don't.
15       Q.    But if you do have the documents where would
16   they be?
17       A.    If I had them they'd be at home.
18       Q.    Do you believe you do still have them?
19       A.    Possibly.  But I would not -- I don't want to
20   say yes or no because I don't want to say I have them
21   and then I don't have them.  I don't know.
22       Q.    Do you agree that if you do still have these
23   documents not to destroy them or in any way damage them
24   until we decide how we're going to handle acquiring
25   copies of these documents?

Coash & Coash                    602-258-1440

Pamela J. Schreiner                         December 3, 2007

Page 66

1    A.    Yeah.  I'll keep them if I have them.
2    Q.    Any other conversations or communications
3  between yourself and the FBI that you're aware of?
4    A.    No.
5    Q.    So, just to be clear, you're flat out
6  refusing to tell me anything regarding the substance of
7  these communications with the FBI agents?
8         MR. REDHAIR:  Object to form.
9         MR. BRAVE:  What part of the form?
10        MR. REDHAIR:  "Flat out refusing."  She was
11  advised by them not to talk about it.
12        MR. BRAVE:  No.  Sir, just so you know, I
13  used to be Chief of Intelligence of Investigative
14  Operations for Justice.  I'm real familiar with the FBI
15  and their protocols.  I'm also real familiar with what
16  they can and cannot do.  I'm also familiar with the U.S.
17  Attorneys Guidebook, so know what had been done.
18  Personally I doubt that she was told that because these
19  FBI agents would not do that.
20        MR. REDHAIR:  Okay.  Well --
21  BY MR. BRAVE:
22    Q.    So, are you going to -- I'll soften the
23  question.  Are you refusing at this point to tell me
24  anything more about your communication with the FBI?
25    A.    It's not that I'm refusing.  I am doing what

Page 67

1  they advised me not to do.  I mean, that is what they
2  told me.  That is what they advised me.
3    Q.    Specifically who advised you not to --
4  specifically who advised you that it is prohibiting you
5  from telling me right here and now under oath what those
6  communications consisted of?
7         MR. REDHAIR:  Object to form.
8         THE WITNESS:  The agent David from New York.
9  I don't know what his last name is.
10  BY MR. BRAVE:
11    Q.    And you don't know which office?
12    A.    I don't.  I didn't -- I didn't realize that
13  they had multiple offices.  I know he's from New York
14  but I didn't know that they had different offices.  I
15  just know he's from New York.
16    Q.    Okay.  We've discussed one incident of
17  verbally being -- verbally threatened by people hired by
18  Taser to harass and intimidate you.
19        Going back in time from that event, please
20  tell me the one that occurred before that?
21    A.    Well, there were many.
22    Q.    Let's take them in sequence.
23    A.    Okay.  I'm sorry.  Let me retract that.
24    Q.    In reverse chronological order, please.
25    A.    Okay.  There were on multiple occasions at

Page 68

1  the grocery store.  There was a Bashas' at Tatum and
2  Bell.  That's normally where I would do my shopping.
3  And I would go in and when I'd come out there would be
4  one, sometimes two and it would be along the same type
5  deal.
6         And any time I saw somebody, you know,
7  following me, there would be people sitting in front of
8  my house, you know, in the middle of the night, in the
9  evening, one at night.
10        I actually had to go pick up my son from his
11  then girlfriend's house who lived maybe a mile away.
12  When I left there was a Chevy truck, a four-door
13  four-wheel drive lifted type truck sitting across from
14  my house.  I live on a cul-de-sac.  And when I backed
15  out, as soon as I backed out he followed me.  He got
16  behind me and started following me and followed me up
17  until the time that I actually stopped in front of my
18  son's girlfriend's -- then his girlfriend at that time,
19  in front of her house and he sped off.
20    Q.    Again going back in time chronologically from
21  the two goons who followed you from work, what was the
22  time immediately before that when someone verbally
23  threatened -- or when you were verbally threatened by
24  people hired by Taser to harass and intimidate you?
25    A.    That was at the grocery store.

Page 69

1    Q.    And what did they say?
2    A.    They --
3    Q.    How many were there?
4    A.    There were -- there were two at that time but
5  they were different gentlemen.  They were -- they were
6  gentlemen that were somewhat clean-cut.  They weren't --
7  they didn't come across as, you know, goon-type people,
8  meaning they were very clean-cut, you know, soft -- with
9  a Polo-type shirt.  I think they had jeans on.  They
10  were probably in their 30s, you know.
11        And I saw them as I was walking out.  My
12  truck was facing Tatum and so I had to go to the
13  passenger side and they were kind of standing on the
14  other side, on the driver's side of the truck, and as I
15  came around there was a car over there so I didn't think
16  really anything of it until I got around there and when
17  I got around to the other side of my truck they asked me
18  who I, you know, if I was Pam and I said, "Well, I don't
19  know.  Might.  Who are you?"
20        And they said, you know, "Just watch your
21  back."
22        And I said, "Well, what does that mean?"
23        And they said, "Well, you know, we know that
24  you used to work at Taser and we also know that you are,
25  you know, going to trial and you need to be careful."

Coash & Coash                         602-258-1440

Pamela J. Schreiner                                   December 3, 2007

Page 70

1        And I said, "Well, what does that mean that I
2   need to be careful?"
3        And they said, "Just watch your back.  You
4   need to watch your back."
5        Q.   When did this incident occur?
6        A.   That was around the Sam Powers case.
7        Q.   What part of the Sam Powers case?
8        A.   That was after I did my deposition and then I
9   received a subpoena to actually go to the trial and then
10  I was actually called and said that I didn't have to
11  appear for the trial.
12       Q.   So, going back in time, the first
13  chronologically going in reverse order were the two
14  goons at work?
15       A.   That was in 2006.
16       Q.   And the time just before that was right
17  around the Sam Powers trial, which was November to
18  December, 2005?
19       A.   Yeah, I would say --.
20       Q.   Correct?
21       A.   I don't remember when the trial was.  I don't
22  remember when the subpoena was.  I know that it was some
23  time in 2005 but I don't recall when.
24       Q.   If I tell you that the trial was November or
25  December, 2005 would you have any basis to dispute that?

Page 71

1        A.   No, I wouldn't.
2        Q.   And I believe you said you haven't seen those
3   two people since?
4        A.   Those two people at the grocery store, no.
5        Q.   Have you ever seen them at any other time
6   other than at the grocery store at that point in time?
7        A.   No, because I honestly, you know, again I was
8   trying to put all this behind me and, you know, every
9   time I see somebody on the street if I see people
10  walking in front of my house I wonder, you know, are
11  they somebody that is going to threaten me again.  I
12  don't go outside my house any more.  I sit in my house
13  other than work.
14       Q.   Just to be clear, the answer to my question
15  was "no," correct?
16       A.   Correct.
17       Q.   What evidence or proof do you have that those
18  two people were hired by Taser to harass and intimidate
19  you?
20       MR. REDHAIR:  Object to form.  Go ahead.
21       THE WITNESS:  Just by their statements that
22  they were making to me.
23  BY MR. BRAVE:
24       Q.   Did they say they were hired by Taser to
25  harass or intimidate you?

Page 72

1        A.   No.
2        Q.   Chronologically going back in time from that
3   one, when was the previous time to that?
4        A.   Again it was at a grocery store.  It was not
5   Bashas' though.  It was actually in a strip mall type
6   facility and at that time when I was -- I had just got
7   there and I saw a car pull up and it was a little red
8   type car, although it was a small like Dodge or some
9   kind of a smaller vehicle, and I saw that car pull in
10  behind me and when I pulled into the parking spot they
11  pulled up right behind me and they just started yelling
12  and screaming things at me and just -- nothing
13  consistent, just very negative remarks to me and they --
14  they came across to me as very threatening.
15       Q.   When was that?
16       A.   That would have been probably in June or
17  July.
18       Q.   Of?
19       A.   2005.
20       Q.   Where was the grocery store in the strip mall
21  where that took place?
22       A.   That was actually over by the PV Mall area,
23  Tatum and Cactus area.
24       Q.   Going back to the other one first, did you at
25  any time file any kind of a police report or notify the

Page 73

1   police or make any kind of a statement to the police
2   regarding that incident?
3        A.   No.
4        Q.   This one you just mentioned, at any time did
5   you again file any kind of a statement or police report
6   or notify the police in that event?
7        A.   No.
8        Q.   If this was right about the time you were
9   being communicated with by the FBI, did you tell the FBI
10  about any of these?
11       A.   At that time?
12       Q.   At any time.
13       A.   I don't recall.  I really -- I don't recall.
14  I'm sorry.
15       Q.   Could that be a "no," that you did not notify
16  the FBI at any time of this harassment?
17       MR. REDHAIR:  Object to the form.  Go ahead.
18       THE WITNESS:  It could be, but I don't
19  recall.
20  BY MR. BRAVE:
21       Q.   And this last incident you just talked about,
22  the one in I think you said June, 2005, that time
23  period, do you have any reason other than their
24  statements to say they were people hired by Taser to
25  harass and intimidate you?

Pamela J. Schreiner                    December 3, 2007

Page 74

1    A.   No.
2    Q.   Did they say they were people hired by Taser
3  to harass and intimidate you?
4    A.   No.
5    Q.   Did they -- other than that one event, have
6  you ever seen those people again?
7    A.   No.
8    Q.   Okay.  Again chronologically going back in
9  time from that one, when was the time prior to that?
10   A.   There was a time in March and when I actually
11  was at home and when I was actually sitting at my -- on
12  my couch watching TV and I had a car sitting out in
13  front of my house revving the engine.  I had walked
14  outside to see who it was because I honestly thought it
15  was maybe one of my kids and I didn't want them to be,
16  you know, making noise because I didn't want the
17  neighbors to be disturbed, and when I walked outside
18  there was a car.  It was actually a red Dodge truck.  I
19  remember it was a small -- the smaller version of the
20  Dodge truck, and it had a red cover on the back.  And
21  somebody screamed something out the window at me.  About
22  that time they took and spun gravel all over me and all
23  over my house and sped off and that vehicle I did see a
24  few times after that.
25   Q.   How many people were in the truck?

Page 75

1    A.   I couldn't see.  The windows were dark.
2    Q.   What was it that they yelled at you?
3    A.   Some obscenities and they basically told me
4  that they know where I am.
5    Q.   Did you file any kind of a police report in
6  that event?
7    A.   No, because at that time when that happened
8  one of my neighbors actually saw it happen and she just
9  said, "Just, you know, probably some kids.  You know,
10  don't worry about it.  They just, you know" -- and I
11  just said, "No, you don't understand" and I just walked
12  back in my house.
13   Q.   What neighbor was that?
14   A.   It was a neighbor to the west of me.
15   Q.   What's her name?
16   A.   I -- I don't know.  She doesn't live there
17  any more.  She's moved out.  She's only lived there a
18  few months.  I don't even know where she moved to.
19   Q.   Did she contact the police or file any kind
20  of a police report or give you anything in writing?
21   A.   No.
22   Q.   Do you have any evidence to prove that those
23  people, person or people were hired by Taser to harass
24  and/or intimidate you?
25   A.   No.

Page 76

1    Q.   Did they state at any time that they were
2  people hired by Taser to harass or intimidate you?
3    A.   No.
4    Q.   Okay.  Chronologically going back in time to
5  the next event, when would that be?
6    A.   I -- I don't know.  There's so many.  I
7  actually have dates in my, you know, in my mind of like
8  time-frame-wise and the order any more, it's just it was
9  one event after another.  It seemed as though every time
10  I turned around there was somebody else behind me that
11  was always there behind me.  And I -- I don't -- I can't
12  tell you.
13       I can tell you that there was a point in time
14  where a bullet came through my garage window and that it
15  scared me because, you know, all of a sudden you hear
16  glass shattering and there's a bullet in your -- came
17  through your window of your garage.  And again, you
18  know, you hear a car, you see a car go whizzing by and,
19  you know, there goes a bullet through your window.
20  Thank God that it was only into the garage because it
21  could have went through -- you know, it could have went
22  through the window where we all sit for dinner or
23  whatever.
24   Q.   So, from starting off in those prior three
25  events going back in time chronologically, what was the

Page 77

1  event just prior to that one?
2    A.   The --
3        MS. JOHNSON:  Objection.  Which one?
4  BY MR. BRAVE:
5    Q.   You've given me three events, correct,
6  chronologically in time going backwards?
7    A.   There was --
8    Q.   Correct?
9        What would have been --
10        MS. JOHNSON:  Misstates her testimony.
11  BY MR. BRAVE:
12   Q.   What would have been the one prior to that
13  event?
14        MR. REDHAIR:  Object to form.
15  BY MR. BRAVE:
16   Q.   Well, prior to the grocery store strip mall
17  event, prior to that one, what was the one in time
18  before that?
19   A.   There were --
20        MR. REDHAIR:  Object to form.  Go ahead.
21        THE WITNESS:  There were actually two
22  incidents, one at a grocery store, one at a strip mall.
23  BY MR. BRAVE:
24   Q.   Yes.
25   A.   And those are two separate issues.  Those are

20 (Pages 74 to 77)

Coash & Coash                    602-258-1440

Pamela J. Schreiner                    December 3, 2007

Page 78

1  two separate incidences.
2       Q.    So, if my memory is correct, you told me
3  about three incidents:  The goons from work, the grocery
4  store by Basha, the grocery store strip mall.
5       A.    Okay.
6       Q.    That was 2006, approximate trial of Powers,
7  November, December, 2005, and it was also then the March
8  of 2005.  From March, from that event going back in
9  time, what was the next previous event?
10      MR. REDHAIR:  Object to form.  Go ahead.
11      THE WITNESS:  Between -- between March and
12 November you also skipped the one where somebody spun
13 rocks all over me and my house, somebody has followed me
14 on a couple of occasions with my -- following me from my
15 house to my friends, girlfriend's at that time's house,
16 and then there was also the bullet that came through my
17 garage window.  Right there is seven cases, seven
18 different incidences that I can tell you.
19 BY MR. BRAVE:
20      Q.    When was the time that the person spun the
21 rocks outside your house?
22      A.    That was right around the deposition time of
23 the Sam Powers case.
24      Q.    When was the time that someone followed you
25 to where you were taking your son?

Page 79

1       A.    That would have been around April or May of
2  2005 at the same time-frame as the whole deposition, the
3  Powers deal.
4       Q.    And when was the time of the bullet through
5  the garage window?
6       A.    That would have been right around that same
7  time-frame, around the Powers, between the deposition
8  and the actual trial.
9       Q.    Okay.  If I remember correctly, the
10 deposition was May 25th of '05, the trial was November
11 of '05.
12      A.    Right.  So it was some time in that
13 time-frame.
14      Q.    Can you narrow it down any closer?
15      A.    It was probably mid to late summer.
16      Q.    Okay.  Any other times?
17      A.    There were -- like I said, there were
18 occasions where people were following me and just
19 verbally saying things out the window to me, people
20 sitting in front of my house.  You know, to me, I
21 considered that to be harassment.  They didn't even have
22 to say anything.  I took it as harassment.
23      Q.    And you've never seen any of these people
24 other than at the one time event when the harassment was
25 occurring, correct?

Page 80

1       A.    The individuals I've never seen again.
2       Q.    Nor had you seen them before?
3       A.    Never before, no.
4       Q.    What evidence did you collect of these
5  various harassments?  Did you take photos of the
6  vehicles or the people, did you record anything, did you
7  get the license plate numbers, did you file any police
8  reports or anything with the police?  Is there any
9  official record with any police agency, law enforcement
10 agency anywhere on any of these events?
11      MR. REDHAIR:  Object to form.
12      THE WITNESS:  No.
13 BY MR. BRAVE:
14      Q.    And you have no evidence or proof that these
15 people who verbally threatened you were hired by Taser,
16 correct?
17      A.    Correct.
18      Q.    The last sentence of paragraph 7 states, "In
19 the summer of 2005, shortly before giving my deposition
20 in the Powers versus Taser case, a window was shot out
21 of my residence," correct?
22      A.    Uh-huh.  That's what I said.  It was some
23 time around the deposition of the Powers case and the
24 actual trial.  I couldn't give you the actual date.  It
25 was some time around the deposition is what I said.

Page 81

1       Q.    But it was before the deposition?
2       A.    It was some time around there, correct.  I
3  can't remember the date.  I don't -- I cannot even
4  remember when the deposition was actually taken or
5  given.
6       Q.    Okay.  The deposition, if I recall it, was
7  May 25th of '05, but this states "in the summer of 2005
8  shortly before giving my deposition."
9       A.    Right.
10      Q.    So, was that a truthful statement or not?
11      A.    Because I was going by the fact that it was
12 in the summer and I remember giving my deposition.  It
13 was -- to me, it was summer.
14            So it was around the deposition of the Powers
15 case.  That is what I said.
16      Q.    No.  You can look at the document.  It says,
17 "shortly before giving my deposition."
18      A.    Correct.
19      Q.    True?
20      A.    And that was correct.
21      Q.    So, therefore, it was before your deposition?
22      A.    It was around that time, yes.
23      Q.    Okay.  It was either -- it either was before
24 the deposition, which is what the affidavit says, or it
25 wasn't.  It was either before, during or after.  Was it

Pamela J. Schreiner                    December 3, 2007

Page 82

1  before?
2        MR. REDHAIR:  Object to the form.
3        THE WITNESS:  I would say yes, that it was
4  before giving my deposition.
5  BY MR. BRAVE:
6    Q.   Did you report the window being shot out to
7  any authorities of any kind?
8    A.   No, I did not.
9    Q.   What evidence or proof do you have that in
10  any way ties Taser to the shooting out of the window?
11    A.   Just coincidental.
12    Q.   So that means you have no evidence or proof?
13        MR. REDHAIR:  Object to form.
14        THE WITNESS:  That is correct.
15  BY MR. BRAVE:
16    Q.   Paragraph 8.  Is there anything in that
17  paragraph that is incorrect, a falsehood or an
18  exaggeration?
19    A.   No.  Those are true to my knowledge.
20    Q.   Do you have any additional explanations that
21  I've missed?  Withdraw that.
22        The first sentence, "Rick Smith, Tom Smith
23  and Doug Klint are responsible for hiding and covering
24  up information on the extent of injuries to officers
25  during Taser trainings."  Other than what we've

Page 83

1  discussed here today, do you have any other evidence
2  supporting that statement?
3    A.   No.
4    Q.   And what evidence -- you mentioned Rick Smith
5  and Doug Klint earlier.  What evidence do you have that
6  Tom Smith was responsible for hiding and covering up
7  information on the extent of injuries to the officers
8  during Taser trainings?
9    A.   Just from general conversations and the way
10  the forms were handled within the office.  As far -- oh,
11  I'm sorry.
12    Q.   Go ahead.
13    A.   As far as when the forms would come in and
14  it -- at one point he would -- he would review them and
15  hand them off to like Jamie or whoever was in the
16  training area.  He was responsible for those as far as
17  looking at them and making sure what was on them.
18    Q.   Tom Smith was responsible for reviewing the
19  Volunteer Exposure Reports?
20    A.   He would, yes.  He would actually review
21  them.
22    Q.   So you're saying --
23    A.   I don't know if he reviewed all of them, but
24  I do know that he reviewed some.
25    Q.   How many is some?

Page 84

1    A.   Maybe 10, maybe 20.
2    Q.   So, basically it could have been as few as 5?
3    A.   True.
4        MR. REDHAIR:  Object to form.
5        THE WITNESS:  It could have been.
6  BY MR. BRAVE:
7    Q.   Could it have been 1?
8        MR. REDHAIR:  Object to form.
9        THE WITNESS:  Maybe.
10  BY MR. BRAVE:
11    Q.   The second sentence:  "I know this because I
12  was instructed to alter the spreadsheets and saw them
13  destroy documents."  Anything other than what we
14  discussed here today supports that sentence?
15    A.   No.
16    Q.   The third sentence:  "Doug Klint told me that
17  the lawsuits against Taser would go away because there
18  would be no documents to prove that Taser knew that
19  injuries were happening."  Other than what we have
20  discussed here today, do you have any evidence
21  whatsoever to support that statement?
22    A.   No.
23    Q.   Paragraph 9.  "Since leaving Taser
24  International I have lived in fear of what Taser
25  International will do to me."  But you have absolutely

Page 85

1  no proof other than your statements supporting that
2  sentence, correct?
3        MR. REDHAIR:  Object to the form.
4        THE WITNESS:  It's -- that's my feeling.
5  That is how I feel and that to me is a true statement.
6  BY MR. BRAVE:
7    Q.   Do you have any evidence other than what
8  you've stated here supporting that sentence?
9    A.   I do not have evidence, no.
10    Q.   You don't have any police reports?
11    A.   No.
12    Q.   You don't have any additional photographs, or
13  any kind of photographs?
14    A.   No.
15    Q.   You don't have any license plate numbers?
16    A.   No.
17    Q.   You haven't identified any of these people
18  who have harassed you?
19    A.   No.
20    Q.   You only saw them at the moment in time that
21  they harassed you?
22    A.   Correct.
23    Q.   You have no evidence or proof tying them to
24  being hired by Taser International, correct?
25        MR. REDHAIR:  Object to form.

Pamela J. Schreiner                                December 3, 2007

Page 86

BY MR. BRAVE:
1
2     Q.   You can answer.
3     A.   Correct.
4     Q.   Paragraph 9, second sentence:  "The company
5  has enormous resources and connections throughout law
6  enforcement."  Are you trying to imply with that that
7  Taser has the power because of their enormous resources
8  and connections throughout law enforcement to intimidate
9  and harass you the way you've testified to here so far
10  today?
11        MR. REDHAIR:  Object to form.
12        THE WITNESS:  That is correct.  That is how I
13  feel.
14  BY MR. BRAVE:
15     Q.   But do you have any proof of that?
16        MR. REDHAIR:  Object to the form.
17        THE WITNESS:  No.  Just I know -- I know that
18  they are -- how large they are and I do know their
19  connection with the law enforcement.
20  BY MR. BRAVE:
21     Q.   Well, here's the distinction I'm making.
22  There's no doubt the company has enormous resources and
23  connections throughout law enforcement.
24        My question is the implication that it's
25  through those resources and connections that they would

Page 87

1  have -- that Taser would have been the sponsor through
2  these law enforcement agencies of the harassment that
3  you have testified to here today.
4        MS. JOHNSON:  Object to the form of that.
5        MR. REDHAIR:  Join.
6  BY MR. BRAVE:
7     Q.   Is that what you're saying?
8     A.   Yes.
9        MR. BRAVE:  It's been an hour and a half.
10  Take a break?
11        MR. KYLER:  We're going off the record.  The
12  time is 11:34.
13        (Short recess.)
14        MR. KYLER:  We are going back on the record.
15  The time is 11:50.  This begins tape 2 in the deposition
16  of Pamela Schreiner.
17        MR. BRAVE:  Are we back on?
18     Q.   Ms. Schreiner, are there any corrections you
19  want to make to your testimony you have already provided
20  today?
21     A.   The only thing that I would like to clarify
22  is the number -- the numbers that we kept throwing out
23  with the stack of papers when we were going through all
24  the paperwork and things like that, and I kept getting
25  asked, you know, 10, 40, 20, whatever.

Page 88

1        You know, the one thing I want to make sure
2  that is very clear that in a stack of documents that was
3  6 inches high it had to have been clearly more than 10,
4  20, 30, 40.  It had to have been in the hundreds only
5  because of how thick the stack was.
6        And at the time I didn't realize that I would
7  have to know how many were actually in that stack.  I
8  didn't know how many because I didn't realize I'd be
9  sitting here in front of you today being deposed, so I
10  did not actually, you know, "Okay, I'm going to now
11  count each one of these."
12        So I just want to clarify and make sure that
13  everyone understands that there was a stack on my desk
14  that was a minimum of 6 inches high, so there had to
15  have been clearly more than a hundred pieces of paper in
16  that stack.
17     Q.   During the break -- any other clarifications
18  or changes?
19     A.   That would be my --
20     Q.   During the break that we just had did you
21  speak to or in the presence of Ms. Johnson regarding
22  anything?
23     A.   We -- we did discuss the stack of papers.
24     Q.   What did you discuss exactly?
25     A.   How the numbers, you know, how many there

Page 89

1  were as far as, you know, the 10, 20, 30, 40 and I, you
2  know, basically said, "Well, you know, the stack was 6
3  inches high and I couldn't tell you if it was 10, 20,
4  30, 40.  I just know that it was 6 inches high."  So it
5  had to have been at least 100 sheets of paper and that
6  was really all we discussed.
7     Q.   So, just to be clear, if I remember correctly
8  your prior testimony was that that number could have
9  been as few as 2 and now it is a minimum of 100 after
10  speaking with Ms. Johnson, is that correct?
11        MR. REDHAIR:  Object to form.
12        MR. BRAVE:  What part of the form?
13        MR. REDHAIR:  Well, I think its implication
14  is objectionable and I think it misstates her testimony.
15        Why don't we get some -- a stack of photocopy
16  paper and we can set it here and she can tell us how
17  many stacks that was and we can figure out how many
18  pages it was if you like.
19        MR. BRAVE:  So, to be clear, your only
20  objection is the implication?
21        MR. REDHAIR:  Well, and it was vague and
22  confusing.  If you want to repeat it, I forgot the --
23  what I thought the problem was.
24  BY MR. BRAVE:
25     Q.   Regarding your previous statement that I

Coash & Coash                           602-258-1440

Pamela J. Schreiner                    December 3, 2007

Page 90

1  believe it was 6 inches of paper on the corner of your
2  desk that Rick Smith and Doug Klint of the Volunteer
3  Exposure Reports took to the shred bin, your previous
4  testimony was it could have been as few as 2 Volunteer
5  Exposure Reports.  Now, as I understand it, after
6  speaking to Ms. Johnson during the break you're saying
7  it was a minimum of 100.  Did I mischaracterize
8  anything?
9          MR. REDHAIR:  Object to the form.  Go ahead.
10         THE WITNESS:  At the time you had asked me
11  what "many" meant because it had said something about
12  many pieces of paper or something along that line in
13  here.  You asked me what the term "many" meant and I
14  said it was a multiple, meaning it was more than 2
15  because in my opinion "many" means multiple and it's
16  more than 2.
17         And I was stating to you that it was at least
18  100 because it was 6 inches thick and then you kept
19  breaking it down by, you know, 40, 50, whatever it was
20  you were breaking it down to and I kept saying it could
21  have been, it could have been, it could have been.
22         But it had to have been at least a minimum of
23  that.  If you have a stack of papers this tall, then it
24  had to have been at least over 100 because, you know, to
25  me 100, you know, might be this thick.  If you have a

Page 91

1  stack that's 6 inches tall then it had to have been over
2  100 pieces of paper and that's what I was trying to get
3  through when you were asking me a question of how many
4  and you kept breaking it down.  I was trying to say that
5  it was more than this many, but you -- I was being
6  honest and I was saying, yeah, it could have been, but
7  it had to have been at least 100 because you have a
8  stack that's this tall.  There's no way it could have
9  been only 2.  It couldn't have been only 10 and it
10  couldn't have been 40 or 50 or -- it was more than that.
11  So that's what I was trying to clarify.
12         MR. BRAVE:  Would you read back my question,
13  please?
14         (Whereupon, the record was then read
15         back by the reporter as requested.)
16         THE WITNESS:  Okay.
17         MR. REDHAIR:  Same objection.
18  BY MR. BRAVE:
19    Q.   You can answer.
20    A.   Okay.  And again there were a stack of papers
21  that was at least 6 inches thick, which means to me that
22  it had to have been more than 100 sheets of paper
23  because of the stack and how big the stack was.
24    Q.   So it could not have been 90?
25    A.   No.

Page 92

1    Q.   It could not have been 80?
2    A.   No.
3    Q.   It had to be 100 or more?
4    A.   It had to have been 100 or more, yes.
5         MR. REDHAIR:  Object to the form.
6  BY MR. BRAVE:
7    Q.   And prior to speaking with Ms. Johnson you
8  testified it was 2 and after speaking with Ms. Johnson
9  it was 100 or more, correct?
10         MR. REDHAIR:  Object to form.
11         THE WITNESS:  That -- that is partly correct,
12  but it was also because that's what I was wanting or
13  trying to say when you were questioning me.  I was
14  actually trying to say that it was more than 100 and I
15  felt as though you were asking me the question and I was
16  trying to answer the question.
17  BY MR. BRAVE:
18    Q.   Anything else you want to correct or change
19  from your prior testimony?
20    A.   Not at this time.
21    Q.   Referring to Exhibit 1, the affidavit, who
22  prepared that?
23    A.   Cindy Johnson, Cynthia Johnson.
24    Q.   So it was prepared -- to your knowledge it
25  was prepared in Georgia?

Page 93

1    A.   To the best of my knowledge, yes.
2    Q.   Were there any drafts of this document?
3    A.   I don't recall.  There could have been.
4    Q.   Do you have any of the drafts of this
5  document?
6    A.   If I had it I would still have it, but I
7  don't recall if I have one.  I -- I would have to look
8  and see.
9    Q.   And what form would it be in, electronic,
10  paper, FAX?
11    A.   It would have been mailed to me.
12    Q.   If you do have one, where would it be located
13  now?
14    A.   If I did have it, it would be at my home.
15    Q.   And if you do have it, how many different
16  drafts would there be?
17    A.   If there was any, it would probably be one.
18  There would only have been one.
19    Q.   Do you agree with me at this point that if
20  you do have any drafts of this document at your home to
21  not destroy or shred or change anything?
22    A.   No, I would not do that.
23         MR. REDHAIR:  You do agree?
24         THE WITNESS:  I do agree.  I'm sorry.
25         MR. REDHAIR:  "No, I would not do that"?

Coash & Coash                    602-258-1440

Pamela J. Schreiner                    December 3, 2007

Page 94

1          THE WITNESS:  No, I'm sorry.  I'm sorry.  I
2    will not shred it.  I'm sorry.
3    BY MR. BRAVE:
4        Q.    Referring to the -- I believe you said you
5    got a subpoena from the FBI?
6        A.    For a grand jury.
7        Q.    The grand jury.  And you no longer have that?
8        A.    I don't know if I still have it or not.
9        Q.    When did you receive it?
10       A.    It was in 2005, April, March or April, 2005.
11       Q.    To what court was that?
12       A.    It was in New York.
13       Q.    Did you ever meet with any of the FBI agents?
14       A.    Yes.
15       Q.    How many times?
16       A.    There were -- there were three occasions.
17       Q.    Where?
18       A.    Once in their Phoenix office, once at my home
19   and once at my place of employment.
20       Q.    Within what time-frame?
21       A.    Within probably maybe two months.
22       Q.    And --
23       A.    Maybe three.
24       Q.    And in what year?
25       A.    2005.

Page 95

1        Q.    And what months?
2        A.    Between April and July.
3        Q.    The agents that you met with, which office
4    were they out of?
5        A.    The one -- they were out of New York.  The
6    one was out of New York.  I'm not sure where the other
7    two were from.
8        Q.    During your three meetings with them how
9    much -- on the very first meeting with them how much
10   time were you together, how long?
11       A.    Four to five hours.
12       Q.    And the second time how long were you
13   together?
14       A.    I would say maybe -- maybe twenty minutes.
15       Q.    And the third time?
16       A.    Another fifteen to twenty minutes.
17       Q.    And as we sit here now are you going to tell
18   me what was discussed during those meetings with the FBI
19   agents?
20            MR. REDHAIR:  No, she's not.
21            MR. BRAVE:  And you're directing her not to
22   answer?
23            MR. REDHAIR:  Yes.
24   BY MR. BRAVE:
25       Q.    Do you have copies of the 302s that were

Page 96

1    prepared after the conclusion of these meetings with the
2    FBI agents?
3            MR. REDHAIR:  302s?  Object to form.
4            THE WITNESS:  I'm sorry.  I don't know what a
5    302 is.
6    BY MR. BRAVE:
7        Q.    A 302 is a basic document that FBI agents
8    create after each interview which lists and outlines
9    their statements as to what occurred during that
10   interview.  If there were three formal interviews such
11   as this, there will be three 302s and I'm curious as to
12   whether you have copies of any of those three 302s?
13           MR. REDHAIR:  Object to form.
14           THE WITNESS:  Obviously I don't because I
15   didn't know what they were.
16   BY MR. BRAVE:
17       Q.    When did you receive the FBI business card?
18       A.    At the first meeting.
19       Q.    And where did that one take place again?
20       A.    In Phoenix.
21           MR. REDHAIR:  Is this Exhibit 2?
22           MR. BRAVE:  Yes.
23       Q.    Ms. Schreiner, I'm showing you what has been
24   marked Deposition Exhibit 2.
25       A.    Uh-huh.

Page 97

1        Q.    Will you identify that document?
2        A.    It's says "Amended Subpoena in a Civil Case."
3        Q.    Is this the document that was served upon you
4    last week, a copy of the document?
5        A.    Actually, this is different than the one I --
6    the front page is different than the one I have.
7        Q.    The two pages I'm concerned about is Exhibit
8    A, which is page 3.
9        A.    Oh, I'm sorry.
10       Q.    No, that's okay.  That's my fault.
11           Does Exhibit A look like what you were served
12   with?
13       A.    I believe so, yes.
14       Q.    Okay.  Let's go down the list.  And you knew
15   that you were to bring these documents with you under
16   the subpoena, correct?
17           MR. REDHAIR:  Object to the form.  I
18   instructed her not to bring certain documents.
19   BY MR. BRAVE:
20       Q.    Without going into any communications you had
21   with your attorney, which are -- please identify on
22   Exhibit A which ones your attorney directed not to
23   bring?
24           MR. REDHAIR:  I don't feel comfortable having
25   her answer those questions.  I'll tell you which ones.

25 (Pages 94 to 97)

Pamela J. Schreiner                                      December 3, 2007

Page 98

1          MR. BRAVE:  That's fine.  As long as I get
2    the information, I don't care where I get it from.
3          MR. REDHAIR:  Specifically number 6.
4          MR. BRAVE:  The entire paragraph?
5          MR. REDHAIR:  Yes.
6          MR. BRAVE:  Okay.  Go on.
7          MR. REDHAIR:  Seven.
8          MR. BRAVE:  Okay.  The entire paragraph?
9          MR. REDHAIR:  Yes.
10         MR. BRAVE:  Okay.  Continue.
11         MR. REDHAIR:  Nine.
12         MR. BRAVE:  I assume the entire statement?
13         MR. REDHAIR:  Yes.  And we can -- the entire
14   statement unless I say otherwise to make it easier.  10,
15   11, 14, 15 and 16.  And let me just review because I may
16   have said some others.
17         Also number 5.  I mean, medical bills, I
18   can't see how they are relevant for a fact witness.  The
19   same thing with the cellular phones and all of the
20   diaries about doctors and health care providers.
21         MR. BRAVE:  All my question is, sir, is which
22   ones.  Are there any others that you instructed her not
23   to bring?
24         MR. REDHAIR:  I don't recall off the top of
25   my head.  Those were the ones that jumped out at me when

Page 99

1    I reread the list.
2    BY MR. BRAVE:
3          Q.    Ms. Schreiner, referring to Exhibit Number 2,
4    page 3 of that exhibit, which is Exhibit A to the
5    subpoena.
6          A.    Uh-huh.
7          Q.    Number 1, did you bring anything referenced
8    to number 1 with you today to this deposition?
9          A.    No, I did not.
10         Q.    And you knew that you were under subpoena to
11   bring those, correct?
12         A.    That is correct.
13         Q.    Do you have anything that comports with
14   Exhibit Number -- excuse me -- with number 1 on Exhibit
15   2, page 3?
16         A.    No, I do not have anything in my possession.
17         Q.    Have you transferred anything to -- anything
18   that would fall under number 1 to anyone else's
19   possession or know of it to exist anywhere else other
20   than Taser International?
21         A.    No.
22         Q.    The same set of questions for number 2; did
23   you bring anything in response to number 2 with you
24   today to this deposition?
25         A.    No.

Page 100

1          Q.    You understood that you were under subpoena
2    to bring those, that information to this deposition,
3    correct?
4          A.    Correct.
5          Q.    And do you have anything or know of anything
6    outside of Taser International that would be relevant to
7    number 2 or comply with number 2?
8          A.    No.  I think we've already covered that
9    before because I don't -- I didn't have any reports or
10   anything.  I didn't -- we have already discussed that.
11         Q.    You testified in your October 18, 2007
12   deposition that first you had notes of the harassment.
13         A.    Uh-huh.
14         Q.    That would comply with number 2, would it
15   not?
16         A.    Yes.  And when I actually -- when I actually
17   was at home I was trying to pull together my documents
18   and I did not have anything that would be more than what
19   I'm saying to you today.
20         Q.    So you do not have any written notes of any
21   kind regarding the statements of harassment, correct?
22         A.    That is correct.
23         Q.    Also on October 18, 2007 at that deposition
24   you stated that you had the receipts for the window that
25   your husband replaced from your garage that was shot

Page 101

1    out.  You did not bring that -- those receipts with you
2    today either, did you?
3          A.    That is correct.  I thought that -- I thought
4    that he had it and he did not have it.  When I went
5    looking for it it was not there.
6          Q.    So, therefore, you do not have those
7    receipts?
8          A.    Correct.  I thought I had but it was not
9    there.  I did not have it.
10         Q.    And the same question; you have not
11   transferred or provided those to anybody, do you know of
12   any place that those receipts might exist in any form?
13         A.    No.
14         Q.    Number 3, did you bring -- did you bring
15   anything with you today that isn't -- that is in direct
16   reference to number 3?
17         A.    There were the two letters that you have in
18   front of you.
19         Q.    Anything else?
20         A.    No.
21         Q.    Wouldn't the draft of affidavit if you have
22   such a draft affidavit be within number 3?
23         A.    Yes, if I had it.
24         Q.    So, since you did not bring it, can we safely
25   assume you do not have it?

Coash & Coash                              602-258-1440

Pamela J. Schreiner                                    December 3, 2007

Page 102

1       A.    We could assume that, yes.
2       MS. JOHNSON:  I'll state in my place that
3  there was no draft.
4       THE WITNESS:  Yes.  Because I honestly don't
5  recall one.
6  BY MR. BRAVE:
7       Q.    Number 4, anything responsive to number 4?
8       A.    Other than those two letters, that what I
9  gave to you.
10      Q.    Anything in response to number 8?
11      A.    No.
12      Q.    Do you know of the existence of anything that
13  would be responsive to number 8 in anyone's possession
14  other than Taser International?
15      A.    Not to my knowledge.
16      Q.    Number 12.  Did you bring anything with you
17  today in response to number 12?
18      MR. REDHAIR:  I may have instructed her not
19  to -- let me read that again.
20      To be honest, I can't remember.  It's Monday
21  morning and I'm having a difficult time figuring out
22  what that's asking for.  I'm sorry.
23      MR. BRAVE:  I don't want to ask her this.
24  When you communicated that to her not to bring it, did
25  you do that in written form or do you have any way of

Page 103

1  memorializing that or --
2       THE WITNESS:  No, I don't have any way of
3  memorializing that.
4       MR. BRAVE:  Do you object to her answering
5  number 12 at this time or are you going to instruct her
6  not to answer?
7       MR. REDHAIR:  Well, I mean, she can talk
8  about it.  Well, let me read it.
9       Why don't you explain to me what this is
10  trying to get at, if you don't mind?
11      MR. BRAVE:  Well, my first question is I need
12  to know whether or not you instructed her not to bring
13  these things because if you did then it's a moot point.
14      THE WITNESS:  I've read it three times and I
15  can't understand what this is asking.  I think I
16  probably did based on that.  I think I did instruct her
17  not to --
18  BY MR. BRAVE:
19      Q.    Okay.  Number 13.
20      MR. REDHAIR:  -- bring anything.
21  BY MR. BRAVE:
22      Q.    Number 13.  Do you understand you were to
23  bring with you anything relative to number 13 and in
24  compliance therewith?
25      A.    Yes.  Yeah, but I don't have anything.

Page 104

1       Q.    And do you know of anything that is in
2  existence other than possibly at Taser International
3  anywhere?
4       A.    Not to my recollection.  Not to my knowledge.
5       Q.    Now, going through the ones that he
6  instructed you not to bring the items to, number 5, do
7  you have anything that would have complied with number 5
8  in your possession?
9       MR. REDHAIR:  I'm going to tell her not to
10  answer that.
11      What I propose we do is I just don't think
12  those things are relevant or designed to lead to the
13  discovery of relevant information, so if you could write
14  me a letter explaining why it's relevant I'll revisit it
15  and then if I determine that it is discoverable we can
16  reconvene on this deposition.  If I think it's, as I do
17  now, not relevant, not discoverable, then you can make a
18  decision to talk to the judge about it.  That's the way
19  I propose we handle it.
20      MR. BRAVE:  Well, I'm assuming that
21  Ms. Johnson does not want to fly back to Scottsdale to
22  continue this, so --
23      MR. REDHAIR:  Well, we can do it
24  telephonically or we can do it by videotape.  I mean,
25  you've got your chance to eyeball the witness, which is

Page 105

1  typically what's the most important thing.
2       So, no.  I mean, she's not going to be
3  talking about her medical conditions, her medical
4  treatment, any finances, that sort of stuff short of me
5  being convinced that it's somehow relevant.
6       MR. BRAVE:  So you're instructing her not to
7  answer anything with regard to number 5 on Exhibit 2?
8       MR. REDHAIR:  Correct.
9       MR. BRAVE:  Are you instructing her not to
10  answer anything regarding number 6 on number 2 -- on
11  Exhibit 2?
12      MR. REDHAIR:  Six, 7, 9, 10, 11, 14, 15 and
13  16.
14      MR. BRAVE:  So you are instructing her to not
15  answer any questions regarding them?
16      MR. REDHAIR:  Yes.
17      MR. BRAVE:  And obviously we reserve the
18  right to reconvene this deposition once you get up to
19  speed on the case.
20      MR. REDHAIR:  Certainly.  And you don't need
21  to reserve it.  I'll stipulate I'll do it if I'm
22  convinced that I need to.
23      MR. BRAVE:  Well, with education, I need to
24  convince the judge.
25      MR. REDHAIR:  Okay.

27 (Pages 102 to 105)

Pamela J. Schreiner                    December 3, 2007

Page 106

1   BY MR. BRAVE:
2        Q.    Anyway, Ms. Schreiner, once you were working
3   on the Volunteer Exposure Reports what was your
4   procedure?
5              If a report came in, what would you do it
6   with it?
7        A.    I would review it and I would take the
8   information and take it from the exposure report and put
9   it into the spreadsheet.
10       Q.    Anything else you did with them?
11       A.    Depending on some of the -- the Field Use
12  Reports I would actually give to someone in -- like
13  either Rick Gibeaut or who at the time was in the
14  Training Department and ask him to review it prior to.
15       Q.    Did you establish a numbering system for the
16  Volunteer Exposure Reports?
17       A.    At one point towards the end of 2004, late
18  fall of 2004 I had suggested that they create a
19  numbering system like a Bates system or something to
20  number the forms because, you know, that way you knew
21  that there was a chronological order to them.
22       Q.    And when was that?
23       A.    That was in late 2004.
24       Q.    Can you narrow it?
25       A.    The fall.  It was fall of 2004.  I don't

Page 107

1   recall the date, but it was some time in the fall of
2   2004.
3        Q.    Would it have been -- would it be safe to say
4   October 1st or later 2004 but yet in 2004?
5              MR. REDHAIR:  Object to the form.
6              THE WITNESS:  It could have been.
7   BY MR. BRAVE:
8        Q.    When else?
9        A.    But I just -- I don't know.  It was in the
10  fall of 2004.  It could have been September.
11             I know that there was a young girl from
12  Minnesota, I don't recall her name, who came down and
13  actually helped me with the process.
14       Q.    But it was in the fall of 2004, correct?
15       A.    That I recall, yes.
16             MR. BRAVE:  I'm probably going to go into a
17  whole bunch of areas that you're going to instruct her
18  not to answer.
19             MR. REDHAIR:  Okay.
20             MR. BRAVE:  If we can just try to do it
21  efficiently, I'll try to speed through this.
22       Q.    Ms. Schreiner, what is your full name?
23       A.    Pamela J. Schreiner.
24       Q.    And your date of birth?
25       A.    June 15, 1964.

Page 108

1        Q.    Your Social Security number?
2              MR. REDHAIR:  You don't have to give that out
3   if you don't want to.
4              THE WITNESS:  I would rather not.
5              MR. BRAVE:  You're instructing her not to
6   answer?
7              MR. REDHAIR:  Yes.
8   BY MR. BRAVE:
9        Q.    Your present address?
10       A.    3731 East Renee Drive, Phoenix.  East Renee,
11  R-E-N-E-E, Drive, Phoenix, Arizona,
12       Q.    Zip Code?
13       A.    Oh, I'm sorry.  85050.
14       Q.    Your place of birth?
15       A.    Illinois.
16       Q.    Where in Illinois?
17       A.    It was Kankakee County.
18       Q.    Was there a city in Kankakee County?
19       A.    Watseka.
20       Q.    Which facility in Watseka?
21       A.    I --
22             MR. REDHAIR:  You don't have to answer that.
23             MR. BRAVE:  Are you instructing her not to
24  answer?
25             MR. REDHAIR:  Yes.  I'm instructing her not

Page 109

1   to answer.
2   BY MR. BRAVE:
3        Q.    What are your parents' names, full names?
4              MR. REDHAIR:  What is the relevance of this?
5              THE WITNESS:  I would rather not give out my
6   parents' names.
7              MR. REDHAIR:  Yes.  What is the relevance?
8              MR. BRAVE:  Just going through a complete and
9   full deposition.
10             MR. REDHAIR:  Okay.
11  BY MR. BRAVE:
12       Q.    What are your parents' full names?
13             MR. REDHAIR:  You don't need to answer that
14  if you don't want to.
15             THE WITNESS:  I would rather not.
16             MR. REDHAIR:  Okay.  I'm instructing her not
17  to answer.
18  BY MR. BRAVE:
19       Q.    Where do your parents live?
20             MR. REDHAIR:  Before we go down this road too
21  far, there is a four hour limit, presumptive limit of
22  depositions in Arizona.  Typically --
23             MS. GIBEAUT:  We are in federal court.
24  There's a seven hour limit.
25             MR. REDHAIR:  Okay.

Pamela J. Schreiner                    December 3, 2007

Page 110

1   BY MR. BRAVE:
2       Q.   Where do they live, your parents?
3       A.   In Phoenix.
4       Q.   What are their address?
5       A.   I would rather not give that out.
6            MR. REDHAIR:  I'm instructing her not to
7   answer.
8   BY MR. BRAVE:
9       Q.   Do you have any siblings?
10      A.   Yes.
11      Q.   What are their names?
12      A.   Debbie and Laurie.
13      Q.   What are their dates of birth?  What are
14  their full names?
15      A.   Deb Marsh and Laura Parsons.
16      Q.   And where do they live?
17      A.   Phoenix, Arizona and Chicago, Illinois.
18      Q.   Do you know their addresses?
19      A.   No.  I don't off the top of my head.
20      Q.   What is your full maiden name?
21      A.   I don't really want to give out my
22  information.
23      Q.   I understand that.
24           MR. REDHAIR:  I'll instruct her not to
25  answer.

Page 111

1            I mean, I think we're wasting time.  We can
2   sit here for seven hours if you think that's necessary.
3            MR. BRAVE:  So, just to be clear, you're
4   instructing her not to answer?
5            MR. REDHAIR:  Yes.
6   BY MR. BRAVE:
7       Q.   Have you ever used any aliases or any other
8   names?
9       A.   No.
10      Q.   Okay.  First have you ever used any aliases?
11      A.   No.  My name --
12      Q.   Have you ever used any names other than the
13  one you're using here today?
14      A.   Yes.  My maiden name and my previously
15  married name.
16      Q.   So there are two other names that you have
17  used?
18      A.   Yes.
19      Q.   And are you going to give me those or is your
20  attorney going to instruct you not to give me those?
21      A.   I would rather not give them out.
22      Q.   Is your attorney going to instruct you not to
23  give me those?
24      A.   I would ask for him to, yes.
25           MR. REDHAIR:  Yes, I instruct her not to

Page 112

1   answer.
2   BY MR. BRAVE:
3       Q.   Have you ever used any other Social Security
4   number other than the one you have right now?
5       A.   Absolutely not.
6       Q.   What high school did you attend?
7       A.   McHenry East Campus.
8       Q.   Where is that located?
9       A.   McHenry, Illinois.
10      Q.   Was that for the entire duration of high
11  school?
12      A.   No.
13      Q.   What other high school did you attend?
14      A.   Marion Central Catholic High School in
15  Woodstock, Illinois.
16      Q.   Which years did you attend each of those?
17  Any other facilities that you attended high school?
18      A.   That was it.  The two -- I went to Marion
19  Central High School for the first two years of my high
20  school.  I think it was 1978 'til 1980.  1980.  And then
21  I went to McHenry from 1980 'til 1982.
22      Q.   Do you remember the date of your graduation?
23      A.   I left McHenry High School in January of
24  1982.
25      Q.   Did you graduate when you left?

Page 113

1       A.   Not from McHenry, no.
2       Q.   Where did you graduate?  Where did you next
3   go to attend high school?
4       A.   I actually did on-line school with John Adams
5   High School.
6       Q.   And when did you graduate?
7       A.   Just recently.
8       Q.   With your high school diploma?
9       A.   Yes, I did.
10      Q.   How long ago was "recently"?
11      A.   May.
12      Q.   Did you have any specialty throughout high
13  school such as college prep or vocational?
14      A.   Yes.  I did go to junior college.
15      Q.   Now, during high school did you have any
16  specialty field that you were pursuing such as --
17      A.   Oh, I'm sorry.  I'm sorry.  I misunderstood
18  you.
19      Q.   That's all right.  That's fine.
20           Either college prep or vocational or anything
21  else?
22      A.   Not really.  I -- I just wanted to get
23  through junior college of some kind, business.
24      Q.   What colleges have you attended?
25      A.   McHenry Community College in Crystal Lake.

29 (Pages 110 to 113)

Pamela J. Schreiner                    December 3, 2007

Page 114

1    Q.    When was that?
2    A.    1982 on and off for a few years.  I went
3  there for a few years on and off.
4         I also attended Elgin Community College in
5  Elgin, Illinois, took a couple classes there.
6         I attended Paradise Valley Community College
7  here with some courses on and off.
8    Q.    What were your majors or specialty fields of
9  interest?
10    A.    Mostly business.  Administration, that type.
11    Q.    Any other specialty?
12    A.    At one point I did want to go into paralegal,
13  to become a paralegal.
14    Q.    Any other specialties?
15    A.    No.
16    Q.    Did you graduate from any of those
17  institutions?
18    A.    No.
19    Q.    Do you hold any degree other than your high
20  school degree?
21    A.    No.
22    Q.    Did you make any friends in college that
23  you've maintained contact post-college for the
24  long-term?
25         MR. REDHAIR:  Object to form.

Page 115

1  BY MR. BRAVE:
2    Q.    You can answer.
3    A.    Not really.
4    Q.    Not really.  Does that mean you did or you
5  didn't?
6    A.    I haven't communicated -- I don't communicate
7  with people.  I don't really -- I don't associate too
8  much with people.
9    Q.    Do you have any skill development education
10  beyond the education we've just discussed?
11    A.    I -- I would say no.  I am good with
12  computers.  I specialize in things like that, the Word,
13  Excel, PowerPoint, secretarial type duties.
14    Q.    Are you good with Word?
15    A.    Yes.
16    Q.    With Outlook?
17    A.    Yes.
18    Q.    Any other skill development beyond those
19  other than what we've already discussed?
20    A.    No.
21    Q.    Who -- did you pay yourself for that
22  additional development or did someone else or some other
23  entity pay for it?
24    A.    No.  For the most part I paid for everything
25  myself.

Page 116

1    Q.    Can you bracket a time-frame for when you
2  took those additional skill development education
3  programs?
4    A.    It was from 1982 until current.
5    Q.    Switching gears to health history, which I
6  know where you're going to go but I will just start in
7  anyway.  Have you had any serious health issues since
8  2000?
9         MR. REDHAIR:  Don't answer that.
10         THE WITNESS:  No.
11         MR. BRAVE:  So you are going to instruct her
12  not to answer anything on health?
13         MR. REDHAIR:  Yes.  Subject to what I said
14  earlier.
15  BY MR. BRAVE
16    Q.    Switching to family information, how many
17  children do you have --
18    A.    Three.
19    Q.    -- or have you had?
20    A.    Three.
21    Q.    What are their full names?
22    A.    Justin, Matthew and Jessica.
23    Q.    All with the same last name?
24    A.    Yes.
25    Q.    Which is?

Page 117

1    A.    It's Schaffter.
2    Q.    It's what?
3    A.    Schaffter.
4    Q.    Can you spell that for the court reporter,
5  please?
6    A.    S-C-H-A-F-F-T-E-R.
7    Q.    What are their dates of birth?
8    A.    I would rather --
9         MR. REDHAIR:  Don't answer that.
10  BY MR. BRAVE:
11    Q.    Where do each of them live?
12    A.    In Phoenix.
13    Q.    What are their addresses?
14    A.    Two live with me and my daughter lives
15  elsewhere.
16    Q.    Where does she live?
17         MR. REDHAIR:  You don't need to answer that
18  if you don't want to.
19         THE WITNESS:  I would rather not.
20         MR. REDHAIR:  Okay.  Then don't.
21         MR. BRAVE:  So you're instructing her not to
22  answer?
23         MR. REDHAIR:  Yes.
24  BY MR. BRAVE:
25    Q.    Are they working or in school or a

Page 118
1 combination of both?
2    A.   A combination of both for two of them.
3    Q.   Which two?
4    A.   My two sons.
5    Q.   Where do they work?
6    A.   I would rather not say.
7         MR. REDHAIR:  Don't answer that then.  I am
8 instructing you not to answer.
9 BY MR. BRAVE:
10   Q.   Where do they go to school?
11   A.   I would rather not really say.
12        MR. REDHAIR:  The same.
13 BY MR. BRAVE:
14   Q.   And your daughter, what does she do, work or
15 go to school?
16   A.   She works.
17   Q.   Where?
18   A.   I would rather not discuss that.
19        MR. REDHAIR:  Then don't.  I'm instructing
20 her not to.
21 BY MR. BRAVE:
22   Q.   Switching to marriage history, when were you
23 first married, what date?
24   A.   April 11th.
25   Q.   What year?

Page 119
1         MR. REDHAIR:  Let's take a quick break.
2         THE WITNESS:  1983.
3         MR. REDHAIR:  Do you want to break for lunch
4 or do you want to just take five?
5         MR. BRAVE:  Break for lunch.
6         MR. KYLER:  We're going off the record.  The
7 time is 12:25.
8         (Whereupon, the deposition was then
9         recessed at 12:25 p.m. until
10        1:47 p.m.)

Page 120
1                   Phoenix, Arizona
2                   December 3, 2007
3                   1:47 p.m.
4
5
6         (Deposition Exhibit Numbers 3 through 22,
7         inclusive, were then marked for
8         identification.)
9         MR. KYLER:  We're back on the record.  The
10 time is 1:47.
11
12        PAMELA J. SCHREINER,
13 called as a witness herein, having been previously duly
14 sworn, was examined and testified as follows:
15
16             EXAMINATION
17 BY MR. BRAVE:
18   Q.   Allow the record to reflect that Scott Link
19 has left and Doug Klint has joined us as corporate
20 representative for Taser International.
21        Mr. Court Reporter, I believe you had a
22 question.
23        THE REPORTER:  I've already got it.
24        MR. BRAVE:  You've got the answer.  Okay.
25   Q.   Ms. Schreiner, is there anything that you --

Page 121
1 is there anything at this point that you would like to
2 correct or change regarding your prior testimony today?
3    A.   No, sir.
4    Q.   During the lunch break did you have any
5 conversations either with or in the presence of
6 Ms. Johnson?
7    A.   We had conversation, yes, but --
8    Q.   Did any of that conversation pertain at all
9 in any way to your testimony -- to your answers to this
10 case in the broadest possible sense?
11   A.   No.
12   Q.   So you did not discuss anything regarding
13 your testimony in this case at all during the lunch
14 break --
15   A.   No.
16   Q.   -- in Ms. Johnson's presence?
17   A.   No.
18   Q.   Have you had any --
19        MR. REDHAIR:  And just for the record, I
20 called my sister who's an FBI agent, and just -- she
21 didn't talk to her but just so you're clear.
22        MR. BRAVE:  That's fine.
23   Q.   Have you had -- other than what you've
24 testified to here today, have you had any other
25 communications with any other attorneys and/or their

Pamela J. Schreiner                                    December 3, 2007

Page 122

1    staff to your knowledge regarding Taser International,
2    Taser devices, Taser litigation, et cetera in the
3    broadest possible sense?
4        A.   I was deposed a month ago from another law
5    firm.
6        Q.   Let me shorten it.  Other than that
7    deposition and what you testified to there and what you
8    testified to here today, any others?
9        A.   No.
10       Q.   Have you ever had any communications with
11   Mr. John Dillingham?
12       A.   Yes.  But that was in the Powers case.  I'm
13   sorry.  Yes.
14       Q.   But that was only in the Powers case when
15   Taser's attorneys were present?
16       A.   Yes.
17       Q.   Nothing outside of that?
18       A.   Not that I recall.
19       Q.   And what about Mr. Tom Wilmer; the same
20   series of questions?
21       A.   No.
22       Q.   Regarding the statements you made regarding
23   document shredding, did you ever notify anyone at the
24   Securities and Exchange Commission or tell them anything
25   regarding your statements regarding document shredding?

Page 123

1        A.   Not that I recall.
2        Q.   How about Department of Justice?
3        A.   Not that I recall.
4        Q.   How about the FBI?
5        A.   I would rather not answer that.  That was
6    part of the investigation.
7        Q.   Okay.  I'm asking for a yes or no question --
8    the answer.  Did you or did you not discuss with them
9    the statements you've made regarding the document
10   shredding by either Rick Smith and/or Doug Klint?
11           MR. REDHAIR:  I'm going to instruct her not
12   to answer.  She was told by the FBI not to discuss the
13   case or the investigation, so I'm instructing her not to
14   answer.
15           MR. BRAVE:  And just to be clear, the only
16   basis upon which you're making that statement is based
17   upon not your direct knowledge but upon what
18   Mrs. Schreiner said, correct?
19           MR. REDHAIR:  Correct.  And what I have
20   learned in the conversation with my sister about the FBI
21   protocol.
22           MR. BRAVE:  Okay.  But that was only about
23   the protocol.  It had nothing to do with the direct
24   conversation and/or meetings that Ms. Schreiner had with
25   the FBI agents correct?

Page 124

1            MR. REDHAIR:  I don't think I'm being deposed
2    and I don't think I understand that question.
3            I'm instructing her not to answer based on
4    the representation by the FBI agent not to discuss the
5    case.
6            MR. BRAVE:  Okay.  Here's the point I'm
7    making.  The only knowledge you have regarding that
8    supporting instruction not to answer is -- specifically
9    pertains to Ms. Schreiner, her communications with the
10   FBI are her assertions that they told her, instructed
11   her not to answer any questions regarding that, correct?
12           MR. REDHAIR:  And the conversation with an
13   FBI agent over the lunch hour where they informed me
14   that they frequently tell witnesses not to discuss the
15   case.
16           MR. BRAVE:  Right.  The distinction I'm
17   getting at is the discussion -- and I'm not deposing
18   you.  I just want it clear on the record.  The
19   discussion you're talking about did not have anything
20   specifically to do was Ms. Schreiner and her contacts
21   with the FBI?
22           MR. REDHAIR:  Correct.
23   BY MR. BRAVE:
24       Q.   Ms. Schreiner, during your time when you were
25   working at Taser were you on any kind of medication or

Page 125

1    anything else that would have impaired your ability to
2    work or your cognitive abilities at any time during your
3    period of employment at Taser?
4            MR. REDHAIR:  I'm going to instruct her not
5    to answer that.
6    BY MR. BRAVE:
7        Q.   Was there any factor that you can recall
8    during your period of employment with Taser that you
9    experienced that would have in any way limited or
10   impaired your ability to work and/or your cognitive
11   ability?
12           MR. REDHAIR:  Could you repeat that?
13   BY MR. BRAVE:
14       Q.   At any time during your employment with Taser
15   while you were working was there any factor that you can
16   mention in the broadest possible sense that could have
17   had a negative impact on your ability to work or your
18   cognitive ability?
19           MR. REDHAIR:  Excluding medical, right,
20   because I've --
21           MR. BRAVE:  If you wish to object, object.
22   If you wish to instruct her not to answer, do so.
23           MR. REDHAIR:  Object to form.
24           Do you feel comfortable answering that?
25           THE WITNESS:  Well, other than medical, no.

32 (Pages 122 to 125)

Pamela J. Schreiner                    December 3, 2007

Page 126

1   BY MR. BRAVE:
2       Q.   So, other than medical, no, correct?
3       A.   Correct.
4           MR. BRAVE:  And you're instructing her not to
5   answer anything regarding medical?
6           MR. REDHAIR:  Right.  And you may want to
7   follow -- okay.  Correct.
8   BY MR. BRAVE:
9       Q.   Is there anything regarding any potential
10  medical issue that may have had a negative impact on
11  your ability to work and/or cognitive abilities during
12  your employment at Taser International?
13          MR. REDHAIR:  Don't answer that.  She's not
14  going to discuss any of her medical records or
15  conditions.
16          MR. BRAVE:  The only reason I asked that
17  question is because of the statement you began to make
18  and then stopped.  I thought there was something I'm
19  missing.
20          MR. REDHAIR:  There's not.  But she's not
21  going to discuss any medical conditions.
22  BY MR. BRAVE:
23      Q.   Going back to the outline, when were you
24  first married, the date?
25      A.   My previous husband, or my current husband

Page 127

1   rather?
2       Q.   When was your first -- what is the date of
3   the first marriage that you may have entered into?
4       A.   April 11, 1982.
5       Q.   And what was the name of that husband?
6       A.   Steve.
7       Q.   What was his full name?
8       A.   I would rather not answer that.  I -- I
9   really don't want to answer that question.  If I must I
10  will, but I'd rather not.
11          MR. REDHAIR:  Let's answer it now.
12          THE WITNESS:  Okay.  It's Steven Schaffter.
13  BY MR. BRAVE:
14      Q.   Steven with a V or a P-H?
15      A.   V.
16      Q.   What was his middle name?
17      A.   Roger.
18      Q.   And how do you spell his last name?
19      A.   S-C-H-A-F-F-T-E-R.
20      Q.   And what was his date of birth?
21      A.   February 14, 1963.
22      Q.   And where were you married?
23      A.   In McHenry, Illinois.
24      Q.   Did you have any children with that husband?
25      A.   Yes.

Page 128

1       Q.   How many?
2       A.   Three.
3       Q.   What were their -- are these the same three
4   children you have now?
5       A.   Yes.
6       Q.   When did you separate from him?
7           MR. REDHAIR:  Just the date?
8           MR. BRAVE:  Yes.
9           THE WITNESS:  It was in 1990.
10  BY MR. BRAVE:
11      Q.   Did you divorce?
12      A.   Yes, we did.
13      Q.   And what date was the divorce?
14      A.   November 25, 1991.
15      Q.   In what court?
16      A.   McHenry County.
17      Q.   Illinois?
18      A.   Yes.
19      Q.   And did you have a second marriage?
20      A.   Yes.
21      Q.   And what is the date of that second marriage?
22      A.   October 16, 1993.
23      Q.   And what is that husband's name?
24      A.   Michael Schreiner.
25      Q.   And his middle name?

Page 129

1       A.   Eric.
2       Q.   And I'm assuming that's your present husband?
3       A.   Yes.
4       Q.   What is Mr. Schreiner's date of birth?
5       A.   I would really not want to give that out.
6           MR. REDHAIR:  I'll instruct her not to
7   answer.
8   BY MR. BRAVE:
9       Q.   Did you have any children with Mr. Schreiner?
10      A.   No.
11      Q.   Do you have any children other than those
12  you've previously identified today?
13      A.   No.
14      Q.   Have you had any other husbands other than
15  those two?
16      A.   No.
17      Q.   We already know what your current residence
18  is.  When did you move into your current residence?
19      A.   July of 2004.
20      Q.   And where did you live prior to that?
21      A.   3942 East Westcott Drive, Phoenix, Arizona
22  85050.
23      Q.   And did you move contemporaneously from one
24  location, from one address to the other?
25      A.   I'm sorry.  Could you repeat that?

Pamela J. Schreiner                           December 3, 2007

Page 130

1    Q.    Did you basically move from one home to the
2  other without a large gap in time?
3    A.    Yes.
4    Q.    Your present home, do you own or rent?
5    A.    Own.
6    Q.    Your previous home, did you own or rent?
7    A.    Own.
8    Q.    Prior to your previous home where did you
9  live?
10   A.    I don't recall the address but it was in
11 Phoenix.
12   Q.    What time-frame would that have been in?
13   A.    It would have been 1994 to 1995.
14   Q.    Where do you presently work?
15   A.    I have two jobs.  My full-time job is Naumann
16 Hobbs Material Handling.
17   Q.    And what do you do with them?
18   A.    I am a Field Service Supervisor.
19   Q.    And what do your duties consist of?
20   A.    Basically payroll.  I supervise the staff, I
21 mail reports, I invoice.  I do just a number of
22 different administrative type duties.
23   Q.    What is their address?
24   A.    40 -- 43rd Street and Broadway.  I can't
25 think of it.  4331 East 43rd Street I think.

Page 131

1    Q.    In what city?
2    A.    Phoenix, Arizona.
3    Q.    And the phone number for the office?
4    A.    I -- (602) 346-2214.
5    Q.    Who is your immediate supervisor at that
6  employer?
7    A.    Do I need to really give that out?
8          MR. REDHAIR:  I mean, he's entitled to get
9  some background.
10         Here's the problem.  She is concerned about
11 the harassment that she's perceived and so she's having
12 a difficult time deciding, you know, information to give
13 out.  So I don't want to be obstructionist, but I want
14 you to understand her concern.
15         MR. BRAVE:  I understand.  My concern is that
16 we are entitled to this information and our position is
17 that she may have been involved in actions that cost
18 this company hundreds of millions of dollars and there
19 are things and her previous statements and what has
20 transpired that simply do not make sense and, therefore,
21 we are entitled to explore into those areas.
22         MR. REDHAIR:  Okay.  I mean, I would -- if
23 you feel comfortable telling the telephone number make
24 that --
25         MR. BRAVE:  She already gave that.

Page 132

1          THE WITNESS:  I did that.
2          MR. REDHAIR:  What was the other one?
3          MR. BRAVE:  Name of immediate supervisor.
4          MR. REDHAIR:  Okay.
5          THE WITNESS:  Scott Hunt.
6  BY MR. BRAVE:
7    Q.    And what is his title?
8    A.    Service Manager.
9    Q.    Who's the person who is in charge of the
10 entire business?
11   A.    I -- I don't know.  There's several officers
12 of the company.  So I don't know.  I don't actually
13 speak to them.  I don't -- I don't really know.  I've
14 only been there a short time, so --
15   Q.    When did you start there?
16   A.    In July.  The end of July, 2007.
17   Q.    And you've mentioned a second employer.
18 Who's that?
19   A.    Bed, Bath & Beyond.
20   Q.    What's their address or where are they
21 located?
22   A.    Scottsdale Road and the 101 in Scottsdale,
23 Arizona.
24   Q.    And who's your immediate supervisor there?
25   A.    Glenn Johnson.

Page 133

1    Q.    What do you do for them?
2    A.    I'm a cashier.
3    Q.    When did you start there?
4    A.    September of 2007.
5    Q.    Going back in time chronologically, where did
6  you work prior to these two -- prior to these two
7  locations?
8    A.    I worked at Arnold Machinery.
9    Q.    What -- do you know where are they located?
10   A.    Laveen, Arizona.  6024 West Southern Avenue.
11   Q.    Who was your immediate supervisor?
12   A.    Will Long was the branch manager.  I don't
13 know if he's still there, but --
14   Q.    What was your job title?
15   A.    Office Manager.
16   Q.    And what did you -- what was your job
17 description?  What did you do for them?
18   A.    Basically the same thing I'm doing now;
19 payroll, invoicing, filing, any administrative type
20 duties.
21   Q.    When did you start with them?
22   A.    In September of 2005.
23   Q.    And when did you leave their employ?
24   A.    May of 2007.
25   Q.    What was the reason for leaving?

34 (Pages 130 to 133)

Pamela J. Schreiner                    December 3, 2007

Page 134

1    A.    The division was eliminated because of the
2 economy.
3    Q.    Were you at any time while employed with them
4 accused of poor work, dishonesty, inability to get along
5 or anything like that?
6    A.    No.
7    Q.    Prior to that employer where did you work?
8    A.    Quality Building Maintenance.
9    Q.    And during what time period did you work
10 there?
11   A.    May of 2005 'til September of 2005.
12   Q.    Where are they located?
13   A.    They were in Tempe.  I don't know that they
14 are still in business.
15   Q.    What was your job with them?
16   A.    Basically it was a girl Friday office type.
17   Q.    Who was your immediate supervisor?
18   A.    His name was Wade Hardy.
19   Q.    And do you know who owned that business --
20   A.    He did.
21   Q.    -- or who was the principal person?
22   A.    He did.
23   Q.    Why did you leave their employ?
24   A.    Because my paychecks were bouncing.
25   Q.    At any time were you accused of poor work,

Page 135

1 dishonest dealing, inability to get along, et cetera
2 while employed with them?
3    A.    No, no.
4    Q.    And prior to working with them where did you
5 work?
6    A.    I -- that was pretty much it.  I was at Taser
7 International.
8    Q.    Did you ever work with anybody called Prepaid
9 Legal?
10   A.    Yes.
11   Q.    When was that?
12   A.    June of 2002 until March of 2004.
13   Q.    Did you have -- personally have any
14 complaints against Prepaid Legal, the company?
15   A.    No.
16   Q.    Were there any employees at Prepaid Legal
17 that you were particularly close to, any co-workers?
18   A.    Well, I basically talked with everybody.  I
19 was their supervisor of the staff and that's it.
20   Q.    Have you had any contact with anybody from
21 Prepaid Legal after you left Taser International?
22   A.    I would occasionally see people in the mall
23 or something and at one point I actually contacted one
24 of the attorneys for my mom and dad for a personal issue
25 they had to see if they could help them.

Page 136

1    Q.    Did it have absolutely anything to do with
2 you in any way, shape or form?
3    A.    No.
4    Q.    Were you accused of any wrongdoing while at
5 Prepaid Legal?
6    A.    No.
7    Q.    So, just to be clear, you were not accused of
8 embezzlement while at Prepaid Legal?
9    A.    No.
10        MR. BRAVE:  My next section is family
11 finances.  Do you want me to go through each question or
12 do you want just instruct her not to answer?
13        MR. REDHAIR:  Yes, I'm going to instruct her
14 not to answer and you can deal with them.
15        MR. BRAVE:  The next section is asset
16 inventory.
17        MR. REDHAIR:  The same.
18        MR. BRAVE:  Next group is inventory
19 communication devices.
20        MR. REDHAIR:  I don't understand.
21        MR. BRAVE:  Such as how many computers in the
22 household, who they belong to, et cetera.
23        MR. REDHAIR:  Yes, the same on that.
24        MR. BRAVE:  Next area is investments.
25        MR. REDHAIR:  The same.

Page 137

1        MR. BRAVE:  Next area is tax returns.
2        MR. REDHAIR:  Yes, the same.
3 BY MR. BRAVE:
4    Q.    Getting back to Prepaid Legal, how did you
5 end up applying for a job with them?
6    A.    I answered -- I responded to an ad.  I don't
7 recall if it was in the newspaper or on-line.  I just --
8 I recall responding to an ad, sending my resume.
9    Q.    Did you ever work for a law firm called
10 Parker Stanbury?
11   A.    That was Prepaid Legal, yes.
12   Q.    So while you were at Parker Stanbury you were
13 actually working for Prepaid Legal?
14   A.    Parker Stan -- Parker Stanbury had the
15 contract for Prepaid Legal.
16   Q.    Did you end up applying for a job directly
17 with Parker Stanbury law firm?
18   A.    Not -- well, when I responded to the ad it
19 didn't actually say Parker Stanbury, so when I responded
20 to it one of the attorneys from there contacted me and I
21 found out then.  My paychecks came from Parker Stanbury
22 but it was because of the Prepaid Legal contract that
23 the position was there.
24   Q.    So, if I understand you correctly, you
25 applied for a job with Parker Stanbury but you did not

Pamela J. Schreiner                              December 3, 2007

Page 138

1    accept a job with Parker Stanbury?
2        A.   I did.  I worked for Parker Stanbury because
3    of the Prepaid Legal contract.
4        Q.   Did you have any previous legal experience
5    before working for Prepaid Legal?
6        A.   No.
7        Q.   Did you have any previous legal experience
8    before working at Parker Stanbury?
9        A.   No.
10       Q.   Did anyone inform you that there was a
11   position open at Parker Stanbury prior to applying for
12   it?
13       A.   No.
14       Q.   Did you have any referral help at all for
15   that job?
16       A.   No.
17       Q.   Did you have any interviews for that job?
18       A.   Yes.
19       Q.   What was the name of the person that
20   interviewed you for that job?
21       A.   Mike Fuller and Stacey Fuller.
22       Q.   What was your title with that organization?
23       A.   Legal administrator.
24       Q.   What tasks were you involved in in your job?
25       A.   Basically supervising the staff and

Page 139

1    maintaining the reports for Prepaid Legal, making sure
2    that the calls were being answered timely, watching the
3    document room, making sure that the files were filed
4    accordingly, word processing.  It wasn't a traditional
5    law firm.
6        Q.   How many lawyers were in that office?
7        A.   When the law firm closed I believe there were
8    22 to 25.
9        Q.   Who was your immediate supervisor?
10       A.   Mike Fuller.
11       Q.   How well did you get along with Mr. Fuller?
12       A.   Pretty well.
13       Q.   When was the last time you've been in contact
14   with Mr. Fuller?
15       A.   It's been a few years.  I've seen him at the
16   mall at Christmas time and he wished me a merry
17   Christmas and that's it.
18       Q.   Who was head of the Parker Stanbury law firm?
19       A.   They were out of California.  It was Robert
20   Lopresti and Ron Smith.
21       Q.   What was -- how was your relationship with
22   both of them?
23       A.   I really didn't know Ron Smith that well.
24   And Mr. Lopresti and I got along very well, pretty well.
25       Q.   When is the last time you've seen either one

Page 140

1    of them?
2        A.   Probably February of 2004.  That was
3    Mr. Lopresti I met with.
4        Q.   Were there any attorneys at Parker Stanbury
5    who you felt did not like you or the job you were doing
6    for any reason?
7        A.   No.
8        Q.   For any lawyer who has advised you, paid or
9    for free, since January, 2004 please provide the
10   following:  First the name of the law firm?
11       A.   I'm not sure I understand.  I'm sorry.
12       Q.   Has there been any attorney who has advised
13   you, paid or for free, since January, 2004 on any issue?
14       A.   No.
15            MR. REDHAIR:  Object to the form.  Go ahead.
16            THE WITNESS:  No.
17   BY MR. BRAVE:
18       Q.   Please name every person in the securities
19   industry you have communicated with since January, 2004?
20   Communications include verbal, telephonic, electronic,
21   FAX and mail if there have been any.
22       A.   There haven't been any.
23       Q.   The same question for reporters.  Name every
24   reporter that you have communicated with since January,
25   2004?  Communications include verbal, telephonic,

Page 141

1    electronic, FAX and mail.  Have there been any?
2        A.   No.
3        Q.   The same question with analysts.  Did you
4    ever communicate with any analyst other than to direct
5    phone calls or to take messages?  Communications in this
6    case means disseminating company information, the
7    company being Taser, verbally, electronically,
8    telephonic, FAX or e-mail.
9        A.   No, not to my knowledge.
10       Q.   Isn't it true that there was about a dozen
11   analysts who called on your direct line at Taser and
12   asked for you by name at least immediately after you
13   resigned?
14       A.   I wouldn't know that.
15       Q.   Could you explain why that might happen?
16            MR. REDHAIR:  Object to the form.
17            THE WITNESS:  Well, probably because I
18   reported to Rick Smith and that was actually Rick
19   Smith's direct line when I first started and whenever I
20   answered my phone I could actually answer my phone "Rick
21   Smith's office.  This is Pam."  But why they would call
22   me direct I have no idea other than that reason.
23   BY MR. BRAVE:
24       Q.   While you were employed at Taser did you have
25   any co-workers that you socialized with outside of the

Coash & Coash                           602-258-1440

Pamela J. Schreiner                          December 3, 2007

Page 142

1  company?
2      A.   You mean having a beer with them or
3  something?
4      Q.   Just anything outside of work.
5      A.   No.
6      Q.   What is your relationship with Bonnie
7  O'Malley?
8      A.   She was a -- one of my staff at Parker
9  Stanbury.  She was a secretary there.
10     Q.   When did you first meet Bonnie?
11     A.   We met at Albertson's when we worked together
12  at the Albertson's regional office.  She was also an
13  administrative assistant at Albertson's.
14     Q.   What kind of time-frame would that be?
15     A.   Probably I think she came on to
16  Albertson's -- I don't recall the date, but I believe
17  she came into our group in 2001 maybe, the latter part
18  of.  I don't recall.  I know that it was before I had
19  gone to Parker Stanbury.
20     Q.   Did you work with Bonnie O'Malley anywhere
21  other than Albertson's and Taser?
22     A.   At Parker Stanbury.  She was a secretary
23  there.
24     Q.   Anyplace else?
25     A.   No.

Page 143

1      Q.   Did you both move to Phoenix about the same
2  time?
3      A.   I have no idea when she moved to Phoenix.
4      Q.   Who got the first job at Albertson's, either
5  yourself or Bonnie?
6      A.   I -- I don't know.  I know I was at the
7  Albertson's regional office when she appeared, so I
8  guess I would have.  I don't know.
9      Q.   Did you help Bonnie O'Malley get a job at
10  Albertson's?
11     A.   No.
12     Q.   Was Bonnie O'Malley accused of any misdeeds
13  or inappropriate behavior at Parker Stanbury?
14     A.   Not to my knowledge.
15     Q.   Who came to Taser to be employed first,
16  yourself or Bonnie O'Malley?
17     A.   Myself.
18     Q.   Did you assist Bonnie in coming to work or
19  going to work at Taser?
20     A.   Yes.  I -- I told her of a position and I
21  knew that she was in need of a position because of the
22  closing of the law firm so I did, you know, I told her
23  of a position there.
24     Q.   Back when Taser was investigating the leaks
25  back in January, early January, 2007 --

Page 144

1      A.   Uh-huh.
2      Q.   -- do you know the time-frame I'm referring
3  to?
4      A.   Yes.
5      Q.   Did you have any discussions or conversations
6  with Bonnie O'Malley regarding anything related to the
7  leaks or anything around those accusations or facts?
8      A.   Not that I recall.
9      Q.   Is there anything that would help you recall?
10     A.   No, because I would not have contacted her.
11     Q.   Do you have a friend or a person who's been a
12  co-worker in the past that you have been relatively
13  close to by the name of Debbie?
14     A.   Debbie?
15     Q.   Along the same line of questioning as
16  Ms. O'Malley, something along those lines?
17     A.   I had a Debbie that worked at Parker Stanbury
18  as a receptionist but I wouldn't say that she was my
19  friend or anything.  She was my receptionist at Parker
20  Stanbury.
21     Q.   What was Debbie's full name?
22     A.   Debbie Thompson.
23     Q.   Was she with you at -- was Debbie Thompson
24  with you at any other location or any other place of
25  employment?

Page 145

1      A.   She came on to Taser as well.
2      Q.   After you did or before you did?
3      A.   After I did.
4      Q.   Have you had any contact with her since your
5  departure from Taser on January 27, 2005?
6      A.   No.
7      Q.   At Taser in January of 2005 and the end of
8  December, 2004 where was your normal seat and desk
9  located in relationship to the main company FAX machine?
10     A.   It was around -- there was a wall that
11  separated me from the FAX.
12     Q.   So approximately how far was it?
13     A.   Well, there were -- let me clarify that
14  because there were actually two different FAX machines
15  because there was one that was as you walk in the
16  door -- you walk in the door, there was a receptionist
17  and you kind of made a little bit of a left turn and
18  there was a hallway and there was a FAX that sat in that
19  hallway and you had to go around the corner and then I
20  sat on the other side of the wall from that FAX.  And
21  then there was also another FAX machine that was down by
22  the restrooms that was a little way's away.
23     Q.   Was it part of your duties to include
24  collecting FAXes off those FAX machines?
25     A.   If I saw FAXes there I would collect them.

Pamela J. Schreiner                                    December 3, 2007

Page 146

1    Q.    Was it part of your duties to answer outside
2  telephone calls?
3    A.    Yes.
4    Q.    Did you produce Taser investor packets from
5  your home?
6    A.    With an approval from Doug or Rick.
7    Q.    What computer access did you have to
8  confidential Taser information?  Could you access all
9  the drives in the computer network system?
10        MR. REDHAIR:  Object to form.
11        THE WITNESS:  At my desk, yes.  Well, there
12  were -- I'm sure there were some drives that I couldn't
13  get to that were strictly for the officers.
14  BY MR. BRAVE:
15    Q.    Did you check e-mails for Rick Smith?
16    A.    Eventually, yes.  Not at first I did not.
17    Q.    Did you check e-mails for Tom Smith?
18    A.    No.
19    Q.    Did you check e-mails for Doug Klint?
20    A.    At one point I did.
21    Q.    Approximately when was that and for what
22  period of time?
23    A.    Doug was actually earlier than Rick and it
24  would have been a few months after my hire up until the
25  time I left.

Page 147

1    Q.    Did you check any e-mails for Phil Smith?
2    A.    Yes.
3    Q.    Did you have any of their passwords?
4    A.    Not to my knowledge.  I don't recall ever
5  having anybody's passwords.
6    Q.    If you didn't have their passwords, how did
7  you check their e-mail?
8    A.    It was a shared -- they gave me the access,
9  you know, the -- what's the word for it -- they
10  designated me to be the one in their e-mail.  It would
11  actually come through my -- my Outlook.
12    Q.    Were you employed by -- did you work for or
13  did you have any other kind of independent contracts or
14  employee relationship in the broadest possible sense
15  with any other person or entity other than Taser
16  International during your time at Taser which would have
17  been from March 4, 2004 until January 27, 2005?
18        MR. REDHAIR:  Object to the form.
19        THE WITNESS:  I probably -- I could have had
20  a part-time job because I'm always working part-time
21  jobs, but I don't recall.
22  BY MR. BRAVE:
23    Q.    Is there anything that would refresh your
24  memory?
25    A.    By going back into my -- my financial

Page 148

1  information and looking.
2    Q.    What kind of a part-time job would that have
3  been?
4    A.    It could have been anything from retail to
5  cleaning offices.
6    Q.    Anything else other than that?
7    A.    No, unh-unh.
8    Q.    Since January 1st of 2004 did you --
9  rephrase -- no, that's fine.  Since January 1, 2004 were
10  you ever employed or retained in any way or form in the
11  broadest possible sense with any kind after law firm,
12  legal entity or attorney?
13    A.    Since January of 2004?
14    Q.    Yes.
15    A.    Yes, I worked at Prepaid Legal.
16    Q.    Anywhere else for anyone else?
17    A.    No, no.
18    Q.    Do you know a Dawn Gilbertson?
19    A.    No.
20    Q.    Do you know a Robert -- when I say "do you
21  know" what I mean is have you ever had any contacts with
22  in the broadest possible sense including e-mails,
23  communication, telephone calls, et cetera.
24        Robert Englund?
25    A.    I know the name, but I don't -- I don't --

Page 149

1  I've never spoke to him.
2    Q.    Have you ever had any communications to him
3  or from him in any way?
4    A.    No.
5    Q.    Okay.  Again this applies to this list I'm
6  going to go down.  The question is not whether you know
7  who the person is --
8    A.    Okay.
9    Q.    -- but whether or not you've had any
10  communications of any type either directly or indirectly
11  or through some third party.
12    A.    Okay.
13    Q.    Thor Valdmanis of USAToday?
14    A.    Again I don't recall the name.
15    Q.    So that -- so, therefore, you did not have
16  any communications with him?
17        MR. REDHAIR:  Object to form.
18        THE WITNESS:  I truly don't recall.  I had
19  several people calling when I worked at Taser.  There
20  were several people that would call my line to speak
21  with Rick Smith, so I don't -- I really don't recall
22  their names, all of them.
23  BY MR. BRAVE:
24    Q.    Outside of that, did you have any
25  communications in any way, shape or form with him?

38 (Pages 146 to 149)

Pamela J. Schreiner                    December 3, 2007

Page 150

1    A.   No.
2    Q.   Alex Barenson?
3    A.   No.
4    Q.   J. Carr Bettis?
5    A.   No.
6    Q.   Anybody at Gradient Analytics?
7    A.   No.
8    Q.   Don Vickery?
9    A.   No.
10   Q.   Rob Macelli?
11   A.   No.
12   Q.   Anyone else at Gradient?
13   A.   No.
14   Q.   Law firms; Milberg Weiss?
15   A.   No.
16   Q.   Law firm, Lorach Coughlin?
17   A.   No.
18   Q.   Any other law firm other than Parker
19 Stanbury?
20   A.   No.
21   Q.   Any investment bankers?
22       MR. REDHAIR:  Object to form.  What is the
23 relevance of this to the case that she's here to
24 discuss?
25       MR. BRAVE:  It's real simple.  If she had

Page 151

1 some kind of a financial interest in this or she did act
2 in any way to cause a very large demise of the Taser
3 stock back in 2005, then therefore she has ulterior
4 motives and bias in what she is saying here today and
5 that's a reasonable assumption based on what we know.
6 So, therefore, I'm just asking the broadest possible
7 questions.  If the answer is no, you notice I'm not
8 going any further, but I'm entitled to ask these simple
9 questions.
10   Q.   Investment bankers?
11   A.   No.
12   Q.   Hedge fund managers?
13   A.   No.
14   Q.   Stockbrokers?
15   A.   No.
16   Q.   Any other journalists?
17   A.   No.
18   Q.   Did you cause any Taser company documents,
19 paper or electronic, to be removed to your house?
20   A.   With approval, yes.
21   Q.   And what documents would those have been?
22   A.   It was actually the spreadsheet.
23   Q.   Long-term exposure spreadsheet?
24   A.   Yes, sir.
25   Q.   Anything else?

Page 152

1    A.   No.
2    Q.   And who approved you to do that?
3    A.   Doug Klint.
4    Q.   Did you cause any Taser company documents,
5 paper or electronic, to be removed or transferred to any
6 other computer other than at Taser or the one computer
7 at your home that you just mentioned for the volunteer
8 exposure spreadsheet?
9    A.   No.
10   Q.   Did you cause any Taser company documents,
11 paper or electronic, to be removed to any outside third
12 parties other than what you just discussed?
13   A.   No.
14   Q.   At Taser International did you handle the
15 facsimile from the Securities and Exchange Commission on
16 December 23, 2004?
17   A.   I don't recall.  I don't recall a FAX.  I
18 mean, I don't remember what FAXes came through or what
19 documents they were.
20   Q.   Is there anything that would refresh your
21 memory on that specific question?
22   A.   Not necessarily.  I just -- it was three or
23 four years ago.  I don't recall.
24   Q.   Did you in that same period late December
25 2004, early January, 2005, did you handle a letter to

Page 153

1 Doug Klint from the Securities and Exchange Commission?
2    A.   If I did I would have handed it to Doug
3 Klint.
4    Q.   Do you have any recollection as you sit here
5 today of any letter such as that?
6    A.   I don't recall.
7    Q.   Do you have any recollection of opening such
8 a letter?
9    A.   I do recall getting an envelope only because
10 of remembering the envelope and I gave it to Doug.
11   Q.   Is there anything else that would provide
12 additional refreshment to your recollection regarding
13 that letter and/or its opening?
14   A.   No.
15   Q.   Did you lie about opening the letter, the SEC
16 letter when asked by investigators Click and Robinson?
17       MR. REDHAIR:  Object to form.
18       THE WITNESS:  No, I did not lie.  I just was
19 confused when they were questioning me.
20 BY MR. BRAVE:
21   Q.   Were all these Securities and Exchange
22 Commission letters in a file locked in your desk drawer?
23   A.   They were in my desk drawer because that's
24 where I was told to put them.
25   Q.   Were the company calendars kept in your work

Pamela J. Schreiner                    December 3, 2007

Page 154

1  space?
2      A.   In my computer.
3      Q.   While you were at work at Taser on December
4  30th of 2004 did you handle an order that was in
5  relationship to DGG?
6      A.   No.
7      Q.   D David, G George, G George.  That's the name
8  of the company.
9          Did you know of a January, 2005 meeting with
10 the Arizona Attorney General and members of Taser?
11     A.   No.  I -- I vaguely know that it was on the
12 calendar but I didn't know what it was for.
13     Q.   Did you schedule that meeting?
14     A.   I don't recall if I actually scheduled it or
15 not.
16     Q.   Is there anything that would refresh your
17 memory?
18     A.   No, other than if somebody said I did.  I --
19 but I do not recall actually scheduling it.  I don't
20 know.
21     Q.   If someone said you did schedule it would
22 have any basis to dispute that?
23     A.   No.
24     Q.   Did you tell anyone outside of Taser's
25 executive team about the meeting regarding the Arizona

Page 155

1  Attorney General in January, 2005?
2      A.   No.  I had no reason to.  I didn't even know
3  what it was for.
4      Q.   Did you have access to the Taser confidential
5  stock grant ledger in January of '05?
6      A.   No.  I don't even know what that is.
7      Q.   Did you disclose stock grant information for
8  one to four police officers to Thor Valdmanis in late
9  2004 or January, 2005?
10     A.   No.
11     Q.   Did you have access to the confidential Taser
12 training bulletins?
13     A.   The training bulletins?
14     Q.   Yes.
15     A.   I don't recall if I did or not.  To be honest
16 with you, I don't recall.
17     Q.   Did you cause a September, 2004 training
18 bulletin or any other to go to Alex Barenson of the New
19 York Times or to any other person outside of Taser?
20     A.   Absolutely not.
21     Q.   Did you copy any files from your computer at
22 Taser?
23     A.   No.
24     Q.   Other than the Volunteer Exposure Report that
25 you've already testified to, did you e-mail any of the

Page 156

1  Taser documents to your personal e-mail account?
2      A.   There were a few things that were public that
3  were, you know, clips of, you know, where it was, for
4  instance, if it saved somebody or, you know, an article
5  that was public knowledge that I wanted to watch at
6  home, just to watch the -- the clip.
7      Q.   Anything else?
8      A.   No.
9      Q.   Did you have a key to the office in December,
10 2004 and January 2005?
11     A.   Yes.
12     Q.   On January 27, 2005 why did you resign or
13 provide a resignation to the detectives who were
14 interviewing you?
15         MR. REDHAIR:  Object to form.  Go ahead.
16         THE WITNESS:  Because they basically told me
17 that was the best thing for me to do, so they gave me a
18 little -- they ripped out a piece of paper and I wrote
19 down something and that was that.
20 BY MR. BRAVE:
21     Q.   If both of those investigators state that you
22 brought your statement of resignation with you, would
23 you have any basis to dispute that or disprove that?
24     A.   Yes, I would.
25     Q.   And what would that be?

Page 157

1      A.   Because that's not what happened.  They --
2  they told me in the meeting that that would be the best
3  thing to do and they basically intimidated me into
4  thinking that was the best thing to do, so I did that
5  with them sitting at their present -- they handed me the
6  piece of paper and a pen.  I wrote it out and that was
7  the end of the story.
8      Q.   Have you ever provided in the broadest
9  possible context any Taser confidential information to
10 any attorneys or anyone working on their behalf that you
11 know of that wasn't specifically delegated to you by one
12 of the Taser executives?
13     A.   No.
14     Q.   Are you paying for your own counsel here
15 today?
16     A.   Yes, I am.
17     Q.   Are you being reimbursed in any way for
18 payment of this counsel?
19     A.   No.
20         (Deposition Exhibit Number 23 was
21          then marked for identification.)
22         MR. REDHAIR:  Is this Exhibit 3?
23         MR. BRAVE:  No.  Actually we've marked a
24 bunch while you were out.
25         MR. REDHAIR:  What number?

Coash & Coash                    602-258-1440

Pamela J. Schreiner                          December 3, 2007

Page 158

1          MR. BRAVE:  23.
2      Q.    Ms. Schreiner, I'm showing you what's been
3   marked as Exhibit Number 23.  Would you identify that?
4   Do you identify that document?
5      A.    Yes.
6      Q.    Is that the Taser Employment, Confidential
7   Information, Invention Assignment and Arbitration
8   Agreement?
9      A.    Yes.
10     Q.    On page 6 is that your signature?
11     A.    Yes.
12     Q.    Is there anything on -- and on page 7?
13     A.    Yes.
14     Q.    Is there anything on this document sitting
15  before you that you do not believe is accurate or
16  correct or a correct copy of the document you signed
17  back in March of 2004?
18         MR. REDHAIR:  Object to the form.
19         THE WITNESS:  No.
20         (Deposition Exhibit Number 24 was
21            then marked for identification.)
22  BY MR. BRAVE:
23     Q.    Ms. Schreiner, I'm showing you what has been
24  marked as Exhibit 24.  Do you recognize that as a copy
25  of what?

Page 159

1      A.    Uh-huh.
2      Q.    What is that document?
3      A.    That was the letter that I wrote with one of
4   the detectives.
5      Q.    And just to be clear, you did not bring this
6   with you to the interview; you wrote it at the
7   interview, is that what you're saying?
8      A.    Yes I did.  I wrote that at the interview.
9      Q.    And is this an accurate complete and complete
10  copy as far as you know?
11     A.    It is a copy, uh-huh.
12     Q.    Do you have any reason to dispute its
13  authenticity?
14     A.    Well, I know that I wrote it, but --
15     Q.    You have no reason to believe it's been
16  modified or changed?
17     A.    No.
18         (Deposition Exhibit Number 25 was
19            then marked for identification.)
20  BY MR. BRAVE:
21     Q.    Ms. Schreiner, I'm handing you what has been
22  marked as Exhibit Number 25.  Do you recognize that?
23     A.    Yes.
24     Q.    And what is that?
25     A.    That is a notice of my termination.

Page 160

1      Q.    And did you receive this before or after
2   providing the note of resignation which was Exhibit
3   Number 24?
4      A.    After.
5      Q.    Do you have any reason to believe that this
6   is not true, accurate and complete?
7      A.    No.
8      Q.    You previously testified that you asked Rick
9   Smith for a loan in, I believe it was June of 2004, is
10  that correct?
11     A.    Yes.
12     Q.    What was that loan for?
13     A.    It was to pay some medical bills.
14     Q.    And what did Rick Smith do in response to
15  your request?
16     A.    He gave me a check.
17     Q.    A company check or personal check or some
18  other check?
19     A.    Company.
20     Q.    And was it a loan or what was it?
21     A.    Not -- to my knowledge it was not a loan.
22     Q.    Okay.  Now, you testified on October 18, 2007
23  that it was a loan, so what makes you think now it's not
24  a loan?
25     A.    Because I haven't repaid it, so, therefore,

Page 161

1   you know, to me it was not a loan.
2      Q.    So --
3      A.    So --
4      Q.    Go ahead.  I'm sorry.
5      A.    So I'm not sure.  You know, I was willing to
6   repay it.  If I needed to repay it, I would have repaid
7   it.
8      Q.    Just to be clear, why did you testify on
9   October 18, 2004 that it was a loan?
10     A.    Because when I went to him I did ask him if
11  he could loan me some money.
12     Q.    I'm sorry.  I screwed up on the date.  Why
13  did you testify in your deposition in this room on
14  October 18th of 2007 that it was a loan?
15     A.    Because I just said because when I went to
16  him I did ask him if he could loan me the money and
17  maybe I was naive but I took it as a loan and I was
18  going to be more than happy or was very willing to repay
19  the loan.
20     Q.    I must not be precise.  I apologize.
21         What has happened between October 18, 2007
22  when you testified it was a loan to today when you say
23  it was not a loan?
24     A.    Nothing.  I'm -- that's what I'm saying to
25  you is that I didn't -- I'm not saying that it's not a

Coash & Coash                          602-258-1440

Pamela J. Schreiner                    December 3, 2007

Page 162

1    loan.  I have not repaid the money to Rick.  So I
2    myself, when I asked him for the money I did ask him for
3    it as a loan.  I took it as a loan.
4        Q.    And to this day do you believe it was a loan?
5        A.    Well, yeah, I still do.  And I, you know,
6    would be more than happy to repay it.
7              (Deposition Exhibit Number 26 was
8              then marked for identification.)
9    BY MR. BRAVE:
10       Q.    Ms. Schreiner, I'm showing you what has been
11   marked as Exhibit 26.  Do you recognize that document as
12   a copy of something, and if so what?
13       A.    It's a check.  I don't know what the second
14   sheet is.  I haven't seen that.  I don't know what that
15   is.
16       Q.    Could that be the withholding that was taken
17   out of the check?
18       A.    Possibly, but I don't know.
19       Q.    On the front of the page do you see where it
20   says "Invoice Number" and it says "Bonus"?
21       A.    Yes.
22       Q.    So, wouldn't that indicate that it was a
23   bonus check?
24       A.    Yes.
25       Q.    We've been talking about the shred bin, bin

Page 163

1    or bins, that were brought in in late December of 2004,
2    early January, 2005.
3        A.    Uh-huh.
4        Q.    Do you recall exactly what date they were
5    brought into the office?
6        A.    No, I don't remember the date.
7        Q.    If I were to say to you that they were
8    brought in on December 29th of 2004 would you have any
9    argument or dispute with that?
10       A.    I would probably say it was earlier than
11   that.
12       Q.    Would you have any basis upon which to make
13   that assertion?
14       A.    Yeah.  Because we were doing -- we were doing
15   preparation for all the different investigations and
16   things like that prior to that.  So I -- but I couldn't
17   tell you the date.  I just -- I think it was earlier
18   than that.
19       Q.    When are you saying you began doing the
20   preparations for the investigations?
21       A.    For the DOJ investigation or it wasn't -- it
22   was not a DOJ investigation.  It was an informal
23   something or another.  But that was -- that was some
24   time in December and I don't recall the dates, I mean.
25       Q.    I'm sorry?

Page 164

1        A.    I'm sorry.  I really don't recall the dates.
2        Q.    Are we talking the Securities and Exchange
3    Commission investigation?
4        A.    No.  There were two different things going
5    on, you know, relatively -- either right around the same
6    time, back to back type thing.  There was a DOJ and I
7    don't remember what it was called but it was something
8    to do with the DOJ, and then there was also the SEC.  So
9    there were two separate incidences going on.
10       Q.    But you don't recall any of the exact dates
11   or specifics?
12       A.    No, I really don't.
13       Q.    Do you recall the name of the company that
14   provided the shred bins?
15       A.    No.  I think it started with an A.
16             (Deposition Exhibit Number 27 was
17             then marked for identification.)
18   BY MR. BRAVE:
19       Q.    I'm showing you what has been marked Exhibit
20   Number 27.  Do you recognize that document?
21       A.    Not the -- not this, no.
22       Q.    Do you recognize the name Abco Recycling?
23       A.    It could be.
24       Q.    Do you have any reason to believe -- if I put
25   to you that it was Abco Recycling that provided the

Page 165

1    shred bins, would you have any basis upon which to
2    dispute that?
3        A.    No.  I couldn't dispute that because I really
4    don't recall the name of the company.
5        Q.    And if the owner of Abco Recycling states
6    that the very first date they delivered the shredding
7    bin was on December 29, 2007 do you have any specific
8    ability to dispute that?
9        A.    Yes because it's not December, 2007 yet.
10       Q.    You're absolutely correct.
11             If the owner of Abco Recycling states that
12   based on their records they first provided the shredding
13   bin to Taser on December 29, 2004 would you have any
14   basis or proof upon which to dispute that?
15       A.    Well, I couldn't.  I don't -- I don't recall
16   the date.
17       Q.    I'm showing you what has been marked as
18   Exhibit 13.  That is the January -- that is a transcript
19   of the January 24, 2005 interview of you by Burt
20   Robinson and Tim Click.  Okay?
21       A.    Okay.
22       Q.    If you will turn to page 21.
23       A.    Okay.
24       Q.    Line 24.  Mr. "ROBINSON:  "Let's, let's call
25   it what it is.  You weren't truthful with us?

Coash & Coash                    602-258-1440

Pamela J. Schreiner                         December 3, 2007

Page 166

1        Next, "SCHREINER:  Right, and I apologize.  I
2   mean I -- I didn't give you...
3        "ROBINSON:  So we can agree that was
4   untruthful at the time?
5        "SCHREINER:  Yes, right, correct and I that
6   did something wrong."  Is that what it says?
7        MR. REDHAIR:  Where are you reading?
8        MS. JOHNSON:  Excuse me.  What page are you
9   on?
10       MR. BRAVE:  21.
11       MR. REDHAIR:  I thought you said 22.  I
12  apologize.
13       MR. BRAVE:  Sorry.
14       Q.   So, therefore, according to this you admitted
15  that you were untruthful with them, correct?
16       MR. REDHAIR:  Object to form.  I don't see
17  where you're reading.
18       MS. JOHNSON:  I don't either.
19       MR. BRAVE:  Line 24.  "ROBINSON:  Let's,
20  Let's call it what it is.  You weren't truthful with
21  us?"
22       MS. JOHNSON:  That's not on page 21.  Do you
23  have a page number again?
24       MR. BRAVE:  Page 21 is what I have on the
25  bottom.

Page 167

1        MS. GIBEAUT:  I think there's two
2   transcripts.
3        MR. BRAVE:  Yes, there's two transcripts.
4   This one is on January 24th.
5        MS. JOHNSON:  Before you go any further I am
6   going to impose an objection to all the documents
7   including 23, 26, 27 -- what did you say this was?
8   Exhibit 13 is the first transcript or the second
9   transcript?
10       MR. BRAVE:  14.
11       MS. JOHNSON:  14.
12       MR. REDHAIR:  And you're reading from Exhibit
13  13?
14       MS. JOHNSON:  14.
15       MR. BRAVE:  13.
16       MS. JOHNSON:  My objection is that none of
17  these documents have been produced in discovery.  It's
18  the first time they've been provided.  And to that I
19  would object to the use in this deposition of documents
20  that were not produced in discovery as they should have
21  been.
22  BY MR. BRAVE:
23       Q.   You can answer.  The question is do lines 24
24  through 31 state you were not truthful with the
25  investigators?

Page 168

1        MR. REDHAIR:  Object to form.
2        THE WITNESS:  It does say that but there were
3   things leading up to that because I was confused in what
4   they were asking me and that is why I said what I said.
5   BY MR. BRAVE:
6        Q.   Turn to page 56, please, lines 35 through 38.
7   Investigator "CLICK:  You lied to us straight out.
8        "SHREINER:  I know... and I did that in my
9   mind unintentionally because I'm scared."  Did I read
10  that correctly?
11       MR. REDHAIR:  Object to form.
12       THE WITNESS:  Okay.
13  BY MR. BRAVE:
14       Q.   I am showing you what has been marked Exhibit
15  14, which is the January 27th interview transcript with
16  the same investigators.
17       MR. REDHAIR:  We were just reading from what
18  exhibit?
19       THE WITNESS:  13.
20       MR. REDHAIR:  So the one --
21       MR. BRAVE:  We are now going to 14.
22       MR. REDHAIR:  And that's this one?
23       MR. BRAVE:  The one that says January 27,
24  2005 on it.
25       MS. JOHNSON:  Is 14.

Page 169

1   BY MR. BRAVE:
2        Q.   Turn to page 8.  Between lines 3 and 4,
3   "SCHREINER," says, "I knew that, that not telling you
4   guys the truth about the envelopes, that was wrong of
5   me."  Did I read that correctly?
6        A.   Uh-huh.
7        MR. REDHAIR:  Object to form.
8        MR. BRAVE:  What's your objection to the
9   form?
10       MR. REDHAIR:  I don't know that she's ever
11  seen this.  I don't know what context it's in.  I don't
12  know if she does.
13       MR. BRAVE:  My question was whether I read it
14  correctly.  She answered "yes."
15       THE WITNESS:  But I have not seen this.
16       MR. REDHAIR:  Let's take a quick break.
17       MR. BRAVE:  Sure.
18       MR. KYLER:  We're going off the record.  The
19  time is 2:42.  This ends tape 2 in the deposition of Pam
20  Schreiner.
21       (Short recess.)
22       MR. KYLER:  We're back on the record.  The
23  time is 2:54.
24       This begins tape 3 in the deposition of Pam
25  Schreiner.

43 (Pages 166 to 169)

Page 170

BY MR. BRAVE:
1
2    Q.    Ms. Schreiner, I'm showing you what has been
3  marked Exhibit 20.  I will put to you that that is a
4  condensed copy of your transcript from your October 18,
5  2007 deposition.
6          MR. KYLER:  I'm sorry.  Can everybody put
7  their microphones on?
8          MR. BRAVE:  Did you get that?
9    Q.   Have you seen this before?
10   A.   Yes.  I'm sorry.
11   Q.    Just so you know, I'm not wasting time.  I'm
12  just getting anything that's been asked and answered
13  today, I'm ignoring.
14         Turn to page 16, which is deposition pages 58
15  to 61.  It's deposition page 60.  That will be easier.
16         MR. REDHAIR:  And then page 60 we are looking
17  for?
18         MR. BRAVE:  Yes.
19         THE WITNESS:  Okay.
20  BY MR. BRAVE:
21   Q.   When talking about the science -- the Taser
22  scientific and medical advisory board you stated that
23  you knew that Doctor Kroll and Matt Brady were members
24  of that board, is that correct?
25   A.   Yes.

Page 171

1    Q.    Do you recall -- and also Rick Smith?
2    A.   Uh-huh.
3    Q.    Do you recall any other members of that
4  board?
5    A.    There were some other ones.  I just -- I
6  don't really remember their names.  I just remember
7  there were others on the board.
8    Q.    So the only three specific ones you remember
9  are Mark Kroll, Matt Brady and Rick Smith that were on
10  the scientific and medical advisory board?
11   A.   Yes.  To my knowledge, yes.
12   Q.    Farther down on the page on page 60 and 61
13  you stated that the scientific and medical advisory
14  board members received stock options?
15   A.   Uh-huh.
16   Q.    Do you know how many of those stock options
17  they received?
18   A.   No, I don't.
19   Q.    But you're certain they did receive the stock
20  options?
21   A.    That was my -- my belief, yes.
22   Q.    Going back to that check from a few moments
23  ago called a bonus --
24   A.   Uh-huh.
25   Q.   -- what was -- what did you tell Rick Smith

Page 172

1  was the purpose of that, what it was for?
2    A.    To pay medical bills.
3    Q.    Just so you know, based upon prior telling
4  your client not to answer questions regarding medical
5  and/or financial, I'm skipping those just for the
6  record.
7          You can set that aside.  I'm not going to go
8  through most of those, but I will explain what they are
9  just for the record and then objections can be made.
10         This is Exhibit 21, which is a transcript of
11  the Pam Schreiner deposition in the Powers trial, or the
12  Powers case on May 25, 2005.
13         MR. REDHAIR:  What number was that?
14         MR. BRAVE:  That's number 21.
15         Also Exhibit Number 22 is a CD that has every
16  one of these documents on it in PDF format.
17         Exhibit Number 3 are the two letters that you
18  brought this morning, counsel.
19         MS. JOHNSON:  I thought we already attached
20  23.
21         MR. BRAVE:  I'm sorry.  Number 3.  Sorry.
22         MS. JOHNSON:  Number 3.
23         MR. BRAVE:  Let's go off the record for a
24  minute.  You can keep the video running, that's fine.
25         (Discussion off the record.)

Page 173

1          MR. BRAVE:  It's either number 15 or 17 it
2  says "Alphagraphics" at the top, just like this.  Got
3  it.  Number 15.  Back on the record.
4    Q.    Ms. Schreiner, I'm showing you what has been
5  marked as Exhibit Number 15.  Do you recognize that
6  document?
7    A.   Possibly.
8    Q.   What do you possibly think it is?
9    A.   It looks like an invoice.
10   Q.   Regarding -- from who?
11   A.   Alphagraphics.
12   Q.   Regarding what?
13   A.   Copies that were made.
14   Q.   Copies of what that were made?
15   A.   Field reports.
16   Q.    And also these would have been the Volunteer
17  Exposure Reports that you had made into PDFs, is that
18  correct?
19   A.    I don't know.  It says Field Reports, so I
20  don't know.
21   Q.    Do you have any reason to believe this --
22  other than it says Field Reports that it was not
23  Volunteer Exposure Reports?
24   A.    I couldn't tell by looking at this.  I'm
25  sorry.

Pamela J. Schreiner                     December 3, 2007

Page 174

1    Q.   That's fine.
2         I'm showing you what has been marked Exhibit
3    16.  Do you recognize that document?
4    A.   Again it's an invoice.
5    Q.   From Alphagraphics?
6    A.   Yes.
7    Q.   Again for Field Reports is what it states?
8    A.   Correct.  And also some other type file.
9    Q.   But other than that you really don't know
10   what it pertains to for this?
11   A.   Yeah.  I can't tell.
12        MR. BRAVE:  Okay.  Just for the record,
13   Exhibit 4 is the Volunteer Exposure Report spreadsheet
14   that Taser International currently has today, but ending
15   with dates January 30, 2005 with support material as it
16   pertains to injury reports that were found on that
17   spreadsheet.
18        MS. JOHNSON:  I want to put on the record
19   that I have been asking for this since the beginning of
20   this case and it's never been produced.
21        MR. BRAVE:  And I would also like to put on
22   the record that when Ms. Johnson was at the Taser months
23   ago she had access to the Taser human volunteer reports
24   and I know she spent time with them, I don't know how
25   much time.

Page 175

1         MS. JOHNSON:  Not with the spreadsheet.  It
2    is an entirely different document.
3         MR. BRAVE:  The spreadsheet has been
4    considered work-product until --
5         MS. JOHNSON:  Until today.
6         MR. BRAVE:  Until today.
7         MS. JOHNSON:  Thank you.
8         MR. BRAVE:  Exhibit 5 is the same thing
9    except with a Taser computer network backup tape file
10   from January 5, 2005.
11        Exhibit 6 is the exact same thing except with
12   a computer backup date from tape of December 1, 2004.
13        Exhibit 7 is the same thing except with a
14   computer backup file that was backed up on November 19,
15   2004.
16        Exhibit 8 is the same thing except the
17   computer backup file was created on October 1, 2004.
18        Exhibit 9 is the same thing except it's a
19   computer backup from a file created on September 1,
20   2004.
21        And Exhibit 10 is the same thing except it's
22   computer backup from a file that was created and backed
23   up on July 31, '04.
24        MR. REDHAIR:  Do you intend to attach these
25   to her exhibit -- I mean to her deposition as an

Page 176

1    exhibit?
2         MR. BRAVE:  Yes.  And you've got all of them
3    in your CD, every one of them.
4         MR. REDHAIR:  Okay.  I'm wondering -- I mean,
5    you've attempted to lay the foundation.  Are you going
6    to ask her any questions about them?
7         MR. BRAVE:  No.
8         MR. REDHAIR:  Well, then I would object to
9    them being attached to the exhibit -- I mean, she hasn't
10   looked at them -- or I would object to them being
11   attached as exhibits to her deposition.  She hasn't
12   looked at them, she doesn't know where they came from.
13   She has no knowledge whether they were complete when
14   they were done.  So I think that's inappropriate, but --
15        MR. BRAVE:  Objection noted.
16        Exhibit 11 is a difference of 2 injuries from
17   the August 2, 2004 PDFs done by Alphagraphics and the
18   2001 listing of the volunteer Exposure spreadsheet.
19        MR. REDHAIR:  Same objection.
20        MR. BRAVE:  Continuing objection.
21        MR. REDHAIR:  Okay.
22        BY MR. BRAVE:  Good.
23        Exhibit 12 is the same thing except this one
24   is for the year 2002 and it is for PDFs that were on the
25   August 2, 2004 Alphagraphics PDFs that were made and the

Page 177

1    discrepancy between that and all of the spreadsheets.
2    It shows 16 more injuries.
3         MS. JOHNSON:  Now all this is on this little
4    disc you have given me, is that correct?
5         MR. BRAVE:  Everything is on that disc and
6    then some.
7    Q.   Ms. Schreiner, I'm showing you what has been
8    marked as Exhibit 19, which you have never seen it
9    before.
10   A.   No.
11   Q.   I made it.  I got it done about ten o'clock
12   last night.
13        MR. REDHAIR:  What number?
14        THE WITNESS:  19.
15        BY MR. BRAVE:  Just for the record, this is a
16   legal size table with some analysis -- with some
17   descriptions that is entitled Numerical Summary of TASER
18   Electronic Control Device Volunteer Exposure Reports
19   (VERs) August 2004 PDFs of VERs, Accidental Discharge/
20   Injury Reports by TASER Training Instructors through
21   September 7, 2004 and VER Spreadsheets (VERS) through
22   January 30, 2005.  Table created by Michael Brave,
23   National Litigation Counsel, TASER International, Inc.
24   (TASER) on December 2, 2007.  Documents for analysis,
25   accumulated, organized and analyzed by Kelly Welz and

Pamela J. Schreiner                          December 3, 2007

Page 178

1    Brittany Montoya, TASER.  Computer backup spreadsheet
2    location, acquiring, and providing to Kelly Welz by Eric
3    Rivera, R-I-V-E-R-A, and Ray Rivera.
4         Q.    Ms. Schreiner, this is a breakdown of
5    everything you see in those files in front of you.
6    That's what I will assert to.
7               And a couple things that I would like to
8    point out is when you look at the third column from the
9    left, which is the January 5, 2005 column, and you move
10   backwards you'll notice that other than 2004 where it
11   shows that there were additional entries made on the
12   spreadsheet, all the other spreadsheet entries are
13   identical.
14              MR. REDHAIR:  Object to form.
15              MS. JOHNSON:  I'm going to object to
16   Mr. Brave testifying as a witness in this case and
17   object to the question.  I don't know how she could
18   possibly answer a question that relates to a stack of
19   documents that's at least a foot and a half high, a
20   summary of which you're providing for the first time as
21   Exhibit 19.  That's my objection.
22              MR. BRAVE:  That's fine.  I'm actually
23   providing it as a benefit to you two and not for any
24   other reason.
25              Exhibit 17 is complete list of all the

Page 179

1    injuries, of 135 of them, that were as of September 7th
2    of '04.
3               MR. REDHAIR:  What number is that?
4               THE WITNESS:  17.
5               MR. BRAVE:  17.
6               And Exhibit 18 is the same as that except
7    using the date -- the end date of January 30, 2005.
8               MR. REDHAIR:  And is that 18?
9               MR. BRAVE:  Yes.
10              Take two minutes and I might be done.
11              MR. KYLER:  We're going off the record.  The
12   time is 3:08.
13              (Short recess.)
14              MR. KYLER:  We're back on the record.  The
15   time is 3:10.
16              MR. BRAVE:  No further questions.  Pass the
17   witness.
18              MR. REDHAIR:  I just want to clarify a couple
19   issues.
20                     EXAMINATION
21   BY MR. REDHAIR:
22        Q.    You mentioned earlier in the deposition that
23   you were investigated by the FBI.
24        A.    Yes.
25        Q.    Was that related to your employment at Taser

Page 180

1    or was there some sort of thing going on in your
2    personal life that they were investigating?
3         A.    It was Taser.
4         Q.    Okay.  Was there anything other than your
5    employment and work with Taser?
6         A.    No.
7         Q.    Okay.  So when you said that, you know, the
8    FBI and everybody was investigating you, is that what
9    you meant?
10        A.    I meant the Chandler police and I meant the
11   FBI.
12        Q.    Okay.  You were shown Exhibit 13 and 14 which
13   were transcriptions of interviews with some
14   investigators?
15        A.    Yes.
16        Q.    And you were read certain portions of that
17   and just little snippets of that interview.  Do you
18   recall that?
19        A.    Yes.
20        Q.    Did you lie to those investigators?
21        A.    No.
22        Q.    What -- what context was the statements that
23   were made by the investigators that you were asked
24   about?  Explain that if you would.
25        A.    If you actually read through the document

Page 181

1    itself going, you know, previous to those few lines that
2    we were looking at, they were confusing me and I was
3    confused in some things.
4               I did not intentionally tell the truth -- you
5    know, I mean, not tell a lie.  I was confused in things
6    that they were asking me.  And if you look back into
7    some of the different things that they were saying to me
8    and the way they were asking the question, it was just
9    kind of off course and I was confused in dates and I was
10   confused in maybe a color of an envelope or what the
11   contents of that envelope were at the time of the
12   investigation.
13              MR. REDHAIR:  Okay.  Okay.  That's all I
14   have.
15              MS. JOHNSON:  No questions.
16              MR. BRAVE:  Nothing further.
17              MR. KYLER:  This concludes the deposition of
18   Pam Schreiner and Videotape Number 3.  We're off the
19   record at 3:12.
20              (Whereupon, the deposition was then
21               concluded at 3:12 p.m.)
22
23
24              _____
25                     PAMELA J. SCHREINER

46 (Pages 178 to 181)

Pamela J. Schreiner                           December 3, 2007

Page 182

1   STATE OF ARIZONA    )
                        )  ss.
2   COUNTY OF MARICOPA  )
3          BE IT KNOWN that the foregoing deposition was
4   taken before me, PAUL GROSSMAN, a Notary Public and
5   Certified Reporter #50028 in and for the County of
6   Maricopa, State of Arizona; that the witness before
7   testifying was duly sworn by me to testify to the whole
8   truth; pursuant to request, notification was provided
9   that the deposition is available for review and
10  signature; that the questions propounded to the witness
11  and the answers of the witness thereto were taken down
12  by me in shorthand and thereafter reduced to print by
13  computer-aided transcription under my direction; that
14  the foregoing 181 pages are a true and correct
15  transcript of all proceedings had upon the taking of
16  said deposition, all done to the best of my skill and
17  ability.
18         I FURTHER CERTIFY that I am in no way related
19  to any of the parties hereto, nor am I in any way
20  interested in the outcome hereof.
21         DATED at Phoenix, Arizona, this 5th day of
22  December, 2007.
23         _____
           Paul Grossman, Notary Public
24         AZ CR #50028
25

Coash & Coash                          602-258-1440